1  JACOB S. KREILKAMP (State Bar No. 248210)
   jacob.kreilkamp@mto.com
2  WILLIAM D. TEMKO (State Bar No. 98858)
   william.temko@mto.com
3  MELINDA E. LEMOINE (State Bar No. 235670)
   melinda.lemoine@mto.com
4  SARA A. McDERMOTT (State Bar No. 307564)
   Sara.McDermott@mto.com
5  OMAR H. NOURELDIN (State Bar No. 301549)
   Omar.Noureldin@mto.com
6  ARIEL T. TESHUVA (State Bar No. 324238)
   Ariel.Teshuva@mto.com
7  ESTALYN S. MARQUIS (State Bar No. 329780)
   Estalyn.Marquis@mto.com
8  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
9  Fiftieth Floor
   Los Angeles, California 90071-3426
10 Telephone: (213) 683-9100
   Facsimile: (213) 687-3702
11
   KATHLEEN GUNERATNE (State Bar No. 250751)
12 KGuneratne@aclunc.org
   SHILPI AGARWAL (State Bar No. 270749)
13 SAgarwal@aclunc.org
   AMY GILBERT (State Bar No. 316121)
14 AGilbert@aclunc.org
   ACLU FOUNDATION OF NORTHERN CALIFORNIA
15 39 Drumm Street
   San Francisco, CA 94111
16 Telephone: (415) 621-2493

17 *Attorneys for Plaintiffs*

18                    UNITED STATES DISTRICT COURT

19                    EASTERN DISTRICT OF CALIFORNIA

20

21 Charles Criswell, Levi Johnson, Samuel        | Case No.
   Camposeco, Adam Ibarra, and California
22 Attorneys for Criminal Justice,               | **CLASS ACTION COMPLAINT FOR
                                                  | DECLARATORY AND INJUNCTIVE
23                    Plaintiffs,                 | RELIEF AND PETITION FOR WRIT OF
                                                  | HABEAS CORPUS**
24         vs.

25 Michael Boudreaux in his official capacity as
   Sheriff of Tulare County,
26
                    Defendant.
27

28

Plaintiffs Charles Criswell, Levi Johnson, Samuel Camposeco, and Adam Ibarra, on behalf of a class of similarly situated incarcerated people in the custody of the Tulare County Sheriff's Office, and Plaintiff California Attorneys for Criminal Justice (collectively, "Plaintiffs") allege as follows:

**JURISDICTION AND VENUE**

1.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States, specifically 28 U.S.C. § 2241 and 42 U.S.C. § 1983. Plaintiffs allege that Defendant Michael Boudreaux, in his official capacity as Sheriff of Tulare County, has violated the First, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has supplemental jurisdiction over Plaintiffs' claim under the Bane Act, Cal. Civ. Code § 52.1(b), because the state claim and federal claims derive from a common nucleus of operative facts.

2.       Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–02, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

3.       Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this action occurred, and continue to occur, in this District.

**INTRODUCTION**

4.       Plaintiffs bring this action to prevent avoidable illness and death from COVID-19 among people incarcerated at Tulare County Jails.[1] Plaintiffs challenge Defendant Sheriff Michael Boudreaux's callous indifference to their health and safety. And they challenge Defendant's callow attempts to prevent them from challenging his unconstitutional practices in court. Plaintiffs, like many Americans in this age of pandemic, simply want the opportunity to be safe, to protect themselves as best they can from a novel and frightening disease. But as long as Defendant

---

[1] The term "Tulare County Jails" refers to the five detention facilities managed by the Tulare County Sheriff's Office: Bob Wiley Detention Facility (BWDF), Main Jail, Men's Correctional Facility, Adult Pre-Trial Facility (APTF), and South County Detention Facility.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

continues to ignore the widely-known risk of COVID-19 to Tulare County Jails, the lives of Plaintiffs, and the class they seek to represent, will remain imperiled.

5.      The rapid spread of COVID-19 has been met with alarm by the media, public health officials, and governments across the globe—and with good reason. COVID-19 is highly contagious and potentially deadly. For those who become infected, COVID-19 creates a significant risk of death or severe illness, which can include extreme chest pain and difficulty breathing. In some cases, treatment requires highly invasive and psychologically traumatic life-support measures. Even those who contract only a "mild" case experience unnecessary pain and suffering, which may linger or recur for weeks or months after the initial onset of symptoms. Nor do scientists yet know the long-term effects of contracting the disease.

6.      In correctional facilities, congregate living and unsanitary conditions facilitate rapid disease transmission. Public health officials have urged jails to ensure that incarcerated people can eat, sleep, and recreate while maintaining at least six feet of physical distance from others. They emphasize the importance of providing incarcerated people with masks, soap, and sanitizer, and explain that common areas and cells should be frequently disinfected. Because turnover is high, jails should quarantine newly-arrived people for at least 14 days before releasing them into the general population. And given the risk of asymptomatic transmission, experts recommend that quarantine be paired with testing of everyone in a facility. Those who fall ill should be identified and humanely isolated. And sick people must be given appropriate medical treatment responsive to their condition. Without these measures in place, the virus is likely to spread not only through the incarcerated population, but also the staff and then to the community living beyond its walls.[2]

_____

[2] That community is already struggling with a devastating outbreak. *See, e.g.*, Sheyanne N. Romero, *COVID-19 Update: Tulare County Case Levels Still 'Extremely High,' Hospitals Fill*, Visalia Times-Delta (July 23, 2020, 2:03 p.m.), https://www.visaliatimesdelta.com/story/news/2020/07/23/tulare-county-case-levels-still-extremely-high/3288145001/ (explaining that "[p]ositive testing rates in the county are hovering between 12% and 14%, significantly higher than California's threshold for the monitoring list at 8% positive rate").

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

7.     It is critical that Tulare County Jails heed this public advice. As the COVID-19 pandemic has spread, jails and prisons have been among the hardest-hit. By mid-May, 10 of the 15 largest COVID-19 clusters had occurred in jails and prisons.[3] Across the United States, the number of known infections among people incarcerated in state prisons and correctional officers has surged by 45 percent since July 1.[4] The 13 largest known clusters of the virus in the United States, and 87 of the top 100, can be found inside correctional institutions.[5] Public health officials believe that the virus is introduced into correctional facilities by officers and other facility staff.[6] Prison outbreaks often occur in tandem with increases in infection in the surrounding communities.[7] Since the start of the pandemic, more than 100,000 people in prisons and jails have been reported infected, with more than 800 reported dead.[8] Given the lack of testing in many locations, the actual numbers are likely to be much higher.

8.     It would be difficult to live in America today and not know about the threat of COVID-19. Officials across the nation have repeatedly implored—and in some instances, required—Americans to practice "social distancing," avoid congregating in groups, wash their hands and use hand sanitizer regularly, disinfect frequently touched surfaces, wear cloth face coverings, and seek prompt medical attention if symptoms develop. Officials have spent time, money, and political capital to bring these messages to the public for one simple reason: Without

---

[3] Daniel Fernandez, *There is Only One Way to Prevent Mass Deaths in Prisons: Let them Out*, The Nation (May 14, 2020), https://www.thenation.com/article/activism/coronavirus-prison-danbury/.

[4] New York Times, *A surge in U.S. prisons is hitting inmates and officers alike* (July 28, 2020), https://www.nytimes.com/2020/07/28/world/coronavirus-covid-19.html?action=click&campaign_id=154&emc=edit_cb_20200728&instance_id=20725&module=Top+Stories&nl=coronavirus-briefing&pgtype=Homepage&regi_id=85528050&segment_id=34584&te=1&user_id=92006863350757aafcdd26d002680ab6#link-288d1535.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, (last visited July 28, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

1  these measures, the spread of COVID-19 will continue unabated, claiming countless lives in its

2  wake.

3      9.      Defendant knows about the risk of COVID-19. And he knows how important

4  preventive measures are. On July 3, 2020, Defendant announced on Facebook a new campaign,

5  "MASK UP Tulare County," seeking to raise awareness about the importance of masks. As

6  Defendant said, "The people of Tulare County have always taken care of each other. And we are

7  asking you to continue to do that now, by wearing masks, practicing good hygiene, and, of course,

8  social distancing." Yet Defendant has categorically refused to extend that protection to the people

9  incarcerated in his jails. His explicit policy forbids incarcerated people from wearing masks while

10  in their housing units—even those with underlying medical conditions who are especially

11  vulnerable to death and serious injury from COVID-19.

12      10.     Defendant has also ignored calls from the judicial branch to take action to prevent

13  the spread of COVID-19. On July 1, 2020, the Honorable Brett R. Alldredge, presiding judge of

14  the Tulare County Superior Court, and Stephanie Cameron, Court Executive Officer, recognizing

15  the threat of COVID-19 to the Court and the community, wrote a letter respectfully requesting that

16  the county "immediately implement testing of all inmates in the county jail facilities and entry

17  temperature checks for all shared county courthouse buildings open to the public."[9] Defendant has

18  flatly refused to implement even these simple procedures.

19      11.     Defendant's refusal to allow incarcerated people to wear cloth face coverings and

20  to implement COVID-19 testing is part of a pattern of reckless disregard for the people in his care.

21  Despite actual knowledge of public health directives and the grave risk posed by COVID-19,

22  Defendant has failed to implement many basic procedures that other facilities commenced long

23  ago: steps as simple as permitting incarcerated people to spread out where bed space is available

24  and providing prompt medical attention to those who report COVID-19 symptoms. Defendant's

25  indifference has left incarcerated people with COVID-19 symptoms to suffer without proper

26  medical care, quarantine, or monitoring. And it has left incarcerated people crammed into close

27

28

[9] Letter from Tulare County Superior Court (Ex. 1 at 1).

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

quarters despite available bed space, unable to practice social distancing or take other precautions. In short, Defendant has created conditions that virtually ensure COVID-19 will spread like wildfire in Tulare County facilities—if it has not already.

12.     Even as he has failed to protect the health and lives of incarcerated people, Defendant has engaged in a concerted effort to stymie attempts by incarcerated people to protect themselves. Defendant has prevented incarcerated people from engaging in confidential attorney visits and has engaged in systematic intimidation and retaliation against incarcerated people who dared to pursue litigation challenging the unconstitutional conditions of confinement at Tulare County Jails. Numerous people have reached out to the American Civil Liberties Union of Northern California (ACLU) about conditions in the Jails. Defendant transferred one of those individuals to a high-security unit without explanation. He transferred another to a less desirable inmate work position. Others have been aggressively questioned about their attorney visits by armed deputies, despite a "no firearm" policy in the Jails. By threat, intimidation, and retaliation, Defendant has actively interfered with the constitutional right of Plaintiffs and the class they represent—all to avoid revealing his own unconstitutional activities.

13.     Defendant also created a new legal visitation policy in response to Plaintiffs' counsel's investigation. That policy was designed to frustrate Plaintiffs' and prospective class members' efforts to meet confidentially with civil rights attorneys about the appalling conditions in the jail—in violation of their constitutional right to access the courts under the First and Fourteenth Amendments.

