1  JACOB S. KREILKAMP (State Bar No. 248210)
   jacob.kreilkamp@mto.com
2  WILLIAM D. TEMKO (State Bar No. 98858)
   william.temko@mto.com
3  SARA A. McDERMOTT (State Bar No. 307564)
   sara.mcdermott@mto.com
4  OMAR H. NOURELDIN (State Bar No. 301549)
   omar.noureldin@mto.com
5  ARIEL T. TESHUVA (State Bar No. 324238)
   ariel.teshuva@mto.com
6  ESTALYN S. MARQUIS (State Bar No. 329780)
   estalyn.marquis@mto.com
7  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
8  Fiftieth Floor
   Los Angeles, California 90071-3426
9  Telephone: (213) 683-9100
   Facsimile: (213) 687-3702
10

11 KATHLEEN GUNERATNE (State Bar No. 250751)
   KGuneratne@aclunc.org
   AMY GILBERT (State Bar No. 316121)
12 AGilbert@aclunc.org
   ACLU FOUNDATION OF NORTHERN CALIFORNIA
13 39 Drumm Street
   San Francisco, CA 94111
14 Telephone: (415) 621-2493

15 *Attorneys for Plaintiffs*

16                    UNITED STATES DISTRICT COURT

17                   EASTERN DISTRICT OF CALIFORNIA

18 | Charles Criswell, et al., | Case No. 1:20-cv-01048-DAD-SAB |

19 |            Plaintiffs, | **PLAINTIFFS' EX PARTE NOTICE OF MOTION AND MOTION FOR** |

20 |        vs. | **TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION; MEMORANDUM OF** |

21 | Michael Boudreaux, in his official capacity as Sheriff of Tulare County, | **POINTS AND AUTHORITIES** |

22 |            Defendant. | Filed concurrently with TRO Checklist; |

23 | | [Proposed] Temporary Restraining Order and Order to Show Cause re Preliminary Injunction |

24

25 | | Judge:    Hon. Dale A. Drozd
      Date:
26 | | Time:
      Crtrm.:   5

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that organizational Plaintiff California Attorneys for Criminal Justice, and Plaintiffs Charles Criswell, Levi Johnson, Adam Ibarra, and Samuel Camposeco, individually and on behalf of all others similarly situated, apply ex parte for a Temporary Restraining Order requiring Defendant Michael Boudreaux to implement CDC-compliant policies for effectuating social distancing and the immediate testing of incarcerated people in the Tulare County Jails, and cessation of his interference in their rights to access counsel and this Court, pursuant to Federal Rule of Civil Procedure 65 and Local Rule 231.

This Motion is based upon this Notice, the Memorandum of Points and Authorities, the declarations and exhibits filed in support thereof, Plaintiffs' Complaint, the filings in this action, the Proposed Order, which is being filed in accordance with Local Rule 231 and lodged in accordance with Local Rule 137, and any and all evidence, argument, or other matters that may be presented at the hearing.

On August 11, 2020, Sara McDermott, counsel for Plaintiffs, met and conferred with counsel for Defendant Kathleen A. Taylor by telephone and gave notice of Plaintiffs' ex parte application. *See* Ex. 1 (Declaration of Sara McDermott ("McDermott Decl.")) ¶¶ 4–7. As outlined in the McDermott Declaration, counsel continue to meet and confer regarding Plaintiffs' request, originally included in Plaintiffs' requested relief, that Defendant draft a CDC-compliant written masking policy substantially reflecting the current practice within the Jails. *Id.* ¶ 7. As to Plaintiffs' remaining requests, counsel have reached an impasse. *Id.* Plaintiffs' counsel advised that Plaintiffs would be moving for a Temporary Restraining Order as to those requests. *Id.*

DATED: August 12, 2020                    MUNGER, TOLLES & OLSON LLP


By:    /s/ Sara A. McDermott
          Sara A. McDermott
          Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 2

  A.  Defendant Continues to Transfer Incarcerated People to Two Overcrowded
      Jails Despite Available Space Elsewhere .................................................. 3

  B.  Defendant's Testing Policy: If You Don't Test, You Get No Positives ................ 4

  C.  Intentional Interference with Access to Courts and Counsel .......................... 8

    1.  Defendant's Attorney Visitation Policy Was Designed to—and Had
        the Effect of—Chilling Incarcerated People's Access to Courts and
        Counsel ......................................................................................... 8

    2.  Defendant Has Intimidated, Interrogated, and Retaliated Against
        Incarcerated People Seeking to Exercise Constitutional Rights ................ 10

III.  ARGUMENT ................................................................................................. 11

  A.  Plaintiffs and the Proposed Class Are Likely to Succeed on the Merits ............ 12

    1.  Defendant Is Deliberately Indifferent to Plaintiffs' Serious Medical
        Needs, In Violation of the Fourteenth and Eighth Amendments ................ 13

      a.  Defendant's Decision to *Increase* Overcrowded Conditions
          During the Pandemic Is Deliberate Indifference ........................... 17

      b.  Defendant's Refusal to Test the Vast Majority of Detainees
          is Deliberately Indifferent .................................................... 17

    2.  Defendant's Active Interference with Plaintiffs' Attempts to Meet
        with Counsel Violates Their First, Sixth, and Fourteenth
        Amendment Rights, and Also Runs Afoul of the Bane Act ..................... 19

    3.  Exhaustion Requirements Do Not Bar Relief ...................................... 21

  B.  Plaintiffs and Proposed Class Members Will Suffer Irreparable Harm ............ 22

  C.  The Balance of Equities and Public Interest Both Favor Plaintiffs and the
      Proposed Class .................................................................................. 23

  D.  Good Cause Exists to Grant Plaintiffs Early Discovery ............................... 24

IV.  CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ............................................................................11, 12

*Apple Inc. v. Samsung Elecs. Co.,*
No. 11-CV-01846-LHK, 2011 WL 1938154 (N.D. Cal. May 18, 2011) ..................24

*Banks v. Booth,*
No. CV 20-849 (CKK), 2020 WL 3303006 (D.D.C. June 18, 2020) .................17, 23

*Benjamin v. Fraser,*
264 F.3d 175 (2d Cir. 2001) ...................................................................................20

*Bent v. Barr,*
No. 19-cv-06123, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) ..............................23

*Bounds v. Smith,*
430 U.S. 817 (1977) .................................................................................................19

*Bradley v. Hall,*
64 F.3d 1276 (9th Cir. 1995) ...................................................................................19

*Brown v. Plata,*
563 U. S. 493 (2011) ................................................................................................23

*Cameron v. Bouchard,*
No. 20-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) .........................15, 16

*Carranza v. Reams,*
No. 20-CV-00977-PAB, 2020 WL 2320174 (D. Colo. May 11, 2020) ...................17

*Casey v. Lewis,*
4 F.3d 1516 (9th Cir. 1993) ...............................................................................19, 20

*Castillo v. Barr,*
2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ........................................................23

*Castro v. Cnty. of L.A.,*
833 F.3d 1060 (9th Cir. 2016) .................................................................................16

*Ching v. Lewis,*
895 F.2d 608 (9th Cir. 1990) ...................................................................................19

*In re Countrywide Fin. Corp. Derivative Litig.,*
542 F. Supp. 2d 1160 (C.D. Cal. 2008) ..................................................................24

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*,
489 U.S. 189 (1989) ..................................................................................................12

*Doe v. Barr*,
No. 20-cv-02141, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) ............................23

*Duvall v. Dallas Cnty., Tex.*,
631 F.3d 203 (5th Cir. 2011) ...................................................................................18

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................................................................22

*Farmer v. Brennan*,
511 U.S. 825 (1994) .....................................................................................12, 13, 15

*Fraihat v. U.S. Immigr. & Customs Enforcement*,
No. 19-CV-1546 JGB, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ....................22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..................................................................................................18

*Frontline Med. Assoc., Inc. v. Coventry Healthcare Workers Comp., Inc.*,
620 F.Supp.2d 1109 (C.D. Cal. 2009)......................................................................12

*Gantt v. City of L.A.*,
717 F.3d 702 (9th Cir. 2013)....................................................................................16

*Gordon v. Cnty. of Orange*,
888 F.3d 1118 (9th Cir. 2018)......................................................................13, 14, 16

*Hall v. Mims*,
No. 1:11-CV-02047-LJO-BAM, 2012 WL 1498893 (E.D. Cal. Apr. 27, 2012) ......25

*Helling v. McKinney*,
509 U.S. 25 (1993) .......................................................................................12, 13, 22

*Hernandez v. Cnty. of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015) .....................................................................16

*Hutto v. Finney*,
437 U.S. 678 (1978) ..................................................................................................13

*Interserve, Inc. v. Fusion Garage PTE, Ltd.*,
No. C 09-05812 JW (PVT), 2010 WL 143665 (N.D. Cal. Jan. 7, 2010)..................24

*Kaur v. U.S. Dep't of Homeland Sec.*,
No. 2:20-cv-03172, 2020 WL 1939386 (C.D. Cal. April 22, 2020) .........................23

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) ........................................................................................16

*King v. Cnty. of L.A.*,
    885 F.3d 548 (9th Cir. 2018) ............................................................................................3

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ........................................................................................23

*L'Oreal USA Creative, Inc. v. Tsui*,
    No. 16-cv-8673 FMO, 2016 WL 9275404 (C.D. Cal. Dec. 22, 2016) ...........................25

*Laureau v. Manson*,
    651 F.2d 96 (2d Cir. 1981) .............................................................................................18

*Malibu Media, LLC v. Doe*,
    319 F.R.D. 299 (E.D. Cal. 2016) ...................................................................................24

*Martinez-Brooks v. Easter*,
    No. 3:20-cv-00569, 2020 WL 2405350 (D. Conn. May 12, 2020) ...........................15, 17

*Mays v. Dart*,
    No. 20-C-2134, 2020 WL 1812381 (N.D. Ill. Apr. 9, 2020) ........................................23

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ....................................................................................22, 24

*Morales Feliciano v. Rosselló Gonzáles*,
    13 F. Supp. 2d 151 (D.P.R. 1998) ..................................................................................17

*Muhammad v. Garrett*,
    66 F. Supp. 3d 1287 (E.D. Cal. 2014) ............................................................................21

*Norton v. LVNV Funding, LLC*,
    396 F. Supp. 3d 901 (N.D. Cal. 2019) ...........................................................................18

*Rep. of the Phil. v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ..........................................................................................2

*Rodde v. Bonta*,
    357 F.3d 988 (9th Cir. 2004) ..........................................................................................22

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ........................................................................................23

*Ross v. Blake*,
    136 S. Ct. 1850 (2016) ....................................................................................................22

<u>**TABLE OF AUTHORITIES**</u>
**(Continued)**

<u>**Page(s)**</u>

*Sas v. Sawabeh Info. Servs. Co.*,
   No. 11-cv-04147 GAF, 2011 WL 13130013 (C.D. Cal. May 17, 2011) ..................................25

*Silva v. Di Vittorio*,
   658 F.3d 1090 (9th Cir. 2011) .........................................................................................19, 21

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) .................................................................................................12

*Texas v. Cobb*,
   532 U.S. 162 (2001) ...............................................................................................................20

*Thakker v. Doll*,
   No. 20-cv-0480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ...........................................23

*Torres v. Milusnic*,
   No. 20-cv-4450-CBM-PVC(x), 2020 WL 4197285 (C.D. Cal. July 14, 2020) ........................15

*United States v. Erie Cnty., NY*,
   No. 09-CV-849S, 2010 WL 11578742 (W.D.N.Y. Mar. 6, 2010).........................................25

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) .................................................................................................................2

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................11, 12

**STATE CASES**

*Cornell v. City & Cnty. of San Francisco*,
   17 Cal. App. 5th 766, 804 (2017).........................................................................................21

*Smith v. Ogbuehi*,
   38 Cal. App. 5th 453, 465 (2019).........................................................................................20

**FEDERAL STATUTES**

Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)........................................................................21

**STATE STATUTES**

Cal. Civ. Code § 52.1 ...............................................................................................................20, 21

Cal. Pen. Code § 2601 ..................................................................................................................20

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

**FEDERAL RULES**

Fed. R. Civ. P. 26 ...................................................................................................................24

Fed. R. Civ. P. 65 ...................................................................................................................11

**CONSTITUTIONAL PROVISIONS**

First Amendment..............................................................................................................19, 21

Sixth Amendment......................................................................................................................20

Eighth Amendment ............................................................................................................14, 16

Fourteenth Amendment ....................................................................................13, 14, 19, 22

**OTHER AUTHORITIES**

California Department of Public Health, COVID-19: Cases (last visited Aug. 10,
   2020), https://public.tableau.com/views/COVID-
   19CasesDashboard_15931020425010/Cases?:embed=y&:showVizHome=no..........................5

Centers for Disease Control and Prevention, Cases in the U.S., Coronavirus Disease
   2019, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-
   us.html ....................................................................................................................................2

Governor Newsom Declares State of Emergency to Help State Prepare for Broader
   Spread of COVID-19, Office of Governor Gavin Newsom (March 4, 2020),
   https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-
   emergency-to-help-state-prepare-for-broader-spread-of-covid-19/ .........................................14

Tulare County Sheriff's Office: Bob Wiley Detention Facility (Bob Wiley), Main
   Jail, Men's Correctional Facility, the Pre-Trial Facility, and South County
   Detention Facility (South County). Tulare County Sheriff, Detentions,
   https://tularecounty.ca.gov/sheriff/index.cfm/divisions/detentions1/. .........................................1

# I.     INTRODUCTION

Plaintiffs bring this action to prevent avoidable illness and death from COVID-19 among people incarcerated at Tulare County Jails. Plaintiffs challenge Defendant Sheriff Michael Boudreaux's callous indifference to their health and safety, and his callow attempts to prevent them from challenging his unconstitutional practices in court. Plaintiffs, like all Americans in this pandemic, have a right to be safe and to protect themselves as best they can from a novel and frightening disease. But as long as Defendant continues to ignore the widely-known risks of COVID-19 in Tulare County Jails,[1] the lives of Plaintiffs, and the class they seek to represent, will remain imperiled.

Defendant's indifference to Plaintiffs' and the prospective class members' health is particularly notable in two regards:

*First*, contrary to the advice of the CDC, Defendant has actually worked to *increase* overcrowding in the Jails. In just the past two weeks, Defendant has directed 148 incarcerated people be transferred out of the Main Jail and into the other three active jails (*i.e.*, Bob Wiley, the Pre-Trial Facility, and South County). These transfers have resulted in a marked increase in the populations of Bob Wiley and the Pre-Trial Facility to nearly 80% of their rated capacity—despite the fact that the Jails as a whole are at only 57% of rated capacity. What's more, Defendant has not tested the vast majority of the 148 incarcerated people that he transferred before initiating the transfers. Far from providing for social distancing, Defendant, by initiating transfers without testing, has actively encouraged the spread of the disease in the resultantly overcrowded dorms and cell blocks.

*Second*, Defendant has administered an inadequate and dangerously low number of COVID tests—about 150 tests in total since the pandemic began—and those tests have been administered only in the Pre-Trial Facility. Incarcerated people in the remaining jails have been

---

[1] The term "Tulare County Jails" refers to the five detention facilities managed by the Tulare County Sheriff's Office: Bob Wiley Detention Facility (Bob Wiley), Main Jail, Men's Correctional Facility, the Pre-Trial Facility, and South County Detention Facility (South County). Tulare County Sheriff, Detentions, https://tularecounty.ca.gov/sheriff/index.cfm/divisions/detentions1/.

denied tests despite exhibiting multiple symptoms of COVID-19. Instead they are flippantly told —contrary to all evidence—that "incarcerated people [are] not likely to get sick from the coronavirus . . . ." Ex. 16 (Declaration of Adam Ibarra ("Ibarra Decl.")) ¶ 11.

At the same time Defendant has ensured conditions are ripe for an outbreak in his Jails, he has also sought to deter incarcerated people from seeking redress in this Court. Incarcerated people seeking to meet with their attorneys have faced armed interrogation, dangerous work reassignments, and unwarranted and retaliatory reclassifications. When those didn't work, Defendant implemented a Kafkaesque visitation policy that continues to prevent counsel from meeting with incarcerated people. The lack of access to counsel has made it extremely difficult for Plaintiffs' to pursue relief on behalf of themselves and the proposed class.

The spread of COVID-19 in Tulare County's Jails threatens both incarcerated people in the Jails and people in the surrounding community: Jails staff, volunteers, and others travel in and out daily, potentially carrying COVID-19 beyond the prison walls. Immediate action is thus necessary to prevent needless suffering and death inside and out of the Jails, and to allow incarcerated people in the Tulare County Jails to exercise their constitutional right to access the courts. Defendant must immediately reduce overcrowding by using the available space in the Jails to facilitate social distancing; conduct universal testing to prevent the spread of COVID-19; and allow confidential attorney visits to proceed immediately without intimidation or the threat of retaliation.

## II.    FACTUAL BACKGROUND

COVID-19 is terribly dangerous. The virus has already killed more than 165,000 people in the United States, and it may cause long-term organ damage even in people who present with minimal or no symptoms.[2] Congregate living facilities, like the Tulare County Jails, are at particularly high risk. Ex. 2 (Declaration of Dr. Joe Goldenson ("Goldenson Decl.")) ¶ 13.

_____

[2] Centers for Disease Control and Prevention, *Cases in the U.S., Coronavirus Disease 2019,* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. A temporary restraining order is customarily granted on the basis of evidence that is less complete than what is presented at a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court may consider hearsay and otherwise inadmissible evidence when considering whether to issue a preliminary injunction. *Rep. of the Phil. v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

1    Yet Defendant continues to operate the Jails as if it's 2019, refusing testing, and crowding

2    individuals into tight quarters despite the well-known and obvious risks. Without this Court's

3    immediate intervention, Plaintiffs and the members of the proposed class face the high likelihood

4    of needless suffering from the virus—and in some cases, even death.

5    **A.    Defendant Continues to Transfer Incarcerated People to Two Overcrowded**

6    **Jails Despite Available Space Elsewhere**

7    Social distancing is a "cornerstone of reducing transmission of respiratory diseases such as

8    COVID-19." Ex. 1 (McDermott Decl.)  ¶ 8, Ex. C at 4. The CDC recommends that correctional

9    facilities reassign bunks to allow for six feet of space between individuals, and to the extent

10   possible, minimize the number of people housed in the same room. *Id.* at 10–11. The CDC

11   recommends ensuring that there is no mixing among housing units by staggering meals and

12   modifying work details. *Id.* Correctional institutions should modify group activities and the

13   delivery of medical services to increase opportunities for social distancing. *Id.* These and other

14   strategies can reduce the risk of transmission even in inherently dangerous settings like

15   correctional institutions. *Id.*

16   Right now, the population of the Tulare County Jails is only 57% of the Jails' total rated

17   capacity. Ex. 1 (McDermott Decl.) ¶ 13. Yet despite the available space, Defendant crams

18   incarcerated people in overcrowded housing units, including barracks-style dormitories and cells.

19   In these close quarters, it is impossible for incarcerated people to maintain at least six feet of

20   distance between themselves at any time. *See, e.g.*, Ex. 16 (Ibarra Decl.) ¶ 3 (reporting that nearly

21   all the cells in his unit are full); Ex. 22 (Declaration of Larry Robinson ("Robinson Decl.")) ¶ 4;

22   Ex. 19 (Declaration of Martin Martinez ("Martinez Decl.")) ¶ 3. So many people are locked

23   together that incarcerated people also cannot keep their distance on the yard or in other common

24   areas. Ex. 19 (Martinez Decl.) ¶¶ 7, 11. Plaintiff Camposeco reports that his "unit is very full and

25   deputies don't seem to care that we are all crowded together" despite incarcerated people's

26   complaints. Ex. 11 (Declaration of Samuel Camposeco ("Camposeco Decl.")) ¶¶ 3, 13. Defendant

27   

28   The Court may also take judicial notice of publicly accessible websites. *See King v. Cnty. of L.A.*, 885 F.3d 548, 555 (9th Cir. 2018).

EX PARTE APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1    continues to book new people into the Jails and transfer them into the already-crowded units,

2    despite significant available space elsewhere in the Jails. Ex. 19 (Martinez Decl.) ¶ 12.

3         Nor does Defendant separate out medically vulnerable people—those with certain

4    preexisting conditions, and those over age 55—who are at particularly high risk from COVID-19.

5    Ex. 2 (Goldenson Decl.) ¶ 22. Defendant has not disclosed how many medically vulnerable people

6    are currently incarcerated in Tulare County, but the number may be in the hundreds.[3] None are

7    afforded even basic CDC-recommended protections for their condition, and all continue to be

8    packed indiscriminately among the general population.

9         Indeed, Defendant appears to have begun intentionally *increasing* crowding in three of the

10   Jails, despite CDC's recommendations for social distancing. From July 25 to August 1, 2020, the

11   total population of the Jails remained stable. Yet during that week, Defendant inexplicably moved

12   148 individuals from the Main Jail to Bob Wiley, the Pre-Trial Facility, and South County. Ex. 1

13   (McDermott Decl.) ¶ 13. As a result of the moves, Bob Wiley's population increased from 72% of

14   rated capacity to 80% of rated capacity—and the population of the Pre-Trial Facility (where 22

15   people have tested positive for COVID-19) skyrocketed from 56% to 74% of rated capacity. *Id.*

16   Meanwhile, the population of the Main Jail plunged from 61% to only 6% of rated capacity. *Id.*

17   These transfers were accomplished *without* any prior testing of the transferees. *Id.*

18        Despite the clear and obvious danger, and despite the fact that the Jails are significantly

19   underpopulated, Defendant continues to crowd incarcerated people together in tight spaces,

20   significantly increasing the opportunities for transmission of COVID-19. Defendant's

21   intentionally cruel transfer policy puts incarcerated people's health at extreme risk.

22        **B.      Defendant's Testing Policy: If You Don't Test, You Get No Positives**

23        Nearly six months into the pandemic, Defendant has tested a mere 153 people in his care—

24   out of a high-turnover jail population that hovers somewhere north of 1,000. *See* Ex. 1

---

26   [3] Defendant reports that the following incarcerated people have conditions that make them
27   medically vulnerable: 31 have chronic lung disease or moderate to severe asthma, 2 are
     immunocompromised, 30 people have severe obesity, 46 people have diabetes, and 60 people have
28   liver disease. *See* Ex. 7 (Declaration of Dylan Verner-Crist ("Verner-Crist Decl.")) ¶ 19, Ex. F at 1.
     Tulare County has not disclosed the number of incarcerated people over the age of 55.

1  (McDermott Decl.) ¶¶ 10–11, Ex. E at 1; *id.* Ex. F at 1.  Defendant's refusal to implement

2  widespread testing, including prior to initiating transfers, is both ineffective and dangerous. The

3  CDC recommends that facilities test anyone before transferring them to another facility—

4  especially if there is a risk that they are transferred to a facility with medically vulnerable people.

5  *See* Ex. 1 (McDermott Decl.) ¶ 9, Ex. D at 4; *see also* Ex. 3 (Declaration of Jaimie Meyer ("Meyer

6  Decl.")) ¶ 19. The CDC also recommends testing before release. *See* Ex. 1 (McDermott Decl.) ¶ 9,

7  Ex. D at 4.

8         For individuals already incarcerated in the facility, the CDC recommends testing

9  symptomatic individuals and close contacts of anyone with a confirmed case of COVID-19. *Id.* at

10  2–3. Because correctional and detention facilities "have potential for rapid and widespread

11  transmission of SARS-CoV-2," and contact tracing can be resource-intensive, the CDC

12  recommends "a broader testing strategy, beyond testing only close contacts within the facility to

13  reduce the chances of a large outbreak." *Id.* at 3. Thus, "[b]aseline testing for all" incarcerated

14  people is recommended when there is a moderate to high level of community transmission, *id.*at

15  4—which Tulare County has.[4] Baseline testing is particularly important because over a quarter of

16  those infected with COVID-19 may be asymptomatic but still transmit the virus. Ex. 2 (Goldenson

17  Decl.) ¶ 18. Thus, experts also recommend that correctional facilities conduct an initial test of all

18  people living and working in a correctional facility, and conduct regular follow-up testing, in order

19  to prevent the spread of the disease. Ex. 3 (Meyer Decl.) ¶ 19.

20         Defendant's policies fall far short of these standards. Defendant has refused to conduct

21  even the initial testing that experts recommend—despite a letter from the Tulare County Superior

22  Court requesting that he do so. *See* Compl. Ex. 1 at 50, 52. As of July 7th, the stated policy of

23  Defendant's medical provider, Wellpath, was to deny COVID-19 testing unless an incarcerated

24

25  _____

26  [4] Tulare County has a 16.7%, 7-day positivity rate for the period of July 19–July 25. Ex. 1
    (McDermott Decl.) ¶ 17, Ex. K at 1. By contrast, the test positivity rate in California is less than

27  half that, with a 5.8% 7-day positivity rate. *See* California Department of Public Health, COVID-
    19: Cases (last visited Aug. 10, 2020), https://public.tableau.com/views/COVID-

28  19CasesDashboard_15931020425010/Cases?:embed=y&:showVizHome=no. Tulare County's test
    positivity rate is currently twice California's target rate of 8% (or less).

person was actively symptomatic, as defined by Wellpath. *See* Ex. 7 (Declaration of Dylan Verner-Crist ("Verner-Crist Decl.")) ¶ 18, Ex. E at 41. To receive a test, incarcerated people must present with specific symptoms: The patient must have a cough, shortness of breath, or difficulty breathing, *or* at least two of the following symptoms: fever of 100 degrees Fahrenheit or greater, repeated shaking with chills, congestion or runny nose, new loss of taste or smell, chills, sore throat, nausea, headache, muscle pain, or diarrhea. *See id.*; *id.* ¶ 20, Ex. H at 107 (example of use of screening form Assessment in practice). When there is no fever, Wellpath operators are to use "clinical judgment" in determining whether to test for COVID-19. *Id.* Ex. E at 41 (small print). This policy entirely ignores the possibility that COVID-19 may be transmitted asymptomatically.

Worse, even those who *do* have symptoms consistent with COVID-19 are regularly refused tests. On April 19, 2020, named Plaintiff Adam Ibarra sought medical attention for a cough, chest pains, and headaches. Ex. 7 (Verner-Crist Decl.) ¶ 20, Ex. G at 105. An examination determined that he had redness in the back of his throat and a dry cough, and concluded that his symptoms "exceed findings for testing of COVID 19." *Id.* Yet Ibarra was never given a test. Instead, he was told to take Tylenol, Robitussin and an antihistamine, drink more water, and seek medical help if his symptoms worsened. *Id.*

On May 20, 2020, named Plaintiff Samuel Camposeco began to experience flu-like symptoms. Ex. 11 (Camposeco Decl.) ¶ 10. He requested a test, but TCSO staff refused to see him. *Id.* It was not until nine days later that medical staff finally responded to his request. *Id.* ¶ 11. Camposeco was handcuffed, then brought to see a nurse (despite never having been handcuffed for a medical visit in the past). *Id.* Camposeco told the nurse that he "had body aches, a cough, severe headaches, joint pain, chills, shortness of breath, and a sore throat, and that [he] was worried that [he] had the coronavirus." *Id.* The nurse responded by asking whether Camposeco— who has been detained in the Jails since February 16, 2017—had traveled outside of the country recently. *Id.* ¶¶ 2, 11. When Camposeco responded that he had not, the nurse "told [him he] could not get a coronavirus test because [he] hadn't traveled recently." *Id.* ¶ 11. The nurse's only advice: "[D]rink more water." *Id.*

Even more recently, on July 28, 2020, Luke Rodriguez—who was imminently due to be released to the home of his elderly, cancer-stricken mother—asked to be tested for COVID-19, consistent with CDC guidelines. Ex. 23 (Declaration of Luke Rodriguez ("Rodriguez Decl.")) ¶ 3; *see also* Ex. 1 (McDermott Decl.) ¶ 9, Ex. D at 4 (Guidelines).  But the nurse refused: "She told me that I could not get tested without a temperature of 104 degrees Fahrenheit or higher." *Id.* ¶ 4. And in a disturbing coda to Camposeco's previous request for testing, he was again denied a test as recently August 5, 2020—despite ostensibly meeting the Jail's own criteria for testing of incarcerated people with symptoms. Ex. 12 (Suppl. Decl. of Samuel Camposeco) ¶ 6.

Defendant's testing strategy has been ad hoc and limited, meaning that the results are essentially useless to determine whether COVID-19 is present in the Jail. On June 29, 2020—five months into the pandemic—Defendant announced he had (finally) conducted a first round of testing. Ex. 1 (McDermott Decl.) ¶ 14, Ex. H.[5] He administered a grand total of 139 tests, of which 22 were positive for COVID-19. *Id.* ¶ 15, Ex. I. Those numbers evince an extremely high rate of infection: Dividing the number of positive tests by the total number of individuals tested yields a **15.8% positive test rate**. *Compare* Ex. 3 (Meyer Decl.) ¶ 41. By contrast, California's target test positivity rate is less than 8%. Ex. 1 (McDermott Decl.) ¶ 17, Ex. K. Moreover, applying the 15.8% test positivity rate to the Jail's population as a whole (1086 people as of August 1) suggests that at least 150 people went undiagnosed in the initial round of testing. *Compare* Ex. 3 (Meyer Decl.) ¶ 43. Yet despite the high likelihood that people are suffering without a diagnosis—or unintentionally passing the virus on to the medically vulnerable— Defendant has declared victory. Ex. 1 (McDermott Decl.) ¶ 15, Ex. I.

What's more, statistics reported by the California Board of State and Community Corrections ("BSCC") confirm that all of the tests were administered in the Pre-Trial Facility, meaning that Defendant has conducted *no* testing at all in Bob Wiley, South County, or the Main Jail—where the majority of incarcerated people are housed. *Id.* ¶¶ 10, Exs. E at 1. The experiences of incarcerated people confirm that this is not coincidence, but policy: When Mario Escobar

---

[5] Defendant inflated the total number of tests in his initial June Facebook announcement, claiming more than 200 given. In fact, Defendant has not administered 200 tests *since the pandemic began*.

1   sought testing on May 30, 2020, he was told that "Bob Wiley [does] not test incarcerated people."

2   Ex. 14 (Declaration of Mario Escobar ("Escobar Decl.")) ¶ 12.

3        Moreover, BSCC statistics indicate that between the week of July 25 and August 1,

4   Defendant transferred 148 people out of the Main Jail and into the other facilities. *See* Ex. 1

5   (McDermott Decl.) ¶¶ 10-13, Exs. E–F. Only 14 people were tested during that period, and all

6   were housed in the Pre-Trial Facility—meaning Defendant initiated the transfers *without* testing

7   the transferees. This is contrary to CDC guidelines, which recommend testing before transfers,

8   especially to a facility where medically vulnerable people are likely to be. Because Defendant

9   does not cohort medically vulnerable people, these transfers put them at especially high risk.

10       Defendant is aware of the possibility of asymptomatic transmission. Yet he refuses to

11  provide meaningful access to testing in the jail, even to those who show some symptoms—let

12  alone those who are not yet symptomatic. And he has transferred incarcerated people between

13  facilities without testing the vast majority of them. Defendant is willfully exposing incarcerated

14  individuals to the virus via unidentified, asymptomatic carriers, putting them at unreasonable risk

15  of contracting the disease themselves.

16       **C.      Intentional Interference with Access to Courts and Counsel**

17       Incarcerated people have reported being harassed, interrogated, or retaliated against after

18  speaking to counsel about Tulare County Jail's response to COVID-19. Defendant has also

19  interfered with incarcerated peoples' rights indirectly, by attempting to prevent counsel from

20  contacting incarcerated people in the first place. Both civil and criminal defense attorneys have

21  had trouble meeting with retained and prospective clients, seeing multiple visits cancelled.

22  Through overt intimidation and interference, Defendant has created unacceptable, and

23  unconstitutional, barriers for incarcerated people who seek to vindicate their constitutional rights.

24       **1.      Defendant's Attorney Visitation Policy Was Designed to—and Had the**

25           **Effect of—Chilling Incarcerated People's Access to Courts and Counsel**

26       In early May, the American Civil Liberties Union Foundation of Northern California

27  ("ACLU") began contacting incarcerated people who had reached out to the ACLU to voice

28  concerns about the Jails' response to the COVID-19 pandemic. *See* Ex. 7 (Verner-Crist Decl.)

¶¶ 3–4. On May 28, the Jails abruptly canceled all of the ACLU's confidential legal visits. Ex. 7 (Verner-Crist Decl.) ¶ 7. That day, Deputy County Counsel Diane Mendez, called Kathleen Guneratne, a senior staff attorney with the ACLU, to ask about the visits. Ex. 5 (Declaration of Kathleen Guneratne ("Guneratne Decl.")) ¶ 3. The next day, on May 29, TCSO promulgated a new policy that required attorneys to attest that they are an "attorney of record"—meaning, attorneys would no longer be permitted to meet with prospective clients. *Id.* Ex. E. This significant restriction on the right to an attorney was unprecedented. Prior to the COVID-19 pandemic, such visits were routinely allowed. Ex. 8 (Declaration of Annie Davidian ("Davidian Decl.")) ¶ 4.

Guneratne wrote to Mendez twice, demanding the ACLU's confidential attorney visits be reinstated immediately. Ex. 5 (Guneratne Decl.) ¶¶ 4–5, Exs. A–B. On June 4, Defendant modified the policy to affirm that attorneys could no longer meet with prospective clients. *Id.* Ex. F.

Mendez responded to the ACLU's letter on June 10. Ex. 5 (Guneratne Decl.) ¶ 5, Ex. C at 2. This response made clear that the Jail's policy was no accident, but rather part of an active attempt to deny the ACLU access to prospective clients. Although prospective clients are privileged and a crucial part of the attorney-client relationship, *see* Ex. 4 (Declaration of Stephen Bundy ("Bundy Decl.")) ¶¶ 7–8, Mendez doubled down, claiming that visits with prospective clients are not protected by the attorney-client privilege and must take place on recorded lines. Ex. 5 (Guneratne Decl.) Ex. C at 2. Despite attempts to further engage with TCSO, Ex. 5 (Guneratne Decl.) Ex. D, the policy has remained in place.

The ACLU has, on numerous occasions, attempted to conduct confidential legal visits with *retained* clients—with whom, according to the policy, they should be able to meet confidentially. Ex. 5 (Guneratne Decl.) ¶ 8; Ex 6 (Declaration of Amy Gilbert ("Gilbert Decl.")) ¶ 3. But those visits have been repeatedly cancelled without explanation. Ex. 6 (Gilbert Decl.) ¶¶ 6-8. TCSO delayed processing ACLU attorneys' requests for confidential visits for weeks. *Id.* ¶¶ 6–16. And Bob Wiley recently rescinded video visitation, meaning that attorneys wishing to speak with clients in that facility must be willing to expose themselves to the possibility of contracting COVID-19. Ex. 7 (Verner-Crist Decl.) ¶ 21. To this day, the ACLU has not been approved to visit confidentially with named Plaintiff Charles Criswell.

Defendant's policy has prevented many incarcerated people from meeting confidentially with the ACLU. *Id.* ¶¶ 15, 21. And the policy of denying access to counsel has not been limited to civil counsel. Criminal defense attorneys have also reported being denied access to their clients. Ex. 8 (Davidian Decl.) ¶¶ 9, 11. Because of TCSO's policy, some criminal defendants can meet with their attorneys only *during* hearings. *Id.* ¶ 12.

> **2.** **Defendant Has Intimidated, Interrogated, and Retaliated Against Incarcerated People Seeking to Exercise Constitutional Rights**

May 28 was the day that TCSO cancelled all of the ACLU's future visits. The policies at the Jails changed shortly after. Even as Defendant changed his policies to make it more difficult for the ACLU to meet with incarcerated people, he worked to threaten, intimidate, and retaliate against incarcerated people who reached out to ACLU attorneys.

***Intimidation and Interrogation.*** Mario Escobar met with an ACLU investigator on May 27. Ex. 14 (Escobar ¶ 5). The next day, on May 28, TCSO deputies pulled Escobar out of his cell and began interrogating him about his conversation. *Id.* ¶ 6. Adam Ibarra was also interrogated after a May 28 visit with the ACLU. Ex. 16 (Ibarra Decl.) ¶¶ 5–6. Brandon Alford was also scheduled to meet with an ACLU investigator in late May. Ex. 9 (Alford ¶ 4). But before the visit, deputies interrogated Alford about the purpose of his meeting. Alford refused to talk to the sergeant. In retaliation, the sergeant canceled Alford's visit with the ACLU. *Id.* ¶ 5.

Deputies also interrogated Jeffrey Nunes, who had met with an ACLU investigator. Ex 20 (Declaration of Jeffrey Nunes ("Nunes Decl.")) ¶ 7. Deputies told Nunes that they would cancel all future legal visits. *Id.* ¶ 8. Later that night, Nunes was taken out of his cell and interrogated by a supervising deputy—visibly armed, despite a no-firearm policy in the Jails—about his meetings with the ACLU, whether he had future meetings scheduled with the ACLU, and whether he had encouraged other incarcerated people to talk to the ACLU. *Id.*

***Retaliation.*** Defendant and his staff also retaliated against incarcerated people who attempted to reach out to the ACLU. In early June, Nunes, who had been employed at the farm in the Pre-Trial Facility, Ex. 20 (Nunes Decl.) ¶¶ 9–10, was moved to a job cleaning cells in the intake unit. *Id.* at 11. This job put Nunes at much higher risk of catching COVID-19. *Id.* ¶ 11–12.

After Brandon Alford spoke with the ACLU, Defendant transferred him, without warning or reason, to a high-security unit populated with people facing far more serious charges than he was. Ex. 9 (Alford Decl.) ¶ 6. While there, Alford was allowed only one hour of out-of-cell time per day. *Id.* Although Alford has since been moved to another housing unit, he retains the same high-security classification he received when he was moved to the high-security unit. *Id.* When Alford attempted to grieve the reclassification, TCSO staff refused him a grievance form. *Id.*

Adam Ibarra and Mario Escobar were also the targets of retaliation: after speaking with the ACLU, in mid-July, deputies conducted unauthorized searches of their cells, and both were given disciplinary infractions for offenses that others were not written up for.  *See* Ex. 16 (Ibarra ¶ 18).

One of the many reasons that incarcerated people must be afforded access to confidential visits with attorneys is that it allows them to speak to attorneys without fear that the information could get back to those with the power to harm them. *See* Ex. 4 (Bundy Decl.) ¶ 9. Defendant's actions are a case study of why privileged and confidential attorney visits are so important: By denying incarcerated people the right to confidential visits and retaliating against them for exercising their right to challenge the conditions of their confinement, Defendant has meaningfully interfered with Plaintiffs', and the proposed class members', right to access the courts.

## III.    ARGUMENT

This Court should grant a temporary restraining order ("TRO") to immediately protect incarcerated people from Defendant's callous refusal to protect their health and safety during the COVID-19 pandemic. A TRO may issue upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). To obtain a TRO, a plaintiff must establish: (1) "that [the plaintiff] is likely to succeed on the merits," (2) "that [the plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [the plaintiff's] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a "sliding scale" approach to *Winter*'s four-element test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under this approach, a preliminary injunction or temporary restraining order may issue if the plaintiff raises at least

1    "serious questions going to the merits" and demonstrates that "the balance of hardships tips

2    sharply in the plaintiff's favor" as long as the plaintiff also satisfies the other *Winter* factors. *Id.* A

3    stronger showing of one element may offset a weaker showing of another. *See id.*[6]

4           Here, Plaintiffs meet the standard for a TRO. Plaintiffs have gathered significant evidence

5    that Defendant has failed to take even the most basic and well-known measures to prevent the

6    spread of COVID-19 in the Tulare County Jails. Defendant's shocking failure to abide by CDC

7    guidelines for testing incarcerated people, or to implement policies for social distancing in the

8    Jails despite available space, has created a substantial risk to the health of all people incarcerated

9    in Tulare County Jails, in violation of their constitutional rights. All the while, Defendant has

10   engaged in a concerted and targeted effort to stymie attempts by incarcerated people to protect

11   themselves in the courts. Not only do Defendant's actions put Plaintiffs in danger of immediate,

12   irreparable harm; they also increase the likelihood of infection in the surrounding community,

13   contrary to the public interest in a County that is already struggling with high COVID-19 infection

14   rates. A TRO should immediately issue to protect incarcerated people and the public.

15          **A.      Plaintiffs and the Proposed Class Are Likely to Succeed on the Merits**

16          "[W]hen the State takes a person into its custody and holds him there against his will, the

17   Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

18   and general well-being." *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–

19   200 (1989)*; Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [incarcerated

20   people] of virtually every means of self-protection and foreclosed their access to outside aid, the

21   government and its officials are not free to let the state of nature take its course."). This principle

22   requires correctional officials to provide adequate medical care to incarcerated people and to

23   protect them from communicable disease. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993)

24   (holding officials may not be "deliberately indifferent to the exposure of inmates to a serious,

25   

26   _____

     [6] The analysis for a TRO and a preliminary injunction are "substantially identical." *See Stuhlbarg*
27   *Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *Frontline*
     *Med. Assoc., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F.Supp.2d 1109, 1110 (C.D.
28   Cal. 2009) ("The standard for a temporary restraining order . . . and a preliminary injunction are
     the same.").

1  communicable disease"); *Hutto v. Finney*, 437 U.S. 678, 682 (1978) (finding constitutional

2  violation where incarcerated people were placed in conditions where infectious disease could

3  easily spread). An official's "deliberate indifference" to a substantial risk of harm from infectious

4  disease violates the Constitution. *See Helling*, 509 U.S. at 33.

5  Plaintiffs need not wait until the risk of an outbreak has actually materialized in order to

6  meet this standard. Prison officials act with deliberate indifference when they "ignore a condition

7  of confinement that is sure or very likely to cause serious illness and needless suffering the next

8  week or month or year," even when that risk has not yet materialized. *Id.* "It would be odd to deny

9  an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on

10 the ground that nothing yet had happened to them. . . . [A] remedy for unsafe conditions need not

11 await a tragic event." *Id.*

12 Plaintiffs are likely to succeed on their constitutional claims because Defendant's response

13 to the pandemic is deliberately indifferent to the substantial risk that his policies, wholly

14 uncompliant with CDC guidelines, will cause a COVID-19 outbreak to occur in Tulare County

15 Jails—if an outbreak has not begun already.

16        **1.        Defendant Is Deliberately Indifferent to Plaintiffs' Serious Medical**

17                    **Needs, In Violation of the Fourteenth and Eighth Amendments**

18 Plaintiffs are likely to succeed on the merits of their claims because Defendant's utter

19 failure to follow CDC guidelines is deliberately indifferent, whether evaluated objectively or

20 subjectively. For pre-trial detainees, whose claims are evaluated under the Fourteenth

21 Amendment, Plaintiffs need only prove objective deliberate indifference. *See Gordon v. Cnty. of*

22 *Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) *cert. denied sub nom. Cnty. of Orange, Cal. v.*

23 *Gordon*, 139 S. Ct. 794 (2019). The claims of post-conviction incarcerated people ordinarily

24 require proving subjective deliberate indifference. *Farmer*, 511 U.S. at 842.

25

26

27

28

Throughout the Jails, however, Defendant mixes pre-trial detainees together with individuals held post-conviction.[7] And "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon*, 888 F.3d at 1124–25. Thus, to prove a claim of deliberate indifference under the Fourteenth Amendment, Plaintiffs held pretrial must show that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. Here, however, it is impossible to order separate relief for pretrial and post-conviction prisoners. Defendant's policies on testing and social distancing apply equally to pretrial detainees and post-conviction prisoners: Whether an individual is entitled to a test, for example, is determined without reference to an individual's conviction status. Because Defendant's policies apply equally to all incarcerated people in the Jails, the Court can consider these claims under the more-protective Fourteenth Amendment. Yet even if the Eighth Amendment standard were to apply, Defendant's refusal to implement policies in the Jails responsive to the pandemic demonstrates a knowing and callous disregard for the incarcerated people in his care.

Five months after Governor Newsom declared a state of emergency in California,[8] it would be impossible for any state or local official not to appreciate the significant and ongoing threat of

---

[7] For example, both pretrial detainee Brandon Alford and Mario Escobar, who has been sentenced following a trial, are housed in Bob Wiley. *Compare* Ex. 9 (Alford Decl.) ¶ 2; *with* Ex. 14 (Escobar Decl.) ¶ 2.

[8] *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, Office of Governor Gavin Newsom (March 4, 2020),

COVID-19. As early as mid-March, cities and states around the country began to put drastic measures into place, almost entirely halting normal economic and social activities, in an attempt to protect citizens from the threat of COVID-19. It is well known that the disease is highly contagious and spreads rapidly in congregate settings. Ex. 2 (Goldenson Decl.) ¶ 13. "[T]he seriousness of the threat posed by COVID-19—and the particular vulnerability of elderly individuals as well as those with certain preexisting medical conditions—are so well known that it would be implausible to suggest that prison officials are unaware of this risk." *Martinez-Brooks v. Easter*, No. 3:20-cv-00569, 2020 WL 2405350, at *21 (D. Conn. May 12, 2020); *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Defendant himself understands the risks presented by COVID-19. On July 1, 2020, the Honorable Brett R. Alldredge, presiding judge of the Tulare County Superior Court, wrote a letter warning that "[t]he pandemic has come to our collective doors[,]" respectfully requesting that the County "immediately implement testing of all inmates in the county jail facilities and entry temperature checks for all shared county courthouse buildings open to the public." Compl. Ex. 1. Yet despite actual notice that "[t]esting all inmates would identify those individuals who have the potential to spread the virus," *id.*, Defendant continues to withhold testing.

Courts across the country have concluded that COVID-19 presents a substantial risk of serious harm to prisoners. *See, e.g.*, *Torres v. Milusnic*, No. 20-cv-4450-CBM-PVC(x), 2020 WL 4197285, at *9 (C.D. Cal. July 14, 2020) ("Petitioners show they are at substantial risk of exposure to COVID-19, which is inconsistent with contemporary standards of human decency."); *Cameron v. Bouchard*, No. 20-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020), *as modified on reconsideration*, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020) ("It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative class [consisting of current and future jail detainees]."); *Martinez-Brooks*, 2020 WL 2405350, at *21. Yet despite the widespread consensus that COVID-19 poses a substantial risk of serious harm to incarcerated

https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

people, Defendant has made a conscious decision not to implement responsive policies. Despite a lawsuit and jails operating at half-capacity, he continues to compress incarcerated people into shared dorms, without any testing available even when they display symptoms. Although the CDC has made clear recommendations for testing and social distancing in correctional facilities—and although Defendant himself has cautioned the people of Tulare County about these measures' importance, *see* Ex. 1 (McDermott Decl.), ¶ 16, Ex. J—Defendant has failed to propagate a clear written policy implementing any of these commonsense precautions.

A reasonable official would have appreciated the extreme risk posed by a failure to act under these circumstances. Defendant knows it. To succeed on their claims, Plaintiffs need show only that Defendant acted with "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon,* 888 F.3d at 1125 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)); *see also Gantt v. City of L.A.*, 717 F.3d 702, 708 (9th Cir. 2013) (explaining objective deliberate indifference "entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 n.2 (9th Cir. 2006) (explaining that a state actor acts with deliberate indifference by ignoring "a known or obvious danger" to another created by the actor's own conduct).

Here, Plaintiffs can show more: Although Defendant demonstrably understands the risks posed by COVID-19, he has recklessly disregarded those risks by actively transferring people to *more* crowded settings and by failing to implement clear and effective policies for the testing of incarcerated people. Defendant's deliberate indifference violates the Eighth Amendment, as well as the Fourteenth. *See, e.g., Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 943 (N.D. Cal. 2015) (stating that "known noncompliance with generally accepted guidelines for inmate health strongly indicates deliberate indifference to a substantial risk of serious harm"); *Cameron,* 2020 WL 1929876, at *2 (preliminarily finding deliberate indifference in violation of the Eighth Amendment when jail "has not imposed even the most basic safety measures recommended by health experts, the Centers for Disease Control and Prevention, and Michigan's Governor to reduce the spread of COVID-19 in detention facilities").

1        **a.**     **Defendant's Decision to *Increase* Overcrowded Conditions**

2                    **During the Pandemic Is Deliberate Indifference**

3        The evidence shows that Defendant continues to cluster individuals in just a fraction of the

4   housing available in the Jails—including *increasing* the population of the Adult Pretrial Detention

5   Facility from 56% to 74% of capacity over the course of just one week. Ex. 1 (McDermott Decl.) ¶

6   13. This flouts well-known CDC guidance for correctional facilities, which stresses that social

7   distancing of at least six feet "is a cornerstone of reducing transmission of respiratory illnesses."

8   Ex. 2 (Goldenson Decl.) ¶ 13. Courts elsewhere agree: "[W]ithout social distancing measures,

9   reliable containment of a highly contagious disease is nearly impossible." *Martinez-Brooks*, 2020

10  WL 2405350, at *23.

11       Defendant not only refused to implement even the most basic CDC guidelines to allow

12  incarcerated people to maintain some degree of distance from one another—he has actively made

13  the situation worse, transferring individuals between jails despite the lack of testing and despite

14  the lack of protections for medically vulnerable individuals. Defendant's intentional actions are

15  deliberately indifferent to the serious risk of harm that such overcrowded conditions pose to

16  people incarcerated in his Jails. *See, e.g.*, *Banks v. Booth*, No. CV 20-849 (CKK), 2020 WL

17  3303006, at *9 (D.D.C. June 18, 2020) (granting preliminary injunction where, "[d]espite

18  widespread understanding of the importance of social distancing, Defendants have taken

19  insufficient and delayed steps to ensure that social distancing is occurring consistently.");

20  *Carranza v. Reams*, No. 20-CV-00977-PAB, 2020 WL 2320174, at *9 (D. Colo. May 11, 2020)

21  (granting preliminary injunction where jail refused to provide social distancing protections for

22  medically vulnerable incarcerated people); *Morales Feliciano v. Rosselló Gonzáles*, 13 F. Supp.

23  2d 151, 208–09 (D.P.R. 1998) (finding that the defendant's "inability . . . to properly isolate cases

24  of active tuberculosis" constituted deliberate indifference).

25       **b.**     **Defendant's Refusal to Test the Vast Majority of Detainees is**

26                   **Deliberately Indifferent**

27       Defendant's failure to implement an appropriate testing policy—including refusing to test

28  *anyone* in three of the four facilities currently operating—also ignores the obvious risk of harm

that COVID-19 poses for incarcerated people. Infected individuals can spread COVID-19 even when they are entirely asymptomatic. The complete lack of testing at intake, before transfer between housing units, and prior to re-entry to the community means that Defendant is likely allowing infected prisoners to interact with healthy populations and spread the virus. Without testing, it is impossible for incarcerated people or TCSO staff to track the course of the disease through the Jail. This risk is particularly acute for medically vulnerable people, who may be unknowingly exposed to asymptomatic carriers of COVID-19.

It is well-established that exposing non-infected incarcerated people to contagious individuals in itself constitutes deliberate indifference. *See, e.g.*, *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (upholding a finding of unconstitutional conditions of confinement where officials continued to house inmates in a facility despite the existence of an extensive MRSA outbreak); *Laureau v. Manson*, 651 F.2d 96, 98–99 (2d Cir. 1981) (upholding finding of unconstitutional conditions of confinement where healthy prisoners were housed with physically ill cellmates). Without an effective testing plan, Defendant all but guarantees that incarcerated people will continue to be exposed to a potentially-deadly disease, without knowledge or recourse.

Nor can Defendant escape liability by pointing to his supposed policies on testing. Any policy that results in only a small fraction of the total population of the Jails—and only those housed in a single facility—receiving COVID-19 testing is simply not compliant with CDC testing guidelines. And even if Defendant were to provide evidence that, following the filing of this action, he began testing more people in the Jails, that would not be sufficient to defeat Plaintiffs' showing. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Given his months-long history of ignoring incarcerated people's serious medical needs, Defendant cannot meet "the heavy burden of persuading" the Court that "the challenged conduct cannot reasonably be expected to start up again" in the absence of judicial intervention. *Id.*; *see also Norton v. LVNV Funding, LLC*, 396 F. Supp. 3d 901, 920 (N.D. Cal. 2019). Plaintiffs reasonably fear that absent

1    injunctive relief, Defendant will revert to his previous policy of denying testing to all but a select

2    few. Immediate injunctive relief is necessary to guarantee the protection of Plaintiffs' health and

3    constitutional rights.

4           In sum, Defendant's refusal to respond to the pandemic has been conscious, active, and

5    deliberate. He has chosen to put incarcerated people at great risk, disregarding the substantial risk

6    to the real possibility of unnecessary suffering and even death they face from COVID-19.

7    Plaintiffs are likely to succeed on the merits of their Eighth and Fourteenth Amendment claims.

8           **2.    Defendant's Active Interference with Plaintiffs' Attempts to Meet with**

9                 **Counsel Violates Their First, Sixth, and Fourteenth Amendment**

10                 **Rights, and Also Runs Afoul of the Bane Act**

11          Plaintiffs and proposed class members, like all incarcerated people, have a constitutional

12   right of access to the courts under the First and Fourteenth Amendments. *See Bounds v. Smith*, 430

13   U.S. 817, 821 (1977). Under the First Amendment, an incarcerated person has both a right to

14   meaningful access to the courts and a broader right to petition the government for redress of

15   grievances. *See Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) (*overruled on other grounds

16   in Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001)). The Fourteenth Amendment's guarantee to

17   substantive and due process also protects incarcerated people's right to meaningful access to the

18   courts. *See Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990). And under the First and Fourteenth

19   Amendments, incarcerated people have a right to meaningful access to the courts "without *active*

20   *interference* by prison officials." *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011)

21   (*overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). "The

22   opportunity to communicate privately with an attorney is an important part of that meaningful

23   access." *Ching*, 895 F.2d at 609. Thus, prison officials may not arbitrarily enforce a policy that

24   prevents "effective attorney-client communication and unnecessarily abridges the prisoner's right

25   to meaningful access to the courts." *Id.* at 610; *see also Casey v. Lewis*, 4 F.3d 1516, 1523 (9th

26   Cir. 1993) (holding that infringement on right to meaningful access to the courts must be

27   reasonably related to legitimate penological interests).

28

The Bane Act allows an individual to bring a civil action for injunctive and other appropriate relief "[i]f a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion with the exercise or enjoyment by any individual or individuals of rights" secured by the constitutions or laws of the United States or California. Cal. Civ. Code § 52.1(b). Additionally, California state prisoners (including those sentenced to serve terms in county jails) have the statutory right "[t]o initiate civil actions" as plaintiffs. Cal. Pen. Code § 2601(d). "This statute has been interpreted to include within its scope the right to be afforded meaningful access to the courts to *prosecute* those civil actions." *Smith v. Ogbuehi*, 38 Cal. App. 5th 453, 465 (2019).

Here, Defendant has actively interfered with the rights of incarcerated people to access the courts in two ways.

*First*, Defendant has imposed an arbitrary policy to frustrate Plaintiffs' and prospective class members' efforts to meet confidentially with civil rights attorneys regarding the appalling conditions in the Jails. *See Casey*, 4 F.3d at 1520 (holding that "the main concern" of the right of meaningful access to the courts is "protecting the ability of an inmate to prepare a petition or complaint"). And the policy is so overbroad as to infringe at least some class members' right to counsel in their criminal cases, Ex. 8 (Davidian Decl.) ¶ 11, in violation of the Sixth Amendment. *See Texas v. Cobb*, 532 U.S. 162, 167 (2001) ("The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'"); *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) (restrictions on attorney visits resulting in significant delays violated Sixth Amendment).

*Second*, Defendant has engaged in systematic intimidation and retaliation to discourage incarcerated people from attempting to access the courts. On multiple occasions, Defendant's deputies have questioned, threatened, intimidated, and retaliated against incarcerated people who have spoken or attempted to speak with ACLU investigators and counsel about conditions of confinement in Tulare County Jails. *See, e.g.*, Ex. 16 (Ibarra Decl.) ¶¶ 5–7; Ex. 11 (Camposeco Decl.) ¶ 6; Ex. 14 (Escobar Decl.) ¶ 8; Ex. 20 (Nunes Decl.) ¶ 10; Ex. 9 (Declaration of Brandon

1  Alford ("Alford Decl.")) ¶¶ 5–6. The Constitution prohibits precisely this type of "active

2  interference by prison officials." *See Silva*, 658 F.3d at 1103.

3      Defendant's retaliation campaign also runs afoul of the Bane Act. A reasonable person,

4  standing in the shoes of Plaintiffs and class members, would have been intimidated. *See*

5  *Muhammad v. Garrett*, 66 F. Supp. 3d 1287, 1296 (E.D. Cal. 2014). Nor does a successful Bane

6  Act claim require a specific intent to violate a person's rights. Instead, "reckless disregard of the

7  right at issue is all that is necessary." *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th

8  766, 804 (2017). By suffering this retaliation to continue, Defendant has recklessly disregarded

9  Plaintiffs' and prospective class members' well-established statutory and constitutional rights.

10      In short, Plaintiffs have presented compelling evidence that Defendant—through his

11  restrictive visitation policy and a systematic practice of intimidation and retaliation—has impeded

12  the ability of Plaintiffs and class members to pursue relief from unconstitutional conditions of

13  confinement. Plaintiffs are likely to succeed on their claims under the First, Sixth, and Fourteenth

14  Amendments, as well as their claims under the Bane Act.

15          **3.**       **Exhaustion Requirements Do Not Bar Relief**

16      Named Plaintiffs Adam Ibarra and Samuel Camposeco both filed grievances challenging

17  Defendant's COVID-19 response, and both were denied. Compl. Ex. 2 at 4; Ex. 3 at 2. Other

18  incarcerated people at Tulare County Jails have tried to file grievances, but these efforts have met

19  with no success. In some cases, TCSO staff refuse to provide incarcerated people with grievance

20  forms. *See, e.g.*, Ex. 22 (Robinson Decl.) ¶¶ 5–6; Ex. 9 (Alford Decl.) ¶¶ 8–9, 16. One individual

21  was told that if he grieved the Jails' coronavirus response, "I would be put on a 'Disciplinary

22  Infraction' or have my classification level raised." Ex. 22 (Robinson Decl.) ¶ 6. As a result of this

23  threat, he declined to file a grievance.

24      The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), does not require

25  exhaustion when circumstances render administrative remedies "effectively unavailable." As the

26  Supreme Court has explained, an administrative remedy is unavailable "when (despite what

27  regulations or guidance may promise) it operates as a simple dead end—with officers unable or

28  consistently unwilling to provide any relief to aggrieved inmates" or "when prison administrators

thwart inmates from taking advantage of the grievance process." *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016). Here, any grievance procedures that exist are simply incapable of addressing the critical health and safety needs of incarcerated people in Tulare County Jails. Because Plaintiffs have exhausted their administrative remedies and an administrative remedy is effectively unavailable in any case, exhaustion is not a bar to Plaintiffs' challenge to conditions of confinement at Tulare County Jails.

### B.   Plaintiffs and Proposed Class Members Will Suffer Irreparable Harm

Plaintiffs and proposed class members are likely to suffer irreparable harm unless this Court grants a temporary restraining order requiring Defendant to implement CDC-compliant testing and social distancing policies, and to refrain from interfering with incarcerated people's immediate access to counsel.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, as described above, not only Plaintiffs' and proposed class members' Eighth and Fourteenth Amendment rights are at stake; so too are their constitutional rights to counsel and access to the courts.

Moreover, as a direct consequence of the unconstitutional conditions, Plaintiffs and the proposed class face a substantial and imminent risk of serious illness. The Constitution protects an incarcerated person's right to be free from the *risk*, not just the fact, of infection. Incarcerated people need not wait for the risk to materialize before they challenge the practices causing the risk, but have a right to prospectively remedy plainly unsafe conditions. *Helling*, 509 U.S. at 33; *Fraihat v. U.S. Immigr. & Customs Enforcement*, No. 19-CV-1546 JGB (SHKx), 2020 WL 1932570, at *27 (C.D. Cal. Apr. 20, 2020); *see also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (upholding preliminary injunction where plaintiffs would suffer "delayed and/or complete lack of necessary treatment, and increased pain and medical complications"). People have already fallen ill at Tulare County Jails—and the lack of testing means many more may be at risk than is currently known. If Plaintiffs and class members succumb to the disease while this case remains

1  pending, no relief from this Court will remedy the resulting injury. The risk to Plaintiffs' health

2  undeniably rises to the level of irreparable harm.

3         Consistent with these principles, courts across the country have concluded that correctional

4  facilities' failure to ameliorate the risk of contracting COVID-19 constitutes irreparable harm. *See,*

5  *e.g.*, *Castillo v. Barr,* 2020 WL 1502864, at *1 (C.D. Cal. Mar. 27, 2020) (granting TRO and

6  finding that the immigration detainee petitioners were likely to suffer irreparable harm from

7  COVID-19 when they were not kept six feet apart from other detainees); *see also, e.g.*, *Banks v.*

8  *Booth*, No. CV 20-849 (CKK), 2020 WL 3303006, at *9 (D.D.C. June 18, 2020), *appeal docketed,*

9  No. 20-5216 (D.D.C. July 22, 2020); *Kaur v. U.S. Dep't of Homeland Sec.,* No. 2:20-cv-03172,

10  2020 WL 1939386, at *3 (C.D. Cal. April 22, 2020); *Doe v. Barr,* No. 20-cv-02141, 2020 WL

11  1820667, at *1, 9 (N.D. Cal. Apr. 12, 2020)*; Bent v. Barr,* No. 19-cv-06123, 2020 WL 1812850,

12  at *1–2 (N.D. Cal. Apr. 9, 2020); *Thakker v. Doll*, No. 20-cv-0480, 2020 WL 1671563, at *9

13  (M.D. Pa. Mar. 31, 2020). As in those cases, Plaintiffs have presented ample evidence that

14  immediate relief is necessary to protect all incarcerated people in Tulare County Jails, especially

15  the Medically Vulnerable, from an imminent health risk.

16         **C.      The Balance of Equities and Public Interest Both Favor Plaintiffs and the**

17                  **Proposed Class**

18         The balance of equities tips in Plaintiffs' favor. Plaintiffs and the class face deprivations of

19  their constitutional rights to adequate medical care and humane conditions of confinement that far

20  outweigh any injury to Defendant. Defendant has no interest in maintaining unconstitutional

21  conditions at Tulare County Jails or in unlawfully interfering with Plaintiffs' right to access the

22  courts. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (noting that the government

23  "cannot suffer harm from an injunction that merely ends an unlawful practice"). While "[c]ourts

24  must be sensitive to the . . . need for deference to experienced and expert prison administrators,"

25  they "may not allow constitutional violations to continue simply because a remedy would involve

26  intrusion into the realm of prison administration." *Brown v. Plata*, 563 U. S. 493, 511 (2011).

27  Thus, any harm to Defendant pales in comparison to the imminent threat to Plaintiffs' health. *See*

28  *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Mays v. Dart,* No. 20-C-

1  2134, 2020 WL 1812381, at *14 (N.D. Ill. Apr. 9, 2020) (holding in a suit challenging a jail's

2  COVID-19 containment efforts that detainees' interest in avoiding infection outweighs sheriff's

3  interest in maintaining current practices).

4          The public interest also favors Plaintiffs for at least two reasons. First, Plaintiffs' suit

5  highlights systemic constitutional deficiencies at Tulare County Jails, and "it is always in the

6  public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at

7  1002. Second, public safety requires containing COVID-19 everywhere it exists, including within

8  Tulare County Jails. The Jails are not hermetically sealed: People enter and leave every day,

9  creating vectors to spread the virus from the Jails to the outlying community. In addition, because

10  the Jails lack resources to treat COVID-19 patients internally, an outbreak would burden local

11  healthcare facilities, straining a system that is already overtaxed by the pandemic.

12          The relief requested here—particularly widespread testing and effective policies for social

13  distancing—would protect the staff at Tulare County Jails as well as the community at large. The

14  requested actions, which will help prevent burdening hospitals and healthcare systems, and allow

15  our communities to safely reopen sooner, are undeniably in the public interest.

16          **D.      Good Cause Exists to Grant Plaintiffs Early Discovery**

17          Plaintiffs additionally seek leave to serve early discovery. A court may allow early

18  discovery for the convenience of the witnesses and parties and in the interests of justice. Fed. R.

19  Civ. P. 26(d). Courts in this district allow discovery to commence prior to the conference required

20  by Rule 26(f) upon a showing of good cause. *See Malibu Media, LLC v. Doe*, 319 F.R.D. 299, 302

21  (E.D. Cal. 2016). There is good cause when the need for discovery, "in consideration of the

22  administration of justice, outweighs the prejudice to the responding party." *Id.* (quoting *In re*

23  *Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d 1160, 1179 (C.D. Cal. 2008)).

24          Here, Plaintiffs' need for discovery outweighs any prejudice to Defendant. Courts

25  routinely find that the good cause test is met when a plaintiff requires information in order to be

26  able to move for a preliminary injunction. *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-

27  LHK, 2011 WL 1938154, at *2 (N.D. Cal. May 18, 2011) (allowing expedited discovery where

28  discovery was "likely to be central to any motion for preliminary injunction"); *Interserve, Inc. v.*

1   *Fusion Garage PTE, Ltd.*, No. C 09-05812 JW (PVT), 2010 WL 143665, at *2 (N.D. Cal. Jan. 7,

2   2010) (same); *cf. Hall v. Mims*, No. 1:11-CV-02047-LJO-BAM, 2012 WL 1498893, at *4 (E.D.

3   Cal. Apr. 27, 2012) (denying expedited discovery in part where plaintiff failed to show

4   "emergency circumstances reasonably creating the need for a potential preliminary injunction").

5            As described throughout the Application, the situation in Tulare County Jails is precarious,

6   and outbreaks of COVID-19 have already been reported in the Jails. What's more, Defendant has

7   blocked Plaintiffs' attempts to investigate the extent of the crisis at every turn, including through

8   interfering with their right to counsel and the courts. Plaintiffs require immediate discovery to

9   assess the situation in the Jails and determine whether to seek further remedial measures to protect

10  Plaintiffs and the proposed class members from the threat of COVID-19. *See United States v. Erie*

11  *Cnty., NY*, No. 09-CV-849S, 2010 WL 11578742, at *4 (W.D.N.Y. Mar. 6, 2010) (granting

12  expedited discovery in lawsuit alleging unconstitutional conditions of confinement to allow DOJ

13  "to determine whether it should seek a preliminary injunction to impose immediate remedial

14  measures to decrease the number of preventable suicides"). Plaintiffs also require immediate

15  discovery to determine whether Defendant has made additional changes in response to the

16  changing facts on the ground or any orders by this Court.

17           By contrast, the burden on Defendant is likely to be minimal. Plaintiffs seek leave to serve

18  early discovery that they would otherwise be entitled to within the course of the case. *See L'Oreal*

19  *USA Creative, Inc. v. Tsui*, No. 16-cv-8673 FMO (FFMx), 2016 WL 9275404, at *7 (C.D. Cal.

20  Dec. 22, 2016) ("The burden on defendants is de minimis, as the discovery plaintiffs [seek] is

21  what they would ordinarily seek in the course of the case."); *Sas v. Sawabeh Info. Servs. Co.*, No.

22  11-cv-04147 GAF (MANx), 2011 WL 13130013, at *7 (C.D. Cal. May 17, 2011) (same). This

23  Court should grant Plaintiffs leave to serve early discovery.

24  **IV.    CONCLUSION**

25           Plaintiffs have shown a high likelihood of success on the merits of their claims and an

26  imminent threat of irreparable injury. Moreover, the balance of harms and public interest weigh in

27  favor of immediate injunctive relief. Plaintiffs therefore respectfully request that the Court grant

28  the ex parte motion for a temporary restraining order.

DATED:  August 12, 2020                    MUNGER, TOLLES & OLSON LLP


                                           By:      /s/ Sara A. McDermott
                                                  Sara A. McDermott
                                                  Attorneys for Plaintiffs

EX PARTE APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION