1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES CRISWELL, et al.,              No.  1:20-cv-01048-DAD-SAB

12                  Plaintiffs,

13        v.                                ORDER GRANTING APPLICATION FOR
                                            PROVISIONAL CLASS CERTIFICATION
14   MICHAEL BOUDREAUX, in his official     AND GRANTING MOTION FOR A
     capacity as Sheriff of Tulare County,  TEMPORARY RESTRAINING ORDER, IN
15                                           PART
                  Defendant.
16                                          (Doc. Nos. 10, 11, 25)

17

18        This matter came before the court on August 26, 2020 for a hearing on the application for

19   provisional class certification (Doc. No. 10) and motion for a temporary restraining order (Doc.

20   No. 11) filed on August 12, 2020 on behalf of plaintiffs Charles Criswell, Levi Johnson, Samuel

21   Camposeco, Adam Ibarra, and California Attorneys for Criminal Justice ("CACJ"), (collectively

22   "plaintiffs").  Attorneys Sara McDermott of Munger, Tolles & Olson LLP and Amy Gilbert of the

23   American Civil Liberties Union Foundation of Northern California ("ACLU") appeared via video

24   for plaintiffs.  Tulare County Chief Deputy County Counsel Kathleen A. Taylor, appeared via

25   video for defendant Michael Boudreaux, in his official capacity as Sheriff of Tulare County.  For

26   the reasons explained below, the court will grant plaintiffs' application for provisional class

27   certification and grant their motion for a temporary restraining order, in part.

28   /////

                                              1

## BACKGROUND

On July 29, 2020, plaintiffs filed their complaint against defendant, alleging the following five causes of action:  (1) 42 U.S.C. § 1983 claim for violation of the Fourteenth Amendment of the U.S. Constitution as a result of defendant's reckless failure to act with reasonable care to mitigate the risk posed by COVID-19 to pretrial detainees; (2) 42 U.S.C. § 1983 claim for violation of the Eighth Amendment of the U.S. Constitution by defendant's deliberate indifference to the obvious risks posed by COVID-19 to prisoners; (3) 42 U.S.C. § 1983 claim for violation of the First and Fourteenth Amendments of the U.S. Constitution as a result of defendant's active interference with the ability of plaintiffs and the proposed class to meaningfully access the courts; (4) 42 U.S.C. § 1983 claim for violation of the Sixth Amendment of the U.S. Constitution by defendant's active interference with the right of plaintiffs and the proposed class to access the assistance of their criminal defense counsel; and (5) California Civil Code § 52.1(b) ("Bane Act") claim that defendant interfered or attempted to interfere by threat, intimidation, or coercion with the rights of plaintiffs and the proposed class, including the right to initiate civil actions under California Penal Code § 2601(d).  (Doc. No. 1 ("Compl.") at 42–45.)

In their complaint, plaintiffs challenge defendant's "callous indifference to their health and safety" and his "callow attempts to prevent them from challenging his unconstitutional practices in court."  (Compl. at ¶ 4.)  Plaintiffs "bring this action to prevent avoidable illness and death from COVID-19 among people incarcerated at Tulare County Jails."  (*Id.*)  Plaintiffs explain in their complaint that their use of the term Tulare County Jails "refers to the five detention facilities managed by the Tulare County Sheriff's Office:  Bob Wiley Detention Facility ("BWDF"), Main Jail, Men's Correctional Facility, Adult Pre-Trial Facility ("APTF"), and South County Detention Facility."  (*Id.* at n.1.)

Plaintiffs Charles Criswell, Levi Johnson, Samuel Camposeco, and Adam Ibarra are currently incarcerated in the Tulare County Jails ("the Jails").  (*Id.* at ¶¶ 19–22.)  Plaintiff Criswell, a 51-year-old man who suffers from Type II diabetes and hypertension, has been incarcerated since October 9, 2019 for possession of a stolen vehicle and drug possession and will

/////

be in custody until February 21, 2021.  (Doc. No. 11-13 at ¶¶ 2–4.)  As of July 1, 2020,[1] plaintiff Criswell declared that he was incarcerated in the Main Jail, following his transfer from BWDF in January 2020.  (*Id.* at 2.)  Plaintiff Johnson, a 60-year-old man with congenital heart failure, hypertension, and respiratory problems, has been incarcerated since June 21, 2020 as a pre-trial detainee facing spousal battery charges.  (Doc. No. 11-17 at ¶¶ 2–3, 5.)  Plaintiff Johnson is currently incarcerated in BWDF, though he was initially booked into APTF and had been transferred to the Main Jail in mid-July.  (*Id.* at ¶ 6; Doc. No. 11-18 at ¶ 2.)  Plaintiff Camposeco, a 24-year-old man, has been incarcerated in the Jails since February 16, 2017 as a pre-trial detainee facing felony murder charges.  (Doc. No. 11-11 at ¶ 2.)  Plaintiff Camposeco is currently in custody at BWDF.  (*Id.*)  Plaintiff Ibarra, a 33-year-old man, has been incarcerated in the Jails since September 20, 2019 as a pre-trial detainee facing charges for drug possession, gun possession, and attempted murder.  (Doc. No. 11-16 at ¶ 2.)  Plaintiff Ibarra is currently incarcerated in BWDF.  (*Id.*)

/////

/////

/////

/////

/////

---

[1]  Plaintiff Criswell declares that because of his confinement and the COVID-19 pandemic, he was unable to sign his declaration in person, but his declaration was read to him over the phone by ACLU investigator Dylan Verner-Crist on July 1, 2020.  (Doc. No. 11-13 at ¶ 13.)  Plaintiff Criswell understood and verified the contents of his declaration and authorized Verner-Crist to sign the declaration on his behalf.  (*Id.*)  Defendant contends that plaintiff Criswell's declaration "is stale" because Main Jail was closed in the middle of July, and plaintiff Criswell was moved at that time to one (without identifying which) of the other three facilities.  (Doc. No. 16-1 at 9.)  Be that as it may, plaintiffs' counsel, ACLU attorney Amy Gilbert has declared that "[a]s of the date of executing this declaration [July 31, 2020], over three weeks since my initial request on July 9, I have still not heard from TCSO [Tulare County Sheriff's Office] as to whether I have been authorized for professional, confidential legal visits with Chris Chriswell [sic]."  (Doc. No. 11-6 at ¶ 29.)  In the pending motion, plaintiffs' counsel represents to the court that "[t]o this day, the ACLU has not been approved to visit confidentially with named Plaintiff Charles Criswell."  (Doc. No. 11 at 17.)  Therefore, the court does not have any evidence before it indicating in which facility plaintiff Criswell is currently incarcerated.

These incarcerated plaintiffs seek to represent a class defined as "all people who are now, or in the future will be, incarcerated in Tulare County Jails, including as subclasses:  (i) persons confined pre-trial, (ii) persons confined pursuant to a judgment of conviction, and (iii) Medically Vulnerable persons confined pre-trial and pursuant to a judgment of conviction."  (Compl. at ¶ 161.)[2]

Plaintiff CACJ is "a membership organization of criminal defense attorneys practicing in California," including member attorneys who handle criminal cases in Tulare County and who have current and former clients now incarcerated in the Jails.  (*Id.* at ¶ 23.)  Plaintiffs allege that CACJ's mission and goals are frustrated by "[d]efendant's current COVID-19 policies and practices," which have caused CACJ "to expend and divert its resources" to this litigation rather than spend its time on advocacy work "to advance justice, fairness, and constitutional protections in the criminal justice system in the courts and the Legislature."  (*Id.*)

The allegations of plaintiffs' complaint detail defendant's purported failures to address the threat posed by COVID-19, including the following:

- Maintaining an explicit policy forbidding incarcerated people from wearing masks.  (*Id.* at ¶¶ 9, 88–93.)

- Failing to provide necessary personal protection equipment, including masks, to staff and incarcerated people.  (*Id.* at ¶¶ 50–59.)

- Refusing to test incarcerated people for COVID-19, even those who have symptoms or have been exposed to someone infected with COVID-19.  (*Id.* at ¶¶ 60–65, 98–101.)

- Refusing to quarantine new intakes on arrival or implement appropriate quarantine measures in housing units in the Jails.  (*Id.* at ¶¶ 66–68, 108–112.)

- Failing to implement a social distancing plan despite the Jails having the needed space to spread out, and instead, maintaining policies to prevent incarcerated people from practicing social distancing.  (*Id.* at ¶¶ 69–75, 102–105.)

---

[2]  Based on information from the Centers for Disease Control ("CDC"), plaintiffs define "Medically Vulnerable" to mean people who have the following medical conditions:  "type 2 diabetes mellitus; chronic pulmonary disease; serious heart conditions; sickle cell disease; chronic kidney disease; immunocompromised state from solid organ transplant; and obesity" as well as people who have "asthma; cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis; smoking; thalassemia; and type 1 diabetes mellitus."  (Doc. No. 1 at ¶¶ 37, 38.)

- Failing to provide an adequate amount of proper cleaning and hygiene supplies to incarcerated people and failing to adequately maintain sanitary conditions in the Jails. (*Id.* at ¶¶ 76–82, 113–115.)

- Failing to consider releasing incarcerated people to reduce the population in the Jails to make social distancing possible, including considering at a minimum, releasing the Medically Vulnerable to home confinement until social distancing is possible. (*Id.* at ¶¶ 116–125.)

- Refusing to be transparent about his response to COVID-19 in the Jails, including obfuscating and hiding from public scrutiny any information about his response, or lack thereof, to COVID-19. (*Id.* at ¶¶ 126–130.)

In addition, plaintiffs have alleged several specific instances of retaliation and intimidation taken against incarcerated people who challenge these purportedly unconstitutional conditions of confinement, whether through the internal grievance procedure in the Jails or by seeking legal assistance and access to the courts. (*Id.* at ¶¶ 83–87, 131–144.) For example, incarcerated people who have spoken to the ACLU investigator and attorneys have been: (i) repeatedly questioned by deputies about why they were meeting with the ACLU and what was discussed during their legal visits (including one instance of questioning by an armed deputy); (ii) transferred to less desirable work as a cleaner in the intake unit, which carries a higher risk of exposure to COVID-19 due to defendant's failure to quarantine newly-booked incarcerated people; and (iii) reclassified as high-security inmates and transferred to a high-security unit, despite not facing as serious charges as the others housed in that unit. (*Id.* at ¶¶ 131–144.) Several incarcerated people, including the named plaintiffs, have also had their legal visits cancelled and have been prevented from having confidential legal visits with counsel. (*Id.* at ¶¶ 141–144.)

Plaintiffs further allege that in response to their counsel's investigation, defendant promulgated a new legal visitation policy on May 29, 2020 designed to frustrate the ability of incarcerated people to participate in confidential legal visits in the Jails. (*Id.* at ¶¶ 13–14, 145–157.) On June 4, 2020, defendant issued a memo outlining these new restrictions, which specifically limit legal visits to attorneys who had already been designated as an incarcerated person's "attorney of record," thereby precluding attorneys from meeting confidentially with prospective clients or current clients for whom a lawsuit has not yet been filed. (*Id.*) Plaintiffs

5

1    contend that this policy on its face interferes "with the attorney-client privilege at the most critical

2    stage, *i.e.* the first meeting before an attorney has even entered an appearance on behalf of a

3    client." (*Id.* at ¶ 145.)  In practice, since the promulgation of this new policy, "*no* potential class

4    members have been afforded a confidential meeting with ACLU attorneys," and "criminal

5    defense attorneys have also found their clients' access cut off." (*Id.* at ¶¶ 14, 146.)  Moreover,

6    plaintiffs allege that even after their attorneys complied with the requirements of defendant's

7    new policy, plaintiffs' attorneys were unable to schedule visits because no matter which date or

8    time they selected on the required form appearing online, they received an error message stating

9    "No stations available." (*Id.* at ¶ 153.)  Plaintiffs' counsel has been able to communicate with

10   plaintiffs only through short phone calls on recorded phone lines, or on recorded video feeds. (*Id.*

11   at ¶ 154.)  In their complaint, plaintiffs allege that "[i]mmediate injunctive relief is crucial to

12   restore confidential legal visits at Tulare County Jails and to cease [d]efendant's ongoing

13   constitutional violations." (*Id.* at ¶ 157.)

14        On August 12, 2020, plaintiffs filed the pending application for provisional class

15   certification ("Application") and the pending motion for a temporary restraining order

16   ("Motion"), seeking a court order requiring defendant to "immediately reduce overcrowding by

17   using the available space in the Jails to facilitate social distancing; conduct universal testing to

18   prevent the spread of COVID-19; and allow confidential attorney visits to proceed immediately

19   without intimidation or the threat of retaliation." (Doc. Nos. 10; 11 at 10.)  Plaintiffs contend that

20   "[i]mmediate action is [] necessary to prevent needless suffering and death inside and out of the

21   Jails, and to allow incarcerated people in the [] Jails to exercise their constitutional right to access

22   the courts." (Doc. No. 11 at 10.)  Plaintiffs seek provisional class certification for the purposes of

23   the emergency relief requested because all members of the proposed class "are affected by

24   [d]efendant's inadequate response to COVID-19 and are in urgent need of protection." (Doc. No.

25   10 at 3.)

26        In addition to their own declarations, plaintiffs filed several declarations in support of

27   their Application and Motion, including declarations attesting to the conditions of confinement in

28   the Jails from four pre-trial detainees currently incarcerated in the BWDF (Doc. Nos. 11-9

6

1  ("Alford Decl."); 11-10 ("Bradbury Decl."); 11-22 ("Robinson Decl."); 11-23 ("Rodriguez

2  Decl.")), five sentenced prisoners currently incarcerated in the Jails (Doc. Nos. 11-14 ("Escobar

3  Decl."); 11-15 ("Hernandez Decl."); 11-19 ("Martinez Decl."); 11-21 ("Redmon Decl."); 11-24

4  ("Ward Decl.")), and one individual who was formerly incarcerated in APTF (Doc. No. 11-20

5  ("Nunes Decl.").  Regarding COVID-19 specifically and health care in correctional facilities,

6  plaintiffs submit the declarations of Dr. Joe Goldenson, a physician with 33 years of experience in

7  correctional health care (Doc. No. 11-2), and Dr. Jaimie Meyer, an Associate Professor of

8  Medicine and Clinical Professor of Nursing at Yale University (Doc. No. 11-3).  Regarding

9  plaintiffs' concerns with respect to the impact of defendant's legal visitation policy on attorney-

10  client privilege and access, plaintiffs have submitted the declarations of Stephen Bundy, a lawyer

11  and Professor of Law, Emeritus at Berkeley Law (Doc. No. 11-4) and Annie Davidian, a local

12  criminal defense attorney who has approximately twenty-five clients currently incarcerated in the

13  Jails (Doc. No. 11-8).

14       On August 20, 2020, defendant filed his oppositions to the Application and Motion.  (Doc.

15  Nos. 15, 16.)  In support of his oppositions, defendant filed declarations from officials in the

16  Tulare County Sheriff's Department ("TCSD") including Captain Gabriel Macias (Doc. No. 15-

17  2), Lieutenant Cory Jones (Doc. No. 15-3), Assistant Sheriff Cheri Lehner (Doc. No. 15-4),

18  Lieutenant Cyrena Robles (Doc. No. 15-6), and Undersheriff Tom Sigley (Doc. No. 15-7).

19  Defendant also filed a declaration from Kevin Silveira, the Health Services Administrator for

20  Wellpath, which contracts with TCSD to provide medical services in the Jails.  (Doc. No. 15-5).

21       On August 24, 2020, plaintiffs filed their replies to defendant's oppositions to the pending

22  Application and Motion.  (Doc. Nos. 17, 18.)  In further support of their motion, plaintiffs also

23  filed supplemental declarations from plaintiffs' attorney Sara McDermott and ACLU investigator

24  Dylan Verner-Crist.  (Doc. Nos. 18-1, 18-2.)

25                              **FACTS**

26       Based on the evidence that the parties have submitted to the court, the relevant facts are

27  summarized as follows.

28  /////

**A.      COVID-19 and CDC Guidance**

COVID-19 is a serious and highly contagious respiratory disease that has reached pandemic status.  (Doc. No. 11-2 at ¶¶ 6, 7.)  COVID-19 "is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze."  (*Id.* at ¶ 7.)  COVID-19 symptoms may appear 2–14 days after exposure and "may include fever, cough, and shortness of breath or difficulty breathing," though infected individuals do not always exhibit symptoms and these asymptomatic individuals can still transmit the disease to others.  (*Id.* at ¶¶ 8–9.)  There is presently no cure, effective treatment, or vaccine for COVID-19.  (*Id.* at ¶ 10.)  However, widely recognized preventative measures include: "social distancing (keeping persons separated by at least six feet), frequent handwashing, and respiratory hygiene (e.g., covering mouth and nose when coughing or sneezing), and frequent cleansing of surfaces to prevent infection and the spread of the virus."  (*Id.* at ¶ 11.)

The risk of exposure and transmission of COVID-19 is particularly high in jails and prisons where people are crowded in close quarters with limited ability to practice preventative measures.  (*Id.* at ¶¶ 12–16.)  Recognizing this fact, the Centers for Disease Control ("CDC") has issued guidance specifically for correctional facilities "to assist in preparing for potential introduction, spread, and mitigation of [COVID-19] in their facilities," ("CDC Guidelines"). (Doc. No. 11-1, Ex. C, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated July 22, 2020)).  The CDC Guidelines recommend the following strategies to be employed to help prevent the spread of COVID-19 within correctional facilities:  "reinforcing hygiene practices; intensifying cleaning and disinfection of the facility; regular symptom screening for new intakes, visitors, and staff; continued communication with incarcerated/detained persons and staff; social distancing measures; as well as, testing symptomatic and asymptomatic individuals in correctional and detention facilities."  (*Id.*)  In addition, the CDC guidelines recommend the following strategies to help facilities clinically manage persons with confirmed and suspected COVID-19 inside the facility:  "medical isolation and care of incarcerated/detained persons with

COVID-19 (including considerations for cohorting), quarantine and testing of close contacts, restricting movement in and out of the facility, infection control practices for interactions with persons with COVID-19 and their quarantined close contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas where infected persons spend time." (*Id.*)

With regards to testing, the CDC Guidelines state:  "Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts can help prevent the spread of SARS-CoV-2, the virus that causes COVID-19, in correctional and detention facilities."  *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last updated August 10, 2020).  The CDC Guidelines advise that facilities "consider" various strategies, including "[b]aseline testing for all current [incarcerated or detained persons]."  *Id.*[3]

/////

/////

---

[3]  On August 27, 2020, defendant filed a motion to supplement his opposition to the pending Motion by providing the court with copies of recent CDC guidance documents, some of which were updated by the CDC after defendant filed his response.  (Doc. Nos. 22, 25.)  That motion will be granted.  However, the court was already aware of those updates and notes that as recently as August 24, 2020, the CDC revised their generally applicable recommendations (not those relating to jails and prisons) on testing, reversing its prior recommendations, and now advising that people who "have been in close contact (within 6 feet) of a person with a COVID-19 infection for at least 15 minutes but do not have symptoms" "do not necessarily need" to be tested.  *Overview of Testing for SARS-CoV-2 (COVID-19),* https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html (last updated August 24, 2020).  Nonetheless, that apparent reversal by the CDC in its generally applicable recommendations came on the heels of a CDC weekly report issued just three days earlier on August 21, 2020, in which the CDC found that "mass testing irrespective of symptoms, combined with periodic retesting, can identify infections and support prevention of widespread transmission in correctional and detention environments," and concluded that "[i]n correctional and detention facilities, broad-based SARS-CoV-2 testing provides a more accurate assessment of disease prevalence than does symptom-based testing and generates data that can potentially help control transmission."  *Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020*, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6933a3.htm?s_cid=mm6933a3_w (last visited on August 31, 2020).  Of course, whatever the actual applicable CDC guidance is here, as one district court has recently observed, "the CDC Guidelines represent the floor, not the ceiling, of an adequate response to COVID-19 at the Jail . . .."  *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 691 (C.D. Cal. 2020).

1   **B.     The Jails**

2         Although plaintiffs identify five facilities in their complaint, TCSD currently operates

3   only three of those detention facilities:  Adult Pre-Trial Facility ("APTF"), Bob Wiley Detention

4   Facility ("BWDF"), and the South County Detention Facility.  (Doc. No. 15-2 at ¶ 3.)  As to the

5   other two facilities referenced in plaintiffs' complaint, defendant closed the Main Jail on August

6   1, 2020 (Doc. No. 15-4 at ¶ 15)[4], and the Men's Correctional facility has been inactive since

7   inmates were transferred out of that facility in September 2019 (Doc. No. 15-3 at ¶ 2).

8         The California Board of State and Community Corrections ("BSCC") reports that as of

9   April 24, 2020, the rated capacities for the three active facilities are as follows:  384 inmates for

10  APTF, 696 inmates for BWDF, and 510 inmates for the South County Detention Facility.  (Doc.

11  No. 11-1 at ¶ 12–13, Ex. G at 57.)  Following the transfer of the 148 individuals who had been

12  incarcerated at the Main Jail to the other detention facilities, the population in each of those

13  facilities as of August 1, 2020 was as follows:  285 inmates in APTF, 558 inmates in BWDF, and

14  226 inmates in the South County Detention Facility.  (Doc. No. 11-1 at ¶ 11, Ex. F at 53.)  For the

15  reporting period of August 9–15, 2020, the BSCC reports the following populations:  281 in

16  APTF, 573 in BWDF, and 277 in the South County Detention Facility.[5]  Accordingly, the

17  population as a percent of the rated capacities for each of defendant's facilities are as follows:

18  73% for APTF, 82% for BWDF, and 54% for South County Detention Facility.

19        According to defendant, South County currently has an empty unit, "which may be used if

20  an outbreak requires additional prisoner movement and/or separation."  (Doc. No. 15-2 at ¶ 9.)

21  With the exception of one housing unit in BWDF, which is a dormitory style unit of 25 female

22  prisoners who live and program together as kitchen workers, all prisoners are now housed in one

23  _____

24  [4]  The Mail Jail was built in the late 1950s and had multiple ongoing problems related to its age
    and design, including flooding.  (Doc. No. 15-2 at ¶¶ 5–6.)  As a result, the closing of the Main

25  Jail had "been a part of future planning for some years."  (*Id.*)  The fourth floor of the Main Jail
    was closed in January 2020 due to flooding, and the other two housing floors were shut down in

26  late July.  (*Id.*)  "As a coronavirus prevention measure, no new prisoners were admitted to the
    housing floors for 30 days prior to the prisoners being moved to other facilities."  (*Id.* at ¶ 6.)

27
    [5]  *See* BSCC website at https://public.tableau.com/profile/kstevens#!/vizhome/BSCCCOVID-
28  19inDetentionFacilitiesDashboard/Instructions.

or two person cells in the three active detention facilities.  (*Id.* at ¶ 7.)  The single cells in each

facility are consistently occupied because of classification concerns requiring that certain

prisoners be housed alone.  (*Id.* at ¶ 8.)  Currently, all of the single cells are in use, except for

those in the infirmary that are reserved for medical use.  (*Id.* at ¶ 9.)

## C.     Defendant's Response to COVID-19

In consultation with Wellpath and local public health officials, TCSD "has implemented

and continues to implement measures to mitigate the risks related to coronavirus."  (Doc. No. 15-

4 at ¶ 2.)  According to defendant, a wide variety of additional precautions are currently in place

in the Jails to prevent the spread of COVID-19, including:  "posting of CDC posters regarding

steps to prevent the spread of germs for all inmates/detainees []; access to bar soap and water for

inmates/detainees; a 14 day quarantine period and testing for all new intakes; access to hygiene

and cleaning supplies for inmates/detainees; enhanced sanitation protocols implemented in the

detention facilities; segregation and isolation of symptomatic, exposed, or positive inmates and

detainees in three housing locations; wearing of masks by detentions staff in the facilities;

wearing of masks by inmates/detainees when outside their cells with daily replacements provided;

temperature checks on inmates when they enter and exit the facility or perform work details;

[and] verbal screening and temperature checks of all staff entering a facility."  (Doc. No. 15-4 at

¶ 3.)[6]

---

[6] Defendant initially prohibited all use of masks in the Jails, but that policy was finally changed on July 30, 2020—the day after plaintiffs filed their complaint in this action.  (Doc. Nos. 11-1 at 13; 15-4 at ¶ 4; 11-18 at ¶ 3.)  Defendant contends that under its current policy, masks are provided, and all staff are required to wear masks in the Jails and all inmates are required to wear masks, except when in their own cells.  (Doc. No. 15-4 at ¶ 4.)  Although plaintiffs had anticipated requesting injunctive relief to require defendant to create a CDC-compliant, written mask policy, plaintiffs' pending motion does not seek any such relief because plaintiffs' counsel and defense counsel met and conferred before plaintiffs filed the pending motion and had expressed optimism that a resolution of this issue could be reached without need for litigation on this issue.  (Doc. No. 11-1 at ¶¶ 4, 7.)  Plaintiffs' counsel notes, however, that as of the date of filing their replies, "[d]efendant has [] failed to make good on his agreement to meet and confer on the masking policy."  (Doc. No. 18 at 16 n.6.)  At the hearing on the pending motion, defense counsel confirmed that there still as of that date had not been a follow-up to meet and confer with plaintiffs' counsel, but assured the court that defendant was working on memorializing the current masking policy in writing.  (Hr'g Tr. at 28–30.)  The court notes, however, that the current masking policy was purportedly enacted nearly a month ago, and the fact that defendant has yet to

1          1.    COVID-19 Testing

2          On June 26, 2020, an employee at APTF tested positive for COVID-19.  (Doc. No. 15-4 at

3   ¶ 11.)  TCSD tested only the inmates in the unit where this employee worked and, according to

4   Assistant Sheriff Lehner, "[e]leven (11) of these inmates tested positive, two (2) refused to submit

5   to a test, the fifteen (15) inmates that tested positive or were at risk of testing positive, were

6   immediately moved into a sanitized unit and single celled for quarantine."  (*Id.*)  The court is

7   puzzled by this declaration because the math does not appear to add up—11 plus 2 does not equal

8   15.  Though Lehner does not explicitly state the total number of inmates who were administered

9   tests for COVID-19, she does state that 22 tested negative.  (*Id.*)  Thus, at least 11 of 35 people

10  (or 31%) tested positive from this single unit at APTF.  Defendant did not administer tests in any

11  other unit as a result of this known outbreak inside the facility.

12         Then, at some unspecified later date, an inmate housed in a different unit in APTF also

13  tested positive for COVID-19, and "[i]nmates and staff from this unit were all tested, resulting in

14  some positive tests."  (Doc. No. 15-4 at ¶ 12.)  However, defendant does not specify how many

15  inmates were tested in this instance nor does defendant report how many inmates tested positive,

16  and defendant's counsel was unable to provide any specifics whatsoever in this regard at the

17  hearing on the pending Motion.  (Hr'g Tr. at 6–7.)  Again, defendant did not administer tests to

18  inmates in any other unit as a result of this second known outbreak.

19         Beyond the limited testing associated with these two known outbreaks of the virus, TCSD

20  has not conducted any widespread testing of other inmates.  Notably, both of these outbreaks

21  _____

22  memorialize any such policy in writing is quite concerning to the court, particularly in light of the
    fact that the COVID-19 pandemic and the risks it presents have been well known for over five

23  months.  Accordingly, although not requested by plaintiffs—who had been optimistic of an
    informal resolution of this issue that for some unexplained reason defendant has not brought to

24  fruition—the court concludes that injunctive relief on this issue is now necessary and will order
    defendant to develop written policies with respect to masking in the Jails.  Relatedly, defendant

25  previously limited the amount of soap and cleaning supplies provided to inmates at the Jails.
    However, according to defendant, under the current policy, TCSD deputies "have been instructed

26  to provide new bars of soap upon request by any inmate" and cleaning supplies are available upon
    request.  (Doc. No. 15-2 at ¶¶ 12, 15.)  Because plaintiffs do not challenge defendant's purported

27  new policies regarding soap and cleaning supplies in their pending motion, the court will not
    address these purported policies in this order.  (*See* Doc. No. 18 at 5.)

28

1  occurred in APTF.  Defendant has not presented any evidence that inmates from any of the other

2  facilities have been tested for COVID-19.  Defendant also does not present any evidence (or even

3  assert) that the inmates who were transferred out of the Main Jail had been tested prior to being

4  moved to the other facilities.  Indeed, BSCC's reported COVID-19 testing data for the Jails shows

5  that *zero* incarcerated people were tested for COVID-19 both in BWDF and the South County

6  facility during the reporting period of August 9–15, 2020.  (*See* Doc. No. 18-1, Ex. M.)  During

7  that same period, BSCC reports that 52 incarcerated people in APTF were tested.  (*Id.*)

8  Presumably, those 52 tests were conducted on new inmate intakes as part of TCSD's new testing

9  plan, which was not enacted until July 14, 2020.  (Doc. No. 15-4 at ¶ 13.)  Under that plan, "fresh

10  bookings" are to be screened at intake to see if administration of a COVID-19 test is required

11  (i.e., if the new inmates have a fever above 100.4 and symptoms of respiratory illness), and they

12  remain housed in the Observation Unit at APTF for a 14-day observation period, after which they

13  receive a COVID-19 test.  (*Id.*; Doc. No. 15-5 at ¶ 3.)  Lehner declares that "[a]dditional inmates

14  have been placed in isolation based on positive tests, or refusal to test, during the Observation

15  period."  (Doc. No. 15-4 at ¶¶ 13, 14.)  Again, actual figures are not provided in the declarations

16  submitted to the court by defendant, and defense counsel was unable to provide the court with any

17  details in that regard at the hearing.  (Hr'g Tr. at 6–7.)  In fact, defendant conceded that there has

18  been no testing of any inmates held in the BWDF and South County facilities at all.  (*Id.* at 5–6.)

19      Aside from the COVID-19 testing process for new intakes, testing of all other inmates

20  only takes place if a clinician screens an inmate during a medical visit and determines that testing

21  is clinically indicated.  (Doc. No. 15-5 at ¶ 12.)  Even there, defendant has not come forward with

22  any evidence about the number of inmates, if any, that have been tested as a result of this medical

23  screening process.  Considering the BSCC's report and defendant's concession that *zero* tests

24  were conducted at the other two detention facilities, the court is skeptical that any tests are being

25  performed beyond those for new intakes under observation.

26      2.  Screening and Quarantining Efforts

27      According to defendant, as of July 14, 2020, the Jails use the following procedure for

28  isolation, quarantine, and observation:

1. Isolation Unit - Inmates who tested positive will be isolated for 14 days and must be symptom free for the last 3 days of isolation. If they are not symptom free for the last 3 days, then the isolation period will be extended an additional 7 days until symptom free for the last 3 days. This would be a 21-day maximum isolation. If they are symptom free or qualify for release from isolation under CDC guidelines, they can return to general population.

2. Quarantine Unit - Inmates that have been exposed to a positive case of COVID -19 will be monitored by Wellpath daily. They will be tested at day(s) 1, 7 and 14. If all tests come back negative and they are symptom free, they will be transferred back to general population. If they test positive they will be moved to the isolation unit to begin the 14 day isolation protocol.

3. Observation Unit - All fresh bookings are housed in this unit for 14 days. If the arrestee shows symptoms at the time of booking, they will be sent to the negative air flow cells pending test results. If they test positive they will be sent to the isolation unit, if they test negative they will be sent to the quarantine unit and the above listed protocols will be followed. All others will be sent to the observation unit and will be monitored daily by medical staff. If they are symptom free after 14 days, they are tested. If negative, they are moved into general population. If positive, they are placed in isolation and quarantine is extended for contacts based on the new exposure.

(Doc. No. 15-4 at ¶ 13.) However, there is no evidence before the court that this procedure has been memorialized in writing, or that any related policies (such as policies defining terms and setting out operational details as to implementation) exist at all, let alone in writing.

Additional measures being taken by defendant include that "[a]ll inmates leaving the facility for court or medical transports are being screened prior to leaving the facility and upon return to the facility," and "all inmates on a work program are being screened daily by Wellpath prior to going to their work assignments." (Doc. No. 15-4 at ¶ 5.) But, as plaintiffs note, Wellpath is apparently using screening criteria from early March 2020 and the screening form appears to be remarkably outdated—stating, for instance, that most COVID-19 infections are associated with travel to Wuhan, China, and directing the screener to ask whether the patient has spent time in China, Iran, S. Korea, Italy, and Japan. (*See* Doc. No. 15-5 at 10.)

3.   Social-Distancing Efforts

Defendant has also not presented any evidence to the court of an adoption of any sort of comprehensive social distancing policy. Instead, defendant asserts that a handful of distinct efforts have been implemented (though it is unclear when those efforts were undertaken, or if

14

1  they are memorialized anywhere in writing).[7]  First, defendant established keeping cellmates

2  together "as a housing priority to reduce the potential for cross-contamination."  (Doc. No. 15-2

3  at ¶ 10.)  But, as one inmate has declared, "[i]t is impossible to stay six feet away from your

4  cellmate when in your cell."  (Doc. No. 11-19 at ¶ 3.)  Second, "[s]igns and markings have been

5  installed in each facility to create awareness of COVID-19 and its symptoms and to encourage

6  social distancing."  (Doc. No. 15-2 at ¶ 21.)  Third, the court is told that "[p]risoners are

7  transported in reduced numbers to allow for distancing."  (*Id.* at ¶ 22.)  Fourth, TCSD

8  implemented a plan at APTF "to stage inmates in the hallway at 6 ft. apart while awaiting video

9  court."  (Doc. No. 15-4 at ¶ 17.)

10  **D.      Legal Visitation Policy in the Jails**

11          The video visitation process in the Jails is operated by an outside vendor, and it allows for

12  authorized persons to set up confidential video conference visits online.  (Doc. No. 15-6 at ¶ 3.)

13  In May 2020, Undersheriff Sigley was informed[8] that the confidential video conferencing system

14  may have been being misused based on two reported incidents of an ACLU investigator allegedly

15  meeting with inmates who did not expect to meet with him and did not want to talk to him.  (Doc.

16  No. 15-7 at ¶ 3.)  In the first incident, the inmate reportedly thought he would be visiting with his

17  wife.  (*Id.*)  In the second incident, the inmate allegedly reported feeling pressured and disturbed

18  by the interaction with the ACLU investigator who told her that he could get her released.  (*Id.*)

19  Undersheriff Sigley declares only that "[a] review of a report on the visits reflected that access

20  was not being limited to those who qualified for confidential visits," (*id.* at ¶ 4) and that

21  "[v]arious inmates were interviewed as a part of the investigation into whether the ACLU

22  investigator had arranged confidential visits under false pretenses," (*id.* at ¶ 7).

23          Plaintiffs' version of the events is that it was in fact deputies, not any ACLU investigator,

24  who threatened and intimidated inmates and in one instance did so while armed.  Plaintiffs have

25  ─────────────────────
26  [7]  The only social-distancing related assertion that provides a date reference is Assistant Sheriff
    Lehner's statement that she visited the South County facility on April 23, 2020 and observed
    medical staff and TCSD staff maintaining social distancing as safety permitted.  (Doc. No. 15-4 at
27  8.)  Her declaration does not address social distancing of inmates.

28  [8]  Who it was that allegedly so informed Undersheriff Sigley is not identified by defendant.

provided evidentiary support for their position by way of sworn declarations from inmates who felt threatened and intimidated by the deputies who repeatedly asked about the inmates' visits with the ACLU, specifically demanding to know what was discussed, why inmates were talking to the ACLU, which other inmates were also talking to the ACLU, and if additional visits had been scheduled.  (*See* Doc. Nos. 11-14 at ¶¶ 5–6; 11-20 at ¶¶ 8–9.)  For example, inmate Mario Escobar declares that he met confidentially with ACLU investigator Verner-Crist on May 27, 2020, and the next day, he was pulled out of his unit by deputies and questioned about that visit.  (Doc. No. 11-14 at ¶¶ 5, 6.)  He refused to answer the deputies' questions but it "was clear to [him] that they were trying to intimidate [him] out of speaking with ACLU staff about the lack of coronavirus prevention in the jails."  (*Id.* at ¶ 6.)  Similarly, on May 28, 2020, inmate Jeffery Nunes was questioned by Sergeant O'Rafferty and Commander Garcia about why he was talking with the ACLU and what the ACLU was asking him about, to which Nunes answered that he was talking to the ACLU about conditions in APTF.  (Doc. No. 11-20 at ¶ 8.)  Inmate Nunes was told that his legal visits with Verner-Crist were going to be cancelled.  (*Id.*)  As a result, inmate Nunes felt threatened and was reluctant to speak with Verner-Crist after that.  (*Id.* at ¶ 9.)  Even though plaintiffs' declarations were served on defendant weeks ago, defendant has not come forward with any evidence refuting plaintiffs' version of these events.

In addition, in his supplemental declaration Verner-Crist describes his extensive experience interviewing incarcerated individuals in connection with his investigations in prisoners' rights cases, and he asserts that the allegations referenced by Undersheriff Sigley "do not comport with [his] practice, experience or recollection," and that he "did not pressure any interviewee with whom [he] spoke" nor "promise to get someone released."  (Doc. No. 18-2 at ¶¶ 4–6.)  Verner-Crist further explains that with respect to inmates he interviewed in connection with this case "[a]t the beginning of each interview, [he] told each of them that [he] was an investigator with the ACLU, a civil rights organization, that the interview was completely voluntary, and that [he] wanted to speak with them about whether they had any concerns about how TCSD was preparing for the coronavirus pandemic."  (*Id.* at ¶ 8.)  According to Verner-Crist, everyone he spoke to had agreed to speak with him, and they all indicated interest in

16

speaking to him again except for one person who said he was unsure if he wanted to do so again but that he would think about it and contact Verner-Crist if he was interested in doing so.  (*Id.* at ¶¶ 8, 9.)  Verner-Crist declared that he is "unable to identify who allegedly made [the] remarks" referenced in Undersheriff Sigley's declaration.  (*Id.* at ¶ 6.)

Defendant does not dispute that in response to the ACLU investigation and ACLU's use of video conferencing inmates, TCSD reset the video conferencing system at the Jails, thereby requiring all attorneys to establish new accounts in that system, and TCSD instituted a new policy of requiring inmates to complete a form to confirm that the inmate desired a confidential visit with the attorney or the attorney's agent.  (*Id.* at ¶ 5.)  Defendant has not provided the court with a copy of the form inmates are now required to sign in this regard.[9]  Plaintiffs' attorney Kathleen Guneratne attached as exhibits to her declaration a "Video Visiting Directive" dated May 29, 2020 and a letter "Re: Professional Visits" dated June 4, 2020 from defendant (Doc. No. 11-5 at ¶ 10, Exs. E, F), which state that under the new legal visitation policy, access will not be allowed until "the inmate has verified that [the attorney/investigator] [is] in fact their attorney of record *and* they wish to visit."  (*Id.* at 26) (emphasis added).  At the hearing on the pending Motion, plaintiffs' counsel confirmed that despite taking the steps outlined in defendant's new directive, they have not been able to meet confidentially with prospective clients, all of whom have expressed a desire to confer with counsel and seek legal advice in connection with this action.  (Hr'g Tr. at 51.)  Plaintiffs' counsel also confirmed at the hearing that neither they nor their investigator had "cold called" any inmates in the Jails.  (*Id.*)

Undersheriff Sigley declares that "[a]lthough the policy references 'attorney of record' it has not been interpreted in a limited sense, and [TCSD] is revising the policy and related forms to reflect that inmates seeking representation are also permitted confidential video visits."  (*Id.* at ¶ 6.)  But, once again, defendant has not submitted any evidence of a written revised policy reflecting the change they now claim to have made after this lawsuit was filed.

/////

---

[9]  The court notes that Lieutenant Robles states that a copy of the form is attached as an exhibit to her declaration, but there is no such attachment.  (*See* Doc. No. 15-6 at ¶ 5.)

17

Lieutenant Robles, who is responsible for the video visitation process, explains in her declaration that after the system was reset, she was on vacation for an extended period of time and, as a result, "there were some difficulties and confusion in implementation," and "enquiries may have gone unanswered."  (Doc. No. 15-6 at ¶ 9.)  In addition, Lieutenant Robles has declared that there is no requirement that the prisoner already have an attorney/client relationship with the attorney for a confidential visit to be scheduled.  (*Id.* at ¶ 5.)  Lieutenant Robles does say that there was a period of time where setting up confidential video visits at BWDF "was difficult because the two rooms available for such visits were also used by pro per inmates for preparation, resulting in overwhelming demand," but that "the situation was rectified . . . within 1–2 days." (*Id.* at ¶ 6.)

Lieutenant Robles also declares that prisoners can make unrecorded telephone calls to attorneys if the attorneys have their phone number entered into the Jails' system, which blocks the recording of calls made to specified numbers entered in the system.  (*Id.*)  Though it is not clear that inmates or their attorneys know about this option.  As one inmate declared, "[the] calls I make to Mr. Verner-Crist are recorded and deputies can listen into what I tell the ACLU.  There is no privacy.  The Sheriff's obstruction of my right to talk to legal representatives has made it very difficult to report my concerns about conditions in the jails.  I'd like to work with ACLU staff on a civil rights case about the jail conditions, but the Sheriff has made it very difficult for me to do so."  (Doc. No. 11-14 at ¶ 8.)

## LEGAL STANDARD

### A.      Provisional Class Certification

District courts in this circuit can provisionally certify a class for the purposes of a preliminary injunction.  *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 (9th Cir. 2020) (noting that the Ninth Circuit has "approved provisional class certification for purposes of preliminary injunction proceedings") (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (concluding that "the district court acted within its discretion when it ruled that [plaintiff] met the commonality, typicality, and adequacy requirements of [Federal Rule of Civil Procedure] 23(a) and did not abuse its discretion by granting provisional class certification.").

18

1        Pursuant to Federal Rule of Civil Procedure 23, a party seeking class certification must

2  establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If these prerequisites—commonly referred to as numerosity, commonality, typicality, and adequacy—are satisfied, then the party seeking class certification must also satisfy one of the three subsections of Rule 23(b).  Here, plaintiffs seek class certification under Rule 23(b)(2), which requires a showing that defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  (Doc. No. 10 at 9) (quoting Fed. R. Civ. P. 23(b)).

        The party seeking class certification bears the burden of establishing conformity with these requirements and must do so by producing facts that "affirmatively demonstrate" that certification is warranted.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Only after it has conducted a "rigorous analysis" of these facts and determined that they show "actual, not presumed, conformance" with Rule 23(a) and (b), may a district court certify a class.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161 (1982)); *see also Comcast*, 569 U.S. at 33–34 (extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Servs., Inc.*, 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b).").  A court must review the merits of a party's substantive claim only if they overlap with issues touching on class certification.  *Ellis*, 657 F.3d at 981 (citing *Dukes*, 564 U.S. at 350–51; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

1     "The decision to grant or deny class certification is within the trial court's discretion."

2   *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (citing *Yamamoto v.*

3   *Omiya,* 564 F.2d 1319, 1325 (9th Cir. 1977)).  If a court does decide to certify a class, it must

4   define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1).  Finally,

5   "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under

6   this rule." Fed. R. Civ. P. 23(c)(5).

7   **B.      Temporary Restraining Order**

8            The standard governing the issuing of a temporary restraining order is "substantially

9   identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Intern. Sales Co. v.*

10  *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

11  preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

12  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

13  balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans,*

14  *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

15  *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

16  Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

17  possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*,

18  632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth Circuit has also held that an "injunction is

19  appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were

20  raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for Wild Rockies*,

21  632 F.3d at 1134–35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (*en*

22  *banc*)).[10]  The party seeking the injunction bears the burden of proving these elements.  *See Klein*

23  *v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs.*

24  *Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege

---

25  [10]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale
26  approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild*
    *Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of
27  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,
    so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
28  injunction is in the public interest." *Id*. at 1135.

1   imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

2   injury as a prerequisite to preliminary injunctive relief.")  Finally, an injunction is "an

3   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

4   to such relief."  *Winter*, 555 U.S. at 22.

**ANALYSIS**

**A.      Plaintiffs' Application to Provisionally Certify the Proposed Class**

7        Plaintiffs seek to provisionally certify a class defined as "all people who are now, or in the

8   future will be, incarcerated in Tulare County Jails" (the "Proposed Class").  (Doc. No. 10 at 4.)

9   Because plaintiffs do not currently seek certification of the subclasses alleged in their complaint,

10  the court will not consider certification of any putative subclasses in this order.

11       Recently, several district courts have provisionally certified classes of detained and

12  incarcerated individuals seeking preliminary injunctive relief related to their conditions of

13  confinement and detention during the COVID-19 pandemic.  *See, e.g.*, *Roman v. Wolf*, No. 20-cv-

14  00768-TJH-PVCx, 2020 WL 3869729, at *4 (C.D. Cal. Apr. 23, 2020) (provisionally certifying

15  class of people who are "currently detained in civil immigration detention at the Adelanto

16  Immigration and Customs Enforcement Processing Center"); *Ahlman v. Barnes*, 445 F. Supp. 3d

17  671, 694 (C.D. Cal. May 26, 2020) (provisionally certifying subclasses of pre-trial detainees and

18  post-conviction prisoners incarcerated at the Orange County Jail).

19       In his opposition to the pending Application defendant argues, with minimal citation to

20  authority, that the Proposed Class fails to meet the requirements of Rule 23, except numerosity.

21  (Doc. No. 16-1.)

22       For the reasons explained below, the court will grant plaintiffs' Application and

23  provisionally certify the Proposed Class.

24       1.      Numerosity

25       A proposed class must be "so numerous that joinder of all members is impracticable."

26  Fed. R. Civ. P. 23(a)(1).  "'[I]mpracticability' does not mean 'impossibility,' but only the

27  difficulty or inconvenience of joining all members of the class."  *Rodriguez v. Penske Logistics,*

28  *LLC*, No. 2:14-cv-02061-KJM-CKD, 2017 WL 4132430, at *5 (E.D. Cal. Sept. 19, 2017)

1    (quoting *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964)).  While

2    there is no strict number requirement for numerosity, courts have routinely held that classes

3    comprised of more than forty members will satisfy this prerequisite.  *Rannis v. Recchia*, 380 Fed.

4    App'x 646, 651 (9th Cir. 2010) ("In general, courts find the numerosity requirement satisfied

5    when a class includes at least 40 members.")[11]; *Gonzalez v. NCI Grp., Inc*., No. 1:18-cv-00948-

6    AWI-SKO, 2020 WL 4547303, at *5 (E.D. Cal. Aug. 6, 2020) ("Generally, forty or more

7    members will satisfy the numerosity requirement."); *Ikonen v. Hartz Mt. Corp.*, 122 F.R.D. 258,

8    262 (S.D. Cal. 1988) ("As a general rule, classes of 20 are too small, classes of 20–40 may or

9    may not be big enough depending on the circumstances of each case, and classes of 40 or more

10   are numerous enough.").

11         Here, plaintiffs have shown that the Proposed Class is sufficiently numerous.  Plaintiffs'

12   counsel McDermott declared that according to data reported by defendant to BSCC, as of August

13   1, 2020, there were approximately 1,086 people incarcerated in the Jails.  (Doc. Nos. 10 at 4; 11-1

14   at ¶ 11, Ex. F.)  Defendant does not contest that the numerosity requirement is satisfied here.

15   (Doc. No. 16-1 at 15.)

16         2.    Commonality

17         Rule 23 requires that there be "questions of law or fact common to the class."  Fed. R.

18   Civ. P. 23(a)(2).  To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend

19   upon a common contention . . . of such a nature that it is capable of classwide resolution—which

20   means that determination of its truth or falsity will resolve an issue that is central to the validity of

21   each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350; *see also Ellis*, 657 F.3d at 983 ("If

22   there is no evidence that the entire class was subject to the same [] practice, there is no question

23   common to the class.").  Commonality turns on whether class treatment will "generate

24   common *answers* apt to drive the resolution of the litigation."  *Wright v. Renzenberger, Inc.*, 656

25   F. App'x 835, 837 (9th Cir. 2016)[12] (quoting *Ellis*, 657 F.3d at 981) (noting that "[w]hether

26   ──────────────

27   [11]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

28   [12]  *See* footnote 11, *supra*.

22

1    Renzenberger's policies complied with the law was a common question, whatever its merits");

2    *see also Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1113 (9th Cir. 2014)

3    (finding the district court erred in denying class certification after evaluating the merits "rather

4    than focusing on whether the questions presented, whether meritorious or not, were common to

5    the members of the putative class").[13]

6         Here, plaintiffs argue that commonality is satisfied because all members of the Proposed

7    Class "are subject to the same practices and lack of policies" related to social distancing, testing,

8    and legal visits.  (Doc. No. 10 at 5–6.)  Plaintiffs assert that there are several common questions

9    of fact and law, including whether:  (i) defendant continues to pack class members into crowded

10   housing units despite available living space elsewhere in the Jails; (ii) defendant has implemented

11   effective testing protocols to prevent the spread of COVID-19 in the Jails; (iii) defendant has

12   interfered with class members' confidential communications with counsel and access to the

13   courts, including by implementing the restrictive legal visitation policy and by permitting

14   intimidation, threats, and retaliation against class members who speak with counsel; (iv)

15   defendant's failure to reduce overcrowding and to provide testing exposes class members to a

16   heightened risk of serious illness and death in violation of the Eighth and Fourteenth

17   Amendments; (v) defendant violated class members' First, Sixth, and Fourteenth Amendments by

18   interfering with their access to counsel and the courts; and (vi) defendant's use of intimidation,

19   threats, and retaliation violates the Bane Act.  (*Id.* at 6–7.)  Plaintiffs contend that these common

20   issues are amenable to class treatment.  (*Id.* at 7.)

21        In opposition, defendant argues that "[t]he proposed class members' differing risk profiles

22   preclude a single, indivisible remedy, because not all risk profiles necessitate the same

23   precautions."  (Doc. No. 16-1 at 19.)  In particular, defendant argues that "[t]he imperative of

24   individualized determinations, makes this case inappropriate for class treatment."  (*Id.* at 18.)  But

---

26   [13]  The commonality requirement of Rule 23(a) is less demanding than the requirement for
     certification under Rule 23(b)(3) that "questions of law or fact common to class members
27   *predominate* over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3)
     (emphasis added); *see also Stockwell*, 749 F.3d at 1113 ("Rule 23(b)(3) imposes a 'far more
28   demanding' standard than 23(a)(2).").

1    in advancing this argument defendant appears to be conflating Rule 23(a)'s commonality

2    requirement with the predominance requirement of Rule 23(b)(3), which plaintiffs need not

3    satisfy here.  Moreover, defendant states that other courts have found the commonality

4    requirement not met by proposed classes of inmates in the COVID-19 context but cites only to

5    one district court's decision in *Money v. Pritzker*, No. 20-cv-2093, 2020 WL 1820660, at *14

6    (N.D. Ill. Apr. 10, 2020).  As plaintiffs note in their reply, the analysis in *Money* is out of step

7    with other courts' decisions regarding certification of COVID-19 related classes.  (Doc. No. 17 at

8    6 n.3.)  Furthermore, defendant does not distinguish any of the cases plaintiffs cited in their

9    Application, which support their assertion that indeed several district courts, including those in

10   this circuit, have provisionally certified classes similar to the Proposed Class here after finding

11   that the requirements of Rule 23(a) and Rule 23(b)(2) had been satisfied.  This court similarly

12   concludes that plaintiffs here have satisfied the commonality requirement.

13           3.    Typicality

14           Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

15   of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality

16   requirement is to assure that the interest of the named representative aligns with the interests of

17   the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  This "typicality

18   requirement is 'permissive' and requires only that the representative's claims are "reasonably co-

19   extensive with those of absent class members; they need not be substantially identical."

20   *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citing *Hanlon v. Chrysler Corp.*, 150

21   F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338.).  This

22   requirement "is satisfied when each class member's claim arises from the same course of events,

23   and each class member makes similar legal arguments to prove the defendant's liability."

24   *Rodriguez*, 591 F.3d 1105 at 1124 (internal quotation marks and citations omitted).

25           Here, plaintiffs contend that the typicality requirement is satisfied because they are

26   currently incarcerated in the Jails and all of their claims are brought on behalf of themselves and

27   the Proposed Class.  (Doc. No. 10 at 7–8.)  In addition, plaintiffs contend that their claims are

28   typical of the class claims, which all arise from the same alleged failures of defendant to

                                                    24

1   adequately respond to COVID-19 and the same unconstitutionally restrictive legal visitation

2   policy.  (*Id.*)  Despite accurately stating the typicality standard, defendant argues in a confusing

3   manner that typicality is not satisfied here because "[t]he vague and unspecified forms of relief

4   requested demonstrate Petitioners' [sic] inability to establish typicality."  (Doc. No. 16-1 at 21.)

5   Whatever elusive argument that might be, it does not speak to Rule 23(a)(3)'s typicality

6   requirement.  It is telling that defendant does not argue that plaintiffs' interests do not align with

7   those of the class, or that their claims are not reasonably coextensive with those of the class.  The

8   court therefore finds that plaintiffs have satisfied the typicality requirement.

9          4.       Adequacy of Representation

10          Rule 23(a)(4) requires plaintiffs to show that they "will fairly and adequately protect the

11   interests of the class."  Fed. R. Civ. P. 23(a)(4).  Generally, the adequacy inquiry seeks to ensure

12   that class representatives are "part of the class and possess the same interest and suffer the same

13   injury as the class members."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)

14   (internal quotations omitted).  "Requiring the claims of the class representatives to be adequately

15   representative of the class as a whole ensures that the interests of absent class members are

16   adequately protected."  *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (citing *Hansberry v.*

17   *Lee,* 311 U.S. 32, 42 (1940)).

18          Whether the adequacy requirement is satisfied depends on "the qualifications of counsel

19   for the representatives, an absence of antagonism, a sharing of interests between representatives

20   and absentees, and the unlikelihood that the suit is collusive."  *Crawford v. Honig,* 37 F.3d 485,

21   487 (9th Cir. 1994).  "To determine whether named plaintiffs will adequately represent a class,

22   courts must resolve two questions:  '(1) do the named plaintiffs and their counsel have any

23   conflicts of interest with other class members and (2) will the named plaintiffs and their counsel

24   prosecute the action vigorously on behalf of the class?'"  *Ellis*, 657 F.3d at 985 (quoting *Hanlon*,

25   150 F.3d at 1020).  "An absence of material conflicts of interest between the named plaintiffs and

26   their counsel with other class members is central to adequacy and, in turn, to due process for

27   absent members of the class."  *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 959 (9th Cir. 2009)

28   (citing *Hanlon*, 150 F.3d at 1020).

1   Here, plaintiffs assert that the adequacy requirement is satisfied because "there is no

2   conflict between the named plaintiffs and other members of the Proposed Class" and they will

3   "vigorously prosecute this action" to "ensur[e] that all people facing the current dangerous

4   conditions in Tulare County Jails benefit from this case."  (Doc. No. 10 at 8.)  In addition,

5   plaintiffs contend that their counsel, the ACLU and Munger, Tolles & Olson, have extensive

6   experience litigating class action lawsuits, including representing incarcerated people in general

7   and in cases related to conditions of confinement during the COVID-19 pandemic.  (*Id.*)

8   Defendant does not present any arguments regarding the adequacy requirement, despite his

9   general position that only the numerosity requirement of Rule 23(a) had been met by plaintiffs in

10  this case.  The court finds that plaintiffs have satisfied the adequacy requirement.

11  Having concluded that all four requirements of Rule 23(a) have been satisfied, the court

12  will proceed to assess whether Rule 23(b)(2) has been satisfied as well.

13          5.      Rule 23(b)(2) Requirements

14  Rule 23(b)(2) requires plaintiffs to show that defendant "has acted or refused to act on

15  grounds that apply generally to the class, so that final injunctive relief or corresponding

16  declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  For

17  class certification under Rule 23(b)(2), plaintiffs must primarily seek declaratory or injunctive

18  relief.  *Rodriguez*, 591 F.3d at 1125.  Courts are not required "to examine the viability or bases of

19  class members' claims for declaratory and injunctive relief, but only to look at whether class

20  members seek uniform relief from a practice applicable to all of them."  *Id.* (noting that Rule

21  23(b)(2) requirements are met when "class members complain of a pattern or practice that is

22  generally applicable to the class as a whole") (citing *Walters,* 145 F.3d at 1047).

23          Here, plaintiffs argue that the requirements of Rule 23(b)(2) are met because they seek

24  uniform injunctive relief and defendant's actions and omissions in failing to adequately respond

25  to COVID-19 allegedly violate the rights of all putative class members and are generally

26  applicable to the class.  (Doc. No. 10 at 9.)  Defendant does not meaningfully oppose plaintiffs'

27  argument in this regard, beyond merely asserting without any elaboration that "[t]he key to the

28  /////

(b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted."  (Doc. No. 16-1 at 19.)

The court finds that plaintiffs have clearly satisfied the requirements of Rule 23(b)(2) and will provisionally certified the Proposed Class.  *See Parsons v. Ryan*, 754 F.3d 657, 688–89 (9th Cir. 2014) (affirming certification under Rule 23(b)(2) where defendants had acted on grounds that apply generally to the proposed class and subclass of prisoners who were "allegedly exposed to a substantial risk of serious harm by a specified set of centralized [department of corrections] policies and practices of uniform and statewide application" that placed every prisoner in peril). The court will appoint plaintiffs Criswell, Johnson, Ibarra, and Camposeco as representatives of the class.  Pursuant to Rule 23(g), the court will also appoint the ACLU Foundation of Northern California and the law firm Munger, Tolles & Olson as class counsel.

**B.    Plaintiffs' Motion for a Temporary Restraining Order**

Below, the court will address whether plaintiffs have satisfied each of the requirements for the issuance of the temporary restraining order which they seek.

      1.    <u>Likelihood of Success on the Merits</u>

Plaintiffs contend that they are likely to succeed on the merits of all five claims asserted in their complaint.  (Doc. No. 11 at 21–29.)  Defendant argues that plaintiffs are not likely to succeed on the merits because:  (1) plaintiffs failed to exhaust their administrative remedies, and (2) plaintiffs cannot show deliberate indifference because defendant has implemented "reasonable available measures."  (Doc. No. 15-1 at 18–25.)  Defendant also emphasizes that "the evidence presented [by plaintiffs] is largely outdated, and the requested measures are already in place as the TCSD's policies and processes have evolved in response to changing conditions in the community and the facilities."  (*Id.* at 6.)

      a.    *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]hat

language is 'mandatory':  An inmate 'shall' bring 'no action' (or said more conversationally, may

not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 136

S. Ct. 1850, 1856 (2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)); *Jones v. Bock*, 549

U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA.").

"Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's

exhaustion requirement.  The only limit to § 1997e(a)'s mandate is the one baked into its text: An

inmate need exhaust only such administrative remedies as are 'available.'"  *Ross*, 136 S. Ct. at

1862.  In *Ross*, the Supreme Court noted that there are "three kinds of circumstances in which an

administrative remedy, although officially on the books, is not capable of use to obtain relief."

*Id.* at 1859.  Remedies are unavailable when:  (1) the administrative procedure "operates as a

simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved

inmates"; (2) the "administrative scheme might be so opaque that it becomes, practically

speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage

of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1859–60.

With regards to the third circumstance, the Supreme Court cited several circuit court

decisions addressing when administrative remedies were effectively rendered unavailable.  *Id.* at

1890, n.3 (citing *Davis v. Hernandez*, 798 F.3d 290, 295 (5th Cir. 2015) ("Grievance procedures

are unavailable . . . if the correctional facility's staff misled the inmate as to the existence or rules

of the grievance process so as to cause the inmate to fail to exhaust such process" (emphasis

deleted)); *Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) ("A remedy is not available,

therefore, to a prisoner prevented by threats or other intimidation by prison personnel from

seeking an administrative remedy"); *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011) ("[I]f

prison officials misled [a prisoner] into thinking that . . . he had done all he needed to initiate the

grievance process," then "[a]n administrative remedy is not 'available'"); *Tuckel v. Grover*, 660

F.3d 1249, 1252–1253 (10th Cir. 2011) ("[W]hen a prison official inhibits an inmate from

utilizing an administrative process through threats or intimidation, that process can no longer be

said to be 'available'"); *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007) (If a prison

"play[s] hide-and-seek with administrative remedies," then they are not "available.")).

The Ninth Circuit has also "recognized that the PLRA does not require exhaustion when circumstances render administrative remedies 'effectively unavailable.'" *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017) (quoting *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010)); *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010) (holding that there is an "exception to the PLRA's exhaustion requirement where a prison official renders administrative remedies effectively unavailable by improperly screening a prisoner's grievances.").

In addition, the PLRA exhaustion requirement is an affirmative defense, and defendants bear the burden of raising and proving the absence of exhaustion. *See Jones*, 549 U.S. at 216 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints."). "[A] defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015). If defendant does so, then the burden shifts to the plaintiff, "who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him . . .." *Id.*

Here, defendant argues that the evidence shows that plaintiffs failed to exhaust their administrative remedies by submitting grievances as required by the grievance policy in the Jails. (Doc. No. 15-1 at 19–20.) Though defendant has not specified which of plaintiffs' claims he contends have not been exhausted, his arguments pertain only to a purported failure by plaintiffs to exhaust their claims that he actively interfered with their right to access the courts and counsel.

Defendant contends that the grievance log, which reflects 450 inmate grievances submitted in 2020 on various issues, shows that grievance forms can in fact be obtained and submitted. (Doc. No. 15-1 at 19–20.) The grievance log also shows that the Jails processed the grievances submitted by the inmates who provided declarations in support of plaintiffs' Motion. (*Id.*) According to defendant, this evidence shows that grievance forms were generally available, and thus plaintiffs and putative class members were not denied access to the Jails' grievance process. (*Id.*) In addition, defendant asserts that "[t]here is no reference in any of the inmate declarations of an attempt to submit a grievance, or even requesting a grievance form, in connection with access to counsel or the confidential visit policy." (Doc. No. 15-1 at 20.)

1    Similarly, with regards to the declarants who described incidents of retaliation, none of those

2    declarations "establish any grievance, or attempt to grieve, perceived retaliation." (*Id.*) For

3    example, despite the declarations of inmates Alford, Escobar, and Ibarra in which they aver that

4    they were questioned about their visits with the ACLU investigator, none of them submitted a

5    grievance about those incidents. (*Id.*)

6           In reply, plaintiffs argue that because of defendant's interference and the threats and

7    intimidation by TCSD deputies, administrative remedies were effectively rendered unavailable to

8    them. (Doc. No. 18 at 8–9.) In particular, plaintiffs urge the court to conclude that the

9    administrative exhaustion requirement does not preclude their claims here because the inmates'

10   requests for grievance forms were denied. (*Id.*) Although Lieutenant Jones declares that inmates

11   are not required to provide a reason in order to receive a grievance form, and that "[d]eputies are

12   not to 'screen' grievances before providing the form," that prohibition on screening by deputies is

13   not stated in the TCSD's grievance policy. (Doc. No. 15-3 at ¶ 5, Ex. A.) The policy does state,

14   however, that "[g]rievances will not be *accepted* if they are challenging the rules and policies

15   themselves." (*Id.*) This provision could fairly be interpreted as authorizing a deputy to refuse to

16   "accept" a grievance form and/or refuse to provide an inmate with a grievance form where the

17   intended grievance stated by the inmate could be construed as "challenging [the Jails'] rules and

18   policies." Indeed, several inmates have submitted declarations attesting to their unsuccessful

19   attempts to pursue their administrative remedies with respect to the claims presented in this

20   action. (*See* Doc. Nos. 11-22 at ¶¶ 5–6; 11-16 at ¶¶ 8–10; 11-9 at ¶¶ 8, 9, 16.) For example,

21   inmate Alford declares that he attempted several times to submit an inmate grievance about the

22   retaliation he faced after speaking with ACLU attorneys (he was moved to a high security-

23   classification), but deputies refused to give him a grievance form after he explained why he

24   wanted it. (Doc. No. 11-9 at ¶ 8.)

25          Defendant presents no evidence to refute the version of events that these inmates have

26   described in considerable detail in their sworn declarations which are before the court.

27           On this record, the court concludes that the circumstances here—namely the deputies'

28   refusal to consistently provide grievance forms without screening the grievances and the deputies'

30

1    intimidation of inmates who spoke with the ACLU—have likely rendered administrative

2    remedies "effectively unavailable."  Accordingly, to the extent defendant asserts the affirmative

3    defense of failure to exhaust administrative remedies, plaintiffs have demonstrated that they are

4    likely to succeed in showing that those remedies were effectively unavailable to them.

5               b.    *Deliberate Indifference to Serious Medical Needs in Violation of the*

6                     *Fourteenth Amendment (Claim 1)*

7          Because plaintiffs challenge the conditions of their confinement in the Jails for pre-trial

8    detainees, their first deliberate indifference claim "arises under the Fourteenth Amendment's Due

9    Process Clause, rather than under the Eighth Amendment's Cruel and Unusual Punishment

10   Clause."  *See Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018).  To succeed on

11   their Fourteenth Amendment claim, plaintiffs will have to prove objective deliberate indifference.

12   *Gordon*, 888 F.3d at 1124–25 (holding that "claims or violations of the right to adequate medical

13   care brought by pretrial detainees against individual defendants under the Fourteenth Amendment

14   must be evaluated under an objective deliberate indifference standard").

15         To satisfy this objective deliberate indifference standard, plaintiff must prove that:

16              (i) the defendant made an intentional decision with respect to the
                conditions under which the plaintiff was confined; (ii) those
17              conditions put the plaintiff at substantial risk of suffering serious
                harm; (iii) the defendant did not take reasonable available measures
18              to abate that risk, even though a reasonable official in the
                circumstances would have appreciated the high degree of risk
19              involved—making the consequences of the defendant's conduct
                obvious; and (iv) by not taking such measures, the defendant caused
20              the plaintiff's injuries.

21   *Id.* at 1125.  As to the third element, the plaintiff must "prove more than negligence but less than

22   subjective intent—something akin to reckless disregard."  *Id.*

23         Plaintiffs contend that they are likely to succeed on the merits of their Fourteenth

24   Amendment deliberate indifference claim because defendant has made conscious decisions not to

25   implement responsive policies to address COVID-19 despite his awareness of the ongoing risks

26   and threats posed to them by COVID-19.  (Doc. No. 11 at 22–27.)  Plaintiffs assert that they are

27   likely to prove defendant knew of the risks of COVID-19 because those risks are obvious to local

28   officials in light of Governor Newsom's declaration of a state of emergency and in particular, the

July 1, 2020 letter from the presiding judge of the Tulare County Superior Court requesting that defendant immediately implement testing of all inmates in the county jail facilities.  (*Id.* at 22–23.)  In addition, plaintiffs argue that defendant has shown a reckless disregard for the safety of the incarcerated people in the Jails by failing to take reasonable available measures with regards to testing and social distancing as recommended by the CDC.  (*Id.* at 24.)  As evidence of defendant's objective deliberate indifference, plaintiffs emphasize defendant's failure to propagate a clear written policy to implement precautions and his intentional decision to transfer people to more crowded settings without any testing protocols in place at the Jails.  (*Id.*)

Plaintiffs do not contend that they have a constitutional right to be tested for COVID-19.  (Hr'g Tr. at 15–16.)  Rather, plaintiffs assert that "[i]t is well-established that exposing non-infected incarcerated people to contagious individuals in itself constitutes deliberate indifference."  (Doc. No. 11 at 26.)[14]  Therefore, plaintiffs contend that defendant's failure to adequately protect them and class members from exposure to COVID-19 constitutes deliberate indifference.  (Doc. No. 11 at 24.)  Essentially, plaintiffs assert that the Constitution requires defendant to take reasonable available measures to protect the incarcerated people in his care from the risk of contracting COVID-19, and because of the nature of this highly infectious, potentially-deadly disease and its mechanism for transmission, universal testing and social

---

[14]  *See Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 208–209 (5th Cir. 2011) (affirming a jury's finding of deliberate indifference to a MRSA outbreak where jury heard evidence "that the Sheriff and other jail officials had long known of the extensive MRSA problem yet had continued to house inmates in the face of the inadequately controlled staph contamination," and "that it was feasible to control the outbreak through tracking, isolation, and improved hygiene practices, but that the County was not willing to take the necessary steps or spend the money to do so"); *Lareau v. Manson*, 651 F.2d 96, 109, 111 (2d Cir. 1981) (affirming a district court's order requiring defendant correctional center to institute "screening procedures to identify and isolate new inmates who may have a 'communicable disease,'" and directing that upon remand, defendants be ordered to not introduce any new inmate into general population without first being examined, including "such tests as are necessary in the opinion of the physician to identify and isolate those who have communicable diseases"); *Morales Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 208–09 (D.P.R. 1998) (finding deliberate indifference where the defendant correctional officers "neglected to fully screen incoming inmates for infectious diseases such as tuberculosis" and "the inability of [defendants'] health care personnel to properly isolate cases of active tuberculosis inflicts cruel and unusual punishment on particular individuals at present, endangers their health in the future and threatens the health of all the members of the class").

1    distancing are not just *reasonable available* measures, they are critically important to abate the

2    risk of contracting COVID-19 in the Jails.  (Hr'g Tr. at 32–34.)  According to plaintiffs, without

3    testing, there is no way to know which people are infected and thus no way to isolate infected

4    individuals from the rest of the incarcerated population.  Similarly, social distancing is recognized

5    by the CDC as the "cornerstone" of prevention efforts because of the manner in which this

6    disease spreads—via airborne droplets released by infected individuals in close proximity.  (*See

7    id.* at 34; Doc. No. 11-2 at ¶ 7.)[15]  Plaintiffs emphasize that both common sense and science

8    dictates that if you do not know who is infected and you are not able to distance from others,

9    COVID-19—once present—will spread.  Thus, plaintiffs argue, they are likely to succeed in

10   showing that defendant's failure to implement an effective testing plan and social distancing

11   policy constitutes deliberate indifference to the known and obvious risks of the spread of COVID-

12   19 in the Jails.  (Doc. No. 11 at 24.)

13           In opposition, defendant essentially argues that because he has consulted local public

14   health officials and CDC guidance in deciding to now take *some* precautionary measures (such as

15   providing masks and soap to inmates), those actions he has taken contradict a finding of

16   deliberate indifference.  (Doc. No. 15-1 at 22.)  Defendant also generally and repeatedly takes the

17   position that the court should defer to his judgment as sheriff.  (*Id.*)

18           The court is not persuaded by defendant's argument, in large part because he has

19   completely failed to address in response to the pending motion how social distancing and testing

20   are not reasonable and available here, especially in light of the CDC Guidelines recommending

21   that testing and social distancing measures be taken in correctional facilities to abate the risks of

22   COVID-19.  Thus, the court finds that plaintiffs have shown a likelihood of success on the merits

23

24   ───────────────
     [15]  The CDC Guidelines, as of August 26, 2020, state:  "Although social distancing is challenging
25   to practice in correctional and detention environments, it is a cornerstone of reducing
     transmission of respiratory diseases such as COVID-19.  People who have been infected with
26   SARS-CoV-2 but do not have symptoms can still spread the infection, making social distancing
     even more important."  *See Interim Guidance on Management of Coronavirus Disease 2019
27   (COVID-19) in Correctional and Detention Facilities*, available at https://www.cdc.gov/coronavir
     us/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated
28   July 22, 2020).

1  of their deliberate indifference claim.  *See Cameron v. Bouchard*, No. 20-cv-10949, 2020 WL

2  1929876, at *2 (E.D. Mich. Apr. 17, 2020), *modified on reconsideration*, No. 20-cv-10949, 2020

3  WL 1952836 (E.D. Mich. Apr. 23, 2020) ("The Court finds that Plaintiffs are likely to succeed on

4  the merits of their claim alleging that jail conditions violate their Eighth and Fourteenth

5  Amendment rights.  Plaintiffs' allegations reflect that Oakland County has not imposed even the

6  most basic safety measures recommended by health experts, the Centers for Disease Control and

7  Prevention, and Michigan's Governor to reduce the spread of COVID-19 in detention facilities.

8  It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative

9  class.").

10                        c.      *Deliberate Indifference to Serious Medical Needs in Violation of the Eighth*

11                                *Amendment (Claim 2)*

12             Because plaintiffs challenge the conditions of confinement in the Jails for convicted

13  prisoners, their second deliberate indifference claim arises under the Eighth Amendment.  *See*

14  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that prison officials' "deliberate indifference

15  to serious medical needs of prisoners" violates the Cruel and Unusual Punishment Clause of the

16  Eighth Amendment); *see also Helling v. McKinney*, 509 U.S. 25, 29–30 (1993) ("[T]he Eighth

17  Amendment applies to conditions of confinement that are not formally imposed as a sentence for

18  a crime.").  The Eighth Amendment "requires that inmates be furnished with the basic human

19  needs, one of which is 'reasonable safety,'" and "hold[ing] convicted criminals in unsafe

20  conditions" constitutes cruel and unusual punishment.  *Id.* at 33 (upholding a prisoner's Eighth

21  Amendment claim that he faced possible future harm from exposure to environmental tobacco

22  smoke).

23             Unlike deliberate indifference claims under the Fourteenth Amendment, Eighth

24  Amendment deliberate indifference claims require a showing of both objective and subjective

25  indifference.  *See Helling*, 509 U.S. at 35–36 (affirming remand to district court to provide

26  plaintiff with an opportunity to satisfy "both the subjective and objective elements necessary to

27  prove an Eighth Amendment violation").  As to the objective component, courts "assess whether

28  society considers the risk that the prisoner complains of to be so grave that it violates

1    contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words,

2    the prisoner must show that the risk of which he complains is not one that today's society chooses

3    to tolerate." *Id.* at 36.  As to the subjective component, the prisoner must show that a prison

4    official has a "sufficiently culpable state of mind," which is one of deliberate indifference to the

5    prisoner's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  "[A] prison official

6    cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

7    confinement unless the official knows of and disregards an excessive risk to inmate health or

8    safety; the official must both be aware of facts from which the inference could be drawn that a

9    substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

10        Where a prisoner asserting a deliberate indifference claim seeks an injunction, "[i]f the

11   court finds the Eighth Amendment's subjective and objective requirements satisfied, it may

12   grant appropriate injunctive relief. *Id.* at 846–47.  In *Farmer*, the Supreme Court noted that "a

13   district court should approach issuance of injunctive orders with the usual caution, and may, for

14   example, exercise its discretion if appropriate by giving prison officials time to rectify the

15   situation before issuing an injunction. *Id.*  Though in *Helling*, the Supreme Court clarified that

16             [i]t would be odd to deny an injunction to inmates who plainly
             proved an unsafe, life-threatening condition in their prison on the
17           ground that nothing yet had happened to them.   The Courts of
             Appeals have plainly recognized that a remedy for unsafe conditions
18           need not await a tragic event. . . .  We thus reject petitioners' central
             thesis that only deliberate indifference to current serious health
19           problems of inmates is actionable under the Eighth Amendment.

20   509 U.S. at 33–34.

21        Here, plaintiffs contend that they are likely to succeed on the merits of their Eighth

22   Amendment deliberate indifference claim for the same reasons described above with respect to

23   their Fourteenth Amendment claim.  The court will not repeat those arguments here.  As to the

24   subjective component, plaintiffs contend that defendant's culpable state of mind is evidenced by

25   his refusal to implement an effective testing plan, which "all but guarantees that incarcerated

26   people will continue to be exposed to a potentially-deadly disease, without knowledge or

27   recourse." (Doc. No. 11 at 26.)  At the hearing on the pending Motion, plaintiffs' counsel also

28   argued that defendant's culpable state of mind is shown by:  (1) his refusal to conduct testing on

35

1  any inmate outside of the two units that had identified outbreaks of the virus despite the fact that

2  the testing of those two units yielded alarmingly high positivity rates; and (2) his intentional

3  decision to transfer inmates from the Mail Jail to the other two active facilities without first

4  conducting any testing of those inmates to reduce the risk of spreading the virus.  (Hr'g Tr. at 3–

5  5.)

6        Defendant counters with the same unpersuasive arguments that the court rejected above—

7  that he has consulted local public health officials and followed CDC guidance in taking *some*

8  precautionary measures and that the court should simply defer to his judgment as to the adequacy

9  of those measures.  The court further notes that to the extent defendant is relying on TCSD's

10  "current" policies, the court is mindful of the timing of the adoption of those policies, shortly

11  after the filing of this lawsuit.  For example, although not challenged in plaintiffs' pending

12  Motion, it is undisputed that defendant actually prohibited the use of masks by inmates and

13  limited their supplies of soap for several months after the pandemic began, despite issuance of

14  CDC guidance to the contrary.  Indeed, TCSD did not implement a policy allowing and providing

15  masks and more soap to inmates until the day after plaintiffs filed their complaint in this action.

16  Moreover, despite the fact that at least over five months have passed since the pandemic began,

17  and nearly a month has passed since the supposed implementation of TCSD's masking policy,

18  defendant has still not memorialized that policy (or any others in response to the virus) in writing.

19  In the court's view, this record does not support defendant's argument that because he is *currently*

20  taking *some* precautions, he necessarily lacked the culpable state a mind sufficient for a finding of

21  subjective deliberate indifference.

22        Accordingly, the court concludes that plaintiffs are likely to succeed on their deliberate

23  indifference claim under the Eighth Amendment as well.

24  /////

25  /////

26  /////

27  /////

28  /////

d.     *Active Interference with Right to Petition The Government and Access*

*Courts in Violation of the First and Fourteenth Amendments (Claim 3)*

Prisoners have a constitutional right of access to the courts.[16]  *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*."); *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *limited in part on other grounds by Lewis*, 518 U.S. at 354 ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."); *Smith v. Ogbuehi*, 38 Cal. App. 5th 453, 465 (2019), *reh'g denied* (Aug. 28, 2019) ("Access to the courts is 'a right guaranteed to all persons by the federal and state Constitutions.'") (quoting *Jersey v. John Muir Med. Ctr.*, 97 Cal. App. 4th 814, 821 (2002)).  In addition, California state prisoners specifically have a statutory right under the California Penal Code "[t]o initiate civil actions" as plaintiffs.  Cal. Penal Code § 2601(d).  The California Courts of Appeal have interpreted that statute "to include within its scope the right to be afforded meaningful access to the courts to prosecute those civil actions."  *Apollo v. Gyaami*, 167 Cal. App. 4th 1468, 1483 (2008).

"A prisoner's right to meaningful access to the courts, along with his broader right to petition the government for a redress of his grievances under the First Amendment, precludes prison authorities from penalizing a prisoner for exercising those rights."  *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001).  "Prisoners have a right under the First and Fourteenth Amendments to litigate claims challenging their sentences or the conditions of their confinement to conclusion without *active interference* by prison officials."  *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015).  The Ninth Circuit has specifically recognized that the right to access the courts includes contact visitation with counsel.  *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) (holding that the

---

[16]  The Supreme Court has noted that the constitutional *basis* for the right of access to the courts is somewhat unsettled, as shown by its decisions grounding the right in various provisions of the U.S. Constitution, including:  the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Due Process and Equal Protection Clauses.  *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002) (citing cases).

1   prison's "apparently arbitrary policy of denying a prisoner contact visits with his attorney

2   prohibits effective attorney-client communication and unnecessarily abridges the prisoner's right

3   to meaningful access to the courts").

4       "Any infringement on prisoners' constitutional rights must be reasonably related to

5   legitimate penological interests." *Casey v. Lewis*, 4 F.3d 1516, 1520 (9th Cir. 1993) (citing

6   *Turner v. Safley*, 482 U.S. 78, 89 (1987).

7       Here, plaintiffs argue that defendant has actively interfered with their right to access to the

8   courts in two ways.  First, plaintiffs contend that defendant's arbitrarily restrictive legal visitation

9   policy was implemented with the intent to frustrate plaintiffs' efforts to meet confidentially with

10  counsel regarding their conditions of confinement in the Jails.  (Doc. No. 11 at 28.)  Second,

11  plaintiffs point to their evidence of multiple incidents of intimidation and retaliation by

12  defendant's deputies to show that defendant engaged in systematic intimidation and retaliation to

13  discourage incarcerated people in the Jails from attempting to access counsel and the courts.  (*Id.*)

14      Defendant does not address plaintiffs' likelihood of success on the merits of their right-to-

15  access claim under the First and Fourteenth Amendment, beyond his assertion that plaintiffs have

16  failed to exhaust their administrative remedies as to these claims.  The court has addressed and

17  rejected defendant's arguments in this regard above.

18      The court concludes that plaintiffs have shown a likelihood of success on the merits of

19  their right-to-access claim under the First and Fourteenth Amendments because plaintiffs have

20  presented ample evidence showing that defendant interfered with inmates' access to counsel and

21  the courts.

22          e.   *Active Interference with Right to Access Assistance of Counsel for Defense*

23              *Against Criminal Charges in Violation of Sixth Amendment (Claim 4)*

24      "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall

25  enjoy the right . . . to have the Assistance of Counsel for his defence.'" *Texas v. Cobb*, 532 U.S.

26  162, 166 (2001) (quoting U.S. Const. amend. VI).  "The right to the assistance of counsel

27  guaranteed by the Sixth and Fourteenth Amendments is indispensable to the fair administration of

28  our adversarial system of criminal justice." *Maine v. Moulton*, 474 U.S. 159, 168 (1985).  "[T]o

deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Id.* at 170; *see also United States v. Helmandollar*, 852 F.2d 498, 501 (9th Cir. 1988). "[I]n the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001).

Plaintiffs argue that they are likely to succeed on the merits of their Sixth Amendment claim because the legal visitation policy that defendant has implemented is "so overbroad as to infringe on at least some class members' right to counsel in their criminal cases." (Doc. No. 11 at 28.) To support their claim, plaintiffs cite to the declaration of local criminal defense attorney Annie Davidian. *Id.* In her declaration, attorney Davidian states that since implementation of the new restrictive policy, she is "unable to meet with incarcerated people or people to whom [she is] appointed before their arraignment." (Doc. No. 11-8 at ¶¶ 7–8.) In particular, on June 19, 2020, she attempted to schedule a legal visit with a criminal defendant and was unable to do so due to defendant's policy. (*Id.* at ¶ 9.) Attorney Davidian also explained that before the pandemic began in March 2020, she regularly had legal visits with incarcerated people in the Jails—even before she was their attorney of record—including confidential visits with prospective clients. (*Id.* at ¶¶ 2–4.) Since implementation of the new visitation policy, attorney Davidian declares that she has "not been able to visit a single incarcerated client" and has "gone from meeting with approximately half a dozen clients a week to none." (*Id.* at ¶ 11.) In addition, the policy requires that incarcerated people fill out a form and identify their attorney of record, but jail staff does not inform them what the purpose of the form is or why they are being asked to complete and sign the form, which has led to delays in access to counsel and difficulties in communicating with clients who are unaware of this new requirement or are hesitant to sign forms without explanation. (*Id.* at ¶ 10.)

Defendant does not present any argument responding to plaintiffs' Motion as it relates to their Sixth Amendment claim.

The court concludes again that plaintiffs have shown a likelihood of success on the merits of their Sixth Amendment claim. Plaintiffs have submitted evidence that defendant's new policy

1    with respect to legal visits, as implemented, has prevented inmates from meeting with their

2    criminal defense counsel.  (Doc. No. 11-8.)  Defendant has presented no evidence to refute

3    plaintiff's evidence but instead has merely asserted that the new visitation policy was

4    unintentionally restrictive and is being revised so as to not limit such visits to attorneys of record.

5    (Doc. No. 15-5.)  Yet, it remains to be seen what the purported revised policy actually is since

6    defendant has not provided the court with a copy of it, and it remains unclear what steps, if any,

7    defendant is taking to address the impacts that TCSD's restrictive new policy has already had.[17]

8             f.    *Interference by Threat, Intimidation, or Coercion with Exercise of Rights*

9                   *Secured by Law in Violation of California's Bane Act (Claim 5)*

10         The Bane Act protects against interference "by threat, intimidation, or coercion" or an

11   attempt to do the same "with the exercise or enjoyment by any individual or individuals of rights

12   secured by the Constitution or laws of the United States, or of the rights secured by the

13   Constitution or laws of this state."  Cal. Civ. Code § 52.1(a).  The Bane Act "does not extend to

14   all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that

15   interferes with a constitutional or statutory right."  *Venegas v. County of Los Angeles*, 32 Cal. 4th

16   820, 843 (2004).

17         Plaintiffs assert that they are likely to succeed on their Bane Act claim because defendant

18   interfered with their constitutional rights "through his restrictive visitation policy and a systematic

19   practice of intimidation and retaliation."  (Doc. No. 11 at 29.)  Plaintiffs contend that because

20   they are likely to succeed on the merits of their claims under the First, Sixth, and Fourteenth

21   Amendments, they are also likely to succeed on their derivative Bane Act claim.  (*Id.*)  In

22   addition, plaintiffs argue that defendant interfered with their statutory right "to initiate civil

23   actions" as plaintiffs under California law, which includes "the right to be afforded meaningful

24   access to the courts to prosecute those civil actions."  (Doc. No. 11 at 28) (citing Cal. Pen. Code

25   § 2601(d)) (quoting *Smith v. Ogbuehi*, 38 Cal. App. 5th 453, 465 (2019)).

26   _____

[17]  As to this issue, as has been the case with many others involved in this case, defendant has

27   simply not been forthcoming at this stage of the litigation.  Thus, defendant does not
     acknowledge that the new visitation policy has had any impact on inmate visitation other than a

28   temporary 1–2 day delay in such visits when the new policy was launched.

In the opposition to the pending Motion, defendant does not present any argument addressing plaintiffs' Bane Act claim.

As noted above, the court has found the declarations from several inmates to be compelling evidence that defendant has interfered, or at least attempted to interfere, by threat and intimidation with the exercise of their constitutional rights and state statutory rights.  (*See* Doc. Nos. 11-14 at ¶¶ 5–6; 11-20 at ¶¶ 8–9; 11-22 at ¶¶ 5–6; 11-16 at ¶¶ 8–10; 11-9 at ¶¶ 8, 9, 16.) Moreover, because the court has already concluded that plaintiffs are likely to succeed on the merits of their claims brought under the First, Sixth, and Fourteenth Amendments, the court agrees that plaintiffs have also shown a likelihood of success on the merits of their Bane Act claim, which is derivative to an extent from those claims.

2.    Irreparable Harm

Having found that plaintiffs have shown a likelihood of success on the merits of their claims, the court now turns to the likelihood that they will suffer irreparable harm in the absence of the granting of preliminary injunctive relief.  The risk of irreparable harm must be "likely, not just possible."  *All. for the Wild Rockies*, 632 F.3d at 1131.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Several courts have found that the risk to incarcerated people of contracting COVID-19 is not speculative and constitutes a risk of irreparable harm, even where there are few confirmed COVID-19 cases at their institution of confinement.  *See Kaur v. U.S. Dep't of Homeland Sec.*, No. 2:20-cv-03172-ODW-MRWx, 2020 WL 1939386, at *3 (C.D. Cal. Apr. 22, 2020) (rejecting the argument that the petitioner's "alleged harm is merely speculative because Respondents have implemented precautions at Adelanto and there are currently no COVID-19 cases identified there" as "missing the point"); *Perez v. Wolf*, 445 F. Supp. 3d 275, 293 (N.D. Cal. Apr. 14, 2020) ("COVID-19 is a highly contagious and novel coronavirus.  The mere fact that no cases have been reported in the Aurora Facility is irrelevant—it is not a matter of *if* COVID-19 will enter the facility, but *when* it will be detected there.") (internal citation omitted); *Banks v. Booth*, No. 20-cv-849-CKK, 2020 WL 3303006, at *16 (D.D.C. June 18, 2020), *appeal docketed*, No. 20-5216

1    (D.C. Cir. July 22, 2020) ("The Court concludes that Plaintiffs' risk of contracting COVID-19

2    and the resulting complications, including the possibility of death, is the prototypical irreparable

3    harm.") (citing *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding

4    irreparable harm from pain, infection, and possible death due to delayed treatment from the

5    reduction of hospital beds)).

6         In addition, "[i]t is well established that the deprivation of constitutional rights

7    'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

8    Cir. 2012) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Basank v. Decker*, No.

9    20-cv-2518-AT, 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) (finding that "[t]he risk of

10   contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious"

11   and concluding that "[p]etitioners face irreparable injury—to their constitutional rights and to

12   their health").

13        As described above, plaintiffs have shown a likelihood of success on the merits of their

14   constitutional claims, which involve both the risks associated with contracting COVID-19 and the

15   deprivation of their constitutional right to access the courts and counsel.  Plaintiffs contend that

16   "[t]he risk to [their] health undeniably rises to the level of irreparable harm."  (Doc. No. 11 at 31.)

17   Similar to the arguments that have been rejected by courts in the above-referenced decisions,

18   defendant here argues that plaintiffs have not shown irreparable harm because "[t]he measures

19   already taken and being taken by Defendants [sic] has ensured that there has not been a single

20   inmate death in the jails," "there has not been a single hospitalization for COVID-19 or flu-like

21   symptoms," and "[o]ngoing efforts have further reduced the potential for contamination."  (Doc.

22   No. 15-1 at 26.)  But as one district court recently explained in determining that "a significant risk

23   of probable irreparable harm" had been shown:

24            The fact that plaintiffs are exposed to some risk of contracting
25            COVID-19, however small, is probably not sufficient to prove
             irreparable harm, even though they are more vulnerable.  For
26            example, if plaintiffs were released, they would still suffer some risk
             of exposure in the community.  However, the plaintiffs who are
27            confined are not only confined in close quarters, but some inmates in
             the Jail have already contracted COVID-19.  [citation] (defendant's
28            declaration that at least ten inmates have tested positive for COVID-

1            19).   Although defendant argues that the decreasing number of
confirmed COVID-19 cases in the Jail indicate that plaintiffs do not
2            have a risk of irreparable harm, defendant does not deny that some
inmates are still in isolation after contracting COVID-19 in the Jail,
3            and asymptomatic staff and new inmates present an ongoing
possibility of additional sources of infection.   The Jail is taking the
4            preventative measures it is currently taking because of the real risk
of COVID-19 exposure to inmates.

5

6    *Carranza v. Reams*, No. 20-cv-00977-PAB, 2020 WL 2320174, at *11 (D. Colo. May 11, 2020).

7         This court concludes that plaintiffs have shown a likelihood that they will suffer

8    irreparable harm in the absence of the requested injunctive relief.

9         3.    Balance of the Equities / Public Interest

10         Courts "must balance the competing claims of injury and must consider the effect on each

11    party of the granting or withholding of the requested relief," and "should pay particular regard for

12    the public consequences in employing the extraordinary remedy of injunction."   *Winter v. Nat.*

13    *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).   "In assessing whether the plaintiffs have met this

14    burden, the district court has a duty to balance the interests of all parties and weigh the damage to

15    each."   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks

16    and alteration omitted).   "Where the government is a party to a case in which a preliminary

17    injunction is sought, the balance of the equities and public interest factors merge."   *Padilla v.*

18    *Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster*

19    *Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).   "Generally, public interest concerns are

20    implicated when a constitutional right has been violated, because all citizens have a stake in

21    upholding the Constitution."   *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

22         Here, plaintiffs contend that the balance of equities tips in their favor because "defendant

23    has no interest in maintaining unconstitutional conditions . . . or in unlawfully interfering with

24    plaintiffs' right to access the courts."   (Doc. No. 11 at 31.)   In addition, plaintiffs argue that

25    consideration of the public interest weighs in their favor because "it is always in the public

26    interest to prevent the violation of a party's constitutional rights," and preventing a COVID-19

27    outbreak in the Jails benefits the public by preventing further spread of the virus in the

28    community and burden on local healthcare facilities.   (*Id.* at 32) (quoting *Melendres v. Arpaio*,

1    695 F.3d 990, 1002 (9th Cir. 2012)).

2          Defendant argues that plaintiffs understate his interests, which include "the orderly

3    administration of the jails, the management of public resources, and in maintaining public and

4    institutional security and safety."  (Doc. No. 15-1 at 26.)  But defendant stops short of arguing

5    that these interests outweigh the interests of plaintiffs and the public, particularly with regards to

6    public health.  *See Banks*, 2020 WL 3303006, at *16 (concluding that an injunction that "lessens

7    the risk that Plaintiffs will contract COVID-19 is in the public interest because it supports public

8    health," and "ordering Defendants to take precautions to lower the risk of infections for Plaintiffs

9    also benefits the public").  In addition, the court is mindful of the Supreme Court's guidance that

10   "[c]ourts may not allow constitutional violations to continue simply because a remedy would

11   involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511

12   (2011).[18]

13         Ultimately, the court finds defendant's arguments in opposition to the pending motion to

14   be both perfunctory and unpersuasive.  Notably, several district courts across the country have

15   recently rejected similar arguments advanced by defendants in cases like this one.  *See, e.g.*,

16   *Banks*, 2020 WL 3303006, at *16 (granting injunctive relief and citing decisions by "other courts

17   [that] have also found that the balance of equities favors injunctive relief to ensure that inmates

18   are adequately protected from the threat of COVID-19"); *Carranza*, 2020 WL 2320174, at *11

19

20   [18]  The court is also mindful that jail administrators are entitled to deference "when there is
     evidence that the challenged medical decision was made pursuant to" a "policy or practice [that]
21   addresses bona fide safety and security concerns."  *Chess v. Dovey*, 790 F.3d 961, 974 (9th Cir.
     2015).  However, "in deciding whether there has been deliberate indifference to an inmate's
22   serious medical needs," the court "need not defer to the judgment of prison doctors or
     administrators."  (*Id.*) (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)); *see
23   also Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1254 (9th Cir. 2016) ("[D]eliberate
     indifference 'can typically be established or disproved without the necessity of balancing
24   competing institutional concerns for the safety of prison staff or other inmates.'") (quoting
     *Whitley v. Albers*, 475 U.S. 312, 320 (1986)); *Shorter v. Baca*, 895 F.3d 1176, 1187 (9th Cir.
25   2018) (holding that prison officials are not entitled to deference for conditions of confinement
     when motivated only by "a concern about overcrowding and understaffing in the facility").  Here,
26   unfortunately, defendant has simply declined to come forward with evidence even defining TCSD
     policies or practices with any degree of specificity, let alone with evidence linking those policies
27   and practices to bona fide safety and security concerns.

28

(finding that the "high risk of serious illness or death if [plaintiffs] contract COVID-19 while in the Weld County Jail [] outweighs the harms identified by the defendant, which include maintaining control over the Jail without Court supervision and the costs of complying with plaintiffs' proposed preliminary injunction"); *Mays v. Dart*, No. 20-cv-2134, 2020 WL 1812381, at *13 (N.D. Ill. Apr. 9, 2020) (rejecting the sheriff's arguments that "an injunction requiring him to implement additional health and protective measures would be disruptive to his ongoing efforts to address the spread of coronavirus in the Jail" and "that the court should defer to the Jail's practices and its execution of policies that preserve internal order, discipline, and security in the facility"); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 694 (C.D. Cal. May 26, 2020) ("mandating compliance with the CDC Guidelines in the Jail serves the public interest").

The court concludes that plaintiffs have satisfied their burden to show that the balance of the equities and public interest weighs in their favor.  Accordingly, the court will grant plaintiffs' Motion, in part, and issue a temporary restraining order that provides some of the injunctive relief that plaintiffs have requested.  However, the court does not find that the evidentiary record before it is sufficiently developed to support an injunction requiring defendant to immediately test all inmates and staff in the Jails for COVID-19 at this time.  Instead, the court finds it prudent at this point to instead require defendant to develop written policies on key COVID-19 related issues, as detailed below, and will order temporary injunctive relief accordingly.  *See Carranza*, 2020 WL 2320174, at *15 (granting a preliminary injunction and ordering the defendant sheriff to institute policies or procedures regarding social distancing, enhanced sanitation, masking and increased medical monitoring and also requiring the sheriff to compile and provide to the court and opposing counsel a list of those medically vulnerable inmates identifying the risk category for each such inmate).  In the court's view, this minimally intrusive approach will enable the parties (and the public for that matter) to finally gain an understanding of what exactly defendant's policies are with regard to the COVID-19 pandemic and to develop an updated factual record regarding what is actually happening in the Jails with respect to COVID-19 related conditions.  To the extent plaintiffs wish thereafter to seek a preliminary injunction, or otherwise challenge defendant's policies and actions, they can so move based on a more adequately developed record.

1    **C.    Plaintiffs' Request for Leave to Serve Early Discovery**

2            Plaintiffs have also requested a court order authorizing them to serve discovery requests

3    without requiring them to wait for the Rule 26(f) conference to be held.  (Doc. No. 11 at 32–33.)

4    Defendant responds to plaintiffs' request by merely asserting that plaintiffs "provide no

5    substantive rationale as to why the normal discovery timelines are inappropriate."  (Doc. No. 15-1

6    at 28.)

7            Federal Rule of Civil Procedure Rule 26(d) provides that no discovery can be sought

8    "from any source before the parties have conferred as required by Rule 26(f), except . . .when

9    authorized . . . by court order."  Fed. R. Civ. P. 26(d)(1).  Generally, courts require a showing of

10   good cause to permit expedited discovery.  *In re Countrywide Fin. Corp. Derivative Litig.*, 542 F.

11   Supp. 2d 1160, 1179 (C.D. Cal. 2008); *Roadrunner Intermodal Servs., LLC v. T.G.S. Transp.,*

12   *Inc.*, No. 1:17-cv-01056-DAD-BAM, 2017 WL 3783017, at *3 (E.D. Cal. Aug. 31, 2017).

13           "Good cause may be found where the need for expedited discovery, in consideration of

14   the administration of justice, outweighs the prejudice to the responding party."  *Semitool, Inc. v.*

15   *Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).  In determining whether good

16   cause exists, courts consider:  (1) whether a preliminary injunction is pending; (2) the breadth of

17   the discovery request; (3) the purpose for requesting the expedited discovery; (4) the burden on

18   the defendants to comply with the requests; and (5) how far in advance of the typical discovery

19   process the request was made."  *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d

20   1086, 1099 (N.D. Cal. 2012).

21           Plaintiffs argue that good cause exists here because "outbreaks of COVID-19 have already

22   been reported in the Jails" and "[d]efendant has blocked Plaintiffs' attempts to investigate the

23   extent of the crisis at every turn, including through interfering with their right to counsel and the

24   courts."  (Doc. No. 11 at 33.)  According to plaintiffs, immediate discovery is necessary so that

25   they can "assess the situation in the Jails and determine whether to seek further remedial

26   measures" and "to determine whether Defendant has made additional changes in response to the

27   changing facts on the ground or any orders by this Court."  (*Id.*)  With regard to the burden that

28   early discovery would place on defendant, plaintiffs argue that any such burden is minimal

46

because plaintiffs would seek the same discovery during the course of the litigation.  Moreover, defendant has not presented any evidence nor even any argument as to how early discovery would be burdensome or otherwise problematic for him.

The court finds that good cause has been shown for early discovery by plaintiffs and will authorize the parties to serve early discovery in this case.

## CONCLUSION

The court pauses to note that at the conclusion of the hearing on the pending Motion it encouraged the parties to meet and confer to determine whether resolution could be reached as to at least some of the issues discussed above.  The court did so because it appeared that there had been a complete lack of meaningful communication between the parties and that at least some of these issues should be capable of resolution without the need for intervention by this court.  Apparently the court's hope in that regard was not well placed.  Given the lack of meaningful response by defendant to plaintiffs' Motion and to the evidence presented by plaintiffs in support thereof, the court is compelled to issue this order.

For all of the reasons stated above:

1. Plaintiffs' application for provisional class certification (Doc. No. 10) is granted;

   a. The provisionally certified class is defined as:  "All people who are now, or in the future will be, incarcerated in Tulare County Jails."

   b. The ACLU Foundation of Northern California and the law firm Munger, Tolles & Olson are appointed as class counsel.

   c. Plaintiffs Criswell, Johnson, Ibarra, and Camposeco are appointed as class representatives.

2. Plaintiffs' motion for a temporary restraining order (Doc. No. 11) is granted, in part.  The court orders that, pending a hearing on a motion for preliminary injunction, defendant shall be required to take the following actions:

   a. Adopt a policy designed to reduce contacts between incarcerated people in all common areas, including (but not limited to) bathrooms, day rooms, yards, and pill lines, and allow for the possibility of social distancing by

inmates.  Defendant shall memorialize this policy in writing and provide a copy of the policy to the court and plaintiffs' counsel by September 14, 2020.

    b.    Adopt a policy with regards to masks, including the provision of masks to inmates and requirements for the wearing of masks.  Defendant shall memorialize this policy in writing and provide a copy of the policy to the court and plaintiffs' counsel by September 8, 2020.

    c.    Memorialize in writing the policy and procedure TCSD enacted on July 14, 2020 with regards to isolation, quarantine, and observation, including TCSD's policy for conducing COVID-19 testing.  Defendant shall provide a copy of the policy to the court and plaintiffs' counsel by September 8, 2020.

    d.    Provide to the court and plaintiffs' counsel, by September 14, 2020, a report detailing TCSD's COVID-19 testing to date, including:  how many total tests have been conducted, how many inmates have been tested, how many staff members have been tested, when those tests conducted, how many inmates tested positive, how many staff members tested positive, how many inmates refused to be tested, and how many staff members refused to be tested.  The report shall include how many "new intakes" have been tested as part of the procedure TCSD enacted on July 14, 2020, when those tests were conducted, and how many of those tests were positive for COVID-19.  In addition, the report shall provide the number of inmates who have been tested as a result of Wellpath's screening criteria, how many of those inmates tested positive, when those tests were conducted, and in which facility the inmates were incarcerated in at the time they were tested.  Defendant shall also provide a copy of the current screening criteria being employed at the Jails by Wellpath and specify when Wellpath began using that current screening criteria.

48

e.   Ensure that Plaintiffs' counsel have the ability to promptly (i.e., within two days) and confidentially communicate via remote means (i.e., video call) with incarcerated people at the Jails.

f.   Immediately cease requiring inmates to complete authorization forms as part of the attorney visitation policy enacted on May 29, 2020 (as revised on June 4, 2020).

g.   Provide to the court and plaintiffs' counsel by September 8, 2020, TCSD's revised legal visitation policy in writing.

h.   Ensure that no intimidation of or retaliation against incarcerated people who speak with counsel takes place at the Jails.

3.   No bond shall be required to be posted by plaintiffs pursuant to Rule 65(c) of the Federal Rules of Civil Procedure;

4.   Plaintiffs' request for leave to serve early discovery is granted;

5.   All other requests for relief in plaintiffs' motion are denied;

6.   The parties are directed to meet and confer and, if possible, submit a joint proposed briefing schedule and hearing date with respect to any motion for a preliminary injunction, with that proposed schedule being submitted to the court no later than September 28, 2020.

7.   Defendant's motion to supplement his opposition to the pending Motion (Doc. No. 25) is granted; and

8.   Defendant is further notified of his right to apply to the court for modification or dissolution of this temporary restraining order, if appropriate and supported by a showing of good cause, on two (2) days' notice or such shorter notice as the court may allow.  *See* Fed. R. Civ. P. 65(b)(4) and Local Rule 231(c)(8).

IT IS SO ORDERED.

Dated:   __**September 2, 2020**__     _____

UNITED STATES DISTRICT JUDGE

49