JACOB S. KREILKAMP (State Bar No. 248210)
jacob.kreilkamp@mto.com
WILLIAM D. TEMKO (State Bar No. 98858)
william.temko@mto.com
SARA A. McDERMOTT (State Bar No. 307564)
sara.mcdermott@mto.com
OMAR H. NOURELDIN (State Bar No. 301549)
omar.noureldin@mto.com
LAUREN M. HARDING (State Bar No. 308029)
lauren.harding@mto.com
ARIEL T. TESHUVA (State Bar No. 324238)
ariel.teshuva@mto.com
ESTALYN S. MARQUIS (State Bar No. 329780)
estalyn.marquis@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:      (213) 687-3702

KATHLEEN GUNERATNE (State Bar No. 250751)
KGuneratne@alcunc.org
AMY GILBERT (State Bar No. 316121)
AGilbert@aclunc.org
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 621-2493

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| Charles Criswell, Levi Johnson, Samuel Camposeco, Adam Ibarra, and California Attorneys for Criminal Justice,<br><br>Plaintiffs,<br><br>vs.<br><br>Michael Boudreaux, in his official capacity as Sheriff of Tulare County,<br><br>Defendant. | Case No. 1:20-cv-01048-DAD-SAB<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND OSC RE: PERMANENT INJUNCTION**<br><br>*Filed Concurrently with Motion for Provisional Class Certification; [Proposed] Order Granting Motion for Preliminary Injunction; and Supporting Exhibits*<br><br>Judge:    Hon. Dale A. Drozd<br>Date:     December 2, 2020<br>Time:     10:00 am<br>Dept:     5 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on December 2, 2020, at 10:00 a.m., or as soon thereafter as possible, before the Honorable Dale A. Drozd, by videoconference, Plaintiffs Charles Criswell, Levi Johnson, Samuel Camposeco, Adam Ibarra, and California Attorneys for Criminal Justice will, and hereby do, move for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 and Local Rule 231. Plaintiffs request two hours for a hearing.

This Motion is based upon this Notice, the Memorandum of Points and Authorities, the declarations and exhibits filed in support thereof, Plaintiffs' Complaint, the filings in this action, the Proposed Order, which is being filed in accordance with Local Rule 231 and lodged in accordance with Local Rule 137, and any and all evidence, argument, or other matters that may be presented at the hearing.

On October 28, 2020, Amy Gilbert, Lauren Harding, Sara McDermott, Omar Noureldin, and Ariel Teshuva, counsel for Plaintiffs, met and conferred by telephone with Christopher Pisano, counsel for Defendant, and gave notice of Plaintiffs' application and motion. *See* Ex. 1 (Declaration of Omar Noureldin ("Noureldin Decl.")) ¶¶ 2–4. As outlined in the Noureldin Declaration, counsel have reached an impasse regarding Plaintiffs' requested relief outlined in this Motion. *Id.* Plaintiffs' counsel advised Mr. Pisano that Plaintiffs would be moving for a Preliminary Injunction as to that requested relief. *Id.*

DATED: November 3, 2020                    MUNGER, TOLLES & OLSON LLP


By:     */s/ Omar H. Noureldin*
        OMAR H. NOURELDIN
        *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................................1

II.  FACTS ....................................................................................................................4

    A.  Defendant Actively Invites a COVID-19 Outbreak by Refusing to Test Appropriately ...............................................................................................5

        1.  Defendant Still Refuses to Test Anyone in Two of Three Operating Jails .........................................................................................................6

        2.  Defendant Still Refuses to Test Symptomatic People ...................................6

        3.  Defendant Still Refuses to Set an Outbreak Prevention Testing Policy ..................................................................................................9

        4.  Defendant Doesn't Follow the One Testing Policy He Does Have, Leaving the Jails Vulnerable to COVID-19 from New Intakes .................11

    B.  Defendant Doesn't Protect the Medically Vulnerable .............................................13

    C.  Defendant Enforces Social Distancing with Solitary-Like Restrictive Housing ...............................................................................................15

III.  ARGUMENT ........................................................................................................16

    A.  Plaintiffs and the Proposed Class Are Likely to Succeed on the Merits .................17

        1.  Defendant's Continued Refusal to Test the Vast Majority of Detainees Is Deliberately Indifferent ...........................................................18

            (a)  Defendant is Objectively Deliberately Indifferent to the Serious Risk that Incarcerated People Will Suffer Serious Illness from COVID-19 ....................................................................18

            (b)  Defendant Is Well Aware of the Risk of COVID-19 to Incarcerated People and Has Chosen to Consciously Disregard It ....................................................................................21

        2.  Defendant Acts with Deliberate Indifference by Failing to Identify and Protect Medically Vulnerable Individuals Who Face a Substantial, Increased Risk of Harm .............................................................23

            (a)  Defendant is Objectively Indifferent to the Particular Medical Needs of Medically Vulnerable Persons ...........................23

            (b)  Defendant Has Acted with Subjective Deliberate Indifference by Knowing of And Disregarding a Substantial, Increased Risk of Harm to Medically Vulnerable Persons .............25

        3.  Defendant's Punitive "Social Distancing" Policy Deprives Incarcerated Individuals of their Right to Exercise ......................................27

# TABLE OF CONTENTS
### (Continued)

Page

B.    Plaintiffs and the Proposed Class Members Will Suffer Irreparable Harm ............30

C.    The Balance of Equities and Public Interest Both Favor Plaintiffs and the Proposed Class ......................................................................................................31

IV.    CONCLUSION ....................................................................................................32

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Alcantara v. Archambeault*,
    2020 WL 2315777 (S.D. Cal. May 1, 2020) ...........................................................25

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .................................................................. passim

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ................................................................................29, 30

*Castillo v. Barr*,
    2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ...........................................31

*Davenport v. DeRobertis*,
    844 F.2d 1310 (7th Cir. 1988) ....................................................................28

*DeGidio v. Pung*,
    920 F.2d 525 (8th Cir. 1990) ......................................................................21

*Duvall v. Dallas Cnty., Tex.*,
    631 F.3d 203 (5th Cir. 2011) ......................................................................19

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) ......................................................................31

*Estelle v. Gamble*,
    429 U.S. 97 (1976) .......................................................................2, 17, 22, 26

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ....................................................................2, 17, 18, 21

*Gordon v. County of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ....................................................................18

*Helling v. McKinney*,
    509 U.S. 25 (1993) .............................................................................17, 18, 24

*Hutto v. Finney*,
    437 U.S. 678 (1978) .....................................................................................30

*Keenan v. Hall*,
    83 F.3d 1083 (9th Cir. 1996) ......................................................................28

*King v. Cnty. of L.A.*,
    885 F.3d 548 (9th Cir. 2018) ........................................................................4

NOTICE AND MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Lareau v. Manson,*
651 F.2d 96 (2d Cir. 1981) .......................................................................................... 19

*Lemire v. Cal. Dep't of Corr. & Rehab.,*
726 F.3d 1062 (9th Cir. 2013) ..................................................................................... 20

*Lopez v. Smith,*
203 F.3d 1122 (9th Cir. 2000) ..................................................................................... 28

*Martinez-Brooks v. Easter,*
2020 WL 2405350 (D. Conn. May 12, 2020) ............................................... 21, 24, 25

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ....................................................................................... 31

*Morales Feliciano v. Rossello Gonzalez,*
13 F.Supp.2d 151 (D.P.R. 1998) ................................................................................. 21

*Pierce v. Cnty. of Orange,*
526 F.3d 1190 (9th Cir. 2008) ..................................................................................... 28

*Preminger v. Principi,*
422 F.3d 815 (9th Cir. 2005) ....................................................................................... 32

*Rep. of the Phil. v. Marcos,*
862 F.2d 1355 (9th Cir. 1988) ....................................................................................... 4

*Spain v. Procunier,*
600 F.2d 189 (9th Cir. 1979) ....................................................................................... 28

*Torres v. Milusnic,*
2020 WL 4197285 (C.D. Cal. July 14, 2020) ............................................................. 25

*Univ. of Texas v. Camenisch,*
451 U.S. 390 (1981) ....................................................................................................... 4

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008) .............................................................................................. 16, 31

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ....................................................................................... 18, 25, 28, 30

Fourteenth Amendment .......................................................................................... passim

**TABLE OF AUTHORITIES**
(Continued)

Page

STATE STATUTES

Cal. Code Regs. Title 15, § 1065 ...............................................28

OTHER AUTHORITIES

*COVID-19 in a Correctional Facility Employee Following Multiple Brief Exposures to Persons with COVID-19—Vermont, July–August 2020*, Morbidity and Mortality Weekly Report (October 21, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6943e1.htm?s_cid=mm6943e1_w ...............................................4

Centers for Disease Control and Prevention, Case Investigation & Contract Tracing Guidance, Appendix A – Glossary of Key Terms: "Close Contact" (October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/appendix.html#contact ...............................................4

Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*, (October 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html ...............................................4

Disease Control and Prevention, *Cases in the U.S., Coronavirus Disease 2019*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html ...............................................5

Los Angeles Times, *Tracking the coronavirus in Tulare County*, (October 27, 2020), https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/tulare-county/#trends ...............................................4

Science, *'There's only one chance to do this right'—FDA panel wrestles with COVID-19 vaccine issues*, (October 23, 2020), https://www.sciencemag.org/news/2020/10/there-s-only-one-chance-do-right-fda-panel-wrestles-covid-19-vaccine-issues ...............................................5

*See Solitary Confinement Should Be Banned in Most Cases, UN Expert Says*, UN News (Oct. 18, 2011), https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says ...............................................29

*U.S. Coronavirus Cases Surpass Summer Peak And Are Climbing Higher Fast*, NPR (Oct. 27, 2020), https://www.npr.org/sections/health-shots/2020/10/27/928062773/u-s-cases-surpass-summer-peak-and-are-climbing-higher-fast ...............................................5

I.     **INTRODUCTION**

This Court's well-reasoned September 2, 2020 Temporary Restraining Order ("TRO") put Defendant Sheriff Michael Boudreaux on notice that he was failing to comply with his constitutional obligations to protect individuals incarcerated in the Tulare County Jails against the dangers of COVID-19. Despite having over two months to remedy any constitutional violations, Defendant continues to operate the Jails in a way that puts the Provisional Class at unconstitutionally high risk of contracting the potentially lethal COVID-19 virus. Defendant's actions pose a particular threat to the proposed Medically Vulnerable Subclass, who have comorbidities that place them at *increased* risk of serious illness if they contract COVID-19. Yet Defendant has not taken steps to identify—much less actively monitor or protect—medically vulnerable individuals in the Jails.

Plaintiffs and prospective class members do not have the luxury of waiting for Defendant to get his act together. With each day that passes, Defendant's deliberate indifference threatens incarcerated people's health and lives, creating a risk of an outbreak that could engulf the Jails and create a public health calamity for the surrounding community in Tulare County.

Defendant's continued deliberate indifference is apparent in three ways. *First*, even though this Court found in the TRO that Plaintiffs were likely to prevail on their claims that Defendant was deliberately indifferent by failing to enact an effective testing plan to prevent an outbreak of COVID-19 in the Jails, Defendant continues to refuse to test residents in two of the three facilities. His own testing data show that only *one* person has been tested at the Bob Wiley or South County facilities over the course of the eight-month pandemic. In response to the Court's TRO, Defendant implemented a policy for testing new intakes within the first 24 hours of arriving at the Jails. But this new policy fails to account for the hundreds of other incarcerated individuals residing at the Jails who have no way of knowing if they have COVID-19. In the nearly eight months since the pandemic started, Defendant has tested only 18 incarcerated individuals outside of intake or a known exposure. Defendant's own data show that Wellpath, the medical provider at the Jails, does not even test symptomatic people *95% of the time*. Defendant's callous refusal to test even symptomatic individuals, who may be at risk of serious injury or death and who may be actively

spreading the disease within the Jails, reinforces the need for the Court to order Defendant to: (1) conduct a one-time test of *all* residents of the Jails and (2) test individuals presenting with *any* symptom of COVID-19. Defendant's failure to take either step following this Court's TRO shows that Defendant cannot be trusted to identify individuals at risk of contracting COVID-19 and take the constitutionally required measures to protect them from contracting this potentially fatal virus.

*Second*, despite his awareness that certain individuals with pre-existing conditions have an increased risk of severe illness and death if they contract COVID-19, Defendant has not sought to identify—much less to protect—all members of the Medically Vulnerable Subclass. Assistant Sheriff Cheri Lehner, who is third-in-command at the Jails, and Lieutenant Cory Jones, who is responsible for overseeing the only facility that conducts tests (Adult Pre-Trial), attempted in their depositions to disclaim responsibility for the safety of these persons by pointing the finger at Wellpath, the Jails' medical provider, as the party that is responsible for identifying medically vulnerable individuals. But under established Supreme Court precedent, Defendant is obligated to provide "humane conditions of confinement," which includes providing adequate medical care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *accord Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Failing to attend to an incarcerated individual's safety and medical needs is unconstitutional regardless of whether the harm stems from a Jails' doctor or prison officials themselves. *Estelle*, 429 U.S. at 103–05.

And Wellpath itself clearly perceives a continued threat to Medically Vulnerable persons from contact with incarcerated people in the Jails. Wellpath's Medical Director testified that she was so concerned that she would contract COVID-19 in the Jails and give it to a Medically Vulnerable relative that she asked for an accommodation so that she would not have to work in the Jails' Adult Pre-Trial facility. Plaintiffs and members of the proposed Medically Vulnerable Subclass thus need this Court's help—*now*—to require Defendant to identify all Medically Vulnerable persons in the Jails and take additional precautions to ensure their health and safety.

*Finally*, Defendant has responded to this Court's TRO requiring him to adopt a social distancing policy with what can only be described as punitive isolation and flagrant disregard for incarcerated persons' right to exercise. *See* TRO at 47-48 (ordering Defendant to "[a]dopt a policy

designed to reduce contacts between incarcerated people in all common areas . . . and allow for the possibility of social distancing by inmates"). In response to the Court's TRO, Defendant has implemented a policy that guarantees incarcerated individuals are out of their cells for only *three hours per week*. In other words, they may be in their cells—without access to phones, TVs, computers, or showers—for 165 out of 168 hours per week. The Sheriff's Department rationalizes this by saying only four (and *possibly* eight) incarcerated individuals can be let out of their cells at any given time. This extreme punitive lock-down is excessive to any goal of ensuring social distancing; for instance, Adult Pre-Trial has a large yard and common space that each can safely accommodate many more than four persons at a time. Defendant's policy, which he insists is consistent with Title 15, instead violates Title 15 by allowing far less than three hours of exercise each week. It also violates the U.S. Constitution, which guarantees a right to exercise, typically for at least five hours each week. In short, Defendant's response to this Court's TRO not only fails to protect incarcerated people from COVID-19, it also further infringes on incarcerated people's *other* constitutional rights.

Defendant's conduct—before and during this litigation—makes clear that absent a Court order, Plaintiffs and Provisional Class members will continue to face serious risks of harm, including possibly death, in violation of their constitutional rights due to Defendant's deliberate indifference to the threat of COVID-19. Accordingly, and as described in greater detail in the accompanying Proposed Order, Plaintiffs and the proposed Provisional Class and Medically Vulnerable Subclass request the following:

1. On testing, Plaintiffs ask that Defendant conduct a one-time test of all incarcerated people in all facilities. Plaintiffs also ask the Court to order Defendant to stop using the current Supplemental Screening form that denies testing even to symptomatic individuals and instead to provide testing to any person self-reporting a symptom of COVID-19. Plaintiffs also ask that Defendant develop an affirmative outbreak control and prevention plan.

2. As to medically vulnerable people, Plaintiffs ask that Defendant (1) identify all medically vulnerable people and (2) develop policies to affirmatively monitor them for COVID-19.

3. On Defendant's social distancing policy, Plaintiffs ask that Defendant develop a plan to

1    allow incarcerated people at least one hour per day of exercise.

2    4.   Plaintiffs further request reporting, compliance, and monitoring of Defendant's COVID-19

3         response, including the appointment of independent experts to evaluate Defendant's

4         compliance with this Court's Orders.

5    **II.    FACTS**

6         Since the Court issued the TRO on September 2, 2020, society has learned more about how

7    to protect itself from COVID-19. The Centers for Disease Control and Prevention ("CDC") has,

8    for example, told us that the most common way by which people are infected with COVID-19 is

9    through exposure to respiratory droplets (e.g., breathing, speaking, coughing, sneezing) that carry

10   the infectious virus, including through airborne transmission.[1] And the virus can spread with even

11   minimal contact: 15 minutes cumulative within a 24-hour period.[2]

12        We also now know, through discovery and continued investigative efforts, that in stark

13   contrast to expert opinions and CDC guidelines, the overwhelming majority of people in the

14   Tulare County Jails (the "Jails") who reported COVID-19 symptoms (including fever, cough, sore

15   throat, shortness of breath, or some combination) since the pandemic began have been denied

16   COVID-19 testing. And we know the rate of community transmission in Tulare County remains

17   "widespread," and the rate of hospitalizations, as of October 27, 2020, is also growing.[3]

18        Unfortunately, however, one thing has not changed: COVID-19 remains a highly

19   infectious and deadly disease without a cure. As of November 1, 2020, over 229,000 people in the

20   _____

21   [1] *See* Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission*, (October 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.  A preliminary

22   injunction is customarily granted on the basis of evidence that is less complete than what is presented at a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court may consider hearsay and otherwise inadmissible evidence when considering whether to issue a preliminary injunction. *Rep. of the Phil. v. Marcos*, 862

23   F.2d 1355, 1363 (9th Cir. 1988). The Court may also take judicial notice of publicly accessible websites. *See King v. Cnty. of L.A.*, 885 F.3d 548, 555 (9th Cir. 2018).

24   [2] Centers for Disease Control and Prevention, Case Investigation & Contract Tracing Guidance, Appendix A –

25   Glossary of Key Terms: "Close Contact" (October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/php/contact-tracing/contact-tracing-plan/appendix.html#contact; Centers for Disease Control and Prevention,

26   *COVID-19 in a Correctional Facility Employee Following Multiple Brief Exposures to Persons with COVID-19—Vermont, July–August 2020*, Morbidity and Mortality Weekly Report, (October 21, 2020),

27   https://www.cdc.gov/mmwr/volumes/69/wr/mm6943e1.htm?s_cid=mm6943e1_w.

     [3] Los Angeles Times, *Tracking the coronavirus in Tulare County*, (October 27, 2020),

28   https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/tulare-county/#trends

United States have died from the disease.[4] COVID-19 cases are again spiking across the country, with cases reaching a peak in recent days.[5] And the timeline for a widely available and accessible vaccine remains an elusive guessing game.[6]

Most importantly, nearly eight months after the start of the pandemic, and two months after the Court issued its TRO Order, Defendant continues to operate the Jails with deliberate indifference to Plaintiffs' and Provisional Class members' health and safety. Defendant (1) has still tested only *one* person in two of the three operational detention facilities and virtually no one who is symptomatic; (2) ignores the increased risks of COVID-19 to members of the proposed Medically Vulnerable Subclass; and (3) implements his purported social distancing measure in a punitive manner that restricts incarcerated persons' right to exercise by imposing dangerous solitary-like restrictive housing conditions throughout the Jails.

### A.   Defendant Actively Invites a COVID-19 Outbreak by Refusing to Test Appropriately

Eight months into the pandemic, the record is clear: Defendant has *no* testing policy in place to identify incarcerated people infected with COVID-19 and isolate them, for their own treatment and the protection of others. He still refuses to test anyone in two of the three Jail facilities currently operating—which account for three quarters of the Jails' total population. He refuses to test the overwhelming majority of even *symptomatic* people, outside the context of new intakes and known exposures (usually by staff). And the one policy he does have—a policy for testing new intakes—is often abandoned in practice, giving COVID-19 yet another foothold into the Jails. Yet, when confronted about Defendant's refusal to protect incarcerated people from COVID-19 through appropriate testing policies, Tulare County Sheriff's Department ("TCSD") staff was content to point fingers at Wellpath and the Tulare County Health and Human Services

---

[4] Centers for Disease Control and Prevention, *Cases in the U.S., Coronavirus Disease 2019,* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[5] Will Stone, *U.S. Coronavirus Cases Surpass Summer Peak And Are Climbing Higher Fast*, NPR (Oct. 27, 2020), https://www.npr.org/sections/health-shots/2020/10/27/928062773/u-s-cases-surpass-summer-peak-and-are-climbing-higher-fast

[6] Science, *'There's only one chance to do this right'—FDA panel wrestles with COVID-19 vaccine issues*, (October 23, 2020), https://www.sciencemag.org/news/2020/10/there-s-only-one-chance-do-right-fda-panel-wrestles-covid-19-vaccine-issues

Agency ("HHSA").

Dr. Alla Liberstein, Medical Director of the Tulare County Jails, summed up Defendant's approach to testing best: When asked what the Jails rely on to determine whether there is a potential outbreak, Dr. Liberstein testified: "Nobody knows. Who knows? Do you know? Do I know? Nobody knows." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 157:5–6.

### 1. Defendant Still Refuses to Test Anyone in Two of Three Operating Jails

Eight months into the pandemic, Defendant has still tested *only one person* at two of the three jail facilities—Bob Wiley and South County—whose combined populations account for nearly 77% of the Jails' total population. Ex. 1 ¶¶ 7–9, Exs. C–D. Defendant's own testing data, provided to the Court, reflect that only one person was tested at either Bob Wiley or South County since March 2020. ECF No. 29-1 at 21. And according to data reported by the California Board of State and Community Corrections ("BSCC"), between July 19, 2020, and October 31, 2020, Defendant tested *zero* people for COVID-19 at Bob Wiley and South County. Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 118. Those two facilities have housed between 700 and 950 people at any given time during the pandemic. Given the transient nature of the Jails' population, thousands of people have been housed at Bob Wiley and South County and likely hundreds have gone undiagnosed for COVD-19. Ex. 3 (Supp. Meyer Decl.) ¶¶ 10, 12.

### 2. Defendant Still Refuses to Test Symptomatic People

Despite scientific consensus that symptomatic persons should be tested when they display just one symptom of COVID-19, the record shows that even in Adult Pre-Trial—the one facility where testing takes place—Defendant refuses to test individuals unless they display *multiple* symptoms of COVID-19. Making matters worse, Defendant often refuses to test even these symptomatic individuals for COVID-19.

Lt. Cory Jones, the Lieutenant in charge of Adult Pre-Trial and intake,[7] testified that anyone who reports COVID-19 symptoms "[a]nywhere in the facilities" is eligible for a COVID-

---

[7] Lt. Jones testified that he was disciplined just four to five months ago by TSCD, but Plaintiffs' counsel were unable to determine whether the discipline was related to COVID-19: Defense counsel instructed the witness not to answer the reasons for the discipline. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 21.

19 test. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 62. Similarly, the Jails' Medical Director testified that it is her medical opinion that a person who shows any COVID-19 symptoms should be tested: "If the patient . . . is symptomatic, patient has to be tested." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 39:23–25.[8] But that testimony is directly controverted by Defendant's own testing data and the experiences of incarcerated people in the Jails: The data establish that Defendant has failed to test even those who show symptoms of COVID-19 and that only 18 individuals with symptoms were tested over 8 months (independent of outbreaks or observations).

According to the Jails' "Coronavirus Supplemental Screening" form—which screens incarcerated people for referral to a medical provider to be *evaluated* for a COVID-19 test, not for the test itself—a person must be experiencing *multiple* symptoms to obtain a referral. Ex. 3 (Supp. Meyer Decl.) ¶ 15. The form, by requiring multiple symptoms, sets an unreasonably high bar to obtain a test, which is not based on any existing scientific evidence or on any public health guidance. *Id.* And even when the screening form results in a referral to a Wellpath medical provider, the provider declines to test symptomatic people *95% of the time*. *Id.* ¶ 14.

As one example, on several occasions, Francisco Arreola, a 57-year old man with diabetes, asthma, and hypertension, who is currently incarcerated at Bob Wiley, was not tested despite reporting to the Jails' medical staff that he was experiencing *multiple* symptoms consistent with COVID-19 (difficulty breathing, cough, chest pain, headaches, and fatigue). Ex. 7 (Arreola Decl.) ¶¶ 5–10. It was not until Mr. Arreola was hospitalized on October 7, 2020, after passing out, that he was tested for COVID-19. *Id.* ¶ 15. The doctor told him that his "medical conditions [were] incredibly bad." *Id.* Rigoberto Benavidez, currently incarcerated in Adult Pre-Trial, similarly requested—more than once—that Defendant test him after he reported a COVID-19 symptom—a severe cough. Ex. 9 (Benavidez Decl.) ¶¶ 10–15. He was never given a test. *Id.* Instead, he was prescribed allergy medication despite never having had allergies before and despite having no

---

[8] Dr. Liberstein was asked in her deposition: "And if the patient exhibits any of the symptoms that the CDC recognizes in its guidelines are symptoms of coronavirus, then it would be your medical judgment that that person has to be tested?" Her answer: "Yes." *See* Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 40:9–14. Similarly, Capt. Macias testified, "If an inmate shows symptoms or has issues, they will be tested. Ex. 1 ¶ 15, Ex. J (Macias Depo.) at 8:21-22. While Dr. Liberstein's medical judgment as to who should be tested for COVID-19 is consistent with CDC guidelines and Dr. Jaimie Meyer, that is sadly not TCSD's practice in the Jails.

1    allergy symptoms apart from a cough. *Id.* ¶ 12.

2          On September 5, 2020, after an in-person court appearance during which he was

3    transported in several crowded spaces, Plaintiff Samuel Camposeco, who is incarcerated in Bob

4    Wiley, started to experience *multiple* COVID-19 symptoms (fever, sore throat, trouble breathing,

5    chest pain, cough, and chills). Ex. 10 (Camposeco Decl.) ¶¶ 11–15. After repeated requests to see

6    a medical provider and receive a test, the nurse and a deputy told Camposeco that his symptoms

7    were likely the result of wildfires. *Id.* ¶ 15. The nurse also told him that she did not know how

8    testing worked in the Jails and had never tested anyone before. *Id.* It was not until October 6,

9    2020—a month after Camposeco first reported symptoms—that he saw a medical provider, who

10   decided Camposeco did not need a test despite displaying clear symptoms of COVID-19. *Id.* ¶ 17;

11   Ex. 3 (Supp. Meyer Decl.) ¶ 16. What's more, the provider told him that the Jails were not testing

12   many people because the tests were not accurate and often led to false positives. *Id.*

13         Since this Court issued its TRO, several other incarcerated people, including Plaintiff

14   Adam Ibarra, have been refused a COVID-19 test despite requesting one and reporting COVID-19

15   symptoms. Ex. 14 (Hounihan Decl.) ¶¶ 5–6; Ex. 15 (Ibarra Decl.) ¶¶ 11–12; Ex. 17 (Kaupelis

16   Decl.) ¶ 7; Ex. 24 (Moreno, S. Decl.) ¶ 8; Ex. 31 (Stephens Decl.) ¶¶ 9–12; Ex. 33 (Vargas Decl.)

17   ¶¶ 7–8; Ex. 34 (Watson Decl.) ¶ 11.

18         As described above, Defendant tests only individuals housed in Adult Pre-Trial and the

19   overwhelming majority of those tests are administered to new intakes. Out of nearly 1,500 tests

20   administered since March 2020, only 18—just 1.2%—were administered because a person

21   reported COVID-19 symptoms. Ex. 3 (Supp. Meyer Decl.) ¶ 13. Nor do all of those tests represent

22   a unique case: Out of the 334 people in Adult Pre-Trial who reported COVID-19 symptoms, only

23   16—about 5%—were administered a test. *Id.* ¶ 12. Put differently, outside of intake and known

24   exposures, Defendant refuses to test symptomatic people 95% of the time. *Id.* ¶ 14.

25         In the few instances in which Defendant did test symptomatic people, the test positivity

26   rate was alarmingly high: 56% of persons tested were positive for COVID-19. *Id.* ¶ 12. Applying

27   the 56% positivity rate to the number of people who reported COVID-19 symptoms (334 people)

28   suggests that at least 187 people in Adult Pre-Trial went undiagnosed because of Defendant's

1    inadequate screening and testing procedures. And there is no way of knowing precisely how many

2    people have gone undiagnosed at the other two Jails—Bob Wiley and South County—which

3    account for more than three quarters of the Jails' population.

4              **3.      Defendant Still Refuses to Set an Outbreak Prevention Testing Policy**

5              The record is unequivocal: Defendant simply does not have a policy in place for testing

6    incarcerated people—making it impossible to identify those who are infected and isolate them

7    from the rest of the population. Experts agree that "a comprehensive and well-implemented testing

8    strategy is critical for COVID-19 prevention and control." Ex. 3 (Supp. Meyer Decl.) ¶¶ 4, 11, 22,

9    28, 31. Where, as here, a congregate facility is otherwise unable to identify and segregate

10   individuals infected with COVID-19 from the rest of the population, broad-based testing strategies

11   are required. Ex. 3 (Supp. Meyer Decl.) ¶ 31.

12             But nearly eight months into the COVID-19 pandemic and two months after this Court's

13   TRO, neither TCSD nor its medical provider have a COVID-19 testing policy to identify and

14   isolate positive cases of COVID-19 among the general population. Indeed, trying to understand

15   Defendant's current testing practices, to the extent they exist, is an exercise in futility. The record

16   demonstrates that lead officials are unaware of basic information about COVID-19, including

17   CDC guidance on COVID-19. And when asked about the testing policy, Defendant sought to

18   avoid accountability by deferring to his medical provider, Wellpath, on matters of testing; yet

19   Wellpath's staff deferred to TSCD, telling us they were just following orders.

20             Lt. Jones testified that the Jails' testing policy "is a two-pronged approach" with oversight

21   split between TCSD and Wellpath, the Tulare County Jails' contracted medical provider. Ex. 1

22   ¶ 12, Ex. G (Jones Depo.) at 57:18–22. Assistant Sheriff Cheri Lehner, the third-in-command

23   responsible for overseeing all of detentions, testified that the "medical people" are responsible for

24   disease response and prevention policies. Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 22–23, 30:9–16,

25   31:20–23, 132:1–9. Lehner could not answer even basic questions about the testing policy. *See id.*

26   at 37:23–38:6, 53:14–54:11, 84:7–86:9, 87:20–90:16, 96:23–97:3. She testified both that she is not

27   familiar with Wellpath's testing policies and practices and that she has not tried to find out under

28   what circumstances an incarcerated person would be tested for COVID-19. *Id.*

But, when we asked the so-called "medical people" about the testing policy, they displayed an astonishing lack of basic knowledge about COVID-19, including lacking any understanding of how to protect incarcerated people from contracting the virus via testing. When asked whether the Jails had a testing policy with respect to COVID-19, Medical Director Dr. Liberstein testified simply, "I don't know." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 39:4–7.

Lt. Jones also testified that "all testing requirements are left up to Wellpath and HHSA" and that "[i]f the recommendation is to test, we test." Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 64:2–16. But a representative from HHSA testified that HHSA's role is not to "affirmatively analyze the conditions of the jail and then develop policies for the Sheriff to implement," but rather to provide feedback to Wellpath and TCSO in response to questions. Ex. 1 ¶ 16, Ex. K (Mitchell Depo.) at 21:23-22:17.

Defendant has done no asymptomatic testing despite a scientific consensus that asymptomatic people can spread the virus at rates as high as 45%. Ex. 3 (Supp. Meyer Decl.) ¶¶ 21, 32. It is not controversial to state that symptomatic testing is necessary to contain or reduce the transmission of COVID-19. *Id.* ¶ 32. Yet, despite clear scientific consensus on asymptomatic spread, Dr. Liberstein—the Jails' Medical Director—inexplicably testified: "There is no definite proof that [an] asymptomatic person can transmit it or cannot transmit it. Therefore it doesn't really matter if he's tested or not tested." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 173:15–174:1. When asked what the Jails rely on to determine whether there is a potential outbreak given that they do not test symptomatic or asymptomatic people, Dr. Liberstein testified: "Nobody knows. Who knows? Do you know? Do I know? Nobody knows." *Id.* at 157:2–6.

When the test positivity rate in the Jails peaked at above 30% the week of June 20, 2020, TCSD conducted only an additional 48 tests between June 25 and June 29, 2020. Ex. 3 (Supp. Meyer Decl.) ¶ 7. At the time, the population in Adult Pre-Trial was about 300. Similarly, in response to a confirmed positive case in early July, when the test positivity rate peaked at 19.2%, TCSD conducted even fewer tests—5 tests the week starting on July 15 and 8 tests the week starting on July 23. It is highly likely that positive COVID-19 infections in both the June and July outbreaks were missed as a result of Defendant's failure to test more. *Id.* A staff member—the

Jails' psychiatric registered nurse—also tested positive around mid-July, and had been in every building in the Jails within the week preceding her diagnosis. See Ex. 1 ¶ 19, Ex. M. But as noted, Defendant conducted no additional tests despite a positive among incarcerated people and a known exposure in every facility. Without widespread testing and a strong outbreak prevention plan going forward, infections will continue to be missed, and incarcerated people will be put at unreasonable risk of contracting the virus.

The dangerous decision not to conduct widespread testing in the Jails after outbreaks is, sadly, consistent with both Asst. Sheriff Lehner's and Capt. Macias's testimony that they had never instructed Wellpath to conduct widespread testing or even considered it. Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 107:22–108:6, 122:13–124:3; Ex. 1 ¶ 15, Ex. J (Macias Depo.) at 88:24-89:14. Even more alarming, when it comes to ordering or even considering widespread testing, the Jails' Medical Director does not believe "[she is] in the position to make such a determination and to give such [ ] orders" and that she "[she] usually follow[s] what [she is] told rather than making suggestions." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 153:6–7. This is in contrast to Asst. Sheriff Lehner's testimony that disease response and prevention at the Jails is up to the "medical people." Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 30:9-19.

But if neither the Sheriff's Department nor the Medical Director believes they have the authority to order widespread testing in response to current or potential outbreaks, who can? The Medical Director said it best: "Nobody knows." *Id.* at 157:5. And it is incarcerated people who suffer when Defendant fails to act.

### 4. Defendant Doesn't Follow the One Testing Policy He Does Have, Leaving the Jails Vulnerable to COVID-19 from New Intakes

Despite having an intake policy that, on paper, shows newly booked inmates are tested at Day 1 and Day 14 of an observation period, in practice, there are multiple gaps in how the "policy" is implemented that allow COVID-19 to gain a foothold in the Jails.

On September 9, 2020, Defendant submitted to the Court his "Coronavirus Prevention and Protection" policy. ECF No. 28-1, Ex. A. The policy describes Defendant's intake and observation policy, which provides for testing at the end of a 14-day observation period where intakes are

1   housed separately from the "General Population." *Id.* at 3. The policy further states that newly

2   booked incarcerated people should be housed together with those who are booked within similar

3   timeframes. *Id.* at 4.  And if newly booked individuals are housed together with those booked on

4   different days, the observation period should be extended for the longer-housed person. *Id.*

5         At the end of September, Defendant updated the intake process to include testing of new

6   intakes within 24-hours of booking. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 61:25–62:8. In the event

7   there is no room in the General Population, the updated policy allows people who have been tested

8   at the end of their 14-day observation period to be housed with a newly booked person who has

9   not yet been tested. *Id.* at 98. What's more, Defendant houses tested new intakes in the quarantine

10  unit with untested new intakes, exposing people who have already been tested to asymptomatic

11  persons of unknown exposure to COVID-19. *See* ECF No. 28-1, Ex. A.

12        Incarcerated people's accounts show that, in practice, Defendant does not follow even

13  these questionable policies. For instance, on September 15, 2020, Defendant moved 20 people out

14  of the observation unit into Rigoberto Benavidez's General Population unit before they had

15  completed the 14-day observation or had been medically cleared. Ex. 9 (Benavidez Decl.) ¶ 22.

16  Similarly, on October 12, 2020, a person from the observation unit was placed in Benavidez's

17  housing unit before the person got the results of a COVID-19 test. *Id.* ¶ 25.

18        That person was James Gonzalez. After being booked, Gonzalez was put in close

19  proximity to people with COVID-19 while in the infirmary. Ex. 12 (Gonzalez Decl.) ¶ 4. He

20  moved into the General Population on October 12, 2020—after being tested but before receiving

21  his results. *Id.* ¶¶ 5–6. A few days later, deputies pulled him out of his General Population unit

22  because he had tested positive. *Id.* ¶ 7.

23        After returning to Adult Pre-Trial from a court appearance on October 19, 2020,

24  Camposeco was placed in a holding cell with four other newly booked people, none of whom had

25  been tested. Ex. 10 (Camposeco Decl.) ¶ 10. He later developed COVID-19 symptoms, but was

26  repeatedly refused a test. *Id.* ¶¶ 10-17. Similarly, Destiny Lopez, who was booked on September

27  16, had four different cellmates during her intake quarantine. Ex. 18 (Lopez Decl.) ¶ 3. At the end

28  of a 20-day observation period, she was moved into a General Population unit at Bob Wiley

NOTICE AND MOTION FOR PRELIMINARY INJUNCTION

1   without ever being tested. *Id.* ¶ 4.

2   Plaintiff Levi Johnson, who is Medically Vulnerable, was newly booked and placed in an

3   observation unit cell with someone who was on Day 10 of his 14-day observation period. Ex. 16

4   (Johnson Decl.) ¶ 11. Four days in, his cellmate was moved into a General Population unit.

5   Defendant did not extend the cellmate's observation period, although the cellmate was exposed to

6   Johnson on Day 10 of the period. *Id.* During the remainder of Johnson's 14-day observation, two

7   people were placed in and out of his cell. *Id.* ¶¶ 12–13. Johnson was moved into a General

8   Population unit in Bob Wiley without an extended observation period—contrary to TCSD's

9   policy. *Id.* ¶ 15. These concerning failures demonstrate that the one testing policy Defendant has

10  put in place cannot stop the spread of COVID-19.

11  **B.**  <u>**Defendant Doesn't Protect the Medically Vulnerable**</u>

12  Despite the high risk posed by Defendant's failure to implement any effective testing

13  policies, Defendant has failed to identify—much less take additional precautions to protect—

14  persons with comorbidities with COVID-19. When asked about these individuals, members of the

15  Sheriff's Department sought to disclaim responsibility over their health and welfare by identifying

16  Wellpath as responsible.

17  The CDC and medical experts have identified people with certain underlying health

18  conditions and diseases as particularly vulnerable to severe illness from COVID-19 (the

19  "Medically Vulnerable"). *See* Ex. 4 (Harawa Decl.) ¶ 36. In general, incarcerated people are at a

20  higher risk of experiencing severe illness and death from COVID-19 than people of the same age,

21  gender, and race/ethnicity in the general community. *Id.* ¶ 35. Thus, incarcerated people who are

22  also Medicinally Vulnerable are at the highest risk of serious illness and death from COVID-19.

23  *Id.* ¶¶ 35-36.

24  Dr. Liberstein unfortunately missed that memo. When asked whether "COVID-19 presents

25  a substantial risk of serious harm to medically vulnerable people who are incarcerated in Tulare

26  County Jails," she answered: "Any disease is potentially fatal . . . people do die from Corona,

27  people do die from diabetes, people die from high cholesterol . . . Flu is also [a] potentially fatal

28  disease." Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 169:17–170:16. That the Jails' Medical Director,

eight months into the pandemic, is still equating the risk of harm from COVID-19 to the flu, especially as it relates to the Medically Vulnerable Subclass, is unconscionable.

Medical experts believe it is necessary for jails to put in place additional measures, beyond those for the General Population, to protect the Medically Vulnerable Subclass from contracting COVD-19. Ex. 4 (Harawa Decl.) ¶ 31-37. The first of these measures is to identify the Medically Vulnerable at intake. *Id.* Again, TCSD falls short. Lt. Jones, who is in charge of the intake facility, testified that neither TCSD nor Wellpath does anything to identify the Medically Vulnerable at intake or otherwise. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 85:22–86:15, 92:2–15, 99:18–22.

While release from custody is the surest way to protect the Medically Vulnerable Subclass from the increased risk of harm they face from COVID-19 while incarcerated, there are several straightforward measures TCSD can and should take to protect the Medically Vulnerable Subclass while incarcerated. Ex. 4 (Harawa Decl.) ¶¶ 37-38. These measures include housing the Medically Vulnerable Subclass in single cells, monitoring and screening them by medical staff routinely, and cohorting them (but only if TCSD staff implement strict anti-contamination procedures). *Id.* ¶ 37. Yet Lt. Jones testified that TCSD has not taken any steps to specially protect Medically Vulnerable people. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 88:2–22, 89:1–16. It is therefore no surprise that Asst. Sheriff Lehner testified that she was "not sure" whether TCSD took any special precautions to keep Medically Vulnerable people safe from contracting COVID-19. Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 138:22–139:6.

Defendant has not even bothered to identify, much less specially attend to, all members of the Medically Vulnerable Subclass. *See* Ex. 1 ¶ 15, Ex. J (Macias Depo.) at 109:4-8. Instead, Defendant continues to house the Medically Vulnerable indiscriminately among the General Population. TCSD has not disclosed how many Medically Vulnerable people are currently incarcerated in the Jails (because TCSD itself does not know), but the number may be in the hundreds.[9] These individuals are at especially high risk, given Defendant's failures to protect the

---

[9] Defendant reports that the following incarcerated people have conditions that make them medically vulnerable: 31 have chronic lung disease or moderate to severe asthma, 2 are immunocompromised, 30 people have severe obesity, 46 people have diabetes, and 60 people have liver disease. *See* ECF 11-7 (Verner-Crist Decl.) ¶ 19, Ex. F at 1. These

1  incarcerated population more broadly from COVID-19

2  **C.**  **Defendant Enforces Social Distancing with Solitary-Like Restrictive Housing**

3  In response to this Court's order to implement a social distancing policy, Defendant

4  implemented a policy so restrictive that it guarantees only *three hours* of out-of-cell time per

5  *week*—during which time incarcerated persons must shower, call their loved ones, call their

6  counsel, and conduct any other necessary out-of-cell activity.

7  Defendant has belatedly attempted to enforce social distancing. Ex. 11 (Cortez Decl.) ¶ 4.

8  But Defendant's purported "social distancing" policy is more akin to punitive, solitary-type

9  confinement. Ex. 5 (Haney Decl.) ¶ 15, 30. People are kept in their six-by-nine, closet-like cells

10  for 23.5 hours a day *or more*. Ex. 9 (Benavidez Decl.) ¶ 3. Several housing units do not get any

11  out of cell time at all on Sundays. *Id.*; Ex. 6 (Alvidrez Decl.) ¶ 6; Ex. 35 (Williams Decl.) ¶ 4.

12  Defendant is not providing religious services at this time. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at

13  132–133. Some individuals have not been allowed fresh air outside of the facility in over a month.

14  Ex. 10 (Camposeco Decl.) ¶ 4; Ex. 15 (Ibarra Decl.) ¶ 5; Ex. 16 (Johnson Decl.) ¶ 6.

15  During their out of cell time—either 30 minutes per day or one hour every other day—

16  incarcerated people must take showers, call their family or attorney, go outside, and/or clean their

17  cells. *Id.* at 112. TCSD does not provide incarcerated people with phones, tablets, or TVs in their

18  cells so that they can spend their out of cell time on other activities. *Id.* at 112; Ex. 26 (Payan

19  Decl.) ¶ 9; Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 130–132.

20  When Jose Ayala asked a deputy why they were being given so little time out of their cells,

21  the deputy responded that it was because people started complaining to the ACLU about COVID-

22  19.[10] Ex. 8 (Ayala Decl.) ¶ 9. Jose Ayala, Adam Ibarra, and Drew Kaupelis have had to choose

23  between showering and calling their families. Ex. 8 (Ayala Decl.) ¶ 6; Ex. 15 (Ibarra Decl.) ¶ 7;

24  Ex. 17 (Kaupelis Decl.) ¶ 6. Others have had difficulty meeting with their lawyers. Ex. 9

25  (Benavidez Decl.) ¶ 9; Ex. 11 (Cortez Decl.) ¶ 5.

26

27  are, of course, not the only conditions that make someone Medically Vulnerable. *See* Harawa Decl. ¶ 36 (listing over 20 conditions that may make someone Medically Vulnerable to COVID-19).

28  [10] Deputies also put Ayala on a 10-day lockdown when Ayala inadvertently tore a mask when attempting to clean it. Ex. 8 (Ayala Decl.) ¶ 19. Deputies told him that he might be criminally prosecuted for destroying state property. *Id.*

This punitive solitary-type confinement is causing severe physical and mental health harms, including depression, anxiety, sleeplessness, violent outbursts, and suicidal thoughts. Ex. 6 (Alvidrez Decl.) ¶ 6–7; Ex. 8 (Ayala Decl.) ¶ 10; Ex. 9 (Benavidez Decl.) ¶ 5; Ex. 11 (Cortez Decl.) ¶ 6; Ex. 20 (Lucero Decl.) ¶ ¶5–8; Ex. 24 (Moreno, S. Decl.) ¶ 6; Ex. 29 (Sanchez Decl.) ¶ 8; Ex. 35 (Williams Decl.) ¶¶ 5–7; Ex. 33 (Vargas Decl.) ¶ 6; Ex. 34 (Watson Decl.) ¶¶ 7–8. One person has even attempted to kill himself by throwing himself from the top tier of his unit. Ex. 8 (Ayala Decl.) ¶ 12. According to Dr. Craig Haney, a psychologist and expert in the effects of solitary-type confinement on the mental health of incarcerated people who reviewed these accounts, "[t]hese extreme solitary-type conditions of confinement are taking a significant toll on the incarcerated population in general in the Tulare County Jails," "psychological deterioration [] is occurring," and the "worsening mental health is collectively affecting the atmosphere in the housing units." Ex. 5 (Haney Decl.) ¶¶ 23–24.

Defendant maintains that to ensure social distancing during out of cell time, he can only let four people (and *possibly* eight) out at a time despite having a large yard and a dayroom each the size of a basketball court and a half. Ex. 1 ¶ 12, Ex. G (Jones Depo) at 136:23–137:3. According to Dr. Haney, these onerous lock-down procedures "are inappropriate, ill conceived, and counter-productive for several reasons." Ex. 5 (Haney Decl.) ¶ 29.

## III.   **ARGUMENT**

A preliminary injunction may issue if Plaintiffs show they are (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of injunctive relief, (3) the balance of equities is in their favor, and (4) injunctive relief is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs a "sliding scale" approach to *Winter*'s test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under this approach, a stronger showing of one element may offset a weaker showing of another. *Id.* This Court may issue a preliminary injunction if Plaintiffs raise at least "serious questions going to the merits" and demonstrate that "the balance of hardships tips sharply" in Plaintiffs' favor, as long as Plaintiffs also satisfy the other *Winter* factors. *Id.*

In issuing a TRO, this Court has already determined that Plaintiffs are likely to prevail on

their claim that Defendant's Jails are constitutionally deficient. Unfortunately, Defendant has done little in the intervening months to remedy those constitutional violations, and emergency relief is once again necessary for three reasons. *First*, Plaintiffs are likely to succeed on the merits of their claims that Defendant exposed them to a serious and unreasonable risk of contracting the potentially deadly COVID-19 virus by failing to implement an effective testing policy and failing to identify and attend to the increased risks of the proposed Medically Vulnerable Subclass, which constitutes deliberate indifference in violation of the U.S. Constitution. Defendant's punitive "social distancing" policy, enacted in response to this Court's TRO, also infringes on Plaintiffs' and Provisional Class members' right to exercise. *Second*, as this Court acknowledged in its TRO, because Plaintiffs face severe risks to their health and allege constitutional violations, they are likely to suffer irreparable injury absent a court order. *Finally*, the balance of equities and public interest weigh in Plaintiffs' favor given that Defendant cannot maintain an interest in violating Plaintiffs' and class members' rights.

### A.   Plaintiffs and the Proposed Class Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their Eighth and Fourteenth Amendment claims.  The Constitution guarantees "humane conditions of confinement," meaning jails must "take reasonable measures to guarantee the safety of," incarcerated people, including providing adequate medical care. *See Farmer*, 511 U.S. at 832; *accord Estelle*, 429 U.S. at 103. Failing to attend to an incarcerated individual's medical needs is "inconsistent with contemporary standards of decency" and, as such, "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 103–05.

Incarcerated people need not wait to become sick before invoking the Constitution's protections; rather, exposing an incarcerated person to a communicable disease or a condition that may cause serious illness constitutes deliberate indifference. *See* ECF 26 (TRO Order) at 32 n.14 (citing cases); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (prison officials cannot be deliberately indifferent to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering," including the possibility of contracting a communicable disease). Correctional officials act with deliberate indifference when they "ignore a condition of

confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when that risk has not yet materialized. *Id.* "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. . . . *[A] remedy for unsafe conditions need not await a tragic event.*" *Id.* (emphasis added).

Correctional officials violate a post-conviction prisoner's Eighth Amendment right to humane conditions of confinement by (1) incarcerating an individual "under conditions posing a substantial risk of serious harm" (an objective test) and (2) "know[ing] of and disregard[ing] an excessive risk to inmate health or safety" (a subjective test). *Farmer*, 511 U.S. at 834, 837. And, as this Court has recognized, prison officials violate a pre-trial detainee's rights under the Fourteenth Amendment by proof of only objective deliberate indifference. *See* ECF 26 (TRO Order) at 31 (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018)). As Plaintiffs have previously explained, because Defendant mixes pre-trial detainees together with individuals being held post-conviction, it would be impossible to order separate relief for pretrial and post-conviction prisoners. ECF No. 11 (TRO Order) at 14. Thus, the Court need only look to whether the Fourteenth Amendment's objective deliberate indifference standard is satisfied. Here, however, Defendant's conduct readily satisfies both tests because he has *intentionally* refused to implement an adequate testing policy and to identify and protect Medically Vulnerable persons.

**1.      Defendant's Continued Refusal to Test the Vast Majority of Detainees Is Deliberately Indifferent**

Defendant's failure to apply his own intake policies and provide testing to people who are symptomatic for COVID-19 has created a dangerous reality: COVID-19 can enter the Jails through leaks in the intake process and from staff who live and work in the community. When the virus inevitably enters the Jails, Defendant's refusal to test allows the virus to transmit itself undetected—until it's too late. Because Defendant has failed to plan for any outbreak or test widely when outbreaks have occurred, this latent danger has the potential to turn into a catastrophe for both incarcerated persons and the surrounding community affected by any outbreak.

*(a)      Defendant is Objectively Deliberately Indifferent to the Serious Risk that Incarcerated People Will Suffer Serious Illness from COVID-19*

As this Court stated in the TRO, Plaintiffs are likely to succeed on their claim that officials violate the Constitution when they expose healthy incarcerated people to people infected with a contagious disease. *See* ECF 26 (TRO Order) at 17-19; *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (upholding a finding of unconstitutional conditions of confinement where officials continued to house inmates in a facility despite the existence of an extensive MRSA outbreak); *Lareau v. Manson*, 651 F.2d 96, 98–99 (2d Cir. 1981) (upholding finding of unconstitutional conditions of confinement where healthy prisoners were housed with physically ill cellmates).

In the case of COVID-19, Defendant's refusal to implement an effective testing policy violates incarcerated people's right to be free from a serious risk of medical harm. To prevent healthy people from being exposed to the virus, jail officials first have to figure out who is infected—an inquiry made more difficult by the fact of asymptomatic spread. To identify the infected, experts recommend a comprehensive testing strategy that includes implementing a broad-based testing program, followed by testing at intake, testing symptomatic people, and testing staff. Ex. 3 (Supp. Meyer Decl.) ¶¶ 4, 11, 21–22, 27–28, 31. Tulare County Jails have either been woefully inadequate in implementing each of these strategies or have not implemented them at all.

The Tulare County Jails do not exist in a vacuum: They are in a community where COVID-19 runs rampant. Ex. 3 (Supp. Meyer Decl.) ¶ 12; Ex. 5 (Haney Decl.) ¶ 7. And there are numerous paths for COVID-19 to enter the Jails from that surrounding community. One obvious point of entry for the virus is through people newly booked in the Jails. Yet Defendant fails to consistently apply his own intake and observation policies, resulting in people being transferred into the Jails' General Population after being potentially exposed to COVID-19. *See* Ex. 3 (Supp. Meyer Decl.) ¶¶ 23–25; Ex. 10 (Camposeco Decl.) ¶¶ 9–10; Ex, 12 (Gonzalez Decl.) ¶¶ 4–7; Ex. 16 (Johnson Decl.) ¶¶ 11–15; Ex. 18 (Lopez Decl.) ¶3. Another obvious point of entry for the virus is through incarcerated persons' contact with staff. Contact with staff has already resulted in two outbreaks in the Jails in June and July. Ex. 1 ¶ 15, Ex. J (Macias Depo.) at 81:10–24. Yet Defendant does not mandate that staff be tested for COVID-19. Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 114:1–8. And as incarcerated people have complained and as at least one Tulare County

Sherrif's Department official has personally admitted, TCSD officials and Wellpath staff do not always wear masks.[11] *See* Ex. 22 (Mendez Decl.) ¶ 3; Ex. 31 (Stephens Decl.) ¶ 13.

Defendant has also consistently failed to test symptomatic people: Even in Adult Pre-Trial, only 6% of individuals presenting with symptoms of COVID-19 have been tested, despite a 56% test positivity rate among those actually tested. Ex. 3 (Supp. Meyer Decl.) ¶¶ 12–14. To the extent that Defendant has implemented a testing policy for symptomatic people (and, as described above, it is far from clear that he has), it is out of step with expert recommendations and, as a result, very few clearly symptomatic persons have been tested. Ex. 3 (Supp. Meyer Decl.) ¶¶ 11–12, 15.

Finally, Defendant lacks any coherent outbreak control plan that includes testing and has already failed to comprehensively test when there have been COVID-19 outbreaks at the Jails. And although the dangers of asymptomatic transmission of COVID-19 are well known, Defendant's own data show that the Jails have tested only *one* person at either Bob Wiley or South County—whose residents make up a combined two-thirds of the total Jails' population—since the pandemic began. ECF No. 29-1 at 21. In other words, Defendant has no idea whether or not the vast majority of the people incarcerated in his Jails are positive for COVID-19. Ex. 3 (Supp. Meyer Decl.) ¶¶ 31–32. As a result, he has no way to isolate those who are currently infectious from the rest of the population, putting all residents of the Jails, staff, and the surrounding community at increased risk of contracting the potentially fatal disease. *Id.* ¶ 28.

"[I]n order to satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013). Plaintiffs readily meet this standard: Defendant fails to enforce his own intake and observation policy and fails to test staff, creating direct paths for COVID-19 to enter the Jails and cause a substantial risk of serious harm to incarcerated people. And his testing policies mean that Defendant is asleep at the wheel, with absolutely no way of knowing whether COVID-19 has entered the Jails. By failing to implement an effective or comprehensive testing plan, Defendant has created conditions that virtually assure not only that an

---

[11] On October 30, 2020, Captain Gabriel Macias testified that the first time that he had ever worn a mask at work was "last week." Ex. 1¶ 15, Ex. J (Macias Depo) at 66:9-13.

outbreak in the Jails will eventually occur, but also that it will go undetected until it is too late. Defendant's lackadaisical approach to testing has already exposed incarcerated people to a substantial risk of serious harm from COVID-19. *See Morales Feliciano v. Rossello Gonzalez*, 13 F.Supp.2d 151, 208 (D.P.R. 1998) (the failure to "fully screen incoming inmates for infectious diseases such as tuberculosis" constituted deliberate indifference); *DeGidio v. Pung*, 920 F.2d 525, 530 (8th Cir. 1990) (affirming a finding of deliberate indifference based on a prison's "lack of general awareness of the potential threat of tuberculosis and the lack of guidance from the health services administrators," which "caused delayed diagnoses of active cases and inadequate responses when active cases were discovered," including due to inadequate contact tracing).

       (b)       *Defendant Is Well Aware of the Risk of COVID-19 to Incarcerated People and Has Chosen to Consciously Disregard It*

"[T]he seriousness of the threat posed by COVID-19—and the particular vulnerability of elderly individuals as well as those with certain preexisting medical conditions—are so well known that it would be implausible to suggest that prison officials are unaware of this risk." *Martinez-Brooks v. Easter*, No. 3:20-cv-00569, 2020 WL 2405350, at *21 (D. Conn. May 12, 2020); *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). TCSD officials are, of course, aware of the risk: In their own personal lives, these TCSD officials responded to the pandemic by adopting social distancing measures and wearing masks. Ex. 1 ¶ 13, Ex. G (Jones Depo.) at 38:1–41:17; Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 40:12–42:24; Ex. J (Macias Depo.) at 57:14-61:10. Wellpath's Medical Director testified that she was so concerned that she would contract COVID-19 in the Jails and give it to a Medically Vulnerable family member that she asked for an accommodation so that she would not have to work out of the Adult Pre-Trial facility. Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 70:6–12, 147:4–9.

A fair review of the record shows that Jails officials knew of the risks posed *by their own policies* and chose to disregard them. As described above, eight months into a pandemic, not a single witness for TCSD could articulate a coherent understanding of TCSD's own testing policy, because no such policy exists. *E.g.* Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 37:23 to 38:6, 53:14 to

54:11, 84:7 to 86:9, 87:20 to 90:16, 96:23-25; *see also supra* at II.A.3. And it is clear why: The officials who provide "oversight" at TCSD lack any interest in either setting policies or overseeing their medical service provider, Wellpath, in carrying those policies out. They have instead attempted to shift the burden of protecting incarcerated individuals' health and safety entirely to Wellpath, who has similarly disregarded the known risks posed by their own policies.

To take just one example: Part of the reason that so few symptomatic incarcerated people have received tests is because of Wellpath's facially inadequate screening form, which requires *multiple* symptoms before an incarcerated person can even be *referred* to a medical provider to be evaluated for a test. If it sounds convoluted, that's because it is. The requirement that a person have multiple—rather than one—symptoms, and undergo multiple screenings, lacks a basis in science or public health guidance. Ex. 3 (Supp. Meyer Decl.) ¶ 15. It also goes against the medical advice of Wellpath's own doctors. As described above, Dr. Liberstein, Wellpath's Medical Director and the sole doctor in the Tulare County Jails, testified that in her medical opinion a person with only *one* symptom of COVID-19 should be tested. Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 39:23–40:19. She admitted that, according to the screening criteria, someone with a 100.4 degree fever *would not* be referred to a provider for testing, and testified merely that she would "usually" be notified anyway of such a result because "everybody [is] afraid of COVID." *Id.* at 99:16–100:5. But despite this clear awareness that the screening form is inadequate, Wellpath's Medical Director also testified that there has been no recent consideration of updating the form. *Id.* at 101:3–16. The system is broken, and neither Wellpath nor TCSD can be bothered to fix it.

Defendant claims to be relying on the "medical people" to make decisions regarding testing. See Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 30:14–31:23. But Defendant has never taken any interest in what Wellpath's policies are and whether they're working. See Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 32:9-11. Whether Wellpath or Defendant is causing Plaintiffs' exposure to COVID-19, Plaintiffs can show deliberate indifference. *Estelle*, 429 U.S. at 104–05 (deliberate indifference by prison doctors constitutes deliberate indifference).

As another example, there has never been any kind of widespread testing in the Jails. As described above, the Jails experienced an outbreak in late June and early July. Not long after, the

1  Tulare County Superior Court wrote a letter to Defendant, again asking Defendant to conduct a

2  one-time test of *all* incarcerated people in Tulare County. *See* Compl. Ex. 1 at 50, 52 (Letter from

3  Hon. Alldredge) at 1. Defendant refused to conduct widespread testing.  *Id.* at 3.

4          Defendant's failure either to supervise its medical team who are allegedly responsible for

5  testing, coupled with the obvious nature of the risk of COVID-19 and the fact that Defendant

6  failed to conduct widespread testing in the midst of an outbreak even when specifically asked to

7  do so, constitute subjective deliberate indifference.

8          At the TRO hearing, the Court expressed skepticism "that any tests [were] being

9  performed beyond those for new intakes and under observation." ECF 26 (TRO Order) at 13. The

10 Court ordered Defendant to provide a summary of his testing efforts. Unfortunately, Defendant's

11 own data and the Jails' Medical Director's testimony now confirm that Defendant tests virtually

12 no one with COVID-19 symptoms. As such, Defendant is willfully exposing incarcerated people

13 to COVID-19, putting them at substantial risk of severe illness and potential death from the virus.

14         To remedy the harm already caused by Defendant's ongoing and persistent failure to

15 provide adequate testing within the Tulare County Jails, Defendant must conduct a one-time test

16 of all incarcerated people in the Jail. Defendant must also adopt constitutionally adequate policies

17 for testing symptomatic people and identifying and preventing outbreaks. Until Defendant takes

18 these measures, Defendant is willfully exposing incarcerated people to COVID-19, putting them at

19 substantial risk of severe illness and potential death from the virus.

20              **2.      Defendant Acts with Deliberate Indifference by Failing to Identify and
                          Protect Medically Vulnerable Individuals Who Face a Substantial,
21                        Increased Risk of Harm**

22         Defendant has admitted to doing nothing to identify—much less to protect—all members

23 of the Medically Vulnerable Subclass, who face substantial *and increased* risk of significant harm

24 from COVID-19. By knowingly failing to take any additional precautions for individuals who face

25 an increased risk of potentially lethal harm, Defendant has acted with deliberate indifference.

26              *(a)      Defendant is Objectively Indifferent to the Particular Medical Needs
                          of Medically Vulnerable Persons*

27 This Court already has held that Plaintiffs are likely to succeed on their claims that

28

Defendant's failure to implement an effective testing plan and social distancing policy constitutes objective deliberate indifference to the known and obvious risk of spreading COVID-19. *See* ECF 26 (TRO Order) at 33, 35. In other words, Defendant is not providing humane conditions that guard against the risk of exposure to COVID-19 for *any* incarcerated individual in the Jails. *See Helling*, 509 U.S. at 35 (objective prong required proof that inmate was being exposed to unreasonably high levels of environmental tobacco smoke).

Defendant has similarly failed to take any precautions to mitigate the substantial *and increased* risk of serious harm faced by members of the Medically Vulnerable Subclass. As the CDC, medical experts, and courts recognize, individuals with certain pre-existing conditions have a substantial and increased risk of serious illness if they contract COVID-19. *See* Ex. 4 (Harawa Decl.) ¶¶ 29–34; *see Martinez-Brooks*, 459 F. Supp. 3d at 440 ("It is also undisputed—*and, indeed, by now common knowledge*—that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death, particularly for members of the Medically Vulnerable Subclass.") (emphasis added). The CDC and medical experts have identified 20 conditions, such as diabetes and obesity, that make someone particularly vulnerable to severe illness and death from COVID-19. *See* Ex. 4 (Harawa Decl.) ¶ 36-37.

As a society, we recognize that individuals with certain preexisting conditions face an increased risk of serious harm and, as such, we should take extra precautions consistent with their risk level. *See Helling*, 509 U.S. at 36 (objective prong requires proof that the complained-of risk "is not one that today's society chooses to tolerate"). For instance, since March 2020, we have closed nursing homes to outside visitors and offered special shopping hours for those at increased risk of COVID-19, all in recognition that the elderly and sick need to take extra precautions during the pandemic. *See* Ex. 4 (Harawa Decl.) ¶ 37. Individuals in detention facilities should be treated no differently. As medical expert Dr. Harawa explains, "[c]orrectional facilities should put in place additional measures to reduce the risk of transmission among the medically vulnerable because detainees, in general, have an increased risk of death, severe illness, and long-term complications related to COVID-19." *Id.* ¶ 31. Her recommendations include, among other things, affirmatively monitoring Medically Vulnerable persons for the virus on a routine basis. *Id.*

Courts, too, have recognized that Medically Vulnerable incarcerated persons are entitled to additional protections in light of with their increased risk levels. *See Martinez-Brooks*, 459 F. Supp. 3d at 442-43 (inadequate implementation of protective measures for medically vulnerable individuals qualified as deliberate indifference under the Eighth Amendment); *Torres v. Milusnic*, No. CV 20-4450-CBM-PVC(x), 2020 WL 4197285, at *16 (C.D. Cal. July 14, 2020) (similar); *Alcantara v. Archambeault*, No. 20CV0756 DMS (AHG), 2020 WL 2315777, at *9 (S.D. Cal. May 1, 2020) (medically vulnerable immigration detainees' confinement was excessive in relation to its purpose). This Court should thus find that Plaintiffs are likely to succeed on their claim that Defendant's failure adequately to respond to the *increased* risk of severe illness and possible death for Medically Vulnerable persons constitutes objective deliberate indifference.

*(b)*     *Defendant Has Acted with Subjective Deliberate Indifference by Knowing of And Disregarding a Substantial, Increased Risk of Harm to Medically Vulnerable Persons*

Despite knowing that Medically Vulnerable individuals in his Jails are at increased risk of severe illness or death if they contract COVID-19, Capt. Macias, who oversees all the TCSD detention facilities, testified that Defendant has failed to take precautions to mitigate the increased risk of harm posed to those individuals. Ex. 1 ¶ 15, Ex. J (Macias Depo.) at 109:4-8. Indeed, Defendant has failed even to *identify* which incarcerated individuals are Medically Vulnerable. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 85, 92, 99. Plaintiffs are thus likely to succeed on their claim that Defendant knew of and disregarded the substantial, increased risk of harm to members of the Medically Vulnerable Subclass.

Both Asst. Sherriff Lehner, who is the third-in-command at the Jails, and Lt. Jones, who is responsible for overseeing the Adult Pre-Trial Detention Center including all intakes, admitted that certain preexisting conditions increase the risk of suffering illness from COVID-19. They had even read the CDC guidelines describing what makes someone particularly vulnerable to COVID-19. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 84:6-25 to 85:1-15 (testifying to having reviewed the CDC guidelines that describe what makes someone particularly vulnerable to COVID-19 and providing examples like obesity, high blood pressure, diabetes, reduced lung function, and age as some of the comorbidities); Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 128:13-25 to 129:1-6 (similar);

NOTICE AND MOTION FOR PRELIMINARY INJUNCTION

1   *see also* Ex. 1 ¶ 14, Ex. I (Liberstein Depo.) at 160:8–21 (similar).

2   Despite knowing that particular conditions predispose individuals to an increased risk of

3   COVID-19 and despite knowing through this Court's September 2, 2020 TRO that TCSD was

4   failing to comply with its constitutional obligations to protect individuals in its Jails against

5   COVID-19, Lt. Jones admitted that the Sheriff has not taken any steps even to *identify* people

6   already incarcerated or just entering the Jails who are Medically Vulnerable to COVID-19. *See* Ex.

7   1 ¶ 12, Ex. G (Jones Depo.) at 85:22–86:15, 92–95, 99:18–22.[12]

8   Consistent with Defendant's favored response, Lt. Jones tried to shift the burden to protect

9   Medically Vulnerable persons' health and safety over to Wellpath, saying it was responsible for

10   identifying and caring for Medically Vulnerable persons. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at

11   92:2–8. But the Supreme Court has made clear that deliberate indifference to the serious medical

12   needs of incarcerated individuals is unconstitutional "[r]egardless of how evidenced." *Estelle*, 429

13   U.S. at 104–05. There is a violation "whether the indifference is manifested *by prison doctors* in

14   their response to the prisoner's needs or by prison guards in intentionally denying or delaying

15   access to medical care or intentionally interfering with the treatment once prescribed." *Id.* In short,

16   Defendant's attempt to pass the buck to Wellpath not only fails to relieve him of his duty to

17   provide adequately preventative care to Medically Vulnerable persons, but also reinforces his

18   conscious disregard of the unique medical needs of those individuals.

19   Indeed, Lt. Jones acknowledged he had received a "chronic care list" from Wellpath in late

20   September, but did not know what qualified someone to be on the list and made clear that the

21   Sheriff's Department "do[es] not receive that on a normal basis." Ex. 1 ¶ 12, Ex. G (Jones Depo.)

22   at 86:16–87:10, 88:23–25. Despite receiving actual knowledge that persons in his custody have

23   "chronic" health conditions, Jones took no steps to address the increased risk of COVID-19 those

24   individuals may face. Instead, after receiving the list, the only step he took was to find where those

25

26

27   [12] Cheri Lehner testified that there were discussions about identifying people who were in an older age group and "making sure that we checked in with them about symptoms," Ex. 1 ¶ 13, Ex. H (Lehner Depo.) at 131:10-21. But she did not recall having any discussions about identifying other medical vulnerabilities and, unsurprisingly, said we

28   should speak with the "medical people" about whether other efforts have been taken to identify medically vulnerable individuals. *See id.* at 131:1-132:22.

persons were housed. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 88:6–20, 89:1–16.

Defendant's conscious disregard to the known, increased risk that Medically Vulnerable persons in the Jails may suffer severe illness or death if they contract COVID-19 qualifies as deliberate indifference. Those individuals cannot wait for relief; each day they live in Defendant's constitutionally inadequate Jails poses a severe risk to their health and potentially also their lives. Plaintiffs thus request that this Court order Defendant to develop constitutionally adequate policies to protect Medically Vulnerable persons incarcerated in the Jails, including by, among other measures described in the Proposed Order, identifying all persons in the Jails who are medically vulnerable, prioritize for single cell units persons who are medically vulnerable, and provide regular monitoring of medically vulnerable persons for COVID-19.

### 3.     Defendant's Punitive "Social Distancing" Policy Deprives Incarcerated Individuals of their Right to Exercise

In response to this Court's TRO requiring Defendant to implement a social distancing policy, TRO at 47–48, Defendant has implemented a purported "social distancing" policy in the Jails. But the policy, which requires only *three hours per week* of out-of-cell time, is in such excess of its intended purpose to mitigate exposure to COVID-19 that it amounts to punishment under the Fourteenth Amendment and also amounts to deliberate indifference to incarcerated persons' right to exercise. As expert Dr. Haney explains, the cells at the Jails "are functioning in ways that are essentially identical to the solitary confinement-type housing that has been shown to place persons at significant risk of grave harm (including damage that is permanent, even fatal)." *See* Ex. 5 (Haney Decl.) ¶ 32.

When asked how much time incarcerated individuals spend out of cell, Lt. Cory Jones unabashedly responded that they receive only *three hours per week*. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 123:7–21. Some days they may not be allowed out of their cell at all "depend[ing] on what is required to give them their three hours per week." *Id.* at 130:5–10. Lt. Jones believed three hours of out-of-cell time was the bare minimum necessary to satisfy California's requirements under Title 15. In Lt. Jones's view, "Title 15 states that every incarcerated person . . . should be allowed out of their cells for a minimum of three hours weekly." *Id.* at 123:19–21. He is mistaken.

1    Title 15 requires that Defendant provide "a minimum of three hours of *exercise* distributed

2    over a period of seven days." Cal. Code Regs. tit. 15, § 1065 (emphasis added). The Fourteenth

3    and Eighth Amendments similarly protect detainees' and prisoners' right to exercise. *See Pierce v.*

4    *Cnty. of Orange*, 526 F.3d 1190, 1212 (9th Cir. 2008) (90 minutes per week of exercise for pre-

5    trial detainees a violation of the Fourteenth Amendment by "not giv[ing] meaningful protection to

6    this basic human necessity"); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) ("Deprivation of

7    outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and

8    long-term segregation."). And under the Eighth Amendment, courts typically require at least five

9    hours of exercise per week. *See e.g.*, *Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979)

10   (affirming order requiring one hour of exercise five days per week); *Davenport v. DeRobertis*, 844

11   F.2d 1310, 1315 (7th Cir. 1988) (same). But Lt. Jones believed Title 15's three-hour minimum

12   requirement applied to *all* out-of-cell time—during which incarcerated individuals must also make

13   phone calls to loved ones, calls to legal counsel, shower, and communicate with the outside world.

14   *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 142:3–19. In other words, Lt. Jones is aware that

15   incarcerated individuals are able to exercise *only if* and after they are able to accomplish all of the

16   other necessities of out-of-cell time, including communicating with the outside world and their

17   lawyer and maintaining basic personal hygiene (which is especially important in a pandemic).

18   Defendant's policy thus "reduces the amount of exercise to a point at which there is no

19   meaningful vindication of the constitutional right [under the Fourteenth Amendment] to exercise

20   for this entire category of detainees." *See Pierce*, 526 F.3d at 1212. And, because Lt. Jones is

21   aware of the limited (or non-existent) time post-conviction inmates have to exercise, the policy

22   also amounts to subjective deliberate indifference to a right to exercise. *See Lopez v. Smith*, 203

23   F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (finding that a prisoner who was denied access to

24   outdoor exercise for six-and-one-half weeks had a cognizable Eighth Amendment claim); *Spain v.*

25   *Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (prisoners had a right to outdoor exercise under the

26   Eighth Amendment when they were subject to "continuous segregation, spending virtually 24

27   hours every day in their cells" and their "contact with other persons was minimal").

28   Not only is the three-hour-per-week policy a flagrant violation of incarcerated individuals'

-28-                                    Case No. 1:20-cv-01048-DAD-SAB

right to exercise, but it also constitutes punishment for pre-trial detainees in violation of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 536–37 (1979) ("[T]he Government concededly may detain [someone] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."). To determine whether a jail condition amounts to punishment, courts evaluate several factors, many of which demonstrate that the three-hour out-of-cell rule is an excessive restraint in relation to its stated purpose of "social distancing." *See id.* at 537–38 (listing factors).

   *First*, being unable to leave one's cell is one of the most "traditional" forms of punishment in penal institutions. *See id.* (looking at "whether [the condition] has historically been regarded as a punishment"). Being confined to a cell with just one other cellmate—and without any means of contacting the outside word through phones, tablets, or computers, *see* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 131:17-25 to 132:1-8—is akin to solitary confinement. As Dr. Haney explains, "[t]here is a large scientific literature that documents the adverse psychological and physical effects of the kind of isolated confinement to which persons incarcerated in the Tulare County Jails are now being subjected." Ex. 5 (Haney Decl.) ¶ 33. The United Nations consider solitary confinement to be torture and have called for the practice to be banned since 2011.[13] *Second,* without access to the outside world, isolating incarcerated persons promotes the "traditional aims of punishment-retribution and deterrence," *Bell*, 441 U.S. at 537–38, by silencing those who speak out against the Jails' deficient conditions and deterring detainees from advocating for their lives and health. *Cf.* Ex. 8 (Ayala Decl.) ¶ 9. As Lt. Jones admitted, there is no way to communicate with the outside world inside the jail cell. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 131:22–132:2. *Third*, confining individuals to their cells for 165/168 hours per week *by definition* involves a restraint on incarcerated individuals' movement. *Bell*, 441 U.S. at 537–38 (looking at "[w]hether the sanction involves an affirmative disability or restraint").

   *Finally*, while Defendant may argue that the purpose of the restrictive out-of-cell time

---

[13] *See Solitary Confinement Should Be Banned in Most Cases, UN Expert Says*, UN News (Oct. 18, 2011), https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says.

1   policy is to enforce social distancing, *see* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 136:7–10, the policy

2   is "excessive in relation to the alternative purpose assigned." *Bell*, 441 U.S. at 537–38. The Adult

3   Pre-Trial facility alone is approximately 88,000 square feet and the common space and yard are

4   *each* the size of one-and-a-half basketball courts. Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 133:20–25,

5   136:23–137:8. Despite this ample space, only four incarcerated individuals (and *possibly* eight)

6   are allowed into the space at any given time. *See* Ex. 1 ¶ 12, Ex. G (Jones Depo.) at 134:12–17.

7   Moreover, that incarcerated persons are given what Defendant believes to be the bare minimum

8   three hours out of cell per week demonstrates the policy is not designed to actually address the

9   rapid transmission of the disease, but instead to punish incarcerated people for speaking out about

10  the unconstitutional COVID-19 conditions at the Jails. Indeed, one incarcerated person overheard

11  a guard saying that the amount of in-cell time was because people had complained to the ACLU

12  about COVID-19. *See* Ex. 8 (Ayala Decl.) ¶ 9.[14] As Dr. Haney explains, TCSD's solitary-type

13  restrictive housing is "inappropriate, ill conceived, and counter-productive." Haney Decl. ¶ 29.

14      The record reflects not only that Defendant is deliberately indifferent to the safety and

15  health of incarcerated persons at the Jails, but also that even when Defendant *does* act in response

16  to the COVID-19 virus, he does so in the most punitive manner possible—infringing Plaintiffs'

17  other Constitutional rights in the process. Plaintiffs thus ask this Court to order Defendant to

18  enforce social distancing in a way that not only protects incarcerated people from the risk of

19  COVID-19 exposure, but also allows them a constitutionally adequate amount of exercise time

20  and reduces the mental and physical harm caused by excessive isolated confinement.

21      **B.      Plaintiffs and the Proposed Class Members Will Suffer Irreparable Harm**

22      To prevail on their Motion, Plaintiffs must show a likelihood that they will suffer

23  irreparable harm absent this Court granting preliminary injunctive relief. *See All. For the Wild*

24  *Rockies*, 632 F.3d at 1131. All residents of the Tulare County Jails are likely to suffer irreparable

25  harm absent this Court's immediate intervention.

26

27

28

---

[14] Because post-conviction inmates are being *indefinitely* held in their cells in near-solitary confinement, Defendant's policy could eventually run afoul of the Eighth Amendment. *See Hutto v. Finney*, 437 U.S. 678, 688 (1978) (evidence sustained finding that over thirty days of punitive isolation in cells violates the Eighth Amendment)

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). That is particularly so when, as here, the constitutional injury may also cause irreparable injury to Plaintiffs' and class members' health. *See, e.g.*, *Castillo v. Barr*, No. CV 20-00605 TJH (AFMx), 2020 WL 1502864, at *1 (C.D. Cal. Mar. 27, 2020) (immigration detainee petitioners likely to suffer irreparable harm from COVID-19 due to jail's policies and practices).

This Court has already held that Plaintiffs have shown a likelihood they will suffer irreparable harm due to COVID-19 and from violations of their constitutional rights absent judicial relief. *See* TRO at 41-43. Unfortunately, not enough has changed in the Jails since this Court's September 2 Order: Defendant continues to maintain a constitutionally deficient testing policy and he has taken no additional precautions to address the risks posed to Medically Vulnerable persons in the Jails. Members of the Medically Vulnerable Subclass, in particular, face increased risk of severe illness and possibly death absent a Court order requiring Defendant to take precautions to protect them. *See* Harawa Decl. ¶ 37.

Making matters worse, Defendant's punitive "social distancing" measure is already causing incarcerated individuals to suffer severe psychological distress. This policy creates a serious risk that incarcerated people experience both mental and physical harm. *See* Ex. 5, Haney Decl. ¶¶ 23-24, 33-43. One individual has even attempted suicide. *See* Ex. 8 (Ayala Decl.) ¶ 12. Such levels of psychological distress constitute irreparable harm. *See Edmo v. Corizon, Inc*., 935 F.3d 757, 797–98 (9th Cir. 2019) (ongoing psychological distress and high risk of suicide constituted irreparable harm).

### C. The Balance of Equities and Public Interest Both Favor Plaintiffs and the Proposed Class

As this Court has already acknowledged in its TRO, the balance of equities tips in Plaintiffs' favor. To award relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences" in granting an injunction. *Winter*, 555 U.S. at 24. In granting Plaintiffs' request for a TRO, the Court concluded that Plaintiffs had

1  satisfied their burden to show the balance of equities and public interest weighed in their favor.

2  TRO at 45. The same considerations that factored into the Court's well-reasoned decision apply

3  again here: namely, Defendant has no interest in maintaining unconstitutional conditions, so

4  Plaintiffs' and class members' interest in their constitutionally protected rights to health, safety,

5  and exercise prevail. Similarly, the public interest weighs in Plaintiffs' favor because it is always

6  in the public interest to prevent a violation of a party's constitutional rights. *See Preminger v.*

7  *Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated

8  when a constitutional right has been violated, because all citizens have a stake in upholding the

9  Constitution."). Society maintains a strong interest in keeping incarcerated persons safe from

10  COVID-19 because preventing a COVID-19 outbreak can help prevent the further spread of the

11  virus in the community and the burden on local healthcare facilities.

12  **IV.    CONCLUSION**

13      Plaintiffs have shown a high likelihood of success on the merits of their claims and an

14  imminent threat of irreparable injury. Moreover, the balance of harms and public interest weigh in

15  favor of immediate injunctive relief. Plaintiffs therefore respectfully request that the Court grant

16  their motion for preliminary injunction.

17  DATED: November 3, 2020           MUNGER, TOLLES & OLSON LLP

18                                    By:    */s/ Omar H. Noureldin*

19                                    OMAR H. NOURELDIN
                                      *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28