1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES CRISWELL, et al.,                    No.  1:20-cv-01048-DAD-SAB

12            Plaintiffs,

13        v.                                      ORDER DENYING PLAINTIFFS' MOTION
                                                  FOR PROVISIONAL CLASS
14   MICHAEL BOUDREAUX, in his official           CERTIFICATION AND MOTION FOR A
     capacity as Sheriff of Tulare County,        PRELIMINARY INJUNCTION WITHOUT
15                                                PREJUDICE
            Defendant.
16                                                (Doc. Nos. 43, 44)

17

18

19        This matter came before the court on December 2, 2020 for a hearing on the motion for

20   provisional class certification (Doc. No. 43) and the motion for a preliminary injunction (Doc.

21   No. 44) filed on behalf of plaintiffs Charles Criswell, Levi Johnson, Samuel Camposeco, Adam

22   Ibarra, and California Attorneys for Criminal Justice, (collectively "plaintiffs").  Attorneys Omar

23   Noureldin and Lauren M. Harding of Munger, Tolles & Olson LLP and Kathleen Guneratne of

24   the ACLU Foundation of Northern California appeared via video for plaintiffs.  Attorney

25   Christopher M. Pisano of Best, Best & Krieger LLP appeared via video for defendant Michael

26   Boudreaux, in his official capacity as Sheriff of Tulare County.  For the reasons explained below,

27   the court will deny the pending motions without prejudice.

28   /////

                                              1

1

**BACKGROUND**

2          The court previously summarized plaintiffs' allegations in its September 2, 2020 order

3   granting their application for provisional class certification and motion for a temporary

4   restraining order, in part.  (Doc. No. 26 ("TRO").)  The court will not repeat that factual

5   background in this order.

6          In the TRO, the court ordered defendant to adopt COVID-19 related policies with regard

7   to social distancing, masks, testing, isolation, quarantine, and observation, and to memorialize

8   those policies in writing.  (*Id.* at 47–48.)  As explained in the TRO, the evidentiary record before

9   the court at that time had not been "sufficiently developed to support an injunction requiring

10  defendant to immediately test all inmates and staff in the [Tulare County] Jails for COVID-19."

11  (*Id.* at 45.)  The court found "it prudent at [that] point to instead require defendant to develop

12  written policies on key COVID-19 related issues," and ordered temporary injunctive relief

13  accordingly.  (*Id.*)

14         With the factual record now more fully developed, plaintiffs filed the pending motion for

15  a preliminary injunction (Doc. No. 44) and a motion for provisional certification of a subclass of

16  "medically vulnerable" inmates in the Jails (Doc. No. 43).  Therein, plaintiffs argue that they are

17  likely to succeed on the merits of their first and second causes of action, in which they assert

18  claims pursuant to 42 U.S.C. § 1983 for deliberate indifference to the serious medical needs of

19  pretrial detainees and prisoners in violation of the Fourteenth and Eighth Amendments of the U.S.

20  Constitution, respectively.  (Doc. Nos. 44 at 24; 46 at 8 n.6 ("Plaintiffs do not seek relief on their

21  third through fifth claims, which pertain to access to counsel.")) In particular, plaintiffs contend

22  that "[d]espite having over two months to remedy any constitutional violations, Defendant

23  continues to operate the Jails in a way that puts the Provisional Class at [an] unconstitutionally

24  high risk of contracting the potentially lethal COVID-19 virus," and his "actions pose a particular

25  threat to the proposed Medically Vulnerable Subclass" yet he "has not taken steps to identify—

26  much less actively monitor or protect—medically vulnerable individuals in the Jails."  (Doc. No.

27  44 at 8.)  Plaintiffs maintain that by failing to implement an effective testing policy and failing to

28  identify and attend to medically vulnerable inmates, defendant's conduct constitutes deliberate

2

1  indifference to their serious medical needs in violation of their constitutional rights.  (*Id.* at 24.)

2  Plaintiffs also contend that defendant's social distancing policy, which effectively limits inmates

3  to only thirty minutes of out-of-cell time per day, is not only untethered to defendant's stated

4  social distancing purposes, but it is also punitive and deprives the inmates of their right to

5  exercise in violation of the Eighth and Fourteenth Amendments and Title 15 of the California

6  Code of Regulations.  (*Id.* at 34–37.)

7         In support of their motion for a preliminary injunction, plaintiffs filed declarations from

8  thirty inmates attesting to the conditions of their confinement in the Jails (Doc. Nos. 44-20–44-

9  25), the declaration of Dr. Jaimie Meyer, an Associate Professor of Medicine and Clinical

10  Professor of Nursing at Yale University, regarding COVID-19 testing strategies (Doc. No. 44-

11  17), the declaration of Dr. Nina Harawa, an epidemiologist and Professor In-Residence at the

12  David Geffen School of Medicine at the University of California, Los Angeles, regarding

13  COVID-19 transmission and COVID-19-related risks posed to medically vulnerable inmates in

14  carceral facilities (Doc. No. 44-18), and the declaration of Dr. Craig W. Haney, a Professor of

15  Psychology at the University of California, Santa Cruz, regarding the psychological impact of

16  defendant's COVID-19 social distancing policy on those incarcerated in the Jails.  (Doc. No. 44-

17  19).  In addition, plaintiffs have submitted excerpts of deposition testimony from the depositions

18  of several officials in the Tulare County Sheriff's Department ("TCSD") and the Tulare County

19  Health and Humans Services Agency ("HHSA").  (Doc. Nos. 44-8–44-12.)

20         On November 17, 2020, defendant filed his opposition to the pending motion for a

21  preliminary injunction.  (Doc. Nos. 45, 45-1.)  Defendant notes in his opposition, however, that

22  he does not oppose plaintiffs' pending motion for provisional certification of a subclass of

23  medically vulnerable inmates, apart from his argument that granting provisional certification is

24  unnecessary because preliminary injunctive relief is not warranted.  (Doc. No. 45-1 at 31.)  In

25  support of his opposition, defendant has filed declarations from the following TCSD and HHSA

26  officials:  Lieutenant Jonathan Brown (Doc. No. 45-5), Lieutenant Cory Jones (Doc. No. 45-6),

27  Captain Gabriel Macias (Doc. No. 45-7), Lieutenant David Winters (Doc. No. 45-8), Lieutenant

28  Cyrena Robles (Doc. No. 45-9), Assistant Sheriff Cheri Lehner (Doc. No. 45-10), Administrative

1     Sergeant Julie Stamper (Doc. No. 45-11), Correctional Sergeant Russell Murphey (Doc. No. 45-

2     12), Administrative Sergeant Andy Garcia (Doc. No. 45-13), Shift Sergeant Jerry Neves (Doc.

3     No. 45-14), Benjamin Mitchell, Health Services Manager for HHSA (Doc. No. 45-3), Dr. Karen

4     Haught, Public Health Officer for HHSA (Doc. No. 45-15), and Dr. Sharon Minnick, Senior

5     Epidemiologist for HHSA (Doc. No. 45-16).  In addition, defendants filed declarations from

6     Kevin Silveira, the Health Services Administrator for Wellpath, which contracts with TCSD to

7     provide medical services in the Jails (Doc. No. 45-4); Michael K. Brady, a consultant who

8     defendant retained to conduct an independent, non-clinical COVID-19 inspection of the Jails

9     (Doc. No. 45-2); and Dr. Philip Keiser, a licensed infectious disease physician and Professor of

10    Medicine for the University of Texas, who defendant retained to review and analyze defendant's

11    COVID-19 policies from a public health perspective (Doc. No. 45-17).

12        On November 24, 2020, plaintiffs filed their reply brief in support of the pending motion

13    for a preliminary injunction.  (Doc. No. 46.)  In further support of their motion, plaintiffs also

14    filed a supplemental declaration from Dr. Meyer (Doc. No. 46-12), additional excerpts of

15    deposition testimony (Doc. No. 46-9, 46-10), and updated COVID-19 testing records (Doc. No.

16    46-11.)

17                         **FACTS**

18        Based on the evidence that the parties have submitted to the court, the relevant facts are

19    summarized as follows.

20    **A.**      **The Jails**

21        TCSD currently operates three detention facilities at issue in this case:  Adult Pre-Trial

22    Facility ("APTF"), Bob Wiley Detention Facility ("Bob Wiley"), and South County Detention

23    Facility ("South County") (collectively, the "Jails").  (Doc. No. 45-1 at 11.)  APTF has an inmate

24    capacity of 394, Bob Wiley has an inmate capacity of 702, and South County has an inmate

25    capacity of 519, for a combined total capacity at the Jails of 1,615 inmates.  (*Id.* at 12–13.)  As of

26    November 6, 2020, there were 312 inmates in APTF (79% of capacity), 582 inmates in Bob

27    Wiley (82% of capacity), and 330 inmates in South County (64% of capacity).  (Doc. No. 45-2 at

28    9, 13, 15.)  The current average daily inmate count is 1,200, and the average length of detention in

the Jails is 90 days.  (Doc. No. 45-1 at 13.)  The Jails are designed for short and intermediate term detentions, as most convicted inmates are transferred to the state prison system and the custody of the California Department of Corrections and Rehabilitation ("CDCR") after they are sentenced.  (*Id.*)[1]

APTF was built in the late '90s and is divided into four units, with each unit subdivided into two housing pods "A" and "B."  (Doc. No. 45-6 at ¶ 3.)  Each housing pod in Units 1, 2, and 4 has capacity for 50 inmates, whereas Unit 3-A has a capacity of 47 inmates and Unit 3-B has a capacity of 37 inmates.  (*Id.*)  Each housing pod is a separate and self-contained housing area with two stories and cells wrapping around 180 degrees of the pod.  (*Id.* at ¶ 4.)  Each housing pod has two showers on each level, an indoor and outdoor program area, and a booth for in-person visits.  (*Id.*)  APTF also has a hospital area with a capacity for 10 hospital beds and an intake area consisting of "five multi-person holding cells, two single person holding cells, three classification booths, and two showers," and a medical screening area.  (*Id.* at ¶¶ 3, 5.)  "There is also a separate area in this location of APTF where inmates are held for court hearings, which contains three single person holding cells and five multi-person holding cells."  (*Id.* at 6.)

Bob Wiley was built in 1984 and is similarly divided into four units that each have separate housing modules with varying capacities and contain both single- and double-occupancy cells.  (Doc. No. 45-8 at ¶¶ 5–6.)  Female inmates are housed in the three modules of Unit 1: Mod-11 has a capacity for 60 inmates in single- and double-occupancy cells; Mod-12 has a capacity for 16 inmates in 16 single cells and is used to house inmates who must be kept separate[2]; and Mod-13 has a capacity for 80 inmates and is the only dormitory-style unit in the Jails.  (*Id.* at ¶ 5.)  Unit 2 has two modules with each having a capacity for 95 inmates in a

---

[1]  The undersigned notes, however, that in light of changes enacted in California over the last several years it is generally recognized that more inmates are serving longer periods of time in all county jails and the court presumes that this trend has impacted Tulare County as well.

[2]  According to the lieutenants in charge of each of the Jails, there are various reasons that inmates would need to be kept separate, including:  "because they have discipline problems[;] mental health issues" (Doc. No. 45-8 at ¶ 5); "are violent, disruptive or combative" (Doc. No. 45-9 at ¶¶ 2, 11); or have gang affiliation, are sex offenders, "or are high profile, and thus likely to be attacked."  (Doc. Nos. 45-8 at ¶ 5, 11; 45-9 at ¶¶ 2, 11).

mixture of single- and double-occupancy cells. (*Id.* at ¶ 6.) Unit 3 has two modules as well, with Mod-31 having a capacity of 127 inmates in a mixture of single- and double-occupancy cells and Mod-32 having a capacity for 32 inmates in single cells to house inmates who must be kept separate. (*Id.*) Unit 4 also has two modules with each having a capacity for 95 inmates. (Doc. No. 47-1 at ¶ 6.) Each unit in Bob Wiley has a separate heating and air conditioning system, and like the housing pods in APTF, each module in Bob Wiley is a separate and self-contained housing area with two stories, shower stalls on each story, and indoor and outdoor programming areas. (*Id.* at ¶ 8.)

South County opened in 2019 and is divided into four units, though only Units 1 and 2, which are self-contained living facilities, are currently being used to house inmates. (Doc. No. 45-9 at ¶ 2.) Each of those two units is divided into five pods. (*Id.* at ¶ 3–4.) In Unit 1, pods 1-A, 1-B, 1-C, and 1-D each have a capacity for 60 inmates in a mix of single- and double-occupancy cells, and 1-E has four single-occupancy cells used for inmates who must be kept separate. (*Id.* at ¶ 3.) In Unit 2, pods 2-A and 2-B have a capacity for 64 inmates each, but they "are currently unoccupied due to staffing" because, as Lieutenant Robles has explained, they "need 15 additional deputies in order to use these pods to house inmates, and these positions are currently not in the budget for the Tulare County Jails." (*Id.* at ¶ 4.) Pods 2-C and 2-D each have a capacity for 60 inmates, and pod 2-E consists of only two single occupancy cells that are used for inmates who must be kept separate. (*Id.*) With the exception of the smaller pods used for inmates who have to be kept separate, each housing pod has two stories with cells wrapping around 180 degrees, shower stalls adjacent to the cells on each level, and an indoor and outdoor program area. (*Id.* at ¶ 5.) Each unit has a separate heating and air conditioning system. (*Id.*) Unit 3, which has a capacity for 16 inmates, is currently unoccupied and being used for remote court appearances via Zoom. (*Id.* at ¶ 6.) The last unit, which is a standalone pod with a capacity for 9 inmates, is also currently unoccupied and is being used as a law library for *pro per* inmates. (*Id.*)

In deciding in which facility to house inmates, TCSD takes "into account numerous factors, including classification of offense, gang affiliation, and whether the inmate has any

protective custody needs." (Doc. No. 45-6 at ¶ 31.)  There are three rival gangs in Tulare County

(Doc. No. 45-2 at 17), and Lieutenant Jones estimates that 70% of the inmates in the Jails "are

either in a gang, are a gang affiliate, or are a 'drop out.'" (Doc. No. 45-6 at ¶ 20.)  Accordingly,

Lieutenant Jones has explained that "[t]he process of determining where to house inmates is an

intricate process that requires a great deal of planning, as we have to try to avoid situations where

rival gang members, or gang members and drop outs, are in the same units, or worse yet on

program time together." (*Id.* at ¶ 21.)

## B.      Defendant's Current COVID-19-Related Policies

According to defendant, "[s]ince the start of the pandemic, TCSD has been preparing,

instituting, and updating COVID-19 prevention policies in cooperation with HHSA," and "has

worked with HHSA to ensure that their policies for the prevention of COVID-19 have been

consistent with CDC guidelines." (Doc. No. 45-1 at 10.)  In particular, HHSA has approved

TCSD's policies, including:

> testing new inmates at intake, isolating inmates who test positive,
> testing and quarantining inmates who come into contact with a
> positive test case, social distancing, cleaning and sanitizing,
> screening upon entry into the Tulare County Jails, the temporary
> suspension of visitors other than by remote means, the wearing of
> masks by inmates, and the wearing of masks and protective
> eyewear by staff while in the jails.

(Doc. No. 45-15 at ¶ 12.)

Under TCSD's policies, each inmate receives a face shield at booking and a clean,

reusable cloth mask each day.[3] (Doc. No. 45-5 at ¶ 8.)  Inmates must wear the face shield and the

mask when they are out of their cells. (*Id.*)  As of July 2020, TCSD and Wellpath staff are

required to wear face masks and protective eye wear at all times in the Jails and have their

---

[3]  In August 2020, TCSD entered into a contract with a vendor "to supply reusable cloth masks
and to provide laundering services" for the masks that inmates are provided. (Doc. No. 45-10 at
¶ 19.)  "These masks must be exchanged daily so that they may be cleaned and sanitized by [the
vendor] for future use." (Doc. No. 45-12 at ¶ 10.)  TCSD secured this contract with the help of
Benjamin Mitchell, HHSA's Health Services Manager and liaison to TCSD and Wellpath, who
had previously contracted with the same vendor to provide the same cloth masks and laundering
services for HHSA employees. (Doc. No. 45-3 at ¶¶ 1, 3, 8–10.)  That is, inmates in the Jails are
receiving the same laundered cloth masks as HHSA employees. (*Id.* at 10.)

temperatures checked upon entry to the Jails.  (Doc. Nos. 54-4 at ¶ 25; 45-10 at ¶¶ 17–18.)  TCSD staff must also self-report any COVID-19 symptoms and not come to work if they are experiencing any such symptoms.  (Doc. No. 45-6 at ¶ 12.)  In addition, a TCSD deputy must put on gloves before making physical contact with an inmate, such as when placing leg restraints on an inmate prior to transport.  (*Id.*)

With regard to cleaning supplies, Assistant Sheriff Lehner declares that TCSD has maintained "a sufficient supply of soap to give to any inmate who is in need of it," has "mounted hand sanitizer bottles in the intake area, in hallways and in the housing pods," and has made cleaning supplies and mops "available to inmates to clean their cells during their programming time." (Doc. No. 45-10 at ¶ 10.)  With regard to sanitization practices, TCSD purchased new industrial power washing and vacuuming machines that mix water and chemicals to spray, clean, and sanitize, and TCSD uses those machines "to clean the intake area, hallways, and common areas in the Jails."  (*Id.* at ¶ 11.)

Throughout the pandemic, TCSD command staff and Mr. Mitchell of HHSA discussed various efforts to inform inmates and staff about COVID-19, which led to TCSD posting the educational flyers received from the CDC in English and Spanish in April, posting informational signage from HHSA in April and additional signage from Wellpath in July, and running an informational video about COVID-19 in the intake area on a constant loop.  (*Id.* at ¶¶ 12–13.)

1.   COVID-19 Testing and Screening Policies at Intake

Beginning in mid-July 2020, TCSD adopted a new intake policy, which required new intakes to be placed in an observation unit for 14 days.  (Doc. No. 45-4 at ¶ 10.)  Inmates were tested for COVID-19 on day 14 and were cleared to enter general population if they tested negative and had no symptoms. (*Id.*)  Inmates were screened on both day 1 and day 14 by Wellpath staff, who asked questions based on a supplemental screening form prepared by Wellpath's Associate Chief Clinical Officer in Wellpath's corporate office.  (*Id.* at ¶¶ 8, 9, )  Mr. Silveira, the Wellpath Health Services Administrator for the Jails has explained that

> while the supplemental screening form was not as important at the day-14 screening due to the mandatory testing at that time, it was still important for the initial intake screening because it gave the

> Wellpath medical professionals guidance in determining whether there was a risk that the detainee had been exposed to COVID-19 prior to being booked, which would allow the medical provider to make the decision of whether to conduct a COVID-19 test immediately on intake.

(*Id.* at ¶ 10.)

As of September 30, 2020, in accordance with a change in CDC guidelines, HHSA and TCSD revised the intake policy at the Jails to require that all new inmates are tested for COVID-19 within 24 hours[4] of booking and again at the end of a 14-day observation period.[5]  (Doc. Nos. 45-4 at ¶ 11; 45-6 at ¶ 16.)  While awaiting the test results from the HHSA lab, which typically takes about 36 to 48 hours for individual inmate testing, new inmates are kept in isolation and begin a 14-day observation period.[6]  (Doc. Nos. 45-3 at ¶ 29; 45-6 at ¶ 16.)  Inmates are tested again at the end of that observation period.  (Doc. No. 45-4 at ¶ 11.)  Lieutenant Jones, who is in charge of APTF (the facility where all new intakes are processed for classification and housing in the Jails), explained that if an inmate who has been "in observation for some duration of the 14 days" is then given a cellmate, then that inmate's observation clock starts over "based on the newer booked inmate's start time."  (Doc. No. 45-6 at ¶ 14.)  Inmates are not cleared to enter general population unless they test negative on day 14 and are not showing any COVID-19 symptoms.  (Doc. Nos. 45-6 at ¶ 13; 45-3 at 19.)  TCSD attempts to keep inmates who have been

/////

---

[4]  According to defendant's consultant Mr. Brady, COVID-19 test samples are not taken from the new intakes who arrive on a Friday or Saturday until Sunday because test samples need to be processed within 72 hours of collection and the HHSA lab processes COVID-19 tests only on Mondays through Fridays.  (Doc. No. 45-2 at 5; *see also* Doc. No. 45-3 at ¶ 17.)

[5]  Mr. Silveira explained in his declaration that the supplemental screening form is still being used by Wellpath to screen new intakes "for information and tracking purposes," despite the fact that "there is no clinical judgment in determining whether a COVID-19 test is needed at intake," because that testing is now required by TCSD's policies.  (Doc. No. 45-4 at ¶ 11.)

[6]  Mr. Mitchell notes in his declaration that since implementation of the revised intake policy on September 30, 2020, "there have been multiple occasions where an inmate tested positive, but the inmate had been released [from custody and] back into the community before the test result came back," and that when this happens, "HHSA's contact tracers reach out and attempt to locate the released individual to let him/her know of the positive test result, and [HHSA] help[s] those individuals with contract tracing."  (Doc. No. 45-3 at ¶ 30.)

1   cellmates during their observation period together when they are transferred to general

2   population.  (Doc. No. 45-6 at ¶ 14.)

3        Any inmate who tests positive is then placed in isolation, and any inmate who has been

4   exposed to someone who has tested positive is placed in quarantine.  (Doc. No. 45-6 at ¶ 16.)  If

5   an inmate refuses to be tested for COVID-19, which Lieutenant Jones estimates in his experience

6   overseeing the intake process occurs one percent of the time, that inmate is placed in quarantine.

7   (Doc. No. 45-6 at ¶ 13.)  TCSD's policy is to continue offering COVID-19 testing to inmates who

8   have refused testing, and for inmates who maintain their refusal to be tested, seven days are added

9   onto their observation period (for a total of 21 days), and they are cleared to enter general

10  population if they do not have symptoms at the end of that extended observation period.  (Doc.

11  No. 45-3 at 19.)

12       Since late March and early April 2020, TCSD has maintained Unit 3-A of APTF as the

13  unit to be used for isolation and quarantine of inmates.  (Doc. No. 45-6 at ¶ 10).  TCSD command

14  staff, which is comprised of Assistant Sheriff Lehner, Captain Macias, and the Lieutenant in

15  charge of each facility (Doc. No. 45-6 at ¶ 7), also made the decision to set the heating and air

16  conditioning system in Unit 3-A for maximum intake of outside air (80% outside air, 20%

17  recycled air), in an effort "to prevent recirculating air that was potentially contaminated with

18  COVID-19," and TCSD has maintained that setting throughout the pandemic despite the

19  significant resulting increase in energy costs.  (Doc. No. 45-6 at ¶¶ 9–10.)[7]

20       In approximately mid-July 2020, TCSD command staff decided to use APTF's Units 1-A,

21  1-B, 2-A, and 4-B as observation units, each with 25 double-occupancy cells.  (Doc. No. 45-6 at ¶

22  14).  Lieutenant Jones notes in his declaration that on occasion, general population inmates have

23  been housed in Unit 4-B "when there is not enough room at the other detention facilities," but that

24  "when this happens, [TCSD] make[s] sure that the general population inmates are not placed in

25  _____

26  [7]  Lieutenant Jones had discussed this air flow plan with TCSD's liaison to HHSA, Mr. Mitchell,
    who then spoke with HHSA's Public Health Officer, Dr. Haught, who had agreed that the air flow

27  plan was a good idea for the quarantine and isolation units.  (Doc. No. 45-3 at ¶¶ 18–19.)  With
    regard to energy costs, because outside air is not climate controlled, "it can require more energy

28  to heat or cool, especially when it is excessively hot or cold outside."  (*Id*. at ¶ 18.)

10

1   the same cells with an observation inmate, and that general population inmates are not allowed to

2   program, *i.e.* be out of their cells at the same time as observation inmates." (*Id.* at 15.)

3       2.   COVID-19 Testing Policies for General Population Inmates

4       TCSD relies on its medical provider Wellpath to make medical decisions for inmates in

5   the Jails, and "Wellpath medical professionals are responsible for making all clinical judgments

6   regarding the care of an inmate patient, including whether or not an inmate patient is tested for

7   COVID-19 outside the intake process." (Doc. No. 45-4 at ¶ 12.)  According to Mr. Silveira,

8   when assessing inmates outside of the intake process, Wellpath staff use the same supplemental

9   screening form that is used at intake "because it guides the initial visiting nurse in determining

10   whether the patient needs to see a Wellpath professional with prescriptive authority to further

11   analyze the patient and determine whether a COVID-19 test is needed, based on the totality of the

12   evidence and clinical judgment." (Doc. No. 45-4 at ¶ 15.)  The supplemental screening form,

13   shown in part below, directs Wellpath staff to ask three questions of inmates to screen for

14   possible COVID-19:

| | Yes | No |
|---|---|---|
| 1.  Does the patient: | | |
|     a.  Have a cough, or shortness of breath/difficulty breathing | ☐ | ☐ |
|     b.  OR at least 2(two) of the following symptoms: | ☐ | ☐ |
|         ☐ fever ≥ 100.0° Fahrenheit (38°C)   ☐ chills   ☐ headache | | |
|         ☐ repeated shaking with chills   ☐ sore throat   ☐ muscle pain | | |
|         ☐ congestion or runny nose   ☐ nausea   ☐ diarrhea | | |
|         ☐ new loss of taste or smell | | |
| 2.  Has the patient: | | |
|     a.  Had a close contact with a laboratory-confirmed COVID-19 case | ☐ | ☐ |
|     b.  Traveled to or from an affected geographic area with widespread community transmission* | ☐ | ☐ |
|         If yes; when/where_____ _____ | | |
|     c.  Traveled internationally or on a cruise | ☐ | ☐ |
|         If yes; when/where_____ _____ | | |
|     d.  Age 65 or more with chronic health conditions | ☐ | ☐ |
| 3.  Has the patient had a COVID-19 test done in the last 14 days? | ☐ | ☐ |
|     Results: ☐ Positive   ☐ Negative   Date of test:_____ | | |
|     Where was test performed (name of clinic/hospital): _____ | | |

26   (Doc. No. 27-2 at 2.)  The form also notes for staff that "[f]ever may not be present in some

27   patients, such as those who are very young, elderly, immunosuppressed, or taking certain

28   medications," and that "[c]linical judgement should be used to guide testing of patients in such

11

1    situations." (*Id.*)  According to Mr. Silveira, "[i]n determining whether a patient with one or

2    more of these symptoms should be tested for COVID-19, as opposed to another ailment, medical

3    professionals need to use clinical judgment," because many symptoms of COVID-19 "overlap

4    with symptoms of other infectious diseases and physical ailments that can plague the human

5    body." (Doc. No. 45-4 at ¶ 15.)  In addition, according to Mr. Silveira, Wellpath follows CDC

6    guidelines, which "do not call for automatic testing of individuals who only display one symptom

7    of COVID-19, or even multiple," but rather provide that "patients with COVID-19 symptoms

8    should be referred for evaluation for testing."  (*Id.* at ¶ 19.)

9             3.      COVID-19 Testing Events and Results

10                    a.      *June 2020 Outbreak in APTF*[8]

11            On June 25 and 26, 2020, there was an exposure and outbreak of COVID-19 in APTF

12    after a TCSD deputy who unknowingly had COVID-19 came to work and later tested positive for

13    the virus.  (Doc. No. 45-10 at 15.)  Once the exposure was discovered, Mr. Silveira and TCSD

14    conducted contact tracing of that deputy's movements to determine what areas and which inmates

15    had been exposed.  With the aid of video surveillance, TCSD determined that exposure was

16    limited to two housing pods in APTF, and those pods were locked down.  (Doc. Nos. 45-10 at ¶

17    15; 45-3 at ¶ 24.)  In addition, Wellpath performed contact tracing of inmates by reviewing the

18    inmate logs and "determined that no inmates had been transferred out of those pods since the

19    exposure."  (Doc. No. 45-4 at ¶ 22.)  Mr. Mitchell discussed the outbreak with Dr. Haught,

20    HHSA's Public Health Officer, who advised that in her opinion, "if Wellpath could determine

21

22    [8]  In its order granting a temporary restraining order, the court discussed two distinct, known
       COVID-19 outbreaks in the Jails, one in June 2020 and another at an unspecified later date, based
23    on the declarations submitted by the parties in connection with plaintiffs' request for temporary
       relief and defendant's opposition thereto.  (Doc. No. 26 at 12.)  Though Assistant Sheriff Lehner
24    referred to the second known outbreak in her prior declaration dated August 20, 2020 (Doc. No.
       15-4 at ¶ 12), she makes no mention of any such second outbreak in her declaration dated
25    November 16, 2020 (Doc. No. 45-10), which defendant submitted in support of his opposition to
       the pending motion.  Neither party has submitted evidence regarding any known outbreak of
26    COVID-19 in the Jails other than the June 2020 outbreak.  Moreover, defendant asserts in his
       opposition that plaintiffs incorrectly refer to *two* outbreaks in their pending motion, when there
27    was only one outbreak.  (Doc. No. 45-1 at 29 n.6.)  Accordingly, the court does not discuss any
       purported second outbreak in this order.
28

through contact tracing that the deputy only had contact with inmates in the two housing pods, then only the inmates in those two housing pods would need to be tested." (Doc. No. 45-3 at ¶ 25.)  Mr. Mitchell, Wellpath, and TCSD command staff then decided to test all inmates in the two exposed pods but not the inmates in other pods at APTF. (Doc. No. 45-4 at ¶ 23.)  Wellpath tested the exposed inmates on June 25 and 26, 2020, and retested the inmates a week later and again after the second week. (*Id.* at ¶¶ 23–24.)  Each time an inmate tested positive, that inmate was placed in the isolation pod, and inmates who tested negative remained in the quarantine pod. (*Id.*)  In total, from June 25 through July 13, 2020, Wellpath administered 142 tests on the 86 exposed inmates, of which 20 inmates tested positive for COVID-19. (*Id.*; Doc. No. 45-2 at 5.)

> b.   *September 2020 Testing of Inmates in Intake Observation*

To bring the intake process into compliance with CDC guidelines and TCSD's revised intake policy of testing new inmates within 24 hours of their booking, in late September 2020 TCSD tested inmates who were between day 1 and day 10 of their 14-day observation period. (Doc. No. 45-3 at ¶ 32.)  Mr. Mitchell has explained in his declaration that "the reason [TCSD] tested all inmates only up to day ten is that those inmates who were between day eleven and day fourteen were too close to the fourteenth day, and by the time [TCSD] got the results, [TCSD] would have retested them almost immediately." (*Id.*)  "The process began on September 29, 2020 with the initial testing being done by Wellpath, and the final test results were all received by October 2, 2020." (*Id.*)  In total, 168 inmates were tested for COVID-19.[9] (*Id.*)  However, defendant does not specify how many of those inmates tested positive.  At the hearing on the pending motion, defense counsel explained that defendant did not consider the test positivity rate of this round of testing to be relevant but rather that this testing event was described merely to demonstrate the logistical challenges defendant faces in testing large numbers of inmates at one time. (Doc. No. 51 at 4–5.)

/////

/////

---

[9] There were technically 174 total tests conducted because six of those tests had problems with collection or results and had to be re-administered. (Doc. No. 45-3 at ¶ 32.)

13

1          c.       *October 2020 Testing of Inmates Transferring to State Prison*

2          On June 30, 2020, CDCR suspended all inmate transfers from county jails to state prisons

3    in California due to the pandemic, causing "a backlog of convicted inmates remaining in the

4    Tulare County Jails." (Doc. Nos. 45-10 at ¶ 5; 45-7 at ¶ 4.)  In August 2020, CDCR resumed

5    transferring inmates from certain counties, and in late October 2020, "CDCR informed TCSD that

6    they would accept 135 inmates who were overdue for transfer upon proof of a negative COVID-

7    19 test." (Doc. Nos. 45-4 at ¶ 31; 45-10 at ¶ 21.)

8          Accordingly, on October 22 and 23, 2020, TCSD tested 135 inmates who were overdue to

9    be transferred to state prison.  (Doc. Nos. 45-4 at ¶ 31; 45-10 at ¶ 21.)  Of the 135 inmates who

10   were tested, 52 of those inmates were housed in South County, 75 inmates were housed at Bob

11   Wiley, and 8 inmates were housed in APTF.  (Doc. No. 45-4 at ¶ 32.)  Of those 135 tested, 134

12   tested negative for the virus.  (*Id.* at ¶ 31)  The one inmate who tested positive in this October

13   round of testing had also tested positive during the outbreak in June 2020.[10]  (*Id.*)  TCSD

14   explained this to CDCR, and CDCR "agreed to take this inmate, as well as the other 134 who

15   tested negative." (*Id.*)

16          d.       *Results of Testing Symptomatic Inmates Outside of Intake Process*

17          Pursuant to the TRO issued by this court, on September 14, 2020, defendant filed a report

18   detailing "the number of inmates who have been tested as a result of Wellpath's screening

19   criteria, how many of those inmates tested positive, when those tests were conducted, and in

20   which facility the inmates were incarcerated in at the time they were tested." (Doc. No. 26 at 48.)

21   The data reflected in that report shows that between March and early September 2020, Wellpath

---

[10]  Though not addressed by the parties, the undersigned notes that several local detention facilities with which the court is familiar, as well as the U.S. Bureau of Prisons, appear to have interpreted CDC guidelines to mean that an inmate who has tested positive for coronavirus can be considered "recovered" at the end of a quarantine period of 14 days (or now even 10 days), without administering another COVID-19 test to confirm that the inmate is no longer infected.  It is not entirely clear from the record in this case that defendant shares this interpretation of those guidelines and deems inmates who have tested positive for coronavirus in the Jails to be "recovered" and eligible for a transfer out of the quarantine unit without administration of a re-test.  Nevertheless, incidents like this one, in which an inmate who tested positive in June and tested positive again in October, at the very least calls into question the soundness of such an interpretation of those guidelines.

tested only 33 inmates solely as a result of Wellpath's screening criteria (not as a part of intake or due to a known exposure), and all but one of those inmates were housed in APTF at the time they were tested. (Doc. No. 29-1 at 22.)  Of those 33 inmates tested, 4 inmates from APTF tested positive for the virus.  (*Id.*)  In other words, Wellpath staff—relying on the screening form and their clinical judgment to assess symptomatic inmates—did not test a single inmate in South County and tested only one inmate in Bob Wiley during that time period.  (*Id.*)

Mr. Silveira declares that there have been other instances of testing inmates at Bob Wiley and South County and that as of to November 16, 2020, "a total of 89 inmates housed at Bob Wiley and 55 inmates housed at South County have been tested for COVID-19, with not a single one of these tests yielding a positive test result."  (Doc. No. 45-4 at ¶ 32.)[11]  The court notes however, that after accounting for the October 22 and 23, 2020 testing of 52 inmates in South County and 75 inmates in Bob Wiley, the "other instances" of testing that Mr. Silveira refers to amounts to testing just *fourteen* inmates in Bob Wiley and *three* inmates in South County.  (*Id.*; *see also* Doc. No. 46-12 at ¶ 18.)  Moreover, in his declaration Mr. Silveira does not clarify whether these few "other instances" of testing were as a result of Wellpath staff assessing symptomatic patients and determining that a COVID-19 test is clinically indicated.

Based on spreadsheets of testing data that defendant has produced in response to plaintiffs' interrogatories, plaintiff calculated the following data points related to defendant's testing of symptomatic inmates, which defendant does not dispute in his opposition to the pending motion.  (Doc. No. 44-1 at ¶¶ 17, 18.)  From April through the end of September 2020,

---

[11]  According to data reported by the California Board of State and Community Corrections ("BSCC"), between July 19, 2020 and October 31, 2020, TCSD tested zero inmates in Bob Wiley and South County.  (Doc. No. 44-4 at 2–14.)  But as noted above, according to Mr. Silveira, 52 inmates in South County and 75 inmates in Bob Wiley were all tested at the end of October 2020 so that they could be transferred to state prison upon proof to CDCR that they tested negative for COVID-19.  (Doc. No. 45-4 at ¶ 32.)  The parties have not explained how BSCC collects the testing data it reports, or why there would be a discrepancy in the data reported by BSCC and defendant's testing records.  At the hearing on the pending motion, defendant could not explain why the October 2020 testing was not reflected in BSCC's reports.  (Doc. No. 51 at 8.)  Nevertheless, plaintiffs confirmed that they have no reason to question Mr. Silveira's declaration that those inmates were in fact tested as a prerequisite to CDCR accepting their transfer to state prison and, implicitly, not as a result of Wellpath's screening and assessing inmates who complained of symptoms.  (*Id.* at 9.)

eighteen inmates were tested due to reported COVID-19 symptoms, representing only 1.2% of all tests administered. (*Id.*; Doc. No. 44 at 15.) Ten of those eighteen inmates tested positive for COVD-19, resulting in a test positivity rate with respect to symptomatic inmates of 56%. (*Id.*) At APTF, 335 inmates reported symptoms but only sixteen—about 5%—were tested for COVID-19. (Doc. No. 44 at 15.) In other words, outside of the intake process and known exposures, defendant did not test *symptomatic* inmates 95% of the time. (*Id.*)

### e.  *Overall Testing Data in the Jails*

According to Mr. Silveira, as of November 16, 2020, "Wellpath and TCSD have conducted 2,059 total COVID-19 inmate tests since the outset of the pandemic," which is not the total number of inmates tested because some inmates have been tested more than once. (Doc. No. 45-4 at ¶ 29.) In defendant's opposition to the pending motion, defendant cites Mr. Silveira's declaration but states that 1,859 COVID-19 inmates tests have been conducted in the Jails. (Doc. No. 45-1.) At the hearing, defense counsel could not explain the 200-test discrepancy in these two figures but speculated it might be that one total reflected the number of tests, whereas another may reflect the number of inmates tested. (Doc. No. 51 at 6–7.) In any event, defense counsel suggested that the total as stated by Mr. Silveira in his declaration is likely correct because Silveira reviewed testing records and had that information readily available when preparing his declaration. (*Id.*)

According to the plaintiffs' summary of a spreadsheet that defendant produced in discovery, which "lists every COVID-19 test administered by the Tulare County Jails since March 25, 2020 to November 16, 2020," 71 of the 1,969 inmates who have been tested received positive test results and four staff members of the 42 Wellpath staff who were tested received positive test results for the virus. (Doc. Nos. 46-1 at ¶ 11; 46-11 at 2.) In total, 2,576 tests were administered during that time period. (*Id.*)

Lieutenant Jones declared that as of November 10, 2020, there were a total of 1,199 inmates in the Jails, and 705 of those inmates "had received at least one COVID-19 test since his/her booking," representing "58.8% of all inmates who are current[ly] housed in the [Jails]." (Doc. No. 45-6 at ¶ 38.)

16

1          4.      Social Distancing Policies

2          In the TRO, the court ordered defendant to "[a]dopt a policy designed to reduce contacts

3  between incarcerated people in all common areas, including (but not limited to) bathrooms, day

4  rooms, yards, and pill lines, and allow for the possibility of social distancing by inmates." (Doc.

5  No. 26 at 48–49.)  Pursuant to the TRO, on September 8, 2020, defendant filed a copy of TCSD's

6  Coronavirus Prevention and Protection, Policy 716, which includes section 716.3 addressing

7  social distancing.  (Doc. Nos. 27 at ¶ 2.a.; 27-1 at 3–4.)  Defendant's social distancing policy

8  outlined directives to be followed in the Jails, including:  (i) suspending in-person visitation

9  except for legal visits; (ii) allowing only the number of inmates that can be kept six feet apart to

10 shower at one time; (iii) encouraging inmates to utilize the bathroom in their cells whenever

11 possible and allowing only the number of inmates that can be kept six feet apart to utilize a multi-

12 person bathroom; (iv) reminding inmates to socially distance by staying six feet apart while in the

13 day room and yard areas and requiring inmates to wear their face masks and shields while in

14 those areas, though "[s]taff will continue to allow only the number of inmates out to program at

15 one time that allows for six feet of distance in the day rooms and the yard areas"; and (v)

16 dispensing medication at the inmate's cell by staff wearing face masks, shields, and gloves while

17 medication is dispensed.  (*Id.*)

18         Between April and July 2020, Mr. Mitchell had several discussions with TCSD command

19 staff to convey Dr. Haught's message that it was important to keep inmates socially distanced as

20 much as possible.  (Doc. Nos. 54-3 at ¶ 22; 45-6 at ¶ 23.)  To that end, Mr. Mitchell discussed

21 with TCSD command staff how to achieve social distancing during the time when inmates are out

22 of their cells (referred to as "programming time"), which jail officials had found to be a challenge

23 "because inmates tend to congregate together when they are out of their cells on programming

24 time, and it is very difficult to keep them apart."  (*Id.* at ¶¶ 22–23; Doc. No. 45-9 at ¶ 7.)  Though

25 each facility operates its own programming time schedule, a common thread across the facilities

26 is that inmates continued to congregate and were not respecting the social distancing requirement

27 of keeping six feet apart.  (Doc. Nos. 45-9 at ¶ 8–9; 45-6 at ¶¶ 18, 12; 45-8 at ¶ 9.)  Lieutenant

28 Robles explained that "[i]n mid-July, after further conversations with Mr. Mitchell, the

Lieutenants at each facility reduced programming time and allowed fewer inmates out of their cells at the same time in order to better prevent inmates from congregating within six feet of each other." (Doc. No. 45-9 at ¶ 9.)

At Bob Wiley and APTF, the number of inmates allowed out of their cells for programming was reduced to two inmates, or one cell at a time, which reduced programming time for each inmate from 1 hour per day to 30 minutes per day, six days a week (Monday through Saturday), with Sundays reserved for making up missed programming time during that week. (Doc. Nos. 45-6 at ¶¶ 23–25, 27; 45-9 at ¶ 10; 45-8 at ¶ 9.) Lieutenant Jones explained that it was his understanding "that Title 15 of the California Code of Regulations requires that inmates receive at least three hours of programming time per week," and that when TCSD made the decision to "reduce the number of inmates who would be allowed to program together, [he] had to figure out a way to make sure that all inmates received at least their minimum out of cell time." (Doc. No. 45-6 at ¶ 24.) Lieutenant Jones reasoned that because most of the pods in APTF have a capacity of 50 inmates in 25 two-person cells, "[i]f a pod is full, and we are limiting programming to one cell at a time, and there is a maximum of 12 hours per day of programming time, then we can only give each cell 30 minutes programming time per day, and that still leaves us one cell short for programming time for that day." (Doc. No. 45-6 at ¶ 24.) For that reason, Sundays were reserved for make-up programming time that had been missed during that week. (*Id.* at ¶ 25.)

At South County, the number of inmates allowed out of their cells at one time was reduced from six to four inmates, and programming time for each inmate was reduced from 1.5 hours per day to 1 hour per day. (Doc. No. 45-9 at ¶ 9.) Lieutenant Robles explained that it is easier "to have more inmates out of their cells at once, at South County, than at APTF or Bob Wiley" because it is easier to schedule programming time at South County, which is a "newer and more efficient facility space" and houses "lower level offenders." (*Id.* at ¶ 10.)

/////

/////

/////

18

1

**LEGAL STANDARDS**

2

**A.      Provisional Class Certification**

3

District courts in this circuit can provisionally certify a class for the purposes of a

4

preliminary injunction.  *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) (noting

5

that the Ninth Circuit has "approved provisional class certification for purposes of preliminary

6

injunction proceedings") (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041–

7

143 (9th Cir. 2012) (concluding that "the district court acted within its discretion when it ruled

8

that [plaintiff] met the commonality, typicality, and adequacy requirements of [Federal Rule of

9

Civil Procedure] 23(a) and did not abuse its discretion by granting provisional class

10

certification.").

11

Pursuant to Federal Rule of Civil Procedure 23, a party seeking class certification must

12

establish the following prerequisites:

13

14

15

16

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests
> of the class.

17

Fed. R. Civ. P. 23(a).  If these four prerequisites—commonly referred to as numerosity,

18

commonality, typicality, and adequacy—are satisfied, then the party seeking class certification

19

must also satisfy one of the three subsections of Rule 23(b).  Here, plaintiffs seek class

20

certification under Rule 23(b)(2), which requires a showing that defendant "has acted or refused

21

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

22

declaratory relief is appropriate respecting the class as a whole."  (Doc. No. 10 at 9) (quoting Fed.

23

R. Civ. P. 23(b)).

24

The party seeking class certification bears the burden of establishing conformity with

25

these requirements and must do so by producing facts that "affirmatively demonstrate" that

26

certification is warranted.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*

27

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  Only after it has conducted a "rigorous

28

analysis" of these facts and determined that they show "actual, not presumed, conformance" with

Rule 23(a) and (b), may a district court certify a class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161 (1982)); *see also Comcast*, 569 U.S. at 33–34 (extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Servs., Inc.*, 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b)."). A court must review the merits of a party's substantive claim only if they overlap with issues touching on class certification. *Ellis*, 657 F.3d at 981 (citing *Dukes*, 564 U.S. at 350–51; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

"The decision to grant or deny class certification is within the trial court's discretion." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (citing *Yamamoto v. Omiya,* 564 F.2d 1319, 1325 (9th Cir. 1977)). If a court does decide to certify a class, it must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1). Finally, "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).

## B.     Preliminary Injunctive Relief

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the

1  plaintiff's favor." *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*,

2  537 F.3d 981, 97 (9th Cir. 2008) (*en banc*)).[12]  The party seeking the injunction bears the burden

3  of proving these elements.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir.

4  2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A

5  plaintiff must do more than merely allege imminent harm sufficient to establish standing; a

6  plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive

7  relief.")  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a

8  clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

9  **ANALYSIS**

10  **A.    Motion for Provisional Certification of the Class and Medically Vulnerable Subclass**

11      For the purposes of the TRO, the court provisionally certified the proposed class of "all

12  people who are now, or in the future will be, incarcerated in the Tulare County Jails" (the

13  "Provisional Class").  (Doc. No. 26 at 27, 47).  Now, for the purposes of their pending motion for

14  preliminary injunctive relief, plaintiffs seek provisional re-certification of the Provisional Class

15  and provisional certification of a subclass of "persons whose age or medical conditions put them

16  at increased risk of severe illness from COVID-19 and who are confined pre-trial and pursuant to

17  a judgment of conviction in the Tulare County Jails" (the "Medically Vulnerable Subclass").[13]

18

19  [12]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale
    approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild*

20  *Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of
    hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

21  so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
    injunction is in the public interest."  *Id*. at 1135.

22

23  [13]  According to plaintiffs, those medical conditions include:  type 2 diabetes mellitus; chronic
    kidney disease; cancer; COPD (chronic obstructive pulmonary disease); immunocompromised

24  state, weakened immune system from solid organ transplant; obesity (body mass index of 30 or
    higher); serious heart conditions such as heart failure, coronary artery disease, or

25  cardiomyopathies; sickle cell disease; asthma (moderate to severe); cerebrovascular disease; liver
    disease; cystic fibrosis; hypertension (high blood pressure); compromised immune system

26  (immunosuppression) from blood or bone marrow transplant, immune deficiencies, HIV, use of
    corticosteroids, or use of other immune weakening medicines; neurological conditions, such as

27  dementia; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); overweight
    (BMI > 25kg/m$^2$, but <30kg/m$^2$); thalassemia; type 1 diabetes mellitus; and those age 55 or older.

28

1    (Doc. No. 43 at 6.)  As noted above, defendant does not oppose plaintiffs' motion to provisionally

2    certify the Provisional Class and the Medically Vulnerable Subclass.  (Doc. No. 45-1 at 31.)

3         Nevertheless, because the court will deny plaintiffs' motion for preliminary injunctive

4    relief for the reasons explained below, the court will also deny plaintiffs' motion for provisional

5    class certification without addressing Rule 23's requirements.  In doing so, the court does not

6    suggest that plaintiffs have failed to meet the Rule 23 class certification requirements with regard

7    to the Provisional Class, which plaintiffs clearly satisfied in connection with the TRO (*see* Doc.

8    No. 26 at 21–27), or that plaintiffs would not be able satisfy those requirements to provisionally

9    certify the Medically Vulnerable Subclass.  In addition, the court recognizes that in this

10   pandemic, circumstances are ever-changing and conditions in the Jails are evolving as well.

11   Thus, the court's denial of plaintiffs' motion for provisional class certification is without

12   prejudice to plaintiffs renewing their request in light of changed conditions in the Jails.

13   **B.    Plaintiffs' Motion for Preliminary Injunctive Relief**

14          1.    Applicable Legal Standard for Objective Deliberate Indifference Claim

15         Plaintiffs contend that they are likely to succeed on the merits of their deliberate

16   indifference claims.  (Doc. No. 44 at 23–24.)  Because plaintiffs' first cause of action challenges

17   the conditions of confinement in the Jails for pre-trial detainees, their first deliberate indifference

18   claim "arises under the Fourteenth Amendment's Due Process Clause, rather than under the

19   Eighth Amendment's Cruel and Unusual Punishment Clause."  *See Gordon v. Cnty. of Orange*,

20   888 F.3d 1118, 1124 (9th Cir. 2018).  Conversely, plaintiffs' second cause of action based upon

21   alleged deliberate indifference challenges the conditions of confinement in the Jails for convicted

22   prisoners, and thus arises under the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104

23   (1976) (holding that prison officials' "deliberate indifference to serious medical needs of

24   prisoners" violates the Cruel and Unusual Punishment Clause of the Eighth Amendment); *see*

25   *also Helling v. McKinney*, 509 U.S. 25, 29–30 (1993) ("[T]he Eighth Amendment applies to

26   /////

27   /////

28   /////

conditions of confinement that are not formally imposed as a sentence for a crime.").[14]

To succeed on their Fourteenth Amendment claim, plaintiffs will have to prove objective deliberate indifference. *Gordon*, 888 F.3d at 1124–25 (holding that "claims or violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard"). To satisfy this objective deliberate indifference standard, plaintiffs must prove that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. As to the third element, plaintiffs must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* Courts "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

---

[14] Plaintiffs maintain that the court need only analyze plaintiffs' claims under the objective deliberate indifference standard of the Fourteenth Amendment because pre-trial detainees and convicted prisoners are housed together and experience the same conditions of confinement in the Jails, and "it would be impossible to order separate relief." (Doc. Nos. 44 at 25; 46 at 9.) The court acknowledges this fact and notes that defendant's consultant has declared that "[a]s of November 6, 2020, there was a total of 945 unsentenced inmates in the [Jails], and that represents 77 percent of the current inmate population of 1224." (Doc. No. 45-2 at 18.) However, the court disagrees that these facts necessarily render analysis of subjective deliberate indifference under the Eighth Amendment unnecessary in all such circumstances. Indeed, in the TRO, the court separately analyzed plaintiffs' likelihood of success as to both of their deliberate indifference claims. (Doc. No. 26 at 31–36.) Nevertheless, the court need not analyze whether plaintiffs have shown a likelihood of success in proving subjective deliberate indifference here because the court finds on the factual record now before it that they have failed to demonstrate a likelihood of success in proving objective deliberate indifference, a necessary element under both the Fourteenth and Eighth Amendments. *See Helling*, 509 U.S. at 35–36 (affirming remand to provide plaintiff an opportunity to satisfy "both the subjective and objective elements necessary to prove an Eighth Amendment violation").

2. <u>Parties' Arguments and Evidence Regarding Deliberate Indifference Claims</u>

Here, plaintiffs contend that they are likely to succeed on the merits of their Fourteenth Amendment deliberate indifference claim because defendant's "refusal to implement an effective testing policy violates incarcerated people's right to be free from a serious risk of medical harm." (Doc. No. 44 at 26.)  In particular, plaintiffs contend that defendant has failed "to consistently apply his own intake and observation policies" and "to supervise [the Wellpath] medical team who are allegedly responsible for testing" but who consistently refuse to test symptomatic inmates.  (*Id.* at 26–27, 30.)  In addition, plaintiffs assert that defendant has acted with deliberate indifference by failing to identify which inmates are medically vulnerable, and by failing to take additional precautions with respect to those medically vulnerable inmates, such as prioritizing them for housing in single cells and providing "regular monitoring."  (*Id.* at 30, 32–34.)

As evidence in support of their argument, plaintiffs point to the declarations from several inmates who have described various instances of TCSD not complying with the intake and observation policies (*id.* at 19–20), including the following examples:

- On September 4, 2020, plaintiff Levi Johnson was booked as a new inmate in the APTF observation unit 2-B and placed in a cell with an inmate who was on day ten of his 14-day observation period. (Doc. No 44-22 at 3, ¶¶ 9–10.) Four days later, that inmate was transferred to general population in Bob Wiley; TCSD did not restart that inmate's observation period as required by defendant's stated policy. (*Id.*)

- In late September 2020, plaintiff Johnson's observation period did not restart despite the fact that a newly arrested inmate was placed in his cell for one weekend while awaiting his court appearance, and after that inmate left, another newly booked inmate was placed in his cell. (*Id.* at 4, ¶¶ 12–15.)

- On September 15, 2020, deputies moved twenty inmates from unit 4-A in APTF to South County, leaving ten inmates, including inmate Rigoberto Benavidez in unit 4-A. (Doc. No. 44-20 at 24, ¶ 22.)  According to inmate Benavidez, the deputies then filled the vacancies in his unit with twenty inmates from the quarantine unit who had not been medically cleared or quarantined for the full 14-day period. (*Id.*)  Upon realizing this mistake, the next day, deputies moved those inmates back into the quarantine unit and brought in another twenty inmates "who *had* been medically cleared and getting off their 14-day quarantine," into his unit. (*Id.*)

- On September 16, 2020, a newly booked inmate, Destiny Lopez, was placed in a quarantine unit in APTF and stayed there for 20 days before transferring to Bob Wiley. (Doc. No. 44-22 at 13–14, ¶¶ 3–4.)  Inmate Lopez was not tested for COVID-19 despite the fact that she had been moved around within the quarantine unit five times and had a new cellmate four times during those 20 days. (*Id.*)

/////

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- On October 8, 2020, inmate James Gonzalez, an inmate who had been temporarily housed in the APTF infirmary for medical care related to a car accident he had prior to being booked into the Jails on September 21, 2020, was tested for COVID-19.  (Doc. No. 44-21 at 5, ¶¶ 4–5.)  Before receiving the test results, on October 12, 2020, he was moved into unit 4-A in APTF, where he used the day room, phones, yard, and socialized with inmate Benavidez.  (*Id.* at ¶ 6; *see also* Doc. No. 44-20 at 24, ¶ 25.)  Two days later, deputies moved inmate Gonzalez and his cellmate to unit 3-A because inmate Gonzalez had tested positive for COVID-19.  (Doc. No. 44-20 at 24, ¶ 7.)

Plaintiffs also point to the declarations from several inmates who described various

instances where COVID-19 testing was denied to symptomatic inmates (Doc. No. 44 at 14–15),

including the following examples:

- In May 2020, inmate Francisco Arreola started experiencing flu-like symptoms, difficulty breathing, and a dry cough.  (Doc. No. 44-20 at ¶ 5.)  Inmate Arreola submitted a sick call slip and was seen by both a nurse and a medical provider that same day, but he was not tested for COVID-19.  (*Id.* at ¶¶ 6–7.)  When he was seen two weeks later for a chronic care appointment, he still had chest pain and a bad cough, but he was not offered a COVID-19 test.  (*Id.* at ¶ 8.)  Inmate Arreola's symptoms did not subside, and he submitted several sick call slips and was seen by medical staff in June, July, August, and September 2020, but he was not tested for COVID-19.  (*Id.* at ¶¶ 9–14.)  On October 7, 2020, inmate Arreola was taken to the hospital after passing out during a medical appointment and the doctor at the hospital thought that inmate Arreola had the coronavirus because of his symptoms and tested him at the hospital for COVID-19.  (*Id.* at ¶ 15)  Inmate Arreola declares that he never got his test results and still does not know whether he had or has the virus.  (*Id.*)

- On September 5, 2020, plaintiff Samuel Camposeco, an inmate in Bob Wiley, had a light cough, felt chills, and felt tightness in his chest and throat.  (Doc. No. 44-20 at 31, ¶ 11.)  After some difficulty obtaining a sick call slip, on September 8, 2020, plaintiff Camposeco submitted a sick call slip, in which he requested a COVID-19 test and detailed his symptoms and the fact that he had been in a holding tank with quarantined inmates in late October.  (*Id.* at ¶¶ 10–13.)  On September 11, 2020, he was taken out of his cell for a sick call appointment, and he again requested a COVID-19 test and told the nurse that he had a heavy cough, chills, trouble breathing, and a sore throat.  (*Id.* at ¶¶ 14–15.)  The nurse told him that his symptoms were likely due to the wildfires.  (*Id.* at 15.)  The nurse told plaintiff Camposeco that she would ask a medical provider whether he could be tested because under Wellpath and TCSD policies, an inmate could not be tested without approval from a medical provider.  (*Id.*)

- On October 6, 2020, plaintiff Camposeco was seen by a doctor for a chronic care appointment, and he asked for a COVID-19 test because he was still experiencing chills, aches, shortness of breath, headaches, and severe shoulder pains.  (*Id.* at ¶ 17.)  According to plaintiff Camposeco, the doctor told him that he did not need a COVID-19 test and that not many inmates were being tested "because the tests were not accurate and often led to false positives."  (*Id.*)

/////

/////

/////

25

- On September 5, 2020, plaintiff Adam Ibarra, an inmate in Bob Wiley, submitted a sick call slip and requested a COVID-19 test because he had a cough, sore throat, headaches, and body aches. (Doc. No. 44-21 at 17, ¶ 12.) Two days later, plaintiff Ibarra was seen by a nurse who treated him for a cold and told him that she would talk to a medical provider about ordering a COVID-19 test for him. (*Id.*) Plaintiff Ibarra did not hear anything back and was not tested for COVID-19. (*Id.*)

- On September 17, 2020, inmate Drew Kaupelis submitted a sick call slip and requested a COVID-19 test because he "had a very sore throat and an earache." (Doc. No. 44-22 at 9, ¶ 7.) Four days later, he saw medical staff who told him that he could not get a COVID-19 test because he did not have clear symptoms of COVID-19. (*Id.*)

- On September 11 and October 7, 2020, inmate Santos Moreno, an inmate in South County, was seen by medical staff after he submitted sick call slips and requested a COVID-19 test because he had body aches, headaches, cotton mouth, and trouble breathing. (Doc. No. 44-23 at 14, ¶¶ 8–12.) Both times, medical staff took inmate Moreno's temperature and vitals and told him that he did not need a COVID-19 test. (*Id.*)

Plaintiffs posit that "[p]art of the reason that so few symptomatic [inmates] have received tests is because of Wellpath's facially inadequate screening form, which requires *multiple* symptoms before an [inmate] can even be *referred* to a medical provider to be evaluated for a test." (Doc. No. 44 at 29.) Plaintiffs emphasize that Wellpath's continued use of this screening criteria is even contrary to the medical opinion of Dr. Liberstein, Wellpath's own Medical Director and the sole doctor in the Jails, who testified at her deposition that in her medical judgment, if a patient exhibits any of the symptoms that the CDC recognizes in its guidelines as symptoms of coronavirus, then that patient has to be tested.[15] (Doc. No. 44-10 at 3–4.) As plaintiffs point out, Dr. Liberstein confirmed that the screening form's criteria does not direct the screener to refer inmates who are experiencing only one symptom of coronavirus to a medical provider for evaluation, and that despite this fact, there have been no discussions about updating the screening form to reflect that an inmate with even just one symptom should be referred for evaluation. (*Id.* at 6–8.) Plaintiffs argue that defendant's failure to oversee Wellpath and to ensure implementation of an effective testing strategy in the Jails—a testing policy that ensures

---

[15] At the hearing, defense counsel disputed plaintiffs' characterization of Dr. Liberstein's testimony and asserted that the context of the question posed to Dr. Liberstein in her deposition was about the CDC guidelines and her understanding of what the CDC requires, and according to defendant, Dr. Liberstein was mistaken in this regard because the CDC guidelines do not require that symptomatic individuals be tested for COVID-19. (Doc. No. 51 at 45–46, 54.)

1   that symptomatic inmates are tested for COVID-19—constitutes deliberate indifference.  (*Id.* at

2   28–30.)

3           Accordingly, in the pending motion, plaintiffs request that the court order defendant to

4   stop using the supplemental screening form and instead provide testing to any inmate self-

5   reporting a symptom of COVID-19.  (Doc. No. 44 at 10.)  In addition, plaintiffs request that the

6   court order defendant to immediately conduct a one-time test of all inmates, as a remedy to the

7   harm already caused by defendant's "ongoing and persistent failure to provide adequate testing"

8   in the Jails.  (*Id.* at 10, 30.)  Plaintiffs also seek a court order requiring defendant to identify the

9   medically vulnerable inmates and to "develop policies to affirmatively monitor them for COVID-

10  19."  (*Id.* at 10.)

11          In his opposition, defendant contends that plaintiffs are not likely to succeed on the merits

12  of their deliberate indifference claims—and thus injunctive relief is not warranted—because

13  TCSD has worked closely with HHSA and Wellpath to develop policies consistent with CDC

14  guidelines and to implement preventative measures, and those COVID-19 related policies have

15  been working.  (Doc. No. 45-1 at 9.)  In particular, defendant points to the "near perfect score"

16  when 135 inmates (75 from Bob Wiley, 52 from South County, and 8 from APTF) who were

17  overdue for a transfer to state prison in late October 2020, were tested and only one inmate tested

18  positive for COVID-19.  (*Id.*; *see also* Doc. No. 45-4 at ¶¶ 31–32.)  In addition, defendant points

19  to the many significant steps that TCSD has taken to reduce the risk of COVID-19 entering the

20  Jails:  "[f]rom the new intake testing policy, to the now mandatory mask and face shield wearing

21  while inmates are out of their cells, to the enhanced social distancing, to the availability of

22  cleaning supplies, to the extra precautions in transportation, and even down to the decision to

23  change the air flow at APTF."  (Doc. No. 45-1 at 26–27.)

24          Defendant also asserts that TCSD relies on Wellpath "to make to make medical decisions

25  and use clinical judgment, and Wellpath's policies regarding medical decision-making are doing

26  the job."  (*Id.* at 27.)  According to defendant, "getting rid of the supplemental screening form and

27  giving COVID-19 tests to all who complain of one symptom runs against the exercise of clinical

28  judgment, which can also do far more harm than good."  (*Id.*)  In support of this assertion,

1   defendant cites only to the declaration of Mr. Silveira, in which he declares that because

2   COVID-19 symptoms overlap with symptoms of other ailments, a provider "blindly" testing

3   inmates for COVID-19 just because they have one or more of those symptoms would lead the

4   provider to miss the actual diagnosis of other ailments and delay delivery of appropriate treatment

5   to the patient.  (Doc. No. 45-4 at ¶ 15–18.)  In Mr. Silveira's opinion, that "would be a terrible

6   approach to medical care" and "probably cause more harm than good."  (*Id.* at ¶ 18.)

7       According to defendant, "Wellpath already tracks medically vulnerable inmates."  (Doc.

8   No. 45-1 at 27.)  In his declaration, Mr. Silveira explains that Wellpath staff assess new inmates'

9   need for chronic care and develop a monitoring and treatment plan, and Wellpath maintains a

10   chronic care list to track the treatment of those inmates.  (Doc. No. 45-4 at ¶ 36.)  According to

11   Mr. Silveira, Wellpath's "chronic care list overlaps with the CDC's list of identified conditions

12   that make a person particularly vulnerable to COVID-19, with two exceptions; age and obesity."

13   (*Id.* at ¶ 37.)  In any event, defendant asserts that the CDC guidelines do not recommend that

14   detention facilities affirmatively monitor medically vulnerable inmates for COVID-19, which is

15   the relief plaintiffs seek in their pending motion.  (Doc. No. 45-1 at 32.)  Moreover, to the extent

16   plaintiffs request that defendant be ordered to cohort the medically vulnerable inmates in the

17   same housing, defendant asserts that such a task would be a "logistical nightmare" and

18   "impossible to accomplish," in light of the many safety-related factors (e.g., gang affiliation, type

19   of criminal offense) that defendant must consider when determining where to house inmates.

20   (*Id.*)

21       Defendant also maintains that immediately conducting a one-time test of all inmates is not

22   a practical, effective, or reasonable available measure.  (Doc. No. 45-1.)  In his declaration, Mr.

23   Mitchell explained that COVID-19 tests from the Jails are processed by HHSA's public health

24   laboratory ("HHSA Lab"), which performs COVID-19 testing Monday through Friday and is the

25   only regional laboratory currently processing COVID-19 tests for six regional counties.  (Doc.

26   No. 45-3 at ¶¶ 11–16).  According to Mr. Mitchell, the HHSA Lab has the capacity to run 300

27   tests per day (450 tests per day with overtime) and each sample requires approximately 12-16

28   hours to process.  (*Id.* at ¶ 15.)  Assuming the HHSA Lab prioritized inmate tests over first

1  responders and health care workers who currently have testing priority and processed tests seven

2  days a week, processing 1,200 inmate tests would take 20 days to complete.  (*Id.* at ¶¶ 35–36.)

3  According to Mr. Mitchell, "[i]f the goal of such mass testing was to identify and separate out

4  contagious carriers of COVID-19, by the time we obtained all the test results, any inmate who

5  may be infected would no longer be contagious."  (*Id.* at ¶ 36.)

6         In reply, plaintiffs recognize that "[d]efendant has implemented some measures in

7  response to Plaintiffs' lawsuit and [the TRO]," but they argue that "much more must be done to

8  satisfy constitutional requirements and mitigate the risk of COVID-19 in the Jails."  (Doc. No. 46

9  at 7.)  Plaintiffs reiterate their position that defendant's multi-step screening and evaluation

10  process has resulted in an "unconstitutional pattern and practice of denying medical care to

11  persons in need absent clinical medical judgment."  (*Id.* at 12.)  In particular, plaintiffs counter

12  defendant's assertion that testing inmates just because they have symptoms is somehow harmful.

13  (Doc. No. 46 at 13.)  Rebutting one of Mr. Silveira's examples, plaintiffs note that Mr. Silveira is

14  not a doctor and "seems to be unaware that a medical provider evaluating a patient with a sore

15  throat could do both simultaneously:  order a COVID-19 test *and* screen for tonsillitis;" and "it is

16  axiomatic that medical providers often screen for and treat multiple possible conditions with

17  similar symptoms at the same time."  (Doc. No. 46 at 13.)

18         With regard to the testing of 135 inmates in October 2020, plaintiffs emphasize that

19  defendant did not initiate that testing event of his own accord; rather, he only tested those inmates

20  because CDCR required proof of a negative test in order to accept an inmate's transfer to state

21  prison.  (*Id.* at 14.)  Moreover, according to plaintiffs, those testing results "are of limited use in

22  determining the prevalence of COVID-19 in the Jails, because the group tested (1) represented

23  only about 11% of the population, (2) was not a representative cross-section of the Jails' general

24  population, and (3) provides only a snapshot of the unrepresentative sample at that moment in

25  time."  (*Id.*)

26         With regard to defendant's assertion of logistical challenges in immediately testing all

27  inmates, plaintiffs assert that "costs and logistics cannot excuse a constitutional violation," and

28  that Mr. Mitchell acknowledged potential alternatives in his declaration, including use of private

1   labs to process tests (where the county would have to pay $180 per test, compared to HHSA's

2   expense of $80 per test) and use of a new California Department of Public Health laboratory that

3   recently opened in Valencia, CA, but is not yet fully online.  (*Id.* at 46; *see also* Doc. No. 45-3 at

4   ¶¶ 17, 37.)

5           3.      Analysis of Whether Plaintiffs are Likely to Succeed on the Merits

6           As an initial matter, the court focuses on the issue presented by plaintiffs' pending motion.

7   The question here is not whether defendant can or should do more, or whether the court would

8   adopt different policies if it were in charge of the Jails.  The question is about what defendant has

9   done to date, and whether those actions were objectively reasonable.  As one district court

10  recently explained in denying injunctive relief to state prisoners who had alleged deliberate

11  indifference claims based on CDCR's response to COVID-19:

12
                    No one questions the magnitude of the challenge that COVID-19
13                  presents in a prison setting, and if the Court were in the Governor's
                    or the Secretary's position, it might adopt additional or different
14                  measures.  But the question before the Court is not what it thinks is
                    the best possible solution.   Rather, the question is whether
15                  Defendants' actions to date are reasonable.

16  *Plata v. Newsom*, 445 F. Supp. 3d 557, 568 (2020).  The test of objective reasonableness

17  "necessarily turns on the facts and circumstances of each particular case."  *Roman v. Wolf*, 977

18  F.3d 935, 943 n.5 (9th Cir. Oct. 13, 2020) (alterations and citation omitted).  Although in the

19  TRO this court previously determined that plaintiffs were likely to succeed on the merits of their

20  deliberate indifference claims, that determination was based on the facts and circumstances

21  presented to the court by the parties at that time.  (Doc. No. 26 at 7, 45.)  Notably, plaintiffs'

22  evidentiary showing had then been limited due to defendant's legal visitation policy, which

23  hindered class counsel's ability to communicate with plaintiffs and putative class members.  (*Id.*

24  at 3 n.1, 38–39.)  For his part, defendant had at that time submitted only scant evidence, much of

25  which the court found puzzling and incomplete, and he had made no effort to refute the evidence

26  plaintiffs had submitted.  (*Id.* at 12–16, 17 n.9.)  As noted above, the parties have now submitted

27  a more fully developed factual record for the court to review, and it is on this evidentiary record

28  /////

1    that the court now proceeds to evaluate whether defendant's actions to date have been objectively

2    reasonable.

3         The court is also mindful of the Ninth Circuit's recent guidance provided in *Roman v.*

4    *Wolf*. There, detainees had alleged that the conditions at the Adelanto immigration facility

5    "placed them at an unconstitutional risk of contracting COVID-19," because it was too crowded

6    to social distance and

7
         detainees had inadequate access to masks, guards were not required
8        to wear masks, there was not enough soap or hand sanitizer to go
         around, detainees were responsible for cleaning the facility with
9        only dirty towels and dirty water, detainees were compelled to sleep
         with less than six feet of distance between them, and not all new
10       arrivals were being properly quarantined or tested.

11   977 F.3d at 938, 943. In that context, the Ninth Circuit held that the district court had correctly

12   concluded that plaintiffs were likely to prevail on the merits of their claim because the

13   government's "inadequate response reflected a reckless disregard for detainee safety." *Id.* at 933–

14   34. The district court had ordered injunctive relief tailored to those conditions in Adelanto as of

15   mid-April, but in May, the Ninth Circuit stayed the preliminary injunction order except to the

16   extent it required compliance with the CDC's guidelines for managing COVID-19 in correctional

17   and detention facilities. *Id.* at 945–46; *see also Roman v. Wolf*, No. 20-55436, 2020 WL

18   2188048, at *1 (9th Cir. May 5, 2020) (granting and denying part emergency motion to stay the

19   injunction pending appeal). On October 13, 2020, the Ninth Circuit vacated the injunction order

20   and remanded to the district court "to assess what relief current conditions may warrant,"

21   recognizing that the circumstances at Adelanto had changed in the five months during the

22   pendency of the appeal and "the facts that motivated the district court's preliminary injunction no

23   longer reflect the current realities at Adelanto." *Id.* at 945. In doing so, the Ninth Circuit also

24   made several "observations for the district court to consider on remand," including that it is now

25   clear that the CDC guidelines do not provide a workable standard for a preliminary injunction

26   because they lack specificity and contain key caveats. *Id.* at 945–46. The Ninth Circuit also

27   reiterated that "the district court possesses broad equitable authority to remedy a likely

28   constitutional violation," but cautioned against "micromanag[ing]" and "wad[ing]" into facility

31

1  administration at a granular level beyond what is required to remedy the constitutional violation

2  identified." *Id.* at 946.

3       Here, the court must first determine if plaintiffs are likely to succeed on the merits of their

4  claim that defendant's actions constitute deliberate indifference—the constitutional violation—

5  before addressing the propriety of plaintiffs' requested relief and proposed remedies.  For the

6  reasons explained below, the court concludes that plaintiffs have not shown a likelihood of

7  success on the merits of their deliberate indifference claims at this time.  Recognizing that the

8  situation with regard to COVID-19 in the Jails may rapidly change, however, the court will deny

9  plaintiffs' motion for a preliminary injunction at this time without prejudice.

10             a.    *Adherence to Intake and Observation Policies*

11       Plaintiffs do not appear to challenge the adequacy of defendant's revised intake and

12  observation policies, as *written*.  Rather, plaintiffs focus on defendant's failure to strictly adhere

13  to those written policies.  The court notes that defendant did not dispute in his opposition or at the

14  hearing on the pending motion that there were instances where his intake and observation policies

15  were not followed, as shown by the declarations submitted by plaintiffs.[16]  Nevertheless, the court

16  concludes that these occurrences, whether they be due to mistake or carelessness, do not rise to

17  the level of reckless disregard.  To show objective deliberate indifference, a "mere lack of due

18  care" is not enough; a plaintiff must show "something akin to reckless disregard." *Roman*, 977

19  F.3d at 943 (citing *Gordon*, 888 F.3d at 1125) (internal quotation marks omitted).

20       Moreover, the court finds the test results from the October 2020 testing of 135 inmates,

21  which yielded only one positive test, to be at least somewhat persuasive.  While the court

22  understands plaintiffs' concerns that this testing event is not a representative sample and only

23  provides a snapshot at that particular time, it stands to reason that the policies employed by

24  /////

25

26  [16]  The court is aware that defendant has called into question the veracity and credibility of some
of the declarants based on their assertions of staff failing to comply with defendant's mask policy,
27  which is not at issue in the pending motion.  (Doc. No. 45-1 at 30, n.7) (noting that video
surveillance footage directly refutes inmates' declarations that TCSD personnel and Wellpath
28  staff were not wearing masks and face shields at specified dates, times, and locations).

1    defendant must have been effective at least to some extent for there to be a *nearly zero* positivity

2    rate for those 135 inmates tested at that time.

3                      b.      *Testing of Symptomatic Inmates*

4            The crux of plaintiffs' deliberate indifference argument is that defendant has failed to test

5    symptomatic inmates, not just some of the time, but 95% of the time.  Defendant does not dispute

6    this testing rate.  Indeed, plaintiffs point not only to several declarations from inmates who were

7    repeatedly refused COVID-19 testing despite complaining of multiple symptoms, but also to

8    defendant's testing records which confirm his incredibly low rate of testing reportedly

9    symptomatic inmates.  It is baffling to the court that defendant stands behind a testing policy that

10   resulted in only 18 inmates who presented with symptoms being tested for COVID-19 between

11   April and September 2020, especially when ten of the only 18 to whom tests were administered

12   tested positive—a 56% test positivity rate.

13           At the hearing on the pending motion, defense counsel could not tell the court how many

14   inmates had been tested in October and November 2020 based solely on reporting symptoms,

15   though counsel suggested that the testing records attached to plaintiffs' reply probably contained

16   that information, albeit in raw data form.  (Doc. No. 51 at 7.)  The court has reviewed those

17   updated records, which include testing data from the Jail through November 18, 2020 and reflect

18   that a total of six symptomatic inmates were tested outside of the intake process:  one inmate was

19   tested in October, and five inmates were tested in November.  (Doc. No. 46-11 at 19–30.)  All six

20   of those inmates tested negative for COVID-19.  (*Id.*)  As far as the court can discern from those

21   records, it appears that of the five symptomatic inmates tested in November, two of those inmates

22   were housed in Bob Wiley, and one inmate was housed in South County.  (*Id.*)  Based on the data

23   from these most recent months, it appears that the rate of testing symptomatic inmates in the Jails

24   may be trending in a more positive direction, though the court remains concerned about what may

25   be causing the overall low rate of testing symptomatic inmates.

26           Even more concerning to the court is that defendant has attempted to justify this low

27   testing rate by relying on Mr. Silveira's highly questionable suggestion that testing symptomatic

28   inmates for COVID-19 would lead to missed diagnoses of other ailments whose symptoms

1   overlap with COVID-19 symptoms.  At the hearing, defense counsel clarified that despite

2   defendant's assertion in his opposition brief that testing symptomatic inmates for COVID-19 may

3   cause more harm than good, defendant's position is actually that he must be able to rely on the

4   clinical judgment of the medical professionals in determining whether an inmate needs to be

5   tested for COVID-19.  (Doc. No. 51 at 32–37.)  Thus, defendant maintains that his low testing

6   rate of symptomatic inmates is justified, but he clarified that his justification is based on the

7   purported exercise of clinical judgment, not based upon Mr. Silveira's opinion.

8           To the extent defendant relies on the medical judgment of Wellpath providers who

9   evaluate inmates and decide in their clinical judgment whether any particular inmate should be

10  tested for COVID-19, that process only functions appropriately if the inmate is actually referred

11  to the provider for such an evaluation.  While the court agrees with plaintiffs that the

12  supplemental screening form does not direct Wellpath staff to refer an inmate to a provider for an

13  evaluation unless the inmate is experiencing *multiple* symptoms, it is not clear that Wellpath staff

14  utilize the form in restrictive this manner.  Dr. Liberstein's deposition testimony acknowledged

15  that the form says what it says, but she also appeared to imply that in practice, she is usually

16  notified even if an inmate only presented with a high fever, for example.  (*See* Doc. No. 44-10 at

17  6–8.)  Further, many of the inmates who submitted declarations describing instances of defendant

18  refusing to test them for COVID-19, despite them suffering from multiple symptoms, were in fact

19  ultimately seen by a provider.  In other words, those inmates were not blocked at the screening

20  stage from proceeding to be evaluated by a medical provider.  There remain several unanswered

21  questions, including whether the providers have actually exercised their clinical judgment in

22  deciding whether to order a COVID-19 test for an inmate, or if Wellpath had directed providers to

23  refrain from ordering COVID-19 tests for inmates if possible, as plaintiff Camposeco's

24  declaration suggests.  (*See* Doc. No. 44-20 at 33, ¶ 17) (declaring that the medical provider told

25  him that "they were not testing many people [in the Jails], because the tests were not accurate and

26  often led to false positives").  It may be that the parties will decide to address these questions in

27  further discovery.

28  /////

"Deliberate indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hutchinson v. United States,* 838 F.2d 390, 394 (9th Cir. 1988)).  Further, "[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir. 1989).

In the court's view, while defendant's testing rate of symptomatic inmates is shockingly low, this alone does not support a finding that plaintiffs are likely to succeed on the merits of their deliberate indifference claim, particularly in light of defendant's implementation of many other measures designed to prevent the spread of COVID-19 in the Jails.  At the hearing, plaintiffs also argued that defendant's failure to test TCSD staff for COVID-19 constitutes deliberate indifference.  (Doc. No. 51 at 23, 27.)  While the testing records filed with the court show that TSCD staff are not tested for COVID-19, those records also reflect that Wellpath staff do receive COVID-19 testing (*see* Doc. No. 46-11 at 2), thereby undercutting plaintiffs' argument in this regard to some extent.  In addition, many of the measures implemented by defendant are specifically targeted at staff (e.g., defendant's policies requiring TCSD staff to self-report symptoms and not come to work if they are symptomatic, to wear masks, to have their temperatures checked upon entering the Jails).  Again, the court is particularly mindful that the question before it is not whether the court would implement different or better testing policies at the Jail, but rather whether defendant's actions in response to COVID-19 have been reasonable.

The court concludes based upon the evidence currently before it that plaintiffs have not shown a likelihood of success on the merits of their deliberate indifference claims.  Accordingly, the court and will deny plaintiff's motion for a preliminary injunction without prejudice.

c.     *Medically Vulnerable Inmates*

The court is not persuaded by plaintiffs' arguments regarding defendant's purported failure to adequately monitor medically vulnerable inmates.  Wellpath's chronic care list does overlap substantially with plaintiffs proposed medically vulnerable subclass, and Wellpath staff

35

1    employ its chronic care list to monitor and track the treatment of inmates who have chronic care

2    needs.  Plaintiffs have not presented any evidence at this time to show that Wellpath's process in

3    this regard is inadequate.  In light of defendant's process for tracking and monitoring inmates

4    who need chronic care, plaintiffs have not demonstrated that they are likely to succeed in showing

5    that defendant's failure to also track inmates who are obese or over age 65 but are not in need of

6    chronic care, constitutes a reckless disregard for all medically vulnerable inmates.

7         Moreover, although plaintiffs refer to several cases in which courts have ordered

8    injunctive relief for medically vulnerable inmates (Doc. No. 44 at 32), the facts and circumstances

9    that led the courts to find deliberate indifference in those cases are not similar to defendant's

10   actions in this case.  In *Martinez-Brooks*, for instance, the court found that because there was a

11   serious, active outbreak of COVID-19 in a federal correctional institution with dormitory-style

12   housing, and because "Congress has provided statutory authority for, and the Attorney General

13   has directed the warden to 'immediately' implement, the broad use of home confinement for

14   vulnerable inmates . . . the warden's failure to make prompter, broader use of this authority to

15   protect the lives of vulnerable inmates is likely to constitute deliberate indifference."  *Martinez-*

16   *Brooks v. Easter*, 459 F. Supp. 3d 411, 439–443 (D. Conn. 2020).  Similarly, in *Torres v.*

17   *Milusnic*, No. 20-cv-4450-CBM-PVC, 2020 WL 4197285, at \*18 (C.D. Cal. July 14, 2020), the

18   court concluded that the federal prisoners confined in FCI Lompoc and USP Lompoc were likely

19   to succeed on their Eighth Amendment claims because the warden at those prisons failed "to

20   make meaningful use of the home confinement authority as expanded by the CARES Act or

21   compassionate release which takes into account Lompoc inmates' risk for severe illness or death

22   from COVID-19."  Unlike the wardens in these cases who failed to meaningfully and promptly

23   exercise their home confinement authority to protect vulnerable inmates, plaintiffs in this case

24   have not pointed to a comparable statutory authority that TCSD is failing utilize in the Jails in

25   order to address the risks posed by the virus.  Finally, in *Alcantara v. Archambeault*, No. 20-cv-

26   0756-DMS-AHG, 2020 WL 2315777, at \*8–9 (S.D. Cal. May 1, 2020), the court found that

27   immigration detainees were likely to succeed on their Fifth Amendment substantive due process

28   claim because in light of the COVID-19 outbreak at their detention facility, their continued

1  confinement amounted to punishment and was "excessive in relation to its purpose, namely

2  preventing danger to the community and ensuring appearance at deportation hearings."  Unlike

3  the immigration detention facility at issue in *Alcantara*, plaintiffs have not shown that there is a

4  severe outbreak of COVID-19 in the Jails and that the conditions of confinement there amounts to

5  punishment or is excessive in relation to its purpose.  Thus, plaintiffs' reliance on the holdings in

6  these cases is therefore unavailing.

7        Accordingly, the court will deny plaintiffs' request for injunctive relief related to their

8  proposed subclass of medically vulnerable inmates.

9        4.        Social Distancing Policy Arguments

10       The court notes at the outset that plaintiffs are not challenging defendant's social

11 distancing directives as outlined in section 716.3 of TCSD's Coronavirus Prevention and

12 Protection Policy, a copy of which defendant filed with the court on September 8, 2020 in

13 compliance with the TRO issued by this court.  (*See* Doc. Nos. 27 at ¶ 2.a.; 27-1 at 3–4.)  Rather,

14 plaintiffs have challenged defendant's implementation of a different policy than that reflected in

15 those directives, in which defendant reduced inmates' out-of-cell programming time to 30

16 minutes (for Bob Wiley and APTF) and 60 minutes (for South County) for six days each week.

17 (*See* Doc. Nos. 45-6 at ¶¶ 23–25, 27; 45-9 at ¶ 10; 45-8 at ¶ 9.)  Although the decision to limit

18 programming time in this manner was made in mid-July 2020 (*see* Doc. No. 45-9 at ¶ 9), defense

19 counsel was unable to explain at the hearing on the pending motion why this decision was not

20 reflected in the written policy filed with the court on September 8, 2020.  (Doc. No. 51 at 42–44.)

21       Plaintiffs argue in their pending motion that defendant's social distancing policy is

22 punitive and deprives inmates of their right to physical exercise in violation of the Eighth and

23 Fourteenth Amendments and Title 15 of the California Code of Regulations.  (*See* Doc. No. 44 at

24 34–37.)  However, plaintiffs have not alleged such a claim in their complaint nor have they

25 sought leave to amend their complaint to add such a claim.  For this reason, defendant asserts that

26 plaintiffs' argument in this regard "is not a cognizable ground upon which the motion for

27 injunctive relief may be premised."  (Doc. No. 45-1 at 33.)  The court agrees.  *See Devose v.*

28 *Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (holding that "a party moving for a preliminary

1    injunction must necessarily establish a relationship between the injury claimed in the party's

2    motion and the conduct asserted in the complaint"); *Pac. Radiation Oncology, LLC v. Queen's*

3    *Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (adopting the rule of *Devose* and requiring "a

4    sufficient nexus between the claims raised in a motion for injunctive relief and the claims set

5    forth in the underlying complaint itself," and explaining that "[a]bsent that relationship or nexus,

6    the district court lacks authority to grant the relief requested.")[17]  In *Devose*, the Eight Circuit

7    found that the plaintiff's motion was "based on new assertions of mistreatment that are entirely

8    different from the claim raised and the relief requested in his inadequate medical treatment

9    lawsuit," and thus could not "provide the basis for a preliminary injunction" even though those

10   "new assertions might support additional claims against the same prison officials."  42 F.3d at

11   471.

12           While plaintiffs attempt to save their argument in support of injunctive relief on their new

13   claim in reply by pointing to the relief requested in their complaint (Doc. No. 46 at 18), the court

14   finds that the single reference in their operative complaint upon which they rely to be unavailing.

15   Plaintiffs point to only one paragraph in the "Requested Relief" section of their complaint, in

16   which they request that defendant be ordered to "[e]nsure that individuals identified as having

17   COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive

18   setting with continued access to showers, recreation, mental health services, reading materials,

19   commissary, phone and video visitation with loved ones, communication with counsel, and

20   personal property."  (Doc. No. 1 at 47, ¶ 14.)

21   /////

22   /////

23   /////

24   /////

25   /////

26   _____

27   [17]  In *Pacific Radiation Oncology, LLC*, the Ninth Circuit concluded that the district court
     properly ruled that the plaintiff's motion for injunctive relief related to an unpled claim of injury
     to patients' privacy rights was unrelated to its underlying complaint alleging unfair trade

28   practices.  810 F.3d at 638.

Simply put, the issue of whether defendant is complying with Title 15 by providing inmates the required amount of exercise time is not related to plaintiffs' complaint, which seeks relief only related to defendant's COVID-19 policies.  Indeed, apparently recognizing this in their reply, plaintiffs "request the opportunity to submit a supplemental pleading addressing these issues."  (Doc. No. 46 at 20.)  However, plaintiffs' request in this regard does not comply with Federal Rule of Civil Procedure 15, which provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.  The court may permit supplementation even though the original pleading is defective in stating a claim or defense.  The court may order that the opposing party plead to the supplemental pleading within a specified time.

Fed. R. Civ. P. 15(d).  Plaintiffs have not filed a noticed motion requesting permission to file a supplemental pleading; they have instead improperly included such a request in their reply brief.  Thus, the court will deny plaintiffs' request, without prejudice to plaintiffs moving for permission to serve a supplemental pleading, as they indicated at the hearing they intend to do.  (Doc. No. 51 at 48–49.)

Accordingly, the court will deny plaintiffs' request for injunctive relief related to defendant's social distancing policy because such a claim has not been properly alleged in the operative complaint before the court.  However, the court's denial of this request should not be construed as a decision on the substance of the parties' arguments, which the court has not reached or evaluated.

/////

/////

/////

/////

/////

/////

/////

/////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons explained above, plaintiffs' motion for provisional class certification (Doc. No. 43) and motion for a preliminary injunction (Doc. No. 44) are denied without prejudice.[18]

IT IS SO ORDERED.

Dated:   __December 22, 2020__                     _____

UNITED STATES DISTRICT JUDGE

---

[18] On December 21, 2020, while the court was finalizing this order, the parties filed an update with the court regarding recent testing of inmates incarcerated in unit Mod-22 at Bob Wiley. (Doc. Nos. 52, 53.) On the morning of December 21, 2020, plaintiffs filed an *ex parte* application seeking leave to supplement the evidentiary record with the following: (i) the BSCC report for the reporting period of December 6, 2020 through December 12, 2020, showing that 70 inmates in Bob Wiley were tested for COVID-19 and 38 of those inmates tested positive for the virus; (ii) a declaration from an inmate currently housed in Bob Wiley's Mod-22 who tested positive for COVID-19 on December 18, 2020; and (iii) a supplemental declaration from Mr. Dylan Verner-Crist, in which he describes his communications with family members of inmates who are currently incarcerated in Mod-22 and are concerned for their safety. (Doc. No. 52.) In the late afternoon of December 21, 2020, defendant filed a status report providing several details about the recent testing of inmates in Mod-22, the significant percentage of positive test results obtained and the actions that defendant is taking in response. (Doc. No. 53.) It is clear to the court that the parties have not had an adequate opportunity to consider and discuss these latest developments and the actions that TCSD is taking in response. Thus, the court concludes that it is premature for it to weigh in regarding these recent developments or to evaluate the adequacy and reasonableness of defendant's response to them. Most importantly, as recognized above, the circumstances posed by the COVID-19 pandemic are ever-changing and conditions in the Jails are likely to evolve as well. This is why the court is denying plaintiffs' pending motion for a preliminary injunction without prejudice to plaintiffs renewing their request if sufficient evidence of changed conditions and the adequacy of defendant's response thereto becomes available.