JACOB S. KREILKAMP (State Bar No. 248210)
Jacob.Kreilkamp@mto.com
WILLIAM D. TEMKO (State Bar No. 98858)
William.Temko@mto.com
ARIEL T. TESHUVA (State Bar No. 324238)
Ariel.Teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

EMILOU MACLEAN (State Bar No. 319071)
EMacLean@aclunc.org
RYAN MCMURRY (State Bar No. 336116)
RMcMurry@aclunc.org
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
Telephone:    (415) 621-2493

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| Charles Criswell, Levi Johnson, Samuel Camposeco, Adam Ibarra, and California Attorneys for Criminal Justice,<br><br>Plaintiffs,<br><br>vs.<br><br>Michael Boudreaux, in his official capacity as Sheriff of Tulare County,<br><br>Defendant. | Case No. 1:20-cv-01048-DAD-SAB<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>*[Filed concurrently with Declarations of Ariel T. Teshuva; Emilou Maclean; Robert Griefinger; Valentine Ornelas; Samuel Camposeco; Dennis Moreno; Michael Balderas; Jarod Martinez; Gene Frisby; Adam Ibara; and Jordan Alan Ruelas-Alvarez]*<br><br>Judge:    Hon. Dale A. Drozd<br>Date:    November 29, 2021<br>Time:    1:30 PM<br>Crtrm.:    5 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT that on November 29, 2021, or on such date as may be specified by the Court, in the courtroom of the Honorable Dale A. Drozd, United States District Court Judge for the Eastern District of California, located at 2500 Tulare Street, Fresno, CA 93721, Plaintiffs Samuel Camposeco, Adam Ibarra and California Attorneys for Criminal Justice, hereby move for an order granting final approval of the terms of the proposed class action settlement as fair, reasonable, and adequate. Defendant does not oppose final approval of the settlement.

This Motion is based upon this Notice of Motion, the Memorandum of Points and Authorities in support thereof, the attached declarations and exhibits, and all of the papers and pleadings on file in this action, and any further evidence presented to the Court at the time of the hearing.

Respectfully submitted,

DATED:  November 1, 2021        MUNGER, TOLLES & OLSON LLP

By:  */s/ Ariel T. Teshuva*
ARIEL T. TESHUVA
Attorneys for Plaintiffs

# TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ...................................................................................2

    A. Plaintiffs Sued, and Successfully Obtained a Temporary Restraining Order, Based on Defendant's Deliberate Indifference to COVID-19. ................................2

    B. The Court Denied Plaintiffs' Motion for Preliminary Injunction But Noted Serious Deficiencies in Defendant's COVID-19 Response. .....................................3

    C. Plaintiffs Filed a Supplemental Complaint Based on Defendant's Unconstitutional Use of Lockdowns. .......................................................................4

    D. After Lengthy, Arm's-Length Negotiations, the Parties Reached Settlement, Which the Court Preliminarily Approved. ................................................................4

    E. Another Outbreak of COVID-19 Has Engulfed the Jails—and Defendant Has Failed to Respond Adequately to Protect Class Members. ................................5

III. TERMS OF SETTLEMENT AGREEMENT AND STIPULATED MODIFICATION REGARDING MONITORING .............................................13

    A. The Settlement Class ...............................................................................14

    B. Injunctive Relief .....................................................................................14

    C. Monitoring Terms ...................................................................................16

    D. Attorneys' Fees and Costs ......................................................................17

    E. Notice to Class ........................................................................................17

IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT ...........17

    A. The Settlement is Entitled to a Presumption of Fairness .......................................18

    B. The Relief Provided by the Settlement Is Fair, Reasonable, and Adequate.............19

        1. Class Representatives and Class Counsel Have Adequately Represented the Class.................................................................................19

        2. The Proposal Was Negotiated at Arm's Length...............................................21

        3. All Class Members Are Treated Equitably under the Settlement. ...............21

        4. Relief is Adequate Given the Costs, Risks, and Delay of Trial and Appeal. .......................................................................................................22

    C. Distributing Class Relief Will be Effective..............................................................23

    D. The Proposed Attorneys' Fees Are Reasonable Under the Circumstances..............23

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

**TABLE OF CONTENTS**
**(Continued)**

**Page**

V. THE COURT SHOULD APPROVE THE SETTLEMENT DESPITE THE UNDERSTANDABLE CONCERNS REGARDING DEFENDANT'S RESPONSE TO THE OUTBREAK RAISED BY THE OBJECTORS ................................................... 24

    A. Summary of Objections ................................................................. 25

    B. Class Counsel Shares the Objectors' Concerns Regarding Defendant's Failure to Comply with the Settlement Agreement ................................................... 25

    C. To the Extent that the Objectors Raise Concerns Regarding the Terms of the Settlement Agreement, Those Concerns Should Not Preclude Final Approval ................................................... 28

VI. CONCLUSION ................................................... 30

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ahlman v. Barnes,*
  445 F. Supp. 3d 671 (C.D. Cal. 2020) ................................................................................27

*In re Bluetooth Headset Products Liability Litigation,*
  654 F.3d 935 (9th Cir. 2011) .............................................................................................23

*City of Colton v. American Promotional Events, Inc.,*
  281 F. Supp. 3d 1009 (C.D. Cal. 2017) .............................................................................21

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ...........................................................................................18

*Coburn v. City of Sacramento,*
  No. 2:19-CV-00888-AC, 2020 WL 7425345 (E.D. Cal. Dec. 18, 2020) ......................17, 22

*Criswell v. Boudreaux,*
  No. 1:20-CV-01048-DAD-SAB, 2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) .............25, 27

*Cruz v. Sky Chefs, Inc.,*
  No. C-012-02705 DMR, 2014 WL 7247065 (N.D. Cal. Dec. 19, 2014) ............................24

*Duvall v. Dallas Cnty., Tex.,*
  631 F.3d 203 (5th Cir. 2011) .............................................................................................27

*Ellis v. Naval Air Rework Facility,*
  87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ................................19

*Fraley v. Facebook, Inc.,*
  966 F. Supp. 2d 939 (N.D. Cal. 2013) ...............................................................................21

*Garcia v. Los Angeles Cnty. Sheriff's Dep't,*
  No. CV 09-8943 MMM (SHX), 2015 WL 13646906 (C.D. Cal. Sept. 14, 2015) ..............24

*Lareau v. Manson,*
  651 F.2d 96 (2d Cir. 1981) ................................................................................................27

*Linney v. Cellular Alaska P'ship,*
  No. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997),
  aff'd, 151 F.3d 1234 (9th Cir. 1998) .................................................................................18

*Mejia v. Walgreen Co.,*
  No. 2:19-CV-00218 WBS AC, 2020 WL 6887749 (E.D. Cal. Nov. 24, 2020) ...................19

*In re NASDAQ Market–Makers Antitrust Litig.,*
  187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................................24

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal 2004) ................................................................................24

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
 292 F. Supp. 3d 1018 (S.D. Cal. 2017) .....................................................................20

*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982) .....................................................................................18

*Plata v. Newsom*,
 No. 4:01-cv-01351-JST (N.D. Cal. Sept. 27, 2021) .....................................................6

*Rodriguez v. W. Publishing Corp.*,
 563 F.3d 948 (9th Cir. 2009) .....................................................................................23

*Stinson v. City of New York*,
 256 F. Supp. 3d 283 (S.D.N.Y. 2017) ........................................................................29

*In re Syncor ERISA Litig.*,
 516 F.3d 1095 (9th Cir. 2008) ...................................................................................18

*In re Tableware Antitrust Litig.*,
 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ....................................................................21

*U.S. v. Chevron U.S.A.., Inc.*,
 380 F. Supp. 2d 1104 (N.D. Cal. 2005) ....................................................................21

*W. v. City of New York*,
 No. 15 CV 5273-LTS-HBP, 2016 WL 4367969 (S.D.N.Y. Aug. 12, 2016) ..............28

*White v. Experian Info. Solutions, Inc.*,
 803 F. Supp. 2d 1086 (C.D. Cal. 2011)......................................................................24

**FEDERAL STATUTES**

18 U.S.C. § 3006A ...........................................................................................................24

42 U.S.C. § 1983 ...............................................................................................................2

42 U.S.C. § 1997e .............................................................................................................24

Fed. R. Civ. P. 23(e)(2) ....................................................................................................18

Prison Litigation Reform Act...........................................................................................17, 24

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Amendment IV ..............................................................................................2

U.S. Const., Amendment VIII ...........................................................................................2

**OTHER AUTHORITIES**

Criminal Justice Act Guidelines, Ch. 2, § 230.16 *Hourly Rates and Effective Dates in Non-Capital Cases*, https://www.uscourts.gov/rulespolicies/judiciary-policies/cja-guidelines/chapter-2-ss-230-compensation-and-expenses#a230_16......................24

Thomas J. Aragon, California Department of Public Health, *Order of the State Public Health Officer Correctional Facilities & Detention Centers Health Care Worker Vaccination Order* (Aug. 19, 2021), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx .............................................................6

Tulare County Sheriff's Office, *HAPPENING NOW: Sheriff Boudreaux Providing Update on Current Covid Numbers & Protocols in Jails*, FACEBOOK (Oct. 21, 2021, 1:08 PM), https://fb.watch/8_KWWnAeio/ .......................................................6

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

## I. INTRODUCTION

Plaintiffs filed this class action lawsuit in late July 2020 on behalf of incarcerated persons in the Tulare County Jails ("Jails")[1] to address Defendant Sheriff Michael Boudreaux's deliberate indifference to the risk of COVID-19 and his unconstitutional attorney visitation policy. Plaintiffs filed a Supplemental Complaint in March 2021 alleging Defendant had failed to respond adequately to a COVID-19 outbreak in the Jails and had imposed an unconstitutional lock-down policy in response to COVID-19. Now Plaintiffs respectfully move for this Court to grant final approval of a Settlement Agreement negotiated between the Parties which provides important protections for incarcerated people from COVID-19. The Settlement Agreement requires Defendant to implement COVID-19 mitigation policies, educate class members about COVID-19 vaccines, provide public information about COVID-19 in the jails; grant access to an independent expert to make recommendations regarding Defendant's compliance with the Settlement Agreement; and ensure adequate out-of-cell time.

This Motion comes in the midst of yet another serious COVID-19 outbreak at the Jails. At least 95 class members have been infected with COVID-19; one person with COVID-19 has died, though Defendant contests that COVID was a cause of death; one other class member has been hospitalized; and both detained class representatives are among those infected. Defendant delayed testing and isolating symptomatic class members, delayed implementing surveillance testing outside of the modules where there were known COVID-19 infections, failed to consistently isolate COVID-positive class members, and continues to jointly house COVID-positive and COVID-negative individuals in shared cells against clear public health guidance and the express terms of the Settlement Agreement. Three Objectors, including Class Representative Samuel Camposeco (who here withdraws his objection), have raised understandable concerns about Defendant's response to the outbreak. These concerns are largely the result of Defendant's failure

---

[1] The term "Tulare County Jails" refers to the three facilities currently managed by the Tulare County Sheriff's Office: Bob Wiley Detention Facility, Pre-Trial Facility, and South County Detention Facility. *See* https://tularecounty.ca.gov/sheriff/index.cfm/divisions/detentions1/.

to comply with the Settlement Agreement. Thus, the presence of these Objections should not delay approval of the Settlement Agreement.

The Objections, and the ongoing outbreak, highlight the need for this Court to act swiftly to grant final approval of the Settlement Agreement, and for the Defendant to ensure its effective implementation. Although the parties have negotiated in good faith throughout the outbreak and will continue to do so, Defendant's response to the outbreak has made clear that further disputes regarding enforcement and modification of the Settlement Agreement may require the Court's intervention. To avoid disputes regarding the ripeness of any such motions, Class Counsel request that the Court expeditiously enter a final approval order.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Sued, and Successfully Obtained a Temporary Restraining Order, Based on Defendant's Deliberate Indifference to COVID-19.

On July 29, 2020, Plaintiffs brought this action on behalf of a prospective class of people incarcerated at the Tulare County Jails at severe risk of harm due to COVID-19. Plaintiffs were comprised of four then-incarcerated individuals—Samuel Camposeco and Adam Ibarra, who are still in Defendant's custody; and Levi Johnson and Charles Criswell, who are no longer in Defendant's custody—and one organization, California Attorneys for Criminal Justice. In the complaint, Plaintiffs raised claims against Defendant Sheriff Michael Boudreaux in his official capacity pursuant to 42 U.S.C. § 1983 for violations of the Fourteenth and Eighth Amendments. Plaintiffs alleged that Defendant failed to prevent the spread of COVID-19 in the Jails by failing to implement—and indeed obstructing—adequate policies and practices like mask-wearing and physical distancing. Plaintiffs also alleged that Defendant's attorney-visitation policy, which restricted class counsel from meeting with current or prospective clients, was unconstitutional and implemented in response to their investigation of COVID-19-related conditions in the Jails. *See generally* ECF No. 11 at 2-11; ECF No. 26 at 11-18.

On August 12, 2020, Plaintiffs applied for a TRO based on these constitutional violations. *See* ECF No. 11. On September 2, 2020, the Court held that Plaintiffs demonstrated a likelihood of success on their claims and ordered a number of emergency relief measures. ECF No. 26 at 47-49

(ordering Defendant to memorialize a social distancing policy, an isolation, quarantine, and observation policy, a mask policy, and a revised legal visitation policy; and to produce additional data). The Court recognized that Defendant "completely failed to address . . . how social distancing and testing are not reasonable and available here, especially in light of the CDC Guidelines recommending that testing and social distancing measures be taken in correctional facilities to abate the risks of COVID-19." *Id.* at 33. The Court also provisionally certified a class of "[a]ll people who are now, or in the future will be, incarcerated in the Tulare County Jails." *Id.* at 47.

**B.    The Court Denied Plaintiffs' Motion for Preliminary Injunction But Noted Serious Deficiencies in Defendant's COVID-19 Response.**

On November 3, 2020, Plaintiffs moved for a preliminary injunction on three grounds: 1) that Defendant failed to test the overwhelming majority of symptomatic persons; 2) that Defendant failed to identify or protect medically vulnerable incarcerated people from the increased risk of severe illness and death from COVID-19; and 3) that Defendant's social distancing policy limited out of cell time to no more than thirty minutes per day. *See* ECF No. 44 at 1-3. While the Court's preliminary injunction ruling was pending, a TCSO staff person who worked in the kitchen tested positive for COVID-19. Defendant's response to this staff infection ultimately resulted in at least 60 incarcerated people testing positive for the virus. *See* ECF Nos. 52, 53.

On December 22, 2020, the Court denied Plaintiffs' motion for a preliminary injunction without prejudice and did not factor the December 2020 outbreak into its decision. ECF No. 55 at 40, n.18. Regarding testing, the Court found that Defendant's rate of testing symptomatic incarcerated people was "shockingly low," but that Plaintiffs were unlikely to succeed on this claim in light of Defendant's other preventative measures taken as a result of the TRO. *Id.* at 35. Regarding Defendant's out-of-cell time policy, the Court declined to rule on the substance of those claims and suggested that Plaintiffs file a supplemental pleading. *Id.* at 39.

**C.      Plaintiffs Filed a Supplemental Complaint Based on Defendant's Unconstitutional Use of Lockdowns.**

On March 29, 2021, following a noticed motion and the Court's order granting leave, Plaintiffs filed a Supplemental Complaint alleging that Defendant's "social distancing" policy violated incarcerated persons' constitutional rights to exercise, to be free from cruel and unusual punishment, and to receive procedural due process. ECF No. 63 at 28-29. Plaintiffs also alleged that Defendant's response to the December 2020 outbreak was inadequate, including by Defendant failing to conduct adequate testing to determine the scope of the outbreak. *Id.* at 6.

**D.      After Lengthy, Arm's-Length Negotiations, the Parties Reached Settlement, Which the Court Preliminarily Approved.**

Following four lengthy settlement conferences with Judge McAuliffe, the parties reached a tentative agreement. (*See* Ex. 1 (Teshuva Decl.) ¶ 3.) The four named individual Plaintiffs participated in some or all of the settlement conferences. *Id.*

On September 29, 2021, the Court granted preliminary approval of the settlement. ECF No. 88. The Court certified the following class for settlement purposes: "All people who are currently incarcerated in the Tulare County Jails or will be incarcerated in the Tulare County Jails at any point before the Termination Date of the Settlement Agreement." *Id.* at 4-5. The Court also appointed Munger, Tolles & Olson and the ACLU of Northern California Class Counsel. *Id.* at 10.

The Court concluded that the Settlement, which was negotiated at arm's-length with the aid of a neutral federal magistrate judge, was procedurally fair. *Id.* at 6. It also concluded that the Settlement was substantively fair: it held that the class representatives and class counsel adequately represented the class, and that the Settlement treated all class members equally. *Id.* at 7. It also held that "[t]he terms of the settlement agreement provide comprehensive protection [to class members] against the threat of COVID-19," and noted that the parties could agree to extend, or the Court could order the extension of, the settlement term should it prove necessary. *Id.* The Court also approved the attorneys' fees provision. *Id.* at 7-8.

**E.** **Another Outbreak of COVID-19 Has Engulfed the Jails—and Defendant Has Failed to Respond Adequately to Protect Class Members.**

In early October, the Jails remained vulnerable to an outbreak of COVID-19 with serious effects on morbidity and mortality. Three safe and effective vaccines for COVID-19 are currently available. Yet every indication is that Defendant has failed to effectively offer and administer vaccines to people in custody at the Jails. The Jail administered fewer than 40 initial vaccine doses in each of the past four weeks, including only a single first dose in the most recent week and fourteen first doses in the week prior. (Ex. 1 (Teshuva Decl.) ¶ 12 Exs. N-Q.)[2] These numbers are particularly notable in light of the County's low vaccination rate of approximately 43 percent, which suggests that many of the hundreds of people who are booked into the Jails on a weekly basis are unvaccinated. (*Id.* ¶ 13.) Defendant's publicly reported statistics seem to confirm poor vaccine outreach by TCSO and not just vaccine resistance from class members. While Defendant has refused to share precise and comprehensive statistics regarding vaccination, Defendant has reported that fewer than 23 class members in each of the past four weeks have *declined* vaccinations—suggesting a large number of class members who are unvaccinated are not registered as *either* accepting or declining to be vaccinated. (*Id.* ¶ 12 Exs. N-Q.)[3] In an October 25 grievance form, a class member reported repeatedly asking for a second vaccine—including in multiple sick call slips—but never receiving the vaccine. (*Id.* ¶ 14 Ex. R.) Incarcerated people also report that vaccine outreach from Jail officials has been poor. (*See, e.g.*, Ex. 4 (Ornelas Decl.) ¶ 9.) In September, Class Counsel identified for Defendant numerous class members who wanted to be vaccinated but were never asked by TCSO staff whether they were willing to be vaccinated. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex. L [Harding Sept. 3 & 12, 2021 emails].) Moreover, only around half of Jail staff are vaccinated despite a statewide vaccine mandate for employees of carceral institutions

---

[2] Thirty-four first doses were provided to people in custody for the week ending October 11; 39 first doses for the week ending October 18; only 14 first doses for the week ending October 25; and only a single first dose for the week ending November 1.

[3] Twenty-two vaccine declinations for the week ending October 11; 7 for the week ending October 18; 19 for the week ending October 25; and only one declination for the week ending November 1.

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

who deliver health-care services.[4] The particular infectiousness and virulence of the Delta variant currently active in the United States, the unique vulnerability of carceral institutions to COVID-19, and the role of jail outbreaks in exacerbating community spread, make taking precautions to mitigate the risk of COVID-19 in jails particularly important. (Ex. 3 (Greifinger Decl.) ¶¶ 12, 14, 31.)

In the face of a new outbreak, which started in October 2021, Defendant failed to react quickly and effectively, further endangering class members. (*Id.* ¶ 34.) Defendant also failed to adequately prepare for and take steps to prevent this and likely future outbreaks.

On October 11, 2021, Defendant notified Plaintiffs of an outbreak at the Jail. By that time, the Jail had already identified 31 COVID-positive individuals in three units at the Bob Wiley Facility. This includes one class member who died on October 8; Defendant disclosed that a post-mortem COVID-19 test for this individual was positive. Another class member was later hospitalized. To date, the outbreak has infected at least 95 class members.

The October 2021 outbreak came to light only after class representative Samuel Camposeco demanded that he be tested for COVID-19 symptoms. Mr. Camposeco began experiencing symptoms on October 5. Over the next few days, Mr. Camposeco's symptoms worsened, and he filed repeated sick call slips and made verbal requests for a COVID-19 test. (Ex. 5 (Camposeco Decl.) ¶¶ 5-6.) Although Mr. Camposeco was already experiencing serious symptoms and had repeatedly demanded that he be tested, TCSO failed to test him. (*Id.* ¶ 6.) Instead, on October 8, TCSO deputies transported Mr. Camposeco to court—despite that he told

---

[4] Tulare County Sheriff's Office, *HAPPENING NOW: Sheriff Boudreaux Providing Update on Current Covid Numbers & Protocols in Jails*, FACEBOOK (Oct. 21, 2021, 1:08 PM), https://fb.watch/8_KWWnAeio/ (admitting that 50% of Jail staff were vaccinated as of October 21) ("10/21/21 Press Conference"); Thomas J. Aragon, California Department of Public Health, *Order of the State Public Health Officer Correctional Facilities & Detention Centers Health Care Worker Vaccination Order* (Aug. 19, 2021), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Correctional-Facilities-and-Detention-Centers-Health-Care-Worker-Vaccination-Order.aspx (statewide vaccine mandate). Although it is not necessary to address this issue for the purposes of this motion, it is Class Counsel's position that, given how health care services are delivered in the Tulare County Jails, all TCSO staff who interact with class members are subject to the vaccine mandate. *See id; see also Plata v. Newsom*, No. 4:01-cv-01351-JST (N.D. Cal. Sept. 27, 2021) (ECF No. 3684) (ordering mandatory vaccination for California prison staff members).

them that he suspected he had COVID-19. (*Id.* ¶ 7.) Mr. Camposeco was not the only person experiencing symptoms whom TCSO staff transported to court that week—Kevin Brown, the class member who later died, was experiencing symptoms and was transported to court around the same time. (Ex. 6 (Moreno Decl.) ¶¶ 7, 9.)[5] From the accounts of class members, COVID-19 was already circulating in the Jails early in the week of October 4. (*See* Ex. 7 (Balderas Decl.) ¶ 3.)

Mr. Camposeco was finally tested for COVID-19 on October 9, after returning from court. (Ex. 5 (Camposeco Decl.) ¶¶ 11-13.) After he was tested, Mr. Camposeco was isolated, but was not told the reason why. (*Id.* ¶ 13.) He only later learned that he had tested positive for COVID-19. Defendant tested everyone else in Module 42—where Mr. Camposeco was housed—and identified 28 other COVID-positive individuals in that Module. Defendant also identified one class member in Module 41 who tested positive after identifying himself as symptomatic and tested everyone in that Module. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex. K [Pisano 10/11/21 email].)

One class member in Module 21, identified as Kevin Brown, died on October 8 and was confirmed COVID-positive after his death. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex. K [Pisano 10/11/21 email].) On October 13, in a meet and confer, Defendant informed Plaintiffs that the TCSO coroner "ruled out COVID as a cause of death and contributing factor in the death" of the class member who died in custody, but did not release the coroner's report or any other information which would support this finding. (*Id.* ¶ 11 Ex. M [MacLean 10/22/21 letter].) Defendant has yet to provide an autopsy report or any documentation regarding his death. Reports of class members confirm, however, that Mr. Brown reported COVID-related symptoms, believed he had COVID, and sought medical attention in the days prior to his death. The day before he died, Mr. Brown told his neighbor in Module 21, Dennis Moreno, that he was feeling very ill and believed that he had COVID-19. (Ex. 6 (Moreno Decl.) ¶¶ 7, 9.) He had gone to court on the same day and informed the bailiff about his illness. (*Id.* ¶ 7.) Mr. Brown reported to a fellow class member that

---

[5] Defendant has identified court as the most likely cause of the outbreak. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex. H [Pisano 10/27/21 email].) Even if true, this does not eliminate Defendant's responsibility for its spread. Defendant is responsibility for screening class members for illness prior to their transport to court and apparently failed to identify numerous symptomatic and COVID-positive individuals.

he had COVID symptoms and repeatedly asked for medical assistance from jail staff. (*Id.*) No help came. The next day, Mr. Brown asked Mr. Moreno and other class members for Tylenol and prayers. (*Id.* ¶ 10.) Later that night, Mr. Brown died. (*Id.* ¶¶ 11-13.)

Upon being notified by Defendant of the outbreak, Class Counsel immediately requested urgent measures to ensure compliance with the Settlement Agreement—specifically individual or cohorted isolation of all individuals with confirmed COVID-19; prompt testing of all symptomatic persons and close contacts; quarantine of all close contacts; individual isolation of all symptomatic individuals with suspected COVID-19; ongoing serial testing throughout the outbreak; and rapid surveillance testing within 24 hours for everyone in the facility. (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex. K, at 7-10 [MacLean 10/12 email].) As expert witness Dr. Robert Greifinger, a physician who previously served as the Chief Medical Officer for the New York State Department of Corrections, has confirmed "timely and effective quarantine and isolation are essential to stop the spread of COVID-19" and "adequate prevention and quick and effective containment" are highly important "in the event of an outbreak" given the "inherent[] high risk" of jails. (Ex. 3 (Greifinger Decl.) ¶¶ 19-25, 27, 31.) But Defendant was slow to implement mitigation strategies, and never implemented some at all. For example, Defendant did not commit to providing a rapid test of everyone in any facility until October 21, 2021—nine days after Class Counsel first urged that such tests should be given and twelve days after the Jails learned that they had their first positive case. (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex. K, at 7-11.) Defendant has not promptly tested and isolated symptomatic class members, has not consistently isolated class members who test positive for COVID-19, and has not committed to ongoing serial testing to last through the duration of the outbreak. (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex H [MacLean 10/19/21 email, MacLean 10/26/21 email & Pisano 10/27/21 email].)

Defendant's slow response has had consequences. COVID spread rapidly through the facility.[6] On October 21, fewer than two weeks after the first individuals tested positive,

---

[6] On October 15, Defendants reported that the number of confirmed COVID-positive individuals in custody increased to at least 46, not including the deceased, and the number of affected units had increased to four. On October 19, Defendant reported that the number of confirmed COVID-positive individuals in custody increased to 74 following the first round of serial testing of affected

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

Defendant confirmed that 86 class members were infected with COVID, including the overwhelming majority of class members in Module 42. (*Id.*) Already by October 21, class members tested positive for COVID in five different Bob Wiley Modules—and in one unit in South County.

On the same day—at least twelve days into the outbreak, and the day after Class Counsel filed a public records request necessitated by Defendant's refusal to share adequate information regarding the outbreak—Sheriff Boudreaux held a press conference concerning the outbreak. Only at this press conference did Defendant commit to test everyone in custody and invite a state public health team to intervene. (*See* Ex. 1 (Teshuva Decl.) Ex H [Pisano 10/21/21 10:57 AM email].) [7] He also misrepresented the breadth and severity of the outbreak. While he acknowledged that one class member was hospitalized due to COVID-19 at that time, Sheriff Boudreaux nonetheless asserted that "none of the [78 inmates who had tested positive through contact tracing at the time of the press conference] had symptoms of COVID-19, and that none of them was having the adverse effects of COVID." (10/21/21 Press Conference.) He went on to declare that "78 of the individuals are completely asymptomatic." (*Id.*)

Meanwhile, numerous class members reported that they and others experienced COVID-19 symptoms (including severe symptoms), were not promptly tested, and were not receiving adequate care.  (Ex. 8 (Martinez Decl.) ¶ 8; Ex. 9 (Frisby Decl.) ¶ 5; Ex. 4 (Ornelas Decl.) ¶ 10; Ex. 6 (Moreno Decl.) ¶ 13.) While Defendant Boudreaux maintained that at most only four COVID-positive individuals were symptomatic,[8] class members reported widespread symptomatic

units. On October 21, Defendant corrected these figures and reported that, in fact, 84 individuals had tested positive after the 7-day serial testing. (*See* Ex. 1 (Teshuva Decl.) ¶ 11 Ex. M [MacLean 10/22/21 letter].)

[7] This is particularly concerning, as experts have asserted that in responding to COVID-19 in a congregate setting, speed and frequency of testing with high levels of accuracy are critical. Delay in test results can lead to people becoming infected while results are pending; quick identification and isolation of positive cases are of very high importance. During outbreaks in congregate settings, even a delay of 24-48 hours can make test results outdated and limit their usefulness. (Ex. 3 (Greifinger Decl.) ¶ 31.)

[8] Counsel for Sheriff Boudreaux asserted that three class members were symptomatic—none in Module 42—and then subsequently confirmed that one class member was hospitalized. (*See* Ex. 1 (Teshuva Decl.) ¶ 11 Ex. M [MacLean 10/22/21 letter]; *Id.* ¶  [Ex. H [Pisano 10/19/21 email] (only identified symptomatic individuals are Mr. Camposeco, one class member in Module 41,

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

cases in Module 42. (Ex. 8 (Martinez Decl.) ¶ 5; Ex. 4 (Ornelas Decl.) ¶¶ 3-5; Ex. 9 (Frisby Decl.) ¶¶ 4-6; Ex.10 (Ibarra Decl.) ¶¶ 5-6, 10; Ex. 11 (Ruelas-Alvarez Decl.) ¶¶ 3, 6; Ex. 6 (Moreno Decl.) ¶ 6-8.) Class members reported chills, strained breathing, extreme fatigue and weakness, severe headaches, and debilitating coughing fits. (*Id.*) COVID-positive class members described how they felt ignored and disregarded by staff as their symptoms went unmonitored. (Ex. 8 (Martinez Decl.) ¶¶ 4-9; Ex. 9 (Frisby Decl.) ¶¶ 5, 9; Ex. 4 (Ornelas Decl.) ¶ 10; Ex. 6 (Moreno Decl.) ¶¶ 7-9.) In Module 42, one COVID-positive individual, Michael Balderas, repeatedly submitted sick call slips and begged for help but received little response. (Ex. 9 (Frisby Decl.) ¶¶ 5-8; Ex. 10 (Ibarra Decl.) ¶¶ 10-13.) Mr. Balderas reported that he "was afraid to go to sleep every night because [he] wasn't sure if [he] would wake up." (Ex. 7 (Balderas Decl.) ¶ 8.) On October 18, he collapsed to the floor "gasping for air"; medical staff took his vitals and returned him to his cell. (*Id.* ¶ 9.) When a doctor came through the unit the next day, Mr. Balderas was removed and taken to the hospital for pneumonia and hospitalized for ten days. (*Id.* ¶¶ 10-11; Ex. 9 (Frisby Decl.) ¶¶ 11-12.)  He lost over thirty pounds and continues to experience symptoms. (Ex. 7 (Balderas Decl.) ¶¶ 10-12.) The impact of this outbreak has been widespread and undercounted. Numerous symptomatic individuals were not included in Defendant's report of the total number of symptomatic people in custody. Defendant has confirmed, but not explained, this discrepancy. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex.  H, at 7, 9 [MacLean 10/26/21 email & Pisano 10/27/21 email].)

Further, class members also reported expressing to jail staff that they exhibited COVID symptoms in the days prior to Mr. Camposeco's positive test and Mr. Brown's death; but that these complaints were not promptly addressed. (Ex. 10 (Ibarra Decl.) ¶¶ 6-8 (symptoms on or around October 5 and notification to staff on October 8 & 9).) Michael Balderas, who was ultimately hospitalized for COVID-19, reported witnessing other class members who were "visibly sick" and requesting medical attention "[e]arly in the week of October 4." (Ex. 7 (Balderas Decl.) ¶ 3.) The failure to identify, isolate and test symptomatic class members almost certainly contributed to the growth of the outbreak. (Ex. 3 (Greifinger Decl.) ¶¶ 6-8.)

and one class member in Module 11).*Id.* .) *Id.* ¶ 10 Ex. H [Pisano 10/21/21 4:57 PM email] (hospitalization).)

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

Most troubling, numerous class members reported that, despite testing negative for COVID-19, they were "locked down" in two-person cells with class members confirmed to be COVID-positive. (Ex. 9 (Frisby Decl.) ¶¶ 4, 8; Ex. 4 (Ornelas Decl.) ¶ 3; Ex. 10 (Ibarra Decl.) ¶¶ 9-10; Ex. 11 (Ruelas-Alvarez Decl.) ¶ 6.) According to Dr. Greifinger, this practice, which is "against overwhelming and clear medical and public health guidance" "all but guarantee[d] increased transmission with associated health and mortality risks." (Ex. 3 (Greifinger Decl.) ¶¶ 21, 34.)

The result is predictable, and tragic: The vast majority of incarcerated people in Module 42 ultimately became infected with COVID-19. (Ex. 1 (Teshuva Decl.) ¶ 11 Ex. M [10/22/21 letter].) Numerous class members who had tested negative for COVID-19 subsequently tested positive after being left in confined cells with confirmed COVID-positive cellmates. (Ex. 9 (Frisby Decl.) ¶¶ 4, 7-8; Ex. 4 (Ornelas Decl.) ¶ 5; Ex. 10 (Ibarra Decl.) ¶¶ 9-11.) Class Representative Adam Ibarra, for instance, tested positive on October 10. His cellmate tested negative, but was never moved from the small six-by-eight foot cell the two of them shared. (Ex. 10 (Ibarra Decl.) ¶¶ 9-10; ECF 11-16 ¶ 3.) Inevitably, when Mr. Ibarra's cellmate was tested again the following week, the cellmate tested positive. (*Id.* ¶¶ 10-11.) Another class member, Gene Frisby, tested negative early in the outbreak, while his cellmate tested positive. A nurse who came to check on Mr. Frisby's cellmate, who was experiencing very serious symptoms such as difficulty breathing, wondered why Mr. Frisby wasn't moved. (Ex. 9 (Frisby Decl.) ¶ 6.) Despite submitting a grievance form, Mr. Frisby was never moved, and after a week of confinement with his COVID-19 positive and extremely symptomatic cellmate, Mr. Frisby predictably tested positive. (*Id.* ¶¶ 7-8.) Class member Jordan Alan Ruelas-Alvarez tested negative but reported also being kept in the same small cell with his COVID-positive and highly symptomatic class member. (Ex. 11 (Ruelas-Alvarez Decl.) ¶¶ 6-8.)

On October 19, Plaintiffs alerted Defendant to the co-housing of COVID-positive and COVID-negative class members, in clear contravention of CDC guidance and TCSO Policy 716, both of which are incorporated expressly into the Settlement Agreement. (Ex. 1 (Teshuva Decl.)

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

Ex. H [10/19/21 email].) Yet the practice persists.[9] Defendant ultimately confirmed that this was their practice in light of the large (and growing) number of COVID-positive people in Module 42, and claimed it was confined to that module.[10]

Defendant has asserted that co-housing COVID-positive and COVID-negative class members was necessary in light of the large number of COVID-positive individuals in Module 42. (Ex. 1 (Teshuva Decl.) ¶ 10 Ex. H, at 1, 10 [Pisano 10/27/21 email].)[11] Defendant also confirmed that this was not the first time that TCSO knowingly failed to isolate confirmed COVID-positive class members, but indeed that this was their practice in response to the December 2020 and June 2021 outbreaks. (*Id.*) Despite co-housing COVID-positive and COVID-negative class members for the past three weeks, Defendant has repeatedly insisted that he is complying with CDC Guidance and the Settlement Agreement. (*See, e.g.*, *Id.* Ex. H [Pisano 10/27/21 email] "TCSD is complying with the settlement agreement and CDC guidelines" and "this strategy [to co-house COVID-positive and COVID-negative class members] is consistent with CDC guidance"); *Id.* Ex. H [Pisano 10/29/21 3:10 pm email] ("This decision was made in consultation with Dr. Haught, and it was based on CDC guidance for how to handle a situation like what occurred in Mod 42.").)[12] Relying on his expertise and CDC guidance, Dr. Greifinger has confirmed that this practice violates "the most basic public health standards" and is not justified by the exigent circumstances of this outbreak or the layout of the facilities: "Nothing I have seen regarding the

---

[9] On October 21, Defendant responded to Class Counsel's demand that this practice be investigated and rectified by noting that "decisions of where to house inmates who test positive outside of intake is made by TCSD on a case-by-case basis," and that because there were "too many positives to move everyone to isolation," TCSD has made the decision to turn the entire module into a lockdown unit and will do "its best to keep those who test positive separated from those who test negative within the module." Defendant noted that "this is exactly how the incident in December 2020 was handled." (Ex. 1 (Teshuva Decl.) Ex. M [Pisano 10/21/21 email].)

[10] *Id.*

[11] Defendant has not explained how the facility structure does not allow for the isolation of COVID-positive individuals. In fact, TCSO has confirmed that it has isolation and quarantine space sufficient for 197 individuals. (*See, e.g.*, *id.* Ex. H [Pisano 10/27/21 email].)

[12] Upon learning of the outbreak, class counsel immediately sought confirmation that Defendant was complying with CDC Guidance, as required by the Settlement Agreement, and referenced in particular that the "Facility [must] isolate (individually) individuals with suspected COVID-19" and "isolate (individually or cohorted) individuals with confirmed COVID-19." (Ex. 1 (Teshuva Decl.) Ex. K [MacLean 10/12/21 email], Ex. K [MacLean 10/14/21 email].)

-12-

facilities and this particular outbreak should require authorities to ignore the most basic public health standards in correctional facilities which urge prompt identification and separation of individuals who have an infectious disease from those who do not have an infectious disease." (Ex. 3 (Greifinger Decl.) ¶ 36.)[13]

At the time of this filing, Defendant has confirmed at least 95 class members who have tested positive, in Bob Wiley Modules 11, 21, 22, 31, 41, and 42; and South County Units 1C and 2C.[14]

## III. TERMS OF SETTLEMENT AGREEMENT AND STIPULATED MODIFICATION REGARDING MONITORING

If effectively implemented, the terms of the parties' Settlement Agreement for the Proposed Settlement Class ensure that class members are meaningfully protected from the risk that COVID-19 poses to their health and safety. The Settlement Agreement defines the class consistent with the class certified by the Court in the TRO; and has four categories of substantive terms: (1)

---

[13] The CDC Guidance for Correctional and Detention Facilities concerning COVID-19 is clear that isolation of COVID-positive individuals is an "essential management strategy," *including* where there are challenging spatial constraints: "If there is an individual with suspected COVID-19 inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include *placing individuals with suspected or confirmed COVID-19 under medical isolation,* quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE. . . Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to *ensure that individuals with suspected COVID-19 will be effectively isolated,* evaluated, tested (if indicated), and given care." CDC, Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, rev'd June 9, 2021 (emphasis added).

[14] The numbers reported by Defendant on the Dashboard, in affirmative reports to Class Counsel, and in records produced in response to public records requests have been inconsistent. For instance, the Dashboard identifies 101 COVID-positive class members outside of intake in the current outbreak (through today's public Dashboard report) whereas Defendant has reported 96 COVID-positive class members in emails to counsel. It is also difficult to ascertain exact numbers because of the manner of reporting. For instance, Defendant does not always clarify whether reports are of new positive tests, whether they include the COVID-positive deceased class member, and how refusals are calculated. However, this figure is the cumulative reports of newly positive COVID tests of class members provided by Defendant's counsel. This includes at least 86 people reported COVID-positive and elaborated in Plaintiffs' Oct. 21 letter to Defendant (Ex. 1 (Teshuva Decl.) Ex. M), five people who were reported on October 27 to have tested positive (one in Module 42, three in Module 21, and one in Module 22 (including two with symptoms) (*id.* Ex. H at 4); and three class members reported on October 29 to have tested positive (two in Module 11 and one in South County Unit 2C) (*id.* Ex. J).

-13-

injunctive relief terms that require Defendant to implement policies to guard against COVID-19; (2) terms aimed at monitoring implementation, including expert site visits and regular public reporting by Defendant; (3) attorneys' fees and expenses; and (4) terms that ensure adequate notice to class members. As is described below, the parties have agreed to an alternate monitor and to an extension of the monitoring period due to the monitor's unforeseen health crisis.

### A. The Settlement Class

The Settlement Class is defined as: "All people who are currently incarcerated in the Tulare County Jails or will be incarcerated in the Tulare County Jails at any point before the Termination Date of the Settlement Agreement." (Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 6.2.) This definition mirrors the class definition the Court previously certified in its TRO, with the addition of the Termination Date of the Settlement Agreement. *See* ECF No. 26 at 47.

### B. Injunctive Relief

The Settlement Agreement requires Defendant to implement policies to meaningfully protect incarcerated persons in the Jails against the risk of serious illness or injury from COVID-19. Defendant is required to do the following:[15]

Masks: Defendant will maintain a mask policy, consistent with, among other things, the policy implemented in response to the Court's TRO and CDC Guidance. (Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 3.1.)

Social Distancing: Defendant will maintain a social distancing policy consistent with, among other things, the policy implemented in response to the Court's TRO and CDC Guidance. Defendant will also provide incarcerated persons with access to meaningful amounts and types of reading materials. (*Id.* ¶ 3.2.)

---

[15] The summary of terms here is not complete and paraphrases the terms in the attached Settlement Agreement. (*See id.* Ex. A.) The Settlement Agreement specifies that Defendant may "continue to" implement some terms in acknowledgment that Defendant may already be complying with some terms. For clarity, this summary does not include that language. The summary is not intended to supersede or conflict with in any way the terms as written in the Settlement Agreement, whose terms will govern, except where specified.

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

Quarantine/Isolation:  Defendant will maintain a quarantine and isolation policy in the Jails for incarcerated persons and staff who test positive for COVID-19 or who have been exposed to a positive case. This policy will be consistent with, among other things, the policy implemented in response to the Court's TRO and CDC Guidance. (*Id.* ¶ 3.3.)

Testing and Screening:  Defendant will maintain a testing policy for incarcerated persons and staff—consistent with CDC Guidance, and including screening and testing all incarcerated persons upon entry to the Jails and re-testing at Day 14, and testing symptomatic incarcerated persons and staff when medically appropriate. (*Id.* ¶ 3.4.)

Contact Tracing:  Defendant will contact trace, test, and/or quarantine following any introduction of COVID-19 in the Jails consistent with the policy implemented in response to the Court's TRO and the CDC Guidance. (*Id.* ¶¶ 3.5, 3.6.) This includes contact tracing, testing, and/or quarantining or isolating when there is a single exposure or positive test result outside of the intake process. Policy Guidance, Sec. 716.4, ECF No. 28-1. All close contacts or confirmed positive class members are housed in an Isolation Unit, which "is a distinct and separate set of cells located in the Adult Pre-Trial Facility." Policy Guidance, Sec. 716.4.1, ECF No. 28-1 . Close contacts will be held "separately from isolation inmates," "monitored by Wellpath daily," and "tested at day(s) 1, 7, and 14." Policy Guidance Sec. 716.4.2, ECF No. 28-1. Any quarantined individuals who test positive "will be moved to the isolation tier." *Id.* Any exposed staff must quarantine at home. (Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 3.6(b).)

Out-of-Cell Time:  Defendant will provide at least two hours out-of-cell time per day for persons in the General Population and at least 45 minutes per day for those outside the General Population, including persons who are new to the Jails and must quarantine for two weeks. The agreement allows Defendant some discretion to address "exigent safety and security concerns or operational issues that may require reducing such out-of-cell time." (*Id.* ¶ 3.7.)

Attorney Visitation Policy:  Defendant will ensure that civil and criminal counsel have the ability to promptly (i.e., within two days of a request) have confidential remote meetings with incarcerated persons and ensure that there is no intimidation of, or retaliation against, incarcerated persons who speak with counsel. (*Id.* ¶ 3.9.)

Vaccines:  Defendant will offer and provide the COVID-19 vaccine to all incarcerated persons and staff, including pregnant individuals, and provide a vaccine record upon release from the Jails. Defendant will also continue to offer the seasonal flu vaccine during flu season. (*Id.* ¶ 3.10.)

Vaccine Education:  Defendant will provide vaccine educational materials to incarcerated persons and staff, including certain "Amend" materials prepared by the University of California San Francisco for use in detention facilities. (*See id.* Ex. A to the Agreement.)  Defendant will ensure that a public health nurse visits the Jails once every two weeks to answer vaccine-related questions; and ensure that Wellpath staff are available at all times to answer vaccine-related questions. (*Id.* ¶ 3.10.)

Medically Vulnerable Individuals:  Defendant will track and provide routine physical exams for all "chronic care" incarcerated persons. (*Id.* ¶ 3.11.)

### C.     Monitoring Terms

The proposed Settlement Agreement includes the following terms aimed at monitoring Defendant's compliance with the Settlement Agreement.

Posting of Information:  Defendant will maintain, and update weekly, a "dashboard" that provides various information about the status of tests and vaccines in the Jails. Defendant must also notify class counsel "as soon as reasonably possible" of any class member testing positive outside of intake, and any class member "exposed" to COVID-19 while in custody. (*Id.* ¶ 3.8.)

Expert Oversight:  The parties agreed in the Settlement Agreement that Michael Brady will serve as an independent expert for the Settlement Agreement. Unfortunately, however, Mr. Brady is unable to serve as a monitor at this time due to unforeseen health circumstances. (Ex. 1 (Teshuva Decl.) ¶ 9 Ex. E-F.)  As a result, the parties have stipulated that Julian Martinez, a senior consultant at Sabot Consulting (Mr. Brady's firm), will act as Mr. Brady's proxy during his incapacitation. Mr. Martinez is highly qualified and has served as a monitor in other cases involving jails and prisons.  (*Id.* Ex. G.)

The Settlement Agreement originally provided that the monitor will make unannounced visits three times before December 31, 2021 to ensure compliance with the Settlement Agreement.

In light of the delays caused by Mr. Brady's health issues, however, the parties have agreed that expert visits may continue until January 31, 2022. (*Id.* ¶ 9 Ex. H, at 2.) The parties therefore request that the Court modify the Settlement in this respect.

The monitor must be allowed unlimited access barring exigent circumstances which necessitate limits; and must have access specifically to grievances and sick-call slips mentioning COVID-19 (or related terms), as well as TCSO's response. He will submit reports following each visit, which shall include recommendations to address any perceived non-compliance in the Jails. Defendant is required to explain, in writing and within two weeks of receiving the report, the reasons for not adopting any of the monitor's recommendations. (Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 3.12.)

Enforcement:  The parties have agreed that this Court will retain jurisdiction for the duration of the Settlement Agreement. (*Id.* ¶¶ 4.1, 4.2.)

### D.      Attorneys' Fees and Costs

Defendant has agreed to pay $95,000 in attorneys' fees and costs. (*Id.* ¶ 5.1.) Accounting for the fee caps of the Prison Litigation Reform Act ("PLRA"), this sum represents a significant reduction from Plaintiffs' overall fees and expenses. (Ex. 1 (Teshuva Decl.) ¶ 7.)

### E.      Notice to Class

The Court approved the notice method proposed in the Settlement Agreement, which consisted of notices posted throughout the Jails' facilities. ECF No. 88 at 8. On September 30, 2021, in compliance with the Court's ruling, notice was posted in both English and Spanish and also posted on the ACLU's website. (*Id.*; Ex. 1 (Teshuva Decl.) ¶ 8 Exs. B-D.) The Court also directed that the amount of attorneys' fees provision be included in the settlement notice. (*Id.*)

In compliance with this ruling, Defendant posted notices in the Jails on September 30, 2021. (*Id.* ¶ 8 Ex. D.) The notices were in both English and Spanish and included the amount in attorneys' fees. (*Id.* at Ex. B-C.) Notice was also posted to the ACLU's website.  (*Id.*)

## IV.      THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

There is a "strong judicial policy" favoring settlement of class actions. *Coburn v. City of Sacramento*, No. 2:19-CV-00888-AC, 2020 WL 7425345, at *3 (E.D. Cal. Dec. 18, 2020)

(quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)); *see also In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101-02 (9th Cir. 2008) (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982)). Settlements are afforded a presumption of fairness where experienced class counsel are involved and the settlement is reached through arm's-length negotiations after relevant discovery has taken place. *Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998). When considering a motion for final approval, the court's inquiry is whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. Pro. 23(e)(2). The district court's task is to scrutinize the settlement only "to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. The court's determination "involves the balancing of several factors," which include: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining a class action; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *City of Seattle*, 955 F.2d at 1291 (quoting *Officers for Justice*, 688 F.2d at 625).

The Court should grant final approval of a class action settlement if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Settlement was negotiated at arm's-length with the assistance of a neutral magistrate judge. The terms of the Settlement Agreement provide effective protection against the threat of COVID-19 to all persons incarcerated in the Jail. They also provide meaningful provisions for monitoring and enforcement. In light of the ongoing outbreak of COVID-19 in the Jails, prompt approval of the Settlement's terms is urgent.

### A. The Settlement is Entitled to a Presumption of Fairness

"The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." *Linney*, 1997 WL 450064 at *5, *aff'd*, 151 F.3d at

-18-

1234; *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) (holding that a class action settlement reached after hard-fought negotiations by experienced counsel entitled to "considerable weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981). Each of these factors is present here. As is outlined in the declarations, both the ACLU and Munger, Tolles & Olson have considerable experience litigating class actions and representing incarcerated people. (Ex. 1 (Teshuva Decl.) ¶ 6; ECF No. 82-1 ¶¶ 1-2).) The settlement was the product of hard-fought, days-long negotiation sessions mediated by a federal magistrate judge. (Ex. 1 (Teshuva Decl.) ¶ 3.) The settlement also followed extensive discovery, allowing for a fair evaluation of the Settlement Agreement. (*Id.* ¶ 2.) These factors all merit a presumption of fairness.

**B.     The Relief Provided by the Settlement Is Fair, Reasonable, and Adequate.**

   **1.     Class Representatives and Class Counsel Have Adequately Represented the Class.**

As the Court agreed in certifying the settlement class[16] and preliminarily approving the settlement, Plaintiffs and their counsel have fairly and adequately protected the interests of the class from the earliest days of this litigation. There is no conflict of interest between Plaintiffs and the class, and Plaintiffs have "vigorously prosecute[d]" this action. ECF No. 26 at 26; *see also* ECF No. 88 at 7. Plaintiffs and their counsel, through their diligence and investigation despite an ongoing pandemic, secured temporary injunctive relief in September 2020 that has resulted in important changes in how the Sheriff protects the settlement class members from the risk of COVID-19 infection. The Settlement Agreement further memorializes the policies that resulted from the TRO. Even after securing the TRO, Plaintiffs did not give up trying to secure additional injunctive relief by moving for a preliminary injunction, conducting extensive discovery, filing a motion to compel, and investigating and filing a supplemental pleading raising additional claims and allegations.

---

[16] The analysis of whether Plaintiffs and their counsel have adequately represented the class is "redundant of the requirements of Rule 23(a)(4)." *See Mejia v. Walgreen Co.*, No. 2:19-CV-00218 WBS AC, 2020 WL 6887749, at *9 (E.D. Cal. Nov. 24, 2020).

Named Plaintiffs Ibarra and Camposeco are both currently incarcerated in the Jails, and hence have aligned interests with other members of the proposed class—all of whom seek protection from COVID-19. Throughout the course of this litigation, the named Plaintiffs advised Plaintiffs' counsel in real time on the conditions in the Jails. Plaintiffs were also active and valuable contributors to the settlement discussions.

Plaintiff Camposeco has now filed an objection to the settlement. *See* ECF No. 90. Mr. Camposeco's objection, and his desire to withdraw it, are addressed in further detail below. But Mr. Camposeco's objection does not, in itself, defeat his adequacy as a class representative. *See Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1060 (S.D. Cal. 2017) (holding that the named plaintiff's "objection alone did not make him an inadequate class representative"). Mr. Camposeco's objection expresses understandable concerns regarding Defendant's response to the current outbreak of COVID-19 in the Jails, and whether it is adequately protective of the class's rights. His objection, indeed, demonstrates his strong desire to advocate for the best interests of the class and further buttresses his adequacy as a class representative. *Id.* (noting that "in that context, objecting to a Settlement on the grounds that it inadequately provided for the Class actually served to bolster his status as an adequate representative"). Mr. Camposeco has withdrawn his objection, concluding that it was the Sheriff's *failure* to comply with the Settlement Agreement that threatened the class. (*Compare* Ex. 5 (Camposeco Decl.) ¶ 18 *with Nunez*, 292 F. Supp. 3d at 1060-61 (holding that the named plaintiff's failure to withdraw his objection to a settlement "now deemed fair, reasonable, and adequate" rendered him inadequate).) In light of these factors, Mr. Camposeco continues to be an adequate representative for the class.

Plaintiffs' counsel from the ACLU and Munger, Tolles & Olson LLP are also experienced litigators with specialized experience involving COVID-19 in detention facilities. (*See* Ex. 1 (Teshuva Decl.) ¶ 6; Ex. 2 (MacLean Decl.) ¶¶ 2-3.) They have vigorously advocated for the class throughout the litigation. *Id.*

Thus, both the class representatives and Class Counsel have adequately represented the interests of the class.

## 2. The Proposal Was Negotiated at Arm's Length

The negotiation process was "fair and full of adversarial vigor," reflecting an arm's-length negotiation. *City of Colton v. American Promotional Events, Inc.*, 281 F. Supp. 3d 1009, 1012 (C.D. Cal. 2017) (quoting *U.S. v. Chevron U.S.A.., Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005)). Settlement discussions began in October 2020, when Plaintiffs were about to file their preliminary injunction motion. Following extensive discovery, settlement discussions re-commenced in Spring 2021, which also marked the widespread arrival of COVID-19 vaccines that helped lower the overall risk of COVID-19. After four separate settlement conferences with Judge McAuliffe, the parties agreed to the proposed Settlement Agreement. During these discussions, the parties discussed (and debated) variations of approximately thirty-four separate substantive injunctive-relief terms. (*See* Ex. 1 (Teshuva Decl.) ¶ 3.) Given the extended and robust settlement discussions, the proposed Settlement Agreement was negotiated at "arm's length." *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 942 (N.D. Cal. 2013) (settlement achieved by a retired federal magistrate judge following "months of active, adversarial, litigation" was fair and adequate); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (approving settlement negotiated at "arm's length" when, as here, "[e]xperienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses, negotiated this settlement over an extended period of time").

## 3. All Class Members Are Treated Equitably under the Settlement.

All members of the Settlement Class, including future class members who may arrive at the Jails, receive the same benefit from the Settlement Agreement: better protection from the risks posed by COVID-19. By including "all" incarcerated persons in the Jails in the class definition, the Settlement Agreement ensures that every current or future incarcerated person through March 2022 benefits equally from the Agreement's terms.

Even the terms that may not directly apply to all class members benefit the class as a whole. For example, the Settlement Agreement requires Defendant to conduct routine wellness checks for persons with "chronic care" needs who also have comorbidities with COVID-19. (Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 3.11.) Protecting medically vulnerable persons in

-21-

the Jails benefits everyone in the Jails because it helps reduce the overall risk of COVID-19 and the resultant morbidity and mortality (heightened for this population), and because it preserves limited health resources given the greater needs for this population if infected with COVID-19.

### 4. Relief is Adequate Given the Costs, Risks, and Delay of Trial and Appeal.

Plaintiffs believe the Settlement Agreement provides adequate relief, particularly given the costs, risks, and delay associated with extensive litigation, including trial and appeal. Despite the clear successes Plaintiffs obtained for class members through the litigation thus far, they recognize that they did not win every motion before this Court and that a trial date may not be set until the COVID-19 pandemic is no longer as severe, or even after the pandemic is over. (This is especially true in light of the judicial emergency in the Eastern District. *See* ECF No. 88 at 1 n.1.) The changing landscape of the pandemic and the increasing availability of three safe and effective vaccines also make future litigation uncertain. Against this backdrop, the Settlement Agreement is reasonable. *See Coburn v. City of Sacramento*, No. 2:19-CV-00888-AC, 2020 WL 7425345, at *6 (E.D. Cal. Dec. 18, 2020) (approving class settlement when plaintiffs sufficiently explained "potential impediments to full recovery," including the prospects of losing at trial or on appeal).

The Settlement Agreement ensures that, after this case is dismissed, Defendant will commit to implement COVID-19 mitigation tactics. Among other things, Defendant has agreed to implement testing at intake, followed by a quarantine period, to mitigate the risk that the virus enters the Jails. Defendant has also agreed to implement CDC-compliant testing, isolation, and quarantine policies; and ensure meaningful and effective vaccine education and administration. Further, Defendant has committed to ensure a minimum acceptable amount of out-of-cell time for all class members. Through the settlement's required routine reporting of test results and vaccines, Plaintiffs' counsel can continue to play a "watchdog" role for the Jails as the pandemic evolves. Defendant has also agreed to arrange and pay for three site visits to the Jails by an independent expert who is an expert in the prevention of infectious diseases like COVID-19 in detention facilities. In short, the Settlement Agreement mitigates the need for further litigation on

Defendant's COVID-19 policies and helps protect class members from the virus for the next critical period of time.

### C. Distributing Class Relief Will be Effective.

The Settlement Agreement accounts for policies or policy changes that will be provided to *all* members of the proposed Settlement Class without any further action on their part. All current members of the proposed Settlement Class should already benefit from many of the policy changes memorialized in the Settlement Agreement—such as additional out-of-cell time, less restrictive access-to-counsel policies, and protective COVID mitigation measures. Any future members of the Settlement Class—i.e., those who are newly detained between the Court's final approval order and March 31, 2022—will receive the same benefits flowing from the COVID-19 policies and practices memorialized in the Settlement Agreement.

### D. The Proposed Attorneys' Fees Are Reasonable Under the Circumstances.

Courts require that "fee awards be reasonable in the circumstances." *Rodriguez v. W. Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009). When evaluating reasonableness, "[f]oremost among these considerations . . . is the benefit obtained for the class." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 942 (9th Cir. 2011). Plaintiffs' counsel vigorously advocated for all current and future members of the Settlement Class throughout the COVID-19 pandemic. Plaintiffs never sought money damages throughout the litigation; their focus has been exclusively on obtaining injunctive relief. They obtained it through winning the September 2020 TRO, and obtained further relief for the class in negotiating the Settlement Agreement.

Given Plaintiffs' successes throughout the case, an award of $95,000 is a reasonable sum for their counsel's time and expense. The agreed-upon award reflects a substantial discount from what Plaintiffs' counsel would have sought and would have reasonably expected to be awarded as part of a fees motion in a successful civil rights litigation. In total, attorneys and other timekeepers for Plaintiffs spent approximately 4,590 hours litigating this matter. (Ex. 1 (Teshuva Decl.) ¶ 7; Ex. 2 (MacLean Decl.) ¶ 5.) Accounting for attorneys' time only (and not any other timekeepers),

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

and taking into account the fee caps of the PLRA,[17] Plaintiffs would otherwise be entitled to approximately $800,000 in fees. Plaintiffs also spent approximately $53,000 in expenses. (Ex. 1 (Teshuva Decl.) ¶ 7.) As such, a sum of $95,000 is well within the range of reasonable fees that courts approve in civil rights cases like these. *See Garcia v. Los Angeles Cnty. Sheriff's Dep't*, No. CV 09-8943 MMM (SHX), 2015 WL 13646906, at *19 (C.D. Cal. Sept. 14, 2015) (approving as reasonable a fee award that constituted a 24.45% reduction from the lodestar).

## V. THE COURT SHOULD APPROVE THE SETTLEMENT DESPITE THE UNDERSTANDABLE CONCERNS REGARDING DEFENDANT'S RESPONSE TO THE OUTBREAK RAISED BY THE OBJECTORS

Three of the approximately 1,246 people incarcerated in the Jails have objected to the settlement.[18] (*See* Ex. 1 (Teshuva Decl.) ¶ 12 Ex. N.) It is well-established that objections to a class action settlement do not defeat approval. *See In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) ("In litigation involving a large class, it would be extremely unusual not to encounter objections.").

These Objections highlight the need for the Court to expeditiously enter a final approval order. As is discussed further below, the Objections arise in large part out of Defendant's failure to comply with the Settlement Agreement. The parties have met and conferred regarding Defendant's compliance with the Settlement Agreement and will continue to do so. But because further

---

[17] The hourly rate in prison civil litigations is set by statute. *See* 42 U.S.C. § 1997e (hourly rate shall not be more than 150% of the hourly rate established under 18 U.S.C. § 3006A). The current judicial council hourly rates for work in 2020 is $152 and $155 for work in 2021. Criminal Justice Act Guidelines, Ch. 2, § 230.16 Hourly Rates and Effective Dates in Non-Capital Cases, https://www.uscourts.gov/rulespolicies/judiciary-policies/cja-guidelines/chapter-2-ss-230-compensation-and-expenses#a230_16. Multiplying those figures by 150% equals $228 and $232.5, respectively.

[18] This low number of objections weighs in favor of approval. "A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Cruz v. Sky Chefs, Inc.,* No. C-012-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014); *see also White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1099 (C.D. Cal. 2011) ("Although several groups have pursued their objections with notable vigor, the total number of objectors and/or opt-outs is small when compared with the number of class members who responded favorably."). "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528-29 (C.D. Cal 2004). Here, the very low number of objections counsels in favor of concluding that the settlement is fair and adequate.

-24-

disputes may well require the Court's intervention, the Court should expeditiously enter the final approval order to avoid any doubt that these disputes are ripe for the Court's adjudication.

### A. Summary of Objections

**Camposeco and Anaya–Casarez Objections.** Both the Camposeco and the Anaya-Casarez objections were drafted on October 10, 2021, shortly after Defendant confirmed the most recent outbreak and after Mr. Camposeco and Mr. Anaya Casarez tested positive for COVID-19. ECF Nos. 89; 90. Both Objectors raised concerns regarding the Sheriff's response to the outbreak. *See, e.g.,* ECF No. 90 ¶¶ 3, 10, 12 (noting that Mr. Camposeco was not tested despite being symptomatic and requesting testing "as early as 10-7-21"; that he was denied access to any out of cell time; and that class members are not being offered vaccines); ECF No. 91 (asserting that he is denied access to out of cell time; that he has contracted COVID-19 "as a result of the Sheiff's [sic] Department negligence"; and that "Sheriff Michael Boudreaux has and continues to violate my constitutional rights and has not upheld the terms of the Settlement Agreement in Case No. 1:20-cv-01048-DAD-SAB *Criswell v. Boudreaux*.").

**Sanchez Objection.** The Sanchez objection raises two concerns: First, Mr. Sanchez is concerned that the Settlement Agreement does not provide for out-of-cell time for individuals not in protective custody. Second, Mr. Sanchez is concerned that the Settlement's termination date is too early, and should be extended to March 2023. ECF No. 91 at 2-4.

### B. Class Counsel Shares the Objectors' Concerns Regarding Defendant's Failure to Comply with the Settlement Agreement

To the extent that the Objectors raise concerns regarding Defendant's failure to comply with the Settlement Agreement, Class Counsel share those concerns. Class Counsel advocated fiercely throughout the outbreak for Defendant to adopt greater protections, and Defendant eventually adopted some but not all of the protections recommended by class counsel. (*See* Ex. 1 (Teshuva Decl.) ¶ 11 Ex. M (10/22/21 MacLean Letter).) The resulting Agreement is an adequate set of protections that benefit class members at heightened risk of COVID-19 because of their incarceration. But, as a result of the Settlement Agreement, it is the minimum set of COVID-19 mitigation measures required of Defendant.

However, Defendant must comply with the terms of the Agreement for it to be protective. As described above, Defendant's response to the outbreak has been slow and halting. He failed to adopt many important measures required under the Settlement Agreement, including surveillance testing, until long after he was urged to do so by Class Counsel. To this date, Defendant maintains a dangerous policy of housing incarcerated people who test positive with those who have tested negative in shared cells in modules that are under "lockdown." (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex. H, at 1, 10 (confirming that TCSO maintains a shelter-in-place lockdown policy and only does its "best" to move people who are infected with COVID-19 out of lockdown modules; *see also*, *e.g.,* Ex. 9 (Frisby Decl.) ¶¶ 4, 9; Ex. 4 (Ornelas Decl.) ¶ 3; Ex. 10 (Ibarra Decl.) ¶ 9; Ex. 11 (Ruelas-Alavarez Decl.)  ¶ 5.) Plaintiffs contend that this policy violates the Settlement Agreement which expressly requires compliance with County Policy 716, mandating individual isolation of COVID-positive people in a "distinct and separate set of cells"[19]; and with relevant CDC Guidance, which is unequivocal that correctional facilities must "ensure that separate physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually – do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19 (ideally individually; cohorted if necessary)."  (*See* Ex. 1 (Teshuva Decl.) Ex. A, Settlement Agreement ¶ 3.) Furthermore, it states that "Incarcerated/detained individuals with COVID-19 symptoms . . . should be placed under medical isolation immediately."

Despite these clear violations, Defendant has not rescinded the policy of co-housing COVID-positive and COVID-negative class memebers together in double cells.[20] Instead,

---

[19] County Policy 716, incorporated by reference into the Settlement Agreement (see Section 3.3), requires isolation of COVID-positive people in a "distinct and separate set of cells." See Policy Guidance 716, Sec. 716.4 ("all inmates who have been exposed or tested positive are housed at the Adult Pre-Trial Facility"); *id*. Sec. 716.4.1 ("Inmates who test positive will be isolated for 14 days and must be symptom free for the last three days of isolation. . . The Isolation Unit is a distinct and separate set of cells located in the Adult Pre-Trial Facility. . . Each inmate in isolation is housed individually in a single cell.").

[20] This policy would independently be a constitutional violation and constitute deliberate indifference. *See Criswell v. Boudreaux*, No. 1:20-CV-01048-DAD-SAB, 2020 WL 5235675, at

Defendant contends that because this policy was approved by his own health director, Dr. Karen Haught, he is free to disregard his own policies, the CDC Guidance, and a legally binding contract. (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex. H, at 1, 10.) This argument strains credulity. Although the Settlement Agreement provides that Defendant must follow the guidance of HHSA, it also provides that Defendant must follow the CDC Guidance and his own policies. (*See id.* Ex. A, Settlement Agreement ¶ 3.3.) Defendant cannot unilaterally choose to disregard one over the other, particularly where the purported advice of the health director is directly contrary not only to CDC Guidance and Defendant's own policies, but to universally accepted public health principles. Defendant's duty is instead to reconcile the conflicting advice and ensure his response to the outbreak is consistent with the CDC Guidance, his own policy, and the Settlement Agreement.[21] He has not done so. As provided by noted expert Dr. Greifinger, the CDC Guidance and Policy 716—which require the prompt isolation of COVID-positive class members—are consistent with basic public health guidance. (Ex. 3 (Greifinger Decl.) ¶ 3.) The failure to follow them places class members at extraordinary risk. (*Id.*) The current exigent circumstances cannot justify the abandonment of policies that were established to respond *to just these exigent circumstances*—an outbreak of COVID-19 in a detention facility. (*See id.* ¶ 36.) Plaintiffs contend that Defendant has also not been fully in compliance with other terms of the Settlement Agreement. (Ex. 1 (Teshuva Decl.) ¶ 11 Ex. M [10/22/21 Maclean Letter].)

---

*18 n.14 (E.D. Cal. Sept. 2, 2020) (citing, *e.g., Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208–209 (5th Cir. 2011) (affirming a jury's finding of deliberate indifference to a MRSA outbreak where jury heard evidence "that the Sheriff and other jail officials had long known of the extensive MRSA problem yet had continued to house inmates in the face of the inadequately controlled staph contamination," and "that it was feasible to control the outbreak through tracking, isolation, and improved hygiene practices, but that the County was not willing to take the necessary steps or spend the money to do so") and *Lareau v. Manson*, 651 F.2d 96, 109, 111 (2d Cir. 1981) (affirming a district court's order requiring defendant correctional center to institute "screening procedures to identify and isolate new inmates who may have a 'communicable disease,'" and directing that upon remand, defendants be ordered not to introduce any new inmate into general population without first being examined, including "such tests as are necessary in the opinion of the physician to identify and isolate those who have communicable diseases")).

[21] Moreover, as this Court has noted: "the CDC Guidelines represent the floor, not the ceiling of an adequate response to COVID-19 at the Jail." ECF No. 26 at 9 n.3 (quoting *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 691 (C.D. Cal. 2020).

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT

Under the Settlement Agreement, Defendant is also required to properly identify, test, and treat symptomatic individuals. (*Id.* ¶¶ 3.4(d), 3.11. *See also* CDC Guidance (incorporated by reference and requiring that "Incarcerated/detained individuals with COVID-19 symptoms . . . should be placed under medical isolation immediately."). The Settlement Agreement also requires Defendant to provide prompt and effective vaccine education and administration. Plaintiffs also contend that Defendant has failed to comply properly with these obligations.

That Defendant may be in breach of the Settlement Agreement, however, is no reason not to grant final approval. The Settlement Agreement's terms remain adequate and fair. Instead, Defendant's failure to comply with the agreement is at the root of the Objectors' concerns and continues to be a concern of Class Counsel. The asserted non-compliance with the Settlement Agreement is further cause for this Court to expeditiously approve the Settlement Agreement and order Defendant to comply with its terms as soon as possible.

**C.      To the Extent that the Objectors Raise Concerns Regarding the Terms of the Settlement Agreement, Those Concerns Should Not Preclude Final Approval**

The Objectors' remaining concerns, while understandable, should not preclude this Court from granting final approval.

*First*, to the extent that the Objections are based on a failure to include certain terms in the agreement, Class Counsel share these frustrations. As reflected in the Complaint and Supplemental Complaint, Class Counsel have deep concerns regarding conditions in the Tulare County Jails. But Class Counsel continue to believe that the Settlement Agreement is in the best interests of the class in light the need for urgent relief and the long delay to trial, and the risks of further litigation. The Settlement Agreement also includes a limited release of claims for unnamed class members and bars only systemic litigation related to the claims in the Supplemental Complaint and Complaint until the Termination Date. *Cf. W. v. City of New York*, No. 15 CV 5273-LTS-HBP, 2016 WL 4367969, at *10 (S.D.N.Y. Aug. 12, 2016) (finding injunctive consent decree unfair and unreasonable based, in part, on "the extraordinary length of time for which the parties propose to bar further systemic litigation"). The Settlement Agreement also preserves the ability of class members to seek retrospective damages. *See Stinson v. City of New York*, 256 F.

Supp. 3d 283, 292–93 (S.D.N.Y. 2017) (approving a settlement where it did not release any class members' individual damage claims arising from the same allegations). The Settlement Agreement thus allows incarcerated people to vindicate their rights while also providing them important protections against COVID-19.

*Second*, Mr. Sanchez's interpretation of the Settlement Agreement is not consistent with Class Counsel's or the Sheriff's.[22] Mr. Sanchez interprets the Settlement Agreement not to provide out-of-cell time to people in protective custody. But people in protective custody are included in Section 3.7(a) of the Settlement Agreement, which provides that individuals in the general population are allowed two hours of out-of-cell time "barring exigent safety and security concerns or operational issues that may require reducing such out-of-cell time." Currently, because Mr. Sanchez is under COVID-19 isolation, he would be covered by Section 3.7(b) of the Settlement Agreement, which requires that Defendant guarantee 45 minutes of out-of-cell time. If Defendant has not provided that to Mr. Sanchez, then that is another instance of breach of the Settlement Agreement.

*Third*, Mr. Sanchez argues that the termination date should be extended. Class Counsel agree. Class Counsel has asked Defendant to stipulate to extend the Settlement Agreement to one year after final approval of the settlement, and to extend the monitoring period to 45 days before the termination date. (Ex. 1 (Teshuva Decl.) ¶ 8 Ex. H, at 3, 7-8.) Defendant has agreed to extend the monitoring period to January 2022. (*Id.* at 1.) The parties will continue to meet and confer regarding further extensions. If Defendant and Class Counsel are unable to agree to a further extension, Class Counsel may move the court for an extension as contemplated by the Settlement Agreement. (*See id.* Ex. A, Settlement Agreement ¶ 2.2.) Because the Settlement Agreement contemplates the possibility of extension, Mr. Sanchez's objection, while understandable, should be disregarded. Instead, Class Counsel requests that the Court expeditiously enter the final approval order so that any remaining disputes regarding modification can be timely brought to the Court's attention.

---

[22] Defendant's counsel appears to agree, contending that the Objector was provided two hours of out-of-cell time prior to the current outbreak. (*See* Ex. 1 (Teshuva Decl.) ¶ 10 Ex. H, at 2.)

## VI. CONCLUSION

Plaintiffs respectfully request that the Court grant this Motion, enter the proposed Final Approval Order, and order Defendant to comply immediately with all provisions of the Settlement Agreement.

DATED:  November 1, 2021                    MUNGER, TOLLES & OLSON LLP


By:  _____/s/ Ariel T. Teshuva_____
                    Ariel T. Teshuva
                    Attorneys for Plaintiffs

NOTICE OF MOTION AND MOTION FOR FINAL
APPROVAL OF CLASS SETTLEMENT