14.     On May 28, 2020, Defendant abruptly canceled ACLU's confidential visits with incarcerated people at Tulare County Jails. The next day, on May 29, 2020, Defendant promulgated a new policy limiting confidential legal visits to those with attorneys who had already been designated as an incarcerated person's "attorney of record." Since the promulgation of the new policy, as supplemented on June 4, 2020, *no* potential class members have been afforded a confidential meeting with ACLU attorneys. And the policy has blocked at least some incarcerated people from meeting with their criminal defense attorneys. The new policy has not only frustrated potential class members' right of access to the courts, in violation of the First and

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

Fourteenth Amendments, it is so overbroad as to infringe at least some class members' right to counsel in their criminal cases, in violation of the Sixth Amendment.

15.     In short: Defendant has failed to take any meaningful action to prepare for COVID-19. In fact, he has actively interfered with incarcerated people's ability to protect themselves, both within the jail by failing to implement CDC-recommended virus response measures, and in court by blocking Plaintiffs' ability to petition the government to enforce their constitutional rights. What is worse: Defendant has created a real, material risk that the Jails will face the pandemic with absolutely no ability or preparation to address it.

16.     When it comes to COVID-19 in jails and prisons, everything goes well until it doesn't. San Quentin, for example, did not see its first COVID-19 case until May 31.[10] It is now dealing with the second worst outbreak in a California prison, seeing thousands infected and 13 dead.[11] What caused the outbreak in San Quentin, from initial reports, is strikingly similar to what is happening in Tulare County right now: A failure to test new intakes, to release incarcerated people to allow for social distancing, and to quarantine those who may be infected.[12]

17.     Tulare County's luck is already running out. Just weeks ago, the Jails saw their first cases of COVID-19. On June 26, 2020, Defendant reported on the Tulare County Sheriff's Office Facebook page that 11 incarcerated people had tested positive, out of "more than 200 total COVID-19 tests in the Tulare County Jail Facilities."[13] One month later, on July 28, 2020, Defendant reported that in fact 22 incarcerated people had tested positive for COVID-19 during

---

[10] Meredith Deliso and Meredith Longo, *California's San Quentin prison using tents, warehouse to treat inmates infected with COVID-19*, ABC News, (July 9, 2020, at 4:50 p.m.), https://abcnews.go.com/US/californias-san-quentin-prison-tents-warehouse-treat-inmates/story?id=71690138

[11] Colleen Shalby, *8th Death row inmate dies as COVID-19 surge continues in prison*, Los Angeles Times (July 22, 2020, at 11:53 a.m.), https://www.latimes.com/california/story/2020-07-22/13th-prisoner-at-san-quentin-dies-from-suspected-coronavirus

[12] Amy Maxmen, *California's San Quentin prison declined free coronavirus tests and urgent advice—now that it has a massive outbreak,* Nature (July 7, 2020), https://www.nature.com/articles/d41586-020-02042-9

[13] *Tulare County Sheriff's Office*, Facebook (June 26, 2020), https://www.facebook.com/TulareSheriff/posts/3939122956158707

the June testing cycle—out of only 139 total tests administered in late June.[14] Defendant also reported that 37 deputies have been tested for COVID-19, five of which have tested positive. Assuming that the most recent reported numbers are most accurate, if the test positivity rate—that is, the number of positive tests divided by the number of total tests administered; here, 15.8%—is applied to the Jails' total population, there were likely more than 150 positive cases that went undetected during the June round of testing. Those undetected cases will continue to silently and unwittingly transmit the disease within the Jails.

18.     The time to intervene is now. The warning signs could not be clearer. Tulare County—where the deputies, nurses, and arrestees who come into the Tulare County Jails live—is itself experiencing a COVID-19 outbreak, and its test positivity rates have skyrocketed to more than 12%. And the fall is fast approaching, with a renewed wave of COVID-19 infections predicted to hit at the same time as seasonal influenza, creating a devastating loss of life and further straining the healthcare system's capacity.[15] Defendant is simply not prepared to handle a COVID-19 outbreak of any scale, and through his deliberate indifference and lack of action, has created a serious risk that one will occur.

**PARTIES**

19.     Plaintiff-Petitioner Charles Criswell is currently in the custody of Defendant at the Main Jail, where he is at risk of death or serious injury if exposed to COVID-19. He is being held post-conviction.

20.     Plaintiff-Petitioner Levi Johnson is currently in the custody of Defendant at the Main Jail, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pre-trial custody and is presumed innocent.

---

[14] *Tulare County Sheriff's Office*, Facebook (July 28, 2020), https://www.facebook.com/TulareSheriff/posts/4081234765280858. Defendant has not explained the discrepancy between the numbers he reported in June and those he reported a month later in July. The lack of transparency regarding the scope of Defendant's testing efforts is yet another indication that Defendant is not being fully forthcoming with the public.

[15] Cory Stieg, *What a 'Second Wave' of Covid-19 Could Look Like and How to Prevent It*, CNBC.com (Jun. 28, 2020, 9:00 a.m.), https://www.cnbc.com/2020/06/28/what-second-wave-of-covid-19-means-and-how-to-prevent-it.html.

21.    Plaintiff-Petitioner Samuel Camposeco is currently in the custody of Defendant at the Bob Wiley Detention Facility, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pre-trial custody and is presumed innocent.

22.    Plaintiff-Petitioner Adam Ibarra is currently in the custody of Defendant at the Bob Wiley Detention Facility, where he is at risk of death or serious injury if exposed to COVID-19. He is being held in pre-trial custody and is presumed innocent.

23.    Plaintiff California Attorneys for Criminal Justice ("CACJ") is a membership organization of criminal defense attorneys practicing in California. CACJ routinely engages in advocacy and educational trainings to advance justice, fairness, and constitutional protections in the criminal justice system in the courts and the Legislature. CACJ has approximately 1,300 attorney members, who handle criminal cases in every county in the state, including Tulare County. CACJ members have clients and former clients now incarcerated in Tulare County Jails. Because of the harms caused by Defendant's current COVID-19 policies and practices, CACJ has had to expend and divert its resources to ensure that our clients who are incarcerated in Tulare County Jails do not become infected by COVID-19. Defendant's current COVID-19 policies and practices frustrate CACJ's mission and goals. Time spent on this Tulare County litigation interferes with time CACJ would otherwise be spending on bills that CACJ is sponsoring during this legislative session.

24.    Defendant Michael Boudreaux is sued in his official capacity as Sheriff of Tulare County. Defendant directs the management of Tulare County Jails and is responsible under California law "to keep the county jail[s] and the prisoners in it . . . ." Cal. Gov't Code § 26605.

## STATEMENT OF FACTS

### I.    COVID-19 is a Global Pandemic that Endangers Correctional Facilities.

#### A.    COVID-19 is a Highly Infectious and Potentially Deadly Disease.

25.    COVID-19 is the disease caused by the SARS-CoV-2 virus responsible for the current global pandemic. The World Health Organization estimates that as of July 28, 2020, there

1  are 16.3 million confirmed cases of COVID-19, 650,805 confirmed deaths, and 216 countries,

2  areas, or territories with confirmed cases.[16]

3      26.    The Centers for Disease Control and Prevention ("CDC") estimates that as of July

4  28, 2020, there are 4.28 million confirmed cases of COVID-19 and 147, 672 confirmed deaths

5  from the disease in all 50 states and the District of Columbia.[17]

6      27.    Cases in California are surging: California now has more confirmed cases of

7  COVID-19 than any other state in the nation.[18] As of July 28, 2020, there were at least 463,635

8  confirmed cases in California, 8,550 reported deaths, and at least 470,762 confirmed cases in

9  California, 8,679  reported deaths, and at least 8,862  confirmed cases and 172 reported deaths in

10 Tulare County.[19]

11     28.    Because these numbers include only laboratory confirmed cases, they likely

12 understate the actual number of cases and deaths. Most medical and public health experts agree

13 that the situation, which is already dire, will continue to worsen over the coming weeks to months.

14     29.    COVID-19 is a highly contagious respiratory illness. It is transmitted between

15 persons in close proximity (within about six feet) by airborne droplets released by infected

16 individuals when they cough, sneeze, speak, or breathe.[20] The droplets can survive in the air for up

17 _____

18 [16] *See* World Health Org., *Coronavirus disease (COVID-19) Pandemic* (last visited July 28, 2020)
   https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

19 [17] *See* Ctrs. Disease Control & Prevention, *Cases in U.S.* (last visited July 28, 2020),
20 https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

21 [18] Luke Money, *California Has Most Covid-19 Cases in U.S., Surpassing New York, As Spike Continues*, Los Angeles Times (July 22, 2020, 9:53 a.m.),
22 https://www.latimes.com/california/story/2020-07-22/california-has-most-covid-19-infections-of-any-state-as-surge-continues.

23 [19] Los Angeles Times, *Tracking coronavirus in California*,
24 https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (last visited July 28, 2020, 4:12 p.m.); *see also* Johns Hopkins University COVID-19 Data Center,
25 https://coronavirus.jhu.edu/ (last visited July 28, 2020); Tulare County Health & Human Services Agency, COVID-19 (Novel Coronavirus) COVID Update July 28, 2020 as of 11:12 AM PDT,
26 https://tchhsa.org/eng/index.cfm/public-health/covid-19-updates-novel-coronavirus/ (last visited July 28, 2020).

27 [20] Centers for Disease Control and Prevention, Interim Infection Prevention and Control
28 Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19)

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

to three hours. It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

30.      Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, and shortness of breath or difficulty breathing. Some individuals who have survived the illness—including those with so-called "mild" cases—have experienced fatigue so extreme they cannot get out of bed or walk to the bathroom, and a cough severe enough to prevent sleep. In more serious forms, the individual can experience excruciating pain, days or weeks of fever and chills, uncontrollable diarrhea and inability to keep down food or water, and extremely labored breathing requiring oxygen therapy.[21] The virus may lead to acute respiratory distress syndrome, in which fluid displaces the air in the lungs. The sensation of that illness is akin to being drowned.[22] The most severe forms require hospitalization and often artificial ventilation to preserve life. The artificial ventilation process is highly invasive.

31.      Some patients are placed in medically induced comas for such treatment. Some do not survive. The overall case fatality rate has been estimated to range from 0.25 to 3.0%,[23] which is 2.5 to 30 times the fatality rate associated with influenza infection.

---

Pandemic (updated July 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html.

[21] Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, HEALTH, March 20, 2020, https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19

[22] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, PROPUBLICA (March 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[23] Centers for Disease Control and Prevention, Emerging Infectious Diseases, Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality, June 2020, https://wwwnc.cdc.gov/eid/article/26/6/20-0320, article (last visited July 16, 2020).

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

32.     In addition to the short-term risk of death posed by COVID-19, contracting the virus can lead to other serious long-term medical conditions, including cardiovascular disease, permanent reduction of lung function, and damage to organs, including permanent injury to the kidneys and neurologic injury.[24] Symptoms may persist for weeks or months after the initial infection.[25]

33.     A significant number of infected individuals do not exhibit symptoms. However, asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25% of people infected with COVID-19 will remain asymptomatic. Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. Because of the high risk of transmission by asymptomatic individuals, in early April 2020, the CDC recommended everyone wear a mask in public. Citing similar concerns, on June 18, 2020, California Governor Gavin Newsom ordered all Californians to wear face coverings while in public or while in high risk settings. People who violate this order can be charged with a misdemeanor.[26]

34.     There is currently no medical treatment for COVID-19, other than supportive measures. Nor is there a vaccine. Recommended preventive measures to slow the transmission of COVID-19 include: social distancing (keeping persons separated by at least six feet), frequent handwashing, respiratory hygiene (e.g., covering mouth and nose when coughing or sneezing), wearing cloth face coverings, frequent cleansing of surfaces, isolating when ill, and tracing and isolating contacts of people who are infected.

---

[24] Tian-Yuan Xiong et al., *Coronaviruses and the Cardiovascular System: Acute and Long-Term Implications*, Euro. Heart J (2020) 41, at pp. 1799-1800.

[25] Pam Belluck, *Here's What Recovery From Covid-19 Looks Like for Many Survivors*, New York Times (July 1, 2020), https://www.nytimes.com/2020/07/01/health/coronavirus-recovery-survivors.html.

[26] Phil Wilon, Hannah Fry & Luke Money, *Californians Must Wear Face Masks in Public under Coronavirus Order Issued by Newsom*, L.A. Times (June 18, 2020), https://www.latimes.com/california/story/2020-06-18/california-mandatory-face-masks-statewide-order-coronavirus-gavin-newsom.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

**B.      COVID-19 is Particularly Dangerous for Medically Vulnerable People**

35.      While COVID-19 threatens everyone, certain individuals are at a heightened risk. Experts believe that older people and those suffering from certain underlying medical conditions are at a higher risk of serious illness or death from the disease.

36.      According to the CDC, the risk of severe illness from COVID-19 increases with age, with older adults aged 65 and above at highest risk. This age is appropriately reduced to 55 for people who are incarcerated. Experts widely agree that because of their high rates of chronic disease, poor previous health care, and histories of drug and alcohol abuse, incarcerated people are physiologically 10 years older than their chronological age. Incarcerated people aged 55 or older face a heightened risk of severe illness or death.

37.      The CDC has identified people with the following medical conditions as being particularly vulnerable to severe illness from COVID-19, regardless of age: type 2 diabetes mellitus; chronic pulmonary disease; serious heart conditions; sickle cell disease; chronic kidney disease; immunocompromised state from solid organ transplant; and obesity.

38.      Additionally, the CDC notes that people with the following conditions might be at an increased risk of severe illness from COVID-19: asthma; cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis; smoking; thalassemia; and type 1 diabetes mellitus.

39.      By virtue of their conditions, people falling in any of the categories discussed in the preceding two paragraphs (collectively, the "Medically Vulnerable") are particularly vulnerable to the dangers of COVID-19 and require precautionary measures responsive to their heightened risk.

**C.      Correctional Facilities are Uniquely Primed for Viral Outbreak.**

40.      The risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails than in the community, putting jail inmates and correctional staff at high risk of becoming ill with COVID-19.

41.     Correctional facilities like the Tulare County Jails face a significant risk for rapid and deadly spread of COVID-19. Several factors contribute to this risk. Correctional facilities are congregate environments where people live and sleep in close proximity. They are designed not for reducing infection, but for maximizing security by grouping many people into a confined space—an arrangement antithetical to social distancing. Correctional facilities often provide insufficient medical and hygiene supplies, such as soap, hand sanitizer, and face coverings. Incarcerated people are subject to frequent internal movement—between housing units, to congregate eating areas, through commissary, laundry, and medication lines, and even to and from other jails—which facilitates rapid disease transmission.

42.     Correctional officers, like sheriff's deputies, and other correctional facility staff routinely have direct physical contact with incarcerated people, especially when handcuffing or removing handcuffs from incarcerated people who are entering, exiting, or moving throughout the facility. Staff also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from incarcerated people in different parts of the facility.

43.     Additionally, compared to the general population, correctional facilities house a disproportionate number of Medically Vulnerable persons. Incarcerated populations have high rates of chronic illnesses such as diabetes, respiratory illness, and heart disease that increase the risk of serious illness from COVID-19. People often arrive at jails or prisons with poor or absent prior health care, alcohol or drug abuse, and other factors that further heighten the risk of contracting or dying from the disease. Thus, not only is COVID-19 more likely to spread in correctional facilities, but the consequences of viral outbreak are more severe than among healthier populations.

44.     Viral outbreaks in jails and prisons have serious public health ramifications, which extend far beyond the incarcerated population. Because people—staff, residents, contractors, community members, and others— constantly cycle in and out of correctional facilities, there is an ever-present risk that new carriers will bring the virus into the facility—or carry the virus from the facility into the surrounding communities. And incarcerated populations have high turnover, as

-14-

people are released while others are continuously admitted to the jail or prison. The revolving door creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus into and out of the jail, spread infection, and trigger outbreaks both inside and outside the jailhouse walls. Thus, viral outbreaks in jails and prisons also pose a significant threat to the surrounding communities. Put simply: "Prison health is public health."

45. Even if correctional institutions screen outsiders, including staff and visitors, for symptoms of COVID-19, that will not stop the introduction of COVID-19 from the outside because COVID-19 can be spread before an infected individual shows symptoms. Indeed, research suggests that up to 25% of people infected with COVID-19 will remain totally asymptomatic.

46. The devastating impact of COVID-19 on United States' correctional facilities has already been felt throughout the country. Prisons in Iowa, Kentucky, and North Carolina are experiencing serious COVID-19 outbreaks. Outbreaks in the Cook County Jail in Chicago and at the Rikers Island Jail in New York were estimated to reflect the highest COVID-19 transmission rates observed anywhere in the world.[27] In Ohio, 78% of the approximately 2,500 prisoners at the Marion Correctional Institute tested positive. This outbreak was discovered through mass testing of the entire incarcerated population, suggesting that infection numbers in correctional facilities that have not implemented universal testing—such as the Tulare County Jails—may be far higher than reported.

47. In California, Avenal State Prison and North County Jail in Castaic have recently seen rapid increases in their COVID-19 cases: The *New York Times* reports that upward of 1,251 people in Avenal and more than 1,376 people in North County Jail have tested positive for the

---

[27] *See* Alleen Brown, *Inside Rikers: An Account of the Virus-Stricken Jail from a Man Who Managed to Get Out*, Intercept(Apr. 21 2020 7:15 a.m.), https://theintercept.com/2020/04/21/coronavirus-rikersisland-jail-nyc/; Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times, Apr. 8, 2020; updated Apr. 23, 2020), https://www.nytimes.com/2020/04/08/us/coronaviruscook-county-jail-chicago.html.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

virus.[28] San Quentin prison is currently facing the third largest coronavirus outbreak in the United States. Since the first case of COVID-19 was reported in the prison nearly six weeks ago, 2,000 people, more than half of the incarcerated people and staff, have tested positive for the virus, and at least ten have died. In the federal Lompoc prison complex, a recent outbreak of COVID-19 has killed four incarcerated people and infected more than 1,000 others.[29]

48.    Officials and courts have recognized the need for drastic action to address the rapidly escalating crisis in prisons and jails. California Governor Gavin Newsom has directed the California Department of Corrections and Rehabilitation ("CDCR") to release as many as 8,000 California state prisoners in an unprecedented attempt to stop the spread of COVID-19 inside state prisons.[30]  Many cities, including San Francisco, Chicago, Cleveland, and New York, are also releasing prisoners to reduce the risk of COVID-19.

49.    Courts likewise continue to grapple with the acute and serious danger COVID-19 poses in correctional facilities. On July 14, 2020, a judge on the United States District Court for the Central District of California ordered federal prison authorities to begin transferring Medically Vulnerable incarcerated people at Lompoc's prison complex to home confinement to prevent further illness.[31] Courts in other jurisdictions have also issued orders requiring the release of

---

[28] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 28, 2020).

[29] *See* Federal Bureau of Prisons: *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited July 28, 2020); Richard Winton, *Judge Orders Release of Vulnerable Inmates at Lompoc Prisons Hit by Virus*, Los Angeles Times (July 22, 2020, 2:39 p.m.), https://www.latimes.com/california/story/2020-07-22/judge-orders-release-some-lompoc-prison-inmates.

[30] *See* California to Release 8,000 Prisoners in Hopes of Easing Coronavirus Crisis, Los Angeles Times, July 10, 2020, https://www.latimes.com/california/story/2020-07-10/california-release-8000-prisoners-coronavirus-crisis-newsom

[31] *See Torres, et al. v. Milusnic, et al.*, Case No. CV 20-4450-CBM-PVC(x), 2020 WL 97285 (C.D. Cal. July 14, 2020), Order re: Plaintiff-Petitioners' Motion for Preliminary Injunction, and *Ex Parte* Application for Provisional Class Certification.

1   incarcerated people and major adjustments to facility protocols and practices in an effort to reduce

2   the risk posed by COVID-19.[32]

3   **II.     Defendant Has Failed to Address the Threat Posed by COVID-19, Subjecting People**

4   **Incarcerated in Tulare County Jails to Imminent Danger of Serious Illness or Death**

5   **from the Virus.**

6   **A.     Defendant Has Failed to Provide Necessary Personal Protective Equipment to**

7   **Staff and Incarcerated People.**

8   50.     Incarcerated people are *not permitted* to wear masks while housed in Tulare County

9   Jails. This policy is intentional and explicit: TCSO deputies have told incarcerated people

10  specifically they cannot wear masks in Tulare County Jails.

11  51.     Incarcerated people have not been given personal protective equipment, including

12  masks, even after numerous requests. Nor are they permitted to wear masks of their own making.

13  TCSO staff denied one individual's mask request while he was being treated in a medical facility

14  in Defendant's custody, even though other patients near him had COVID-19. Others began

15  repeatedly asking for masks after there were confirmed cases of COVID-19 in the Jails, but those

16  requests likewise have been ignored.

17  52.     Other individuals report being given masks before their court appearances. After

18  court, however, TCSO deputies promptly collect the masks, warning that a failure to return the

19  masks will result in disciplinary action. When one person tried to keep his mask, TCSO deputies

20  took it and gave him a disciplinary infraction. As retaliation for trying to keep a mask, TCSO

21  deputies now keep him locked in his cell all day.

22  53.     Similarly, a TCSO deputy told Plaintiff Levi Johnson, who was returning from a

23  medical appointment, that he had to throw his mask away. The deputy said "I wish I could allow

24  you to keep your mask with you but they [superior officers] want you to throw them away."

25

26  [32] *See, e.g.*, *Martinez-Brooks v. Easter*, Case No. 3:20-cv-00569 (MPS), 2020 WL 2405350 (D.
    Conn. May 12, 2020) (granting temporary restraining order requiring warden to speedily identify
27  Medically Vulnerable prisoners appropriate for home confinement and compassionate release);
    *United States v. Salvagno*, Case No. 5:02-CR-051 (LEK), 2020 WL 3410601 (N.D.N.Y. Apr. 23,
28  2020) (ordering release of Medically Vulnerable prisoner).

54.     When Plaintiff Adam Ibarra asked a TCSO nurse why incarcerated people were not being given masks, she responded that incarcerated people were not likely to get sick from COVID-19. After being refused a mask by deputies numerous times, Ibarra filed a grievance. In response, he was told "[d]ue to you not reporting any signs and/or symptoms [of COVID-19], your request for personal protective equipment is unapproved at this time." Ibarra Grievance (Ex. 2 at 3). He has not been permitted to wear a mask since, except while in court for court appearances.

55.     Plaintiff Samuel Camposeco also filed a grievance after being denied a mask. The answer he received was even more direct: "At this time no inmates are being provided PPE masks." Camposeco Grievance (Ex. 3 at 1). On appeal, Camposeco received the same response as Ibarra: "[d]ue to you not reporting any signs and/or symptoms [of COVID-19], your request for personal protective equipment … is unapproved at this time." *Id.* at 2.

56.     In response to Defendant's utter refusal to provide protective masks or other protective equipment, Camposeco and others have begun making their own masks. But as soon as the deputies spot them, the masks are whisked away. Camposeco has sometimes been given masks to wear in court, but those masks are quickly confiscated following his court appearance. TCSO deputies have continued to tell Camposeco that incarcerated people are not allowed to wear masks in Tulare County Jails.

57.     TCSO deputies have taken masks away from the Medically Vulnerable, including Plaintiff Levi Johnson. Moreover, there have been many instances in which TCSO staff (including deputies, nurses, and food workers) and outside volunteers have interacted with incarcerated people, including the Medically Vulnerable, without wearing masks.

58.     Nor do the deputies themselves regularly wear masks while working in the Jails. When one individual told Defendant's deputies that they should be wearing masks, the deputies mimicked coughing noises at him.

59.     Even kitchen workers have been refused the use of masks while they work. When these incarcerated food workers pass out meal trays, their faces come in close contact to the food and dishware. One individual asked a deputy for a grievance form to report this issue. The deputy told him that the issue was not grievable and refused to give him a form.

**B.      Defendant Refuses to Provide COVID-19 Tests—Or Timely Medical Care— To People Incarcerated in Tulare County Jails.**

60.      Defendant has refused to test incarcerated people for COVID-19 in Tulare County Jails, including the Medically Vulnerable. It is difficult even in the best of times for people incarcerated in Tulare County Jails to get a medical appointment. Merely securing a sick call slip—the form to request a medical visit—requires multiple requests to the nursing staff. Once that's done, it can take up to a week to get a medical appointment—which then typically lasts only a few minutes. Nothing has improved since the pandemic began, and incarcerated people do not have access to necessary COVID-19 testing or medical treatment.

61.      When incarcerated people request a COVID-19 test, the deputies and nursing staff refuse them. Jail staff have denied COVID-19 testing requests even if the incarcerated person making the request has exhibited COVID-19 symptoms, or has been in close contact with other incarcerated people who have exhibited COVID-19 symptoms.

62.      When people ask Tulare County Jails' nursing staff why they cannot be tested for COVID-19 despite exhibiting symptoms or suffering a likely exposure, the nurses reply that Defendant does not test incarcerated people in Tulare County Jails.

63.      For example, in late May, Plaintiff Camposeco began to feel sick. He became concerned when others on his unit also developed flu-like symptoms—he was surrounded by a daily din of coughing. Yet despite the obvious need in the unit, TCSO staff refused to give him a coronavirus test. When Camposeco filed a grievance in protest, deputies appeared more troubled with how he'd found the form than with the egregious lack of testing.

64.      Another person reported having flu-like symptoms since the beginning of July, including chills, a cough, body aches, and a likely fever—although without access to a thermometer, he cannot be sure. When he sought care from TCSO nursing staff, the nurse did nothing but check his tonsils and give him a couple of Tylenols. She categorically refused a coronavirus test. Despite continuing to experience symptoms, he has received no further medical care.

65.     Yet another person, who cleaned cells in one of the Jails' intake units, repeatedly asked for COVID-19 testing due to his increased exposure to newly-booked individuals—including those who tested positive for the virus. He was told that he would have to wait for his release to be tested for COVID-19.

**C.     Defendant Refuses to Quarantine New Intakes or Implement Appropriate Quarantine Measures in the Housing Units**

66.     Defendant does not quarantine people newly booked into Tulare County Jails upon their admission to the jail. Sick people with obvious flu-like symptoms are sent straight to the regular housing units after booking. One individual reports that while he was incarcerated, newly-booked individuals—including those with a cough or a sore throat—were assigned straight to his housing unit, without any quarantine period (or testing) whatsoever.

67.     Similarly, incarcerated people who show COVID-19 symptoms in their cramped housing units often remain in their units, unquarantined, where they mingle with other incarcerated people in their cells or dorms, on the yard, in the showers, or in other common areas. These individuals, if positive, continue to expose others in their unit—including the Medically Vulnerable—to COVID-19.

68.     Nor does Defendant quarantine individuals before transferring them to new housing units. Plaintiff Campseco reports that significant numbers of people have been transferred into his unit in Bob Wiley Detention Center from units all over the jail—without any quarantine period between moves. Now, he says, his unit is almost completely full, crowded with individuals of unknown prior exposure.

**D.     Defendant's Policies Actively Prevent Incarcerated People from Practicing Social Distancing.**

**i.     Despite Available Space, Incarcerated People are Crammed Together in Crowded Housing Units.**

69.     It is nearly impossible for incarcerated people in Tulare County Jails to socially distance in their cells, units, or both.

70.     In one Bob Wiley women's unit, for example, bunk beds are placed only three feet apart, with approximately three feet between the top bunk and the lower bunk. Every lower bunk is occupied, meaning each person sleeps only three feet apart from the next. This layout makes it impossible for anyone to maintain more than three feet of distance—at the most—from anyone else. What's worse, the unit is only half-full, but rather than spacing people out across the unit so individuals could sleep more than three feet apart, Defendant closed four of the eight total "houses," and crowded everyone into the remaining four.

71.     Plaintiff Charles Criswell is housed in Main Jail Unit 222, a dorm-like setting with 15 other incarcerated people housed in bunk beds. Each double bunk bed is about two feet away from the next, and all the beds are full. He spends nearly all of his time in close proximity to the other people in his unit. No one can socially distance in this setting. Many other incarcerated people, housed in units across Tulare County Jails, report similar conditions: closely-spaced bunks and full or nearly-full units, despite the fact that the Jails themselves are below-capacity.

72.     Others report being housed together in a nearly-full men's unit, stocked with two-person cells that make it impossible for cellmates to socially distance from one another. Cellmates share a common bunk bed, toilet, and sink. Every day, deputies line up all the people housed in the unit next to each other—so close they are nearly touching—for a routine search. Even in non-dormitory settings, Defendant's policies make it effectively impossible for the individuals incarcerated in his Jails to practice responsible social distancing.

### ii.     Incarcerated People Also Cannot Practice Social Distancing When They Leave Their Cells or Housing Units

73.     Whether on the yard or in a dayroom, it is impossible as a practical matter for individuals to practice social distancing. Not only are those spaces small and cramped, the phones are close together, meaning the lines to speak are tightly packed. The phones are not cleaned between uses.

74.     Programs run by non-incarcerated volunteers have continued to operate in Tulare County Jails during the COVID-19 pandemic, but Defendant has failed to provide any policy on social distancing with respect to these programs. For example, incarcerated people who

participated in a volunteer-run religious program during the pandemic sat side-by-side on a picnic-like table in a small room.

75.    When incarcerated people are searched or transported to work sites, court, or both, they are placed in small holding cells and crowded trailers and vans with incarcerated people from other units and Jails, sometimes elbow-to-elbow. Not only has Defendant refused to implement a plan for social distancing among incarcerated people, but his policies make it impossible for them to do so of their own accord.

**E.    Tulare County Jails Remain in Filthy Condition Because Defendant has Failed to Provide Proper Cleaning and Hygiene Supplies.**

76.    Defendant has not implemented an adequate sanitation policy in Tulare County Jails. Despite the well-known importance of sanitation to combat the COVID-19 virus, incarcerated people have not been given adequate amounts of personal hygiene or other cleaning supplies in Tulare County Jails.

77.    Individuals incarcerated in Tulare County receive only one small bar of soap a week—at best, every few days—for all their sanitation needs. These small bars of soap do not last more than a day, which means people regularly go without soap several days a week. Nor does Defendant provide hand sanitizer, or other personal disinfectants.

78.    Showers are communal, shared by numerous people who all must bathe one after the other. In one women's unit, for example, there are only three showers, shared by 30 people. Twelve people share a single toilet.

79.    Defendant has also failed to provide incarcerated people with a consistent supply of cleaning materials to disinfect their cells and other surfaces. When rats, birds, and insects inevitably make their way into the already-unclean units, the floors, drinking fountains, and other areas become crusted with feces and refuse. Despite the pandemic, many incarcerated people have not been able to keep their units clean and sanitized, due to Defendant's refusal to consistently provide adequate cleaning supplies.

80.    Outside of the incarcerated people's units, common spaces like dayrooms, attorney meeting rooms, holding rooms, and phone booths, including the phones themselves, are not

1  disinfected regularly or between uses, and incarcerated people are not given cleaning supplies to

2  clean these common spaces and surfaces themselves.

3      81.    Deputies do not observe appropriate hygiene when interacting with incarcerated

4  people. Deputies will pat down several different incarcerated people in a row, all with the same

5  pair of rubber gloves. Others will handcuff several different people with the same pair of

6  handcuffs without disinfecting the handcuffs in between uses.

7      82.    What's more, incarcerated people have not been educated on how to prevent the

8  spread of COVID-19. There are no signs or flyers in the jail instructing incarcerated people on

9  how to protect themselves from the virus. Worse, when the TV news begins broadcasting stories

10  or information about COVID-19, TCSO deputies turn off the television. Deputies have also cut

11  out articles about COVID-19 from newspapers before delivering them to incarcerated people.

12      **F.    Defendant Has Retaliated Against Incarcerated People Who Challenge the**

13          **Unconstitutional Conditions of Confinement at Tulare County Jails.**

14      83.    It is not enough for Defendant to leave people incarcerated in his jails helpless to

15  protect themselves from COVID-19. Defendant has also embarked on a retaliation campaign

16  against those individuals who have looked to outside counsel for help.

17      84.    Incarcerated people have filed grievances regarding Defendant's refusal to provide

18  masks to incarcerated people or to require his staff to wear masks; to test incarcerated people for

19  COVID-19; to provide adequate soap, hand sanitizer, and cleaning supplies; and to release any

20  incarcerated people to home confinement to prevent the spread of COVID-19.

21      85.    In many cases, TCSO staff simply do not respond. Often, staff refuse even to

22  provide incarcerated people with grievance forms. And TCSO deputies have retaliated against and

23  intimidated those incarcerated people who have filed grievances, making them and others unlikely

24  to file grievances in the future.

25      86.    One individual was moved to a maximum security unit after talking to an ACLU

26  investigator. He asked the deputies several times for a grievance form so that he could challenge

27  the retaliatory move. The deputies asked him why he wanted the form, and he responded that he

28  wanted to grieve his classification and security level changes. Yet the deputies refused to give him

-23-

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

a grievance form. They told him that his security level change was not a grievable issue even though security classification is a well-established grievable issue.[33]

87.    When another individual asked for a grievance form to report deputies' practice of patting down incarcerated people without changing gloves, he was told that issues about COVID-19 in Tulare County Jails were not grievable. He was informed that if he grieved the COVID-19 response, he would be given a disciplinary infraction or have this security classification raised.

**III.    Despite the Clear and Obvious Danger That COVID-19 Poses to Incarcerated People in Tulare County Jails, Defendant Has Refused to Protect Them.**

    **A.    Defendant Not Only Refuses to Provide Face Coverings to Incarcerated People, His Policy Explicitly Forbids Incarcerated People from Wearing Face Coverings in the Housing Units.**

88.    Experts recommend that people, including incarcerated people, wear cloth face coverings to prevent the spread of COVID-19.

89.    The CDC recommends that all staff and incarcerated people in correctional facilities be encouraged to wear a mask as frequently as possible.[34] The CDC also recommends that correctional facilities provide masks at no cost, and recommends that facilities launder masks regularly. The CDC recommends that correctional facilities explain policies regarding the use of masks to staff and incarcerated people, including when more protective gear may be appropriate.

90.    Defendant has released no public policies on masks or other personal protective equipment ("PPE") in Tulare County Jails. Experiences of people incarcerated in Tulare County show that Defendant has no evidence-based, updated, and comprehensive policies on masks or other PPE in Tulare County Jails.

---

[33] *See, e.g., In re Martinez*, 242 Cal. App. 4th 299, 307 (2015) (sustaining habeas corpus challenge to classification as a gang member).

[34] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

91.     In fact, Defendant has explicitly *forbidden* incarcerated people from wearing masks. His policy persists to this very day, despite the CDC's recommendation—in *April*—that all people wear masks when they leave their home, and Governor Newsom's June mandate requiring all Californians to do so.

92.     Defendant apparently understands the virtues of masking for the non-incarcerated population. Indeed, he has extolled the virtues of mask-wearing to the general public: On July 3, 2020, Defendant announced on Facebook a new campaign, "MASK UP Tulare County," seeking to raise awareness about the importance of masks. The campaign directs TCSO deputies to provide masks and an educational pamphlet whenever they see people in public without masks.[35] As Defendant said, "The people of Tulare County have always taken care of each other. And we are asking you to continue to do that now, by wearing masks, practicing good hygiene, and, of course, social distancing." Defendant has categorically refused to extend that protection to the people incarcerated in his jails.

93.     As Defendant himself recognizes, masks are necessary to combat COVID-19 effectively. For Californians outside of Tulare County Jails' walls, it is a crime *not* to wear a mask in public. Inside, wearing a mask is grounds for discipline. Defendant's refusal to provide personal protective equipment, including masks, to the people incarcerated in his Jails demonstrates a gross and deliberate indifference to their health.

   **B.     Defendant Has No Coherent Testing Policy, Despite an Active Outbreak of COVID-19 in the Jails.**

94.     Experts warn that "[i]n the absence of an effective vaccine, one of the most powerful tools we have in containing the spread of COVID-19 within facilities is testing." "[T]esting is critical for COVID-19 prevention and control" because "it allows people who are diagnosed with COVID-19 to be medically isolated."

---

[35] *Tulare County Sheriff's Office: Mask Up Tulare County!*, Facebook (July 3, 2020, 11:29 a.m.) https://www.facebook.com/TulareSheriff/videos/3207308699315349/?comment_id=397195224620 09111

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

95.     The CDC recommends testing for all symptomatic individuals, and all asymptomatic individuals who are close contacts of symptomatic individuals.[36]

96.     The CDC recommends that correctional and detention facilities consider testing all newly incarcerated people before they join the facility's population and all people who have left the facility and have since returned.[37] Other recommended approaches for testing in correctional and detentions facilities include an initial test of everyone who resides or works in the facility and regular (or weekly) testing of all people living or working in that facility.

97.     Testing is important because relying simply on symptoms offers an incomplete picture of the prevalence of COVID-19.  Many symptoms related to COVID-19 are not easily observable, and incarcerated people may not be aware that they are experiencing symptoms of COVID-19. Moreover, many individuals who are asymptomatic are still carriers of the virus, meaning any symptom-based screening protocols will fail to identify them.

98.     Defendant has released no public testing policies for COVID-19 in Tulare County Jails. Nor have Plaintiffs observed from within the Jails any sort of comprehensive testing plan. Defendant apparently has *no* evidence-based, up-to-date, comprehensive COVID-19 testing policies for the Tulare County Jails. Any limited policies that Defendant may have are not only inadequate to address—or even assess—the scale of the problem, but they also are only sporadically enforced.

99.     Defendant is well aware of the dire need for testing in Tulare County Jails. In fact, on July 1, 2020, the Presiding Judge of the Tulare County Superior Court wrote a letter to the Tulare County Board of Supervisors asking the County, among other things, to test all incarcerated people in Tulare County Jails. Presiding Judge Alldredge emphasized that widespread testing was necessary to gauge the spread of the virus in the Jails, given the at least twelve

---

[36] CDC, *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities* (updated July 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html.

[37] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

individuals in the Jails who had already tested positive and the "alarming rate" of new COVID-19 deaths in Tulare County.[38]

100.    In keeping with Defendant's approach, the County flatly refused to conduct widespread testing in the Jails.[39]

101.    Defendant's refusal to implement reasonable testing policies ignores a potentially deadly risk of infection to incarcerated people in Tulare County Jails and constitutes deliberate indifference to the serious medical needs of Plaintiffs and the class they seek to represent. And it places the Medically Vulnerable in an especially precarious position, making it impossible for them to identify and isolate from potential carriers.

**C.    Defendant has Prevented Incarcerated People from Practicing Social Distancing, One of the Most Important and Simplest Methods of Preventing the Spread of COVID-19.**

102.    Social distancing has been defined by the CDC as the "cornerstone of reducing transmission of respiratory diseases such as COVID-19." While true social distancing is nearly impossible in correctional facilities, the CDC recommends certain strategies for keeping incarcerated people safe from COVID-19.[40] Defendant has implemented none of them.

103.     Defendant has refused to take even limited steps to ensure the health and safety of incarcerated people. For example, in-unit, Defendant can reassign and rearrange bunk beds to provide 6 feet of space; arrange bunk beds so that individuals sleep head to toe; and schedule movements to limit the mixing of people.[41] Outside the unit, Defendant can rearrange common

---

[38] Ex. 1 at 1. We now know, based on more recent reports, that the number of positive tests was even higher: 22 incarcerated people tested positive for COVID-19, out of only 139 total tests. *See Tulare County Sheriff's Office*, Facebook (July 28, 2020), https://www.facebook.com/TulareSheriff/posts/4081234765280858.

[39] *Id.* at 3.

[40] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (updated July 22,2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[41] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

1    areas to create increased space between people, limit the size of group activities, stagger meal

2    times, and modify work details.[42]

3        104.    On April 30, 2020, Defendant acknowledged that "the population in the jails is at

4    almost half of the total capacity." Yet Defendant has refused to implement the measures, outlined

5    above, that would increase the protective space surrounding incarcerated people, citing budget

6    constraints. Instead, Defendant has insisted on closing down certain dormitories and cells within

7    the units, leaving those that remain in use at their full, packed capacity.

8        105.    The ongoing crowding in the Jails makes clear that Defendant has no

9    comprehensive policy on social distancing—despite it being one of the simplest and most effective

10   strategies to prevent COVID-19 transmission. Prioritizing cost savings over the lives and health of

11   incarcerated people is deliberate indifference to the real threat that COVID-19 poses to their

12   health.

13       **D.    Defendant Does Not Adequately Screen Incarcerated People or Staff for**

14           **COVID-19 Symptoms, and Does Not Quarantine Newly-Booked Individuals,**

15           **Increasing the Risk that COVID-19 Will Spread Undetected Through Tulare**

16           **County Jails.**

17       106.    The CDC recommends that all staff working in correctional facilities undergo daily

18   verbal symptom screenings and temperature checks when arriving at work.[43]

19       107.    The CDC recommends that if any incarcerated people or staff members are found

20   positive for COVID-19 *anywhere* in a facility, officials should consider performing regular

21   symptom screenings and temperature screenings on *all* employees and incarcerated people—even

22   if they are located in housing units where infections have not yet been identified.[44]

23

24   _____

     [42] *Id.*

25
     [43] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*
26   *Correctional and Detention Facilities*(updated July 22, 2020),
     https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
27   correctional-detention.html

28   [44] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

108.    On information and belief, Defendant has not implemented any CDC-compliant screening policies, whether for staff or incarcerated people. Indeed, as reports from incarcerated people show, when they do exhibit symptoms they are refused testing and sent back to their cells without meaningful medical treatment.

109.    CDC guidelines recommend testing and quarantining newly incarcerated people for a period of 14 days before introducing them to the general population.[45]

110.    Similarly, experts agree that new intakes should not be introduced into the general population until they have been quarantined for a period of 14 days. If single cells are not available, experts recommend cohorting new arrivals by arrival date in a setting where they can maintain social distancing.

111.    Reports from incarcerated people show that, despite well-publicized CDC guidelines, Defendant continues to introduce newly booked individuals directly into the general population.

112.    The failure to institute symptom screening mechanisms for staff and incarcerated people, and quarantine protocols for newly-booked individuals, allows the virus to spread through the Jails undetected, carried by symptomatic and asymptomatic individuals alike.

**E.    Defendant Has Not Provided Incarcerated People With Adequate Hygiene Supplies and Has Not Maintained Sanitary Conditions.**

113.    Aggressive decontamination and cleaning strategies are a crucial part of combating COVID-19.

114.    At a minimum, incarcerated people must be provided with cleaning supplies and personal hygiene equipment. This includes, under the CDC recommendations, a free supply of liquid soap where possible (liquid soap is more effective than bar soap).[46]

---

[45] *Id.*

[46] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

115.    Defendant has no policy requiring that incarcerated people be provided with the supplies that they need to combat the spread of COVID-19. Defendant's policies and measures are not adequate to maintain sanitary conditions in the Jail.

F.    **Despite Defendant's Refusal to Implement Social Distancing Measures, Defendant Has Opposed Releases at Every Turn.**

116.    Releases are a crucial part of any COVID-19 response strategy. Overcrowding in jails and prisons makes implementing crucial protective measures in prisons difficult. Releases are necessary to reduce populations to a point where protective measures can be implemented. Depopulation is an evidence-based and effective strategy at reducing the incidence of COVID-19 in a detention setting.

117.    Recognizing the important role that releases play in COVID-19 prevention efforts, jurisdictions around the world and in the United States have taken decisive action to save lives in correctional facilities and in the community at large. Germany released "1,000 prisoners who are close to the end of their sentences"; Canada released "1,000 inmates in the state of Ontario"; and Iran "temporarily release[d] 85,000 prisoners, with 10,000 of them being granted pardons."[47]

118.    Closer to home, Governor Gavin Newsom has ordered the release of as many as 8,000 state prisoners to address COVID-19's devastating impact in the state's prisons.[48] And California is not alone in its efforts. As early as March, the New Jersey Supreme Court entered an order releasing as many as 1,000 people from its jails, and New York City also began releasing more than 1,000 people from its jails.[49] Cuyahoga County, Ohio, announced plans to rapidly

---

[47] Luke Baker., *Lock 'Em Up or Let 'Em Out? Coronavirus Prompts Wave of Prisoner Releases*, REUTERS (March 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisoners-released/lock-em-up-or-let-em-out-coronavirus-prompts-wave-of-prisoner-releases-idUSKBN21C38R.

[48] *See* John Myers, *California to Release 8,000 Prisoners in Hopes of Easing Coronavirus Crisis*, Los Angeles Times (July 10, 2020), https://www.latimes.com/california/story/2020-07-10/california-release-8000-prisoners-coronavirus-crisis-newsom.

[49] Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times  (March 23, 2020) https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html?action=click&module=Latest&pgtype=Homepage; *NYC to Release More Than 1,000 Prison Inmates Due to Coronavirus Concerns*, Assoc. Press (March 25, 2020),

release around 600 people from the county jail just two days after President Trump declared a national emergency; Washington County, Oregon, released more than 120 people from the local jail; the Iowa Department of Corrections began to release 700 people from state prisons; Mercer County, Pennsylvania, released 60 of 308 people in their jail.[50]

119.    These depopulation efforts save lives: Corrections experts recognize that major population reductions, together with aggressive, responsive prevention measures, are necessary to protect incarcerated people, correctional officers, and the community at large from COVID-19. Despite actual knowledge of the risk posed by COVID-19 and the appropriate responses available to mitigate that risk, Defendant has failed to take these common sense and necessary steps—and he has loudly decried efforts to reduce populations in jails and prisons. In Defendant's simplistic view: "Those inmates in our facilities are in there for a reason."[51]

120.    If a municipality cannot provide, or cannot afford to provide, adequate social distancing in Jails, it should release people—at the very least, it should consider releasing those in greatest danger from the virus, the Medically Vulnerable, to home confinement—until social distancing becomes possible. Failure to do so is deliberate indifference.

121.    California law provides Defendant clear authority to implement this lifesaving measure. California Government Code section 8658 expressly authorizes him to protect incarcerated people "endanger[ed]" by the COVID-19 pandemic by "remov[ing] them to a safe and convenient place" for the duration of the emergency. Gov't Code § 8658.

---

https://www.syracuse.com/coronavirus/2020/03/nyc-to-release-more-than-1000-prison-inmates-due-to-coronavirus-concerns.html.

[50] Kimberly Kindy et al., *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020, 3:00 a.m. PDT), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html

[51] Reggie Ellis, *State Rule Allows Inmates to Walk Free for Free*, Sun Gazette (April 22, 2020, 7:52 a.m.), https://thesungazette.com/article/news/2020/04/22/state-rule-allows-inmates-to-walk-free-for-free/.

122.    Defendant is aware of his authority under Section 8658. On April 14, 2020, Edward Medrano, Chief Division of Law Enforcement for the California Department of Justice, issued a memorandum to all County Sheriffs, including Defendant, reminding them of their Section 8658 authority.[52] The memorandum notified Sheriffs that Section 8658 applies to the COVID-19 pandemic and provides a tool for responding to the risk of viral outbreak within confinement facilities.

123.    Defendant has conceded that incarcerated people cannot practice social distancing in Tulare County's Jails. But although Defendant has the power to protect Medically Vulnerable incarcerated people by releasing them to home confinement for the duration of the pandemic, he has vehemently and staunchly refused to consider any releases, including any releases pursuant to Section 8658.

124.    In April, the Tulare Superior Court ordered Defendant to release a few dozen nonviolent offenders. Although Defendant ultimately complied with the order, he did so with marked reluctance. On social media, Defendant expressed strong opposition to releases in any form because of COVID-19. A spokeswoman for Defendant said: "[r]eleasing inmates is not Sheriff Boudreaux's first line of defense against the coronavirus."[53] And in May, Defendant accused those who support releasing incarcerated people due to COVID-19 of advancing a political agenda "beyond the scope of need."[54]

125.    Defendant's failure even to consider the release of Medically Vulnerable people constitutes deliberate indifference to a substantial risk to the health and safety of the Medically Vulnerable subclass that Plaintiffs seek to represent.

**G.    Defendant's Response to COVID-19 Lacks Any Transparency.**

---

[52] Information Bulletin from Edward Medrano to All County Sheriffs and Probation Officers (April 14, 2020), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/2020-dle-05.pdf?

[53] Daniel Gligich, *Tulare Co. Sheriff clarifies he won't be forced to release inmates quietly*, The San Joaquin Sun (April 6, 2020), http://sjvsun.com/news/visalia/tulare-co-sheriff-clarifies-he-wont-be-forced-to-release-inmates-quietly/.

[54] *Boudreaux expresses his COVID-19 views on Facebook*, The Porterville Recorder (May 1, 2020), https://www.recorderonline.com/news/boudreaux-expresses-his-covid-19-views-on-facebook/article_5ec608fa-8bec-11ea-8a40-cb107b5bb2c2.html.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

1    126.    CDC guidelines emphasize the importance of transparency in responding to

2 COVID-19: because "limited outside information is available to many incarcerated/detained

3 persons, unease and misinformation regarding the potential for SARS-CoV-2 to spread may be

4 high, potentially creating security and morale challenges." The guidelines recommend that

5 facilities "create and test communications plans to disseminate critical information to

6 incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic

7 progresses."[55]

8    127.    Experts emphasize the importance of transparency in responding to COVID-19.

9 Without transparency and accurate reporting, it is impossible to tell whether any policies that exist

10 are actually working.

11    128.    Transparency is crucial not only to incarcerated people living in the Jails, but also

12 to the surrounding community and individuals seeking to evaluate the efficacy of the Jail's

13 response to COVID-19.

14    129.    Tulare County seemingly recognizes the importance of transparency for non-

15 incarcerated people. Tulare County reports on its website the total number of people who have

16 tested positive for COVID-19 in the general public.[56] Tulare County has a website with

17 comprehensive COVID-19 resources for people, including sections providing resources for

18 businesses, workers, people experiencing homelessness, and others.[57]

19    130.    In comparison, Defendant has provided no public information about his COVID-19

20 response within the Tulare County Jails. The County website does not mention incarcerated

21 people or provide resources for understanding conditions in Tulare County Jails. Defendant has

22

23 _____

[55] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*
24 *Correctional and Detention Facilities* (updated 7/22/2020),
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
25 correctional-detention.html (last visited July 28, 2020).

26 [56] Tulare Cty. Health & Human Servs. Agency, *COVID-19 (Novel Coronavirus) COVID -19 Update* (July 28, 2020 as of 11:12:43 AM PDT), https://tchhsa.org/eng/index.cfm/public-
27 health/covid-19-updates-novel-coronavirus/ (last visited July 28, 2020).

28 [57] *Tulare County Coronavirus (COVID-19) Response*, https://covid19.tularecounty.ca.gov/ (last visited July 28, 2020).

not published an outbreak control plan, nor has he published information concerning current testing data and COVID-19 response efforts within the Jails. And he has not shared information about the Jail's response to the pandemic—or any COVID-19 educational materials—with incarcerated people. At every turn, Defendant has obfuscated and hidden from public scrutiny any information about his (lack of a) COVID-19 response.

**IV.    Defendant has Actively Interfered with Incarcerated People's Access to the Courts.**

**A.    Defendant's Staff Have Retaliated Against Individuals Seeking to Shed Light on Defendant's Apathetic Response to the Threat of COVID-19 in Tulare County Jails.**

131.    Since counsel began investigating conditions at Tulare County Jails, Defendant has engaged in an intentional campaign to prevent incarcerated people from retaining and confidentially meeting with attorneys to develop a challenge to unconstitutional conditions of confinement in the Jails. Confidential legal visits are crucial to incarcerated people's ability to exercise their right to meaningfully access the courts and pursue legal recourse.  Defendant has actively worked to deny incarcerated people confidential legal visits in violation of their right to access the courts under the First and Fourteenth Amendments.

132.    In mid-May 2020, an ACLU investigator met with Jeffery Nunes, who at the time was incarcerated at the Adult Pre-Trial Facility. Nunes told the investigator his concerns about the possible spread of COVID-19 in Tulare County Jails. At the end of the conversation, the investigator told Nunes that he would schedule another legal visit to speak with him about his concerns. Shortly afterward, on May 28, 2020, one of the deputies took Nunes out of his cell to question him about his legal visit. The deputy told Nunes that he was cancelling all future legal visits.

133.    Later that night, another deputy hauled Nunes out of his housing unit to speak with a supervising deputy. Nunes saw that the supervising deputy was wearing a firearm—a fact that concerned Nunes, as it was his understanding that Defendant's deputies do not carry firearms in the Tulare County Jails. The supervising deputy interrogated Nunes about what he spoke to the ACLU investigator about, whether Nunes had any upcoming meetings scheduled with ACLU staff

or attorneys, and whether Nunes had encouraged other incarcerated people to talk to the ACLU. The supervising officer asked Nunes for the names of other incarcerated people who had talked or were trying to talk to the ACLU. Under duress, Nunes told the supervising deputy that he spoke with the ACLU about conditions in Tulare County Jails. He refused to tell the supervising deputy anything else. This questioning was retaliation, an intimidation tactic employed to interfere with Nunes' attempt to remedy conditions in Tulare County Jails.

134.   Following this incident, Nunes became more reluctant to speak to the ACLU. He feared for his safety. He also worried that Defendant's deputies would retaliate against him, including by finding a way to increase the length of his incarceration.

135.   Nunes' fears were confirmed in early June 2020. In retaliation for his conversation with the ACLU investigator, Nunes was moved from his prior job working on the farm at the Adult Pre-Trial Facility to working in the Pre-Trial intake unit as a unit cleaner. The Pre-Trial intake unit is where almost all newly booked incarcerated people in Tulare County Jails are processed. As described above, they are not quarantined. Suddenly, Nunes was put at significantly higher risk of contracting COVID-19.

136.   Mario Escobar had an initial conversation with an ACLU investigator on May 27, 2020. Again, Defendant's deputies engaged in intimidation and retaliation against Escobar for his effort to exercise his right to access the courts. After his conversation with the ACLU, Defendant's deputies took Escobar out of his housing unit and demanded to know why he was talking to the ACLU. They pressed him to reveal what he was talking to the ACLU about, including whether they spoke about conditions in Tulare County Jails. Escobar refused to answer their questions. Later, the deputies tried again, pulling Escobar out of his housing unit and questioning him about his conversations with ACLU staff. These multiple rounds of questioning were part of an effort to intimidate Escobar and to prevent him from seeking to remedy issues related to COVID-19 in Tulare County Jails.

137.   Following his initial conversation, Escobar has tried several times to meet with ACLU staff to discuss his concerns about conditions in Tulare County Jails. But his confidential legal visits have been consistently cancelled by TCSO staff. Escobar has not been able to speak

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

with ACLU staff except for a few minutes a day on a recorded and non-confidential phone line. Escobar would like to work with ACLU staff on a civil rights case to remedy the unsafe conditions in Tulare County Jails, but Defendant has prevented him from taking his case any further.

138.     In late May 2020, Brandon Alford scheduled a confidential legal visit with ACLU staff to discuss Defendant's COVID-19 response. He, too, was met with intimidation from Defendant's staff. Before Alford had even had a chance to meet (by video) with counsel, TCSO staff took Alford out of his housing unit and interrogated him about what he planned to say to the ACLU. Deputies told Alford that because he refused to talk to the TCSO sergeant about his upcoming confidential legal visit, the video visit was cancelled.

139.     Shortly after, Alford was transferred to a high-security housing unit with incarcerated people facing far more serious charges than he. There, he was allowed out of his cell for only one hour per day—whereas in his previous non-high security unit, he could spend multiple hours per day outside of his cell. Neither Defendant nor his staff ever told Alford why he had been transferred to a high-security unit. Alford has since been transferred out of the high-security housing unit, but he still has the same high-security classification.

140.     Alford's transfer to the high-security unit was retaliation for attempting to speak with the ACLU about conditions in Tulare County Jails. Since being moved out of the high-security unit, Alford has not been able to speak with ACLU staff.

141.     Plaintiffs Adam Ibarra and Samuel Camposeco have also struggled to meet with their retained civil attorneys. On May 18, 2020 and May 28, 2020, Ibarra spoke with an ACLU investigator about his concerns. Not long after the second interview, one of the TCSO sergeants took Ibarra out of his housing unit, ostensibly to speak with a TCSO investigator about his conversations with the ACLU. Ibarra refused to speak with the investigator and was returned to his cell.

142.     Since then, Ibarra has not been able to meet confidentially with ACLU staff. Ibarra's only contact with ACLU attorneys takes place over recorded, non-confidential phone lines. And those conversations are constrained by his limited out-of-cell time.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

143.    Defendant's restrictions on Ibarra's ability to have confidential legal visits with ACLU staff have hindered his ability to report his concerns about the dangerous conditions in Tulare County Jails and to protect his civil and constitutional rights.

144.    In early June 2020, Plaintiff Camposeco called an ACLU investigator to whom Camposeco had previously sent a letter regarding conditions in Tulare County Jails. The ACLU investigator, however, has not been able to schedule a legal visit with Camposeco because Defendant has cancelled his confidential legal visits. Since then, Camposeco has not been able to meet with the ACLU in a confidential setting.  Camposeco can only write letters or call the ACLU attorneys and staff on a non-confidential line during the brief time he spends outside his cell each day. These restrictions have made it very difficult for Camposeco to contact ACLU attorneys and staff about the spread of COVID-19 in the Jails.

**B.    Defendant Issued a New Policy Designed to Frustrate Incarcerated People's Ability to Participate in Confidential Legal Visits in the Jails.**

145.    On June 4, 2020, in an attempt to further impede incarcerated people from pursuing legal action to challenge the unconstitutional conditions in Tulare County Jails, Defendant issued a memo outlining new restrictions on confidential professional visits.[58] Defendant's new policy makes it extremely difficult for attorneys to schedule confidential legal visits with incarcerated people. The policy narrowly limits confidential legal visits to "attorneys of record," on its face interfering with the attorney-client privilege at the most critical stage, *i.e.* the first meeting before an attorney has even entered an appearance on behalf of a client.

146.    ACLU attorneys have been blocked from meeting confidentially with incarcerated people in Tulare County Jails since the policy was implemented—and criminal defense attorneys have also found their clients' access cut off. The new policy, in concert with the systemic harassment and retaliation faced by incarcerated people who attempt to speak with attorneys, violates Plaintiffs' right to access the courts under the First and Fourteenth Amendments and their right to counsel under the Sixth Amendment.

---

[58]Tulare County Sheriff's Office Visitation Guidelines (Ex. 4).

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

147.    On Wednesday, July 8, 2020, an ACLU attorney scheduled confidential attorney video visits with three incarcerated people in Tulare County Jails. After becoming aware of Defendant's June 4 memo regarding new procedures for confidential video visits on Thursday, July 9, 2020, the attorney emailed Defendant's representative with all the required information and documentation to request a professional account to enable confidential attorney video visits with incarcerated people in Tulare County Jails.

148.    On Thursday, July 9, 2020, the attorney attempted to conduct a confidential attorney video visit with Ronald Howard, an incarcerated person in one of the Tulare County Jails. A prominent message displayed at the top of the video noted that the conversation was being recorded. At the beginning of the conversation, the attorney identified herself as an attorney with the ACLU and stated that she did not consent to the recording of the visit, which was a confidential attorney-client communication. However, because the message prominently indicated that the visit was recorded and not confidential, the attorney and Howard, a client, did not speak about confidential matters and cut the visit short.

149.    On Friday, July 10, 2020, an ACLU attorney received an email from Tulare County Jails canceling a confidential attorney video visit with a then-incarcerated person, Jack Ward. No explanation for the cancellation was included in the email. The attorney tried to contact Defendant's representatives by phone and email, but received no response.

150.    Later that same day, the attorney attempted a second time to speak confidentially with Ward. But no one appeared on the video feed—the screen remained blank. After approximately three minutes, the visit abruptly ended, and the attorney was not able to re-enter the video feed.  The attorney called Defendant's representative shortly after. This time, the attorney was told that the visits were cancelled because the attorney was not yet set up for confidential visits. Defendant's representative told the attorney that she would probably be approved on Monday, July 13, 2020, and would receive an email and phone call to let her know. But the attorney heard nothing from TCSO on Monday, July 13, 2020.

151.    On Tuesday, July 14, 2020, the attorney called Defendant's representative to inquire about the status of her professional account. She left a voicemail with her information and

1    requested a call back to follow up on the status of the confidential attorney video visits. On

2    Wednesday, July 15, 2020, the attorney called Defendant's staff again and left a voicemail in the

3    "video visitation" mailbox to inquire about the status of her professional account. On Thursday,

4    July 16, 2020, the attorney called Defendant's representative for a third day in a row and left a

5    voicemail in the "video visitation" mailbox to inquire about the status of her professional account.

6    On Friday, July 17, 2020, the attorney emailed Defendant's representative to inquire about the

7    status of her professional account.

8         152.    The attorney called Defendant's representative again on July 21, 2020, and again

9    left a voicemail in the "video visitation" mailbox. Later that afternoon—twelve days after the

10   initial request—the attorney finally received an email from TCSO stating that her account had

11   been confirmed, and that she was approved to schedule confidential legal visits with two clients,

12   Adam Ibarra and Samuel Camposeco. (She remains unapproved to visit seven others.)

13        153.    That evening, the attorney attempted to schedule visits with Ibarra and Camposeco.

14   But for every date or time she selected in the online form, she received an error message, stating:

15   "No stations available." As of the filing of this complaint—more than two weeks after the initial

16   request—the attorney still has not been able to conduct a confidential legal visit with any of her

17   clients in Tulare County Jails.

18        154.    The only way the ACLU attorney has been able to communicate with incarcerated

19   people in Tulare County Jails is if they call her on a recorded line.  At the beginning of every call,

20   she hears a message indicating the conversation is being recorded.  At the beginning of each

21   conversation, the attorney identifies herself as an attorney with the ACLU, and states that she and

22   her client do not consent to the recording of their confidential attorney-client communication.

23        155.    The deleterious impact of Defendant's policy extends beyond meetings with ACLU

24   attorneys. It has prevented incarcerated people at Tulare County Jails from speaking confidentially

25   with their criminal defense attorneys, thus impeding their constitutional right under the Sixth

26   Amendment to present a thorough case in their defense against criminal charges. Indeed, a defense

27   attorney who practices in the county has not been able to confidentially visit a single incarcerated

28   client at Tulare County Jails since Defendant implemented the new legal visiting policy. Plaintiffs

-39-

1   Ibarra and Camposeco have not been able to meet with *any* attorneys confidentially, criminal or

2   civil, since the promulgation of Defendant's new legal visitation policy.

3        156.    Defendant's legal visitation policy threatens to chill incarcerated people's assertion

4   of claims challenging the currently-unlawful conditions of their incarceration. Indeed, short of an

5   outright ban on speaking with a prospective attorney, it is hard to imagine a restriction better

6   calculated to discourage the formation of attorney client relationships relating to claims

7   concerning unlawful conditions of imprisonment, or more harmful to the vindication of the

8   substantive legal rights in question.

9        157.    Defendant has violated—and continues to violate—the constitutional rights of

10   Plaintiffs and potential class members to access the courts under the First and Fourteenth

11   Amendments and to defense counsel under the Sixth Amendment. Immediate injunctive relief is

12   crucial to restore confidential legal visits at Tulare County Jails and to cease Defendant's ongoing

13   constitutional violations.

14   **V.    Tulare County Jails are on the Brink of Disaster.**

15        158.    It is clear that Defendant's policies are not adequate to prevent the spread of

16   COVID-19 in the jails, or to protect Medically Vulnerable people. Defendant refuses to test

17   currently incarcerated people or to quarantine them upon arrival. He actively prevents incarcerated

18   people from wearing masks. And although the jail currently has space for incarcerated people to

19   spread out, Defendant has prioritized costs over implementing necessary social distancing in the

20   housing units. He has not provided adequate sanitation supplies, and has said, over and over again,

21   that he will not consider releases. He has done this while hiding from public scrutiny at every turn,

22   including through interfering with incarcerated people's right to access counsel and the courts.

23        159.    Defendant has violated—and continues to violate—the rights of Plaintiffs and the

24   class they seek to represent under the First, Sixth, Eighth, and Fourteenth Amendments to the

25   United States Constitution. These violations have already resulted in 11 people becoming ill with

26   COVID-19 in Tulare County Jails, and risk causing even more avoidable pain, illness, and death.

27   Immediate action by this court is required to prevent this possibility from occurring.

28

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

160.     Because of Defendant's ongoing, systemic violations of Plaintiffs' constitutional rights, Plaintiffs seek class-wide relief requiring Defendant to join other jurisdictions in enlarging some portion of the current population to home confinement and to implement other basic policies and procedures that would mitigate the risks of COVID-19 to Plaintiffs' health and safety. Plaintiffs also seek class-wide relief requiring Defendant to allow incarcerated people at Tulare County Jails meaningful access to legal counsel.

## CLASS ALLEGATIONS

161.     Pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2), Plaintiffs bring this action as a class consisting of all people who are now, or in the future will be, incarcerated in Tulare County Jails, including as subclasses: (i) persons confined pre-trial, (ii) persons confined pursuant to a judgment of conviction, and (iii) Medically Vulnerable persons confined pre-trial and pursuant to a judgment of conviction. Plaintiffs reserve the right to amend the class definition or establish additional subclasses as appropriate if discovery or further investigation reveals the class should be expanded or otherwise modified.

162.     <u>Numerosity</u>: The class is so numerous that joinder is impracticable. Based upon information and belief, the size of the class is at least 1,900 people and is therefore so numerous that joinder is inherently impracticable for that reason alone. Joinder is also inherently impracticable for other, independent reasons. The class includes unnamed, future class members who cannot by definition be joined. Further, proposed class members are highly unlikely to file individual suits on their own, as all are incarcerated and many are indigent, and thus have limited access to their retained or court-appointed counsel due to Defendant's policies, are currently incarcerated, fear retaliation from filing suits against Defendant, and lack access and financial resources to obtain qualified counsel to bring such suits.

163.     <u>Commonality</u>: The claims of the class share common issues of fact and law, including but not limited to whether Defendant's policies regarding health and hygiene as relevant to the COVID-19 pandemic—policies that systemically affect all proposed class members— violate the Eighth and Fourteenth Amendments to the United States Constitution, and whether Defendant's policy regarding access to counsel violates the First and Fourteenth Amendments to

1  the United States Constitution. The resolution of these questions will drive the outcome of the

2  litigation.

3      164.    Typicality: The claims of Plaintiffs are typical of those of the class as a whole,

4  because each Plaintiff is currently in Defendant's custody and Plaintiffs' claims arise from the

5  same policies and procedures (or lack thereof) that provide the basis for all proposed class

6  members' claims.

7      165.    Adequacy: Plaintiffs are adequate class representatives who meet all of the

8  requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other class

9  members. They will fairly and adequately represent the interests of the class, and each understands

10 the responsibilities of a representative. Counsel for Plaintiffs will vigorously prosecute the

11 interests of the class and include attorneys with extensive experience with the factual and legal

12 issues involved in representing jail and prison inmates, in asserting constitutional rights, and/or in

13 pursuing class actions.

14                          **CAUSES OF ACTION**

15                          **FIRST CLAIM FOR RELIEF**

16                  **42 U.S.C. § 1983—FOURTEENTH AMENDMENT**

17     166.    The Fourteenth Amendment to the United States Constitution guarantees pretrial

18 detainees the right to be free from punitive conditions of confinement.

19     167.    Defendant is violating Plaintiffs' and the proposed class members' Fourteenth

20 Amendment rights because he "recklessly failed to act with reasonable care to mitigate the risk

21 that the condition posed to the pretrial detainee even though the defendant-official knew, or should

22 have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*,

23 849 F.3d 17, 35 (2d Cir. 2017).

24     168.    Defendant is also violating Plaintiffs' and the proposed class members' Fourteenth

25 Amendment rights because "the challenged governmental action is not rationally related to a

26 legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v.*

27 *Hendrickson*, 576 U.S. 389, 398-99 (2015).

28

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

169.    Defendant has recklessly failed to act with reasonable care to mitigate the risk of COVID-19 to Plaintiffs and proposed class members.

170.    Defendant knew, or should have known, about the substantial risks COVID-19 poses to Plaintiffs and the proposed class members' health and safety, yet he disregarded those risks.

171.    Defendant has acted with deliberate indifference towards Plaintiffs and proposed class members by failing adequately to safeguard their health and safety.

172.    Defendant has exposed Plaintiffs and proposed class members to a substantial—indeed grave—risk of serious harm, including death.

173.    Defendant has subjected Plaintiffs and proposed class members to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine, treatment, or cure.

174.    Defendant's continued detention of Plaintiffs and proposed class members fails to protect them adequately from the risks of contracting COVID-19.

175.    As a result of Defendant's unconstitutional actions, Plaintiffs and the proposed class are suffering irreparable injury.

## SECOND CLAIM FOR RELIEF

## 42 U.S.C. § 1983—EIGHTH AMENDMENT

176.    The Eighth Amendment to the United States Constitution protects Plaintiffs and proposed class members from cruel and unusual punishment.

177.    To amount to the infliction of cruel and unusual punishment, (1) jail or prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test), and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test). *Helling v. McKinney*, 509 U.S. 25,  33–35 (1993).

178.    Plaintiffs and proposed class members are subject to a risk of harm that today's society does not tolerate.

179.    Society does not tolerate the risk of exposure to COVID-19 to which Defendant's policies and procedures (or lack thereof) have subjected Plaintiffs and proposed class members.

1    180.    Plaintiffs and proposed class members suffer a substantial risk of serious harm to

2   their health and safety due to the presence of, and spread of, COVID-19.

3    181.    Defendant has acted with deliberate indifference to the risks posed to Plaintiffs and

4   proposed class members by COVID-19.

5    182.    Defendant at all times knew, or should have known, of the risks that COVID-19

6   poses to Plaintiffs and proposed class members.

7    183.    The risk of COVID-19 was, and is, obvious to Defendant.

8    184.    Defendant's response to COVID-19 has not been reasonable.

9    185.    As a result of Defendant's actions, Plaintiffs and proposed class members are

10   suffering irreparable injury.

11   **THIRD CLAIM FOR RELIEF**

12   **42 U.S.C. § 1983—FIRST AND FOURTEENTH AMENDMENTS**

13    186.    The First Amendment to the United States Constitution protects the rights of

14   Plaintiffs and the proposed class members "to petition the government for a redress of

15   grievances," a right that requires meaningful access to the courts. Plaintiffs and proposed class

16   members also have a right to meaningfully access the courts under the Fourteenth Amendment to

17   the United States Constitution.

18    187.    Through his policies and practices, Defendant has actively interfered with the

19   ability of Plaintiffs and proposed class members to exercise their right to meaningfully access the

20   courts.

21    188.    As a result of Defendant's actions, Plaintiffs and proposed class members are

22   suffering an actual injury.

23   **FOURTH CLAIM FOR RELIEF**

24   **42 U.S.C. § 1983—SIXTH AMENDMENT**

25    189.    The Sixth Amendment to the United States Constitution protects the right of

26   Plaintiffs and proposed class members to the assistance of counsel for defense against criminal

27   charges.

28

190.    Through his policies and practices, Defendant has actively interfered with the ability of Plaintiffs and proposed class members to exercise their right to access the assistance of counsel for their defense against criminal charges.

191.    As a result of Defendant's actions, Plaintiffs and proposed class members are suffering an actual injury.

## FIFTH CLAIM FOR RELIEF

### BANE ACT (Cal. Civ. Code § 52.1(b))

192.    The Bane Act allows an individual to bring a civil action for injunctive and other appropriate relief "[i]f a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion with the exercise or enjoyment by any individual or individuals of rights" secured by the constitutions or laws of the United States or California. Cal. Civ. Code § 52.1(b).

193.    Defendant has interfered or attempted to interfere by threat, intimidation, or coercion with the right of Plaintiffs and proposed class members to meaningful access to the courts guaranteed by the First and Fourteenth Amendments to the Constitution, the right of Plaintiffs and proposed class members to access defense counsel under the Sixth Amendment, and the right of Plaintiffs and proposed class members to initiate civil actions as plaintiffs under California Penal Code § 2601(d).

194.    As a result of Defendant's actions, Plaintiffs and proposed class members are suffering an actual injury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs and proposed class members respectfully request that the Court:

A.    **Certify the proposed class and subclasses;**

B.    **Enter a temporary restraining order, preliminary injunction, and permanent injunction and/or a writ of habeas corpus requiring Defendant to:**

1.     Immediately take all actions within his power to release Medically Vulnerable people incarcerated at the Tulare County Jails absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate. This includes, but is not limited to, releasing as many Medically Vulnerable people as possible to home confinement pursuant to California Government Code § 8658;

2.     Appoint an expert under Federal Rule of Evidence 706 to make recommendations to the Court regarding how many and which class members to order released so as to ensure that the number of prisoners remaining at the Tulare County Jails can be housed consistently with CDC guidance on best practices to prevent the spread of COVID-19, including the requirement that prisoners be able to maintain six feet of space between them and further order that such recommendations take into account CDC guidance concerning health factors that put individuals at elevated risk of death from COVID-19;

3.     Conduct COVID-19 testing of all incarcerated people and staff at Tulare County Jails facilities;

4.     Provide access to unmonitored, confidential legal calls and video visits with retained and prospective counsel;

5.     Facilitate video conferencing and telephonic conferencing, when requested, as an alternative to in-person court appearances;

6.     Develop a Jails-specific policy for contact tracing in the event of an outbreak;

7.     Ensure that each incarcerated person receives, free of charge, an individual supply of hand soap, sufficient to allow frequent hand washing; cloth face coverings; paper towels; toilet paper; running water; and facial tissue;

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

8.      Ensure that all incarcerated people, when not in cells with access to hand soap and running water, have access to hand sanitizer containing at least 60% alcohol;

9.      Provide access to daily showers for each incarcerated person and daily access to clean laundry, including clean personal towels and washrags after each shower;

10.     Require that all Tulare County Jails staff wear personal protective equipment, including masks and gloves, when interacting with visitors and incarcerated people or when touching surfaces in common areas;

11.     Provide an anonymous mechanism for residents to report staff who violate these guidelines so that appropriate corrective action can be taken to ensure staff compliance;

12.     Take each incarcerated person's temperature daily (with a functioning and properly operated thermometer) to identify potential COVID-19 infections;

13.     Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the manufacturer's recommended concentration), as well as surfaces in common areas, every two hours during waking hours, and at least once during the night;

14.     Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

15.     Respond to all emergency (as defined by the medical community) requests for medical attention within an hour; and

16.    Appoint an independent monitor with medical expertise to ensure compliance with these conditions, and provide the monitor with unfettered access to medical units, confidential communication with detained individuals in and out of quarantine, and surveillance video of public areas of the facilities; and

C.    **Award such further relief as this Court deems appropriate.**

DATED:  July 29, 2020                              MUNGER, TOLLES & OLSON LLP


By:      */s/ Sara A. McDermott*
                                                        Sara A. McDermott
                                                        Attorneys for Plaintiffs

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